1
2
RISHI BHANDARI (SBN 226055)
rb@mandelbhandari.com
**MANDEL BHANDARI LLP**
3
80 Pine Street, 30th Floor
New York, NY 10007
4
Telephone: (212) 269-5600
Facsimile: (646) 964-6667
5

6
*Attorneys for Plaintiff Yotta Technologies Inc.*

**UNITED STATES DISTRICT COURT**
7
**NORTHERN DISTRICT OF CALIFORNIA**
8

9
10
YOTTA TECHNOLOGIES INC.,

11
                    Plaintiff,

12
        -against-

13
EVOLVE BANCORP, INC., and
EVOLVE BANK & TRUST,
14
                    Defendants.
15

Docket No: 3:24-cv-6456

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

16
17
18
19
20
21
22
23
24
25
26
27
28

1

Plaintiff Yotta Technologies Inc. ("**Yotta**") by and through its attorneys, Mandel Bhandari LLP, for its Complaint against Defendants Evolve Bank & Trust and Evolve Bancorp, Inc. (collectively "**Evolve**"), respectfully alleges as follows on information and belief:

## NATURE OF THE CLAIMS

1.      This is a case about a bank that utterly failed in its most basic duty to its customers, misappropriating and/or misplacing tens of millions of dollars in customer funds.

2.      During the relevant period, Yotta was a financial technology company (sometimes called a "**fintech**").  Yotta created software designed to help individuals better manage their finances and achieve better financial returns than they would receive using traditional banking products.

3.      Yotta is not itself a bank and does not hold customer deposits.  Instead, to the extent that its customers deposit money for safekeeping, those deposits go directly to regulated, FDIC insured institutions like Evolve.

4.      To ensure that Evolve could be trusted to custody its customers' funds, Yotta had numerous, detailed communications with Evolve over the course of four years.  Yotta met with executives at the highest levels of Evolve's organization, including its Chairman, Scot Lenoir, and received substantial representations about Evolve's technical skill, adherence to all applicable regulations, and best-in-class compliance with responsible banking industry practices with respect to the safekeeping of customer funds.

5.      In addition, Yotta held twice monthly compliance meetings with Evolve to identify and address any customer complaints or regulatory guidance requiring corrective action.  Yotta held these meetings, in part, so that Evolve could bring any potential customer problems to its attention expeditiously and ensure that they were properly remedied.

6.      Yotta also received detailed up-to-the-minute financial reporting from Evolve, which affirmatively represented that all customer money was carefully accounted for.  Evolve would provide the reporting through a system operated by Synapse Financial Technologies Inc. ("Synapse"), a software company that Evolve used to connect its computers to Yotta and other fintechs.

7.     Over the course of this four-year relationship, Evolve accepted and processed hundreds of millions of dollars from Yotta's customers.

8.     But on or about May 11, 2024, Evolve suspended access to all monies belonging to Yotta customers.

9.     Evolve also acknowledges – but does not explain – that a substantial amount of customer money is missing.  In filings submitted in connection with the Synapse bankruptcy, the trustee reports a "shortfall" totaling tens of millions of dollars.

10.     Where did the money go?  Yotta's investigation indicates that Evolve and Synapse conspired to simply take it, in violation of responsible banking practices and basic morality.

11.     Long prior to the collapse of Synapse, Evolve debited customer accounts for over $25 million according to Synapse's records.  These transactions were never authorized by customers. Evolve had no right to take this money from customers and never informed Yotta or its customers that it was doing so.  Although Synapse and Evolve purported to report all transactions involving customer funds, they concealed these transactions from Yotta and its customers.  They also inflated the account balances that they reported to Yotta and its customers to make it appear as if the misappropriated funds remained in customers' accounts.

12.     According to Synapse's records, Evolve and Synapse also misappropriated almost $50 million in customer money in connection with "migrating" another fintech company from Synapse's software to Evolve's software.

13.     Evolve and Synapse were aware of this missing money (and more) by at least September of 2023.  Despite this, they never told Yotta or its customers that their money was missing. To the contrary, they continued to represent that all customer money was available and that Yotta's customers could safely deposit more into the financial black hole that was Evolve.

14.     Had Yotta known the truth about Evolve's malfeasance, it never would have done business with Evolve, and Yotta's customers would have been spared a brutal theft at the hands of this bank.

COMPLAINT

15.     Because of Evolve's grotesque misconduct, Yotta's business has been decimated. Yotta's customers are rightly enraged at the loss of their funds. Many remain unwilling to use Yotta's services going forward.  Yotta's reputation in the market, once sterling, has been tarnished, potentially beyond repair.  Yotta's banking-related revenues have evaporated and the enterprise value of its banking business, once substantial, has dwindled to nearly nothing.

16.     Yotta brings this case to vindicate its rights against the bank whose dereliction of duty threatens to bury Yotta's once-promising business.

## THE PARTIES, JURISDICTION, AND VENUE

17.     Plaintiff Yotta Technologies Inc. is a corporation organized under the laws of Delaware.  Yotta has a virtual office located in California and its employees and executives work remotely, including from California and New York.  Upon information and belief, Yotta's principal place of business is California or New York.  Either way, this Court has diversity jurisdiction over this action.

18.     Defendant Evolve Bank & Trust is a bank organized under the laws of Arkansas with locations in California.  Its corporate headquarters is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee, 38119.

19.     Defendant Evolve Bancorp, Inc. is a bank holding company organized under the laws of Arkansas whose corporate headquarters is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee, 38119.

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy in this action exceeds $75,000 and the parties are residents of different states.

21.     This Court has personal jurisdiction over Evolve because (i) of its continuous and systematic contacts with California, including its locations and substantial presence in California, its authorization to do business in California, its appointment of a local agent for service of process, and its prior litigation in the courts of this state, (ii) it purposefully directed its activities at California,

1 including through its relationship and contacts with Synapse, which included numerous meetings in
2 and contacts with California, and the subject matter of this lawsuit and Yotta's claims arise out of
3 and are related to that relationship and those meetings, and (iii) Evolve engaged in the tortious
4 conduct at issue here within this state.

5      22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) since a substantial
6 part of the events or omissions giving rise to the claim occurred within this district.

7 **STATEMENT OF FACTS**

8 **Yotta and Its Business**

9      23.     Yotta was founded in 2019.  At all relevant times, Yotta was a financial technology
10 company.

11      24.     Yotta developed software designed to make it fun and easy for consumers to manage
12 their finances and save money.

13      25.     In lieu of traditional interest payments, reward points, or cashback promotions,
14 Yotta's products instead allowed its customers the opportunity to win substantial prizes.  For
15 example, the Yotta Savings Account gave users "tickets" in proportion to their savings that could be
16 redeemed for entry into daily prize drawings.  Similarly, an Evolve-issued Yotta MasterCard card
17 gave users "tickets" in proportion to their monthly expenditures.  Some of the prizes for the daily
18 drawings were paid in cash, while others were paid in valuable consumer goods, such as a Tesla
19 Model 3.

20      26.     These so-called "prize linked savings accounts" have been recognized as a valuable
21 way of promoting personal saving by diverting money that would otherwise be spent on traditional
22 gambling.[1]  Foreign governments use similar accounts to encourage people to save money.  Indeed,
23 Yotta customers have received more than $20,000,000 in prizes.

24      27.     Because Yotta is not itself a bank, it cannot personally accept customer deposits or
25 issue card products.  Instead Yotta partnered with regulated, FDIC insured institutions to take custody
26 of its customers' savings and issue Yotta-branded debit and credit cards.

---

27 [1] *See e.g.*, Peter Coy, *A Smart Way to Turn Gambling into a Virtue*, THE NEW YORK TIMES, July 28,
28 2023, *available at* https://www.nytimes.com/2023/07/28/opinion/gambling-prize-linked-savings.html.

5

28.     End users loved using Yotta, and by late 2023, end users had over $100 million in Yotta's savings program.

**Evolve and its Business**

29.     Originally called "First State Bank," Evolve was founded in 1925 in Eastern Arkansas.  Now based in Memphis, Evolve is a small, full-service consumer bank with over forty locations in ten states, including California.

30.     While it offers traditional banking products, such as consumer banking, mortgage origination, and SBA lending, in recent years, Evolve has sought to distinguish itself through its "Open Banking" business.

31.     Evolve's "Open Banking" business, which it touts as "The Future of Banking" and "powering the fintech revolution" involves partnering with fintech companies to offer new financial products and create customizable user experiences.[2]  As Evolve describes it:

> Open banking uses technology like APIs to offer nonfinancial and financial businesses a network of financial products like accounts and transaction methods. This means third-party providers are allowed access to payment products so they can design and build new user experiences. From the bank perspective, Open Banking is like extending their banking charter to other companies.[3]

32.     Why should a fintech like Yotta use Evolve to power its products rather than a different bank?  Evolve has an answer for that too:

> Why Partner With Evolve? Evolve Bank & Trust's BaaS environment is highly secure, and is customizable and flexible to fit your business' use case.

33.     Indeed, Evolve specifically touts its strong customer security and corporate compliance as a selling-point for its services:

> Evolve Open Banking is committed to the safety of personal and financial information of our partners and their end users. As such, we maintain our charter and status with the Federal Reserve, the central

---

[2]  *See* https://www.getevolved.com/openbanking/the-future-of-banking/.
[3]  *See* https://www.getevolved.com/openbanking/baas-vs-open-banking/.

COMPLAINT

banking system in the United States. We have an obligation to always maintain compliance and security within our system, including regular system audits. This obligation ensures that data is stored, and money is transferred at the highest industry standard set by the Federal Reserve.

For partners who need security and compliance solutions, we offer KYC and KYB products and a library of best practices. These solutions offer our partners the ability to verify the identity of consumer and business end users, to reduce false account openings and mitigate fraud. KYC and KYB are important starting points in creating safe financial environments.

The Evolve Opening Banking team works diligently alongside partners and regulators to ensure that compliance standards are met. Our partners trust us with their business, and we do not take their trust for granted. We have a great working relationship with regulators, and our systems are checked regularly both by Federal regulators and external and internal auditors. Our top priority is always the security of financial and personal information of both partner companies and end users.[4]

**Evolve Markets Itself to Yotta As a Safe Place for User Funds**

34.    Yotta was first introduced to Evolve in October of 2019. At the time, Yotta was looking for a banking partner to serve as a custodian for customer accounts.

35.    Meeting at a conference in Las Vegas, Nevada, Yotta's CEO, Adam Moelis, spoke to Evolve's Vice President, Fintech Business Development Officer, Kristen Kines.   Ms. Kines described Evolve's expertise in Open Banking and claimed that Evolve would be a valuable banking partner for Yotta.

36.    Synapse was a software company that acted as an intermediary between banks like Evolve and fintechs like Yotta.

37.    Synapse provided an Application Programming Interface ("**API**") which allowed Yotta's software to safely and securely transmit and receive information from Evolve.

38.    In reliance upon Evolve's representations that it would safeguard end user funds, on February 13, 2020 Yotta entered into a contract allowing it to use Synapse's software to interface with Evolve.

39.    Shortly thereafter, Yotta end users began depositing their funds at Evolve.

---

[4]   *See* https://www.getevolved.com/baas-security/.

40.     In lay terms, Evolve and Synapse would work together to service Yotta's end users. Customer funds were always custodied at Evolve.  Evolve's electronic systems would process certain transactions, and Synapse would play a role in processing other transactions with funds located at Evolve.  Evolve delivered a continuous data stream to California-based Synapse that was supposed to more-or-less instantaneously report on a customer-level any and all transactions that it effected. Pursuant to the parties' agreement, from its California headquarters, Synapse combined Evolve's data stream with its own customer transaction data and deliver the combined data to Yotta and customers.  The combined data stream was supposed to include (a) each and every transaction in each and every customer's account and (b) each customer's current account balance so that Yotta and the customer knew precisely how much money was in their account.  Of course, all of the data – including balance information – was supposed to be accurate because Yotta and its customers relied upon the data in the same way that bank account holders rely upon similar information provided by their banks.

41.     Yotta was not Evolve's only fintech customer.  Evolve actually held funds for many fintechs.  Many of those fintechs interfaced with Evolve through Synapse.  Evolve commingled the end user funds of all Synapse-connected fintechs in one or more accounts for the benefit of ("**FBO**") end users.

**Evolve Repeatedly Represents that it is Diligently Safeguarding Yotta User Funds**

42.     Over the next several years in numerous meetings, telephone calls, and written correspondences, Evolve represented that it was carefully safeguarding Yotta's assets.

43.     For example, in a call that took place in late September 2020, Moelis spoke to Evolve's Chairman, Scott Lenoir.

44.     In written materials sent on September 24, 2020 in advance of that call, Lenoir represented that Evolve had strong compliance, risk management, and operations departments that diligently guarded the assets of fintech customers.  In particular, Lenoir represented that Evolve "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," that Evolve "enforce[s] federally mandated regulations," and that its technology team "[t]ediously test[s] and analyze[s] solutions before going live."

45.     Moelis had additional calls with Lenoir on April 13, 2021 and December 7, 2022, and in person meetings with Lenoir on August 24, 2021 and October 24, 2022.

46.     In addition to periodic assurances from Lenoir, Yotta received regular representations from others at Evolve that user money was being carefully watched.

47.     For at least several months beginning on or about December 5, 2022, Evolve and Yotta held Compliance Check-in meetings via Microsoft Teams approximately every other week.

48.     These meetings were generally attended by Stephen Hogg, Evolve's Lead Quality Assurance Specialist, and Cecilia Russell, Evolve's Senior Vice President and Chief Compliance Officer.

49.     These meetings were also generally attended by, among others, Alex Gerson, Yotta's Vice President of Operations, and Sidhant Bahl, Yotta's Head of Risk Strategy.

50.     In a November 16, 2022 email regarding the first such meeting, Hogg described their purpose as "to provide an open line of communication between Evolve and Yotta to address and resolve any present or future Compliance concerns."

51.     During these weekly meetings Evolve personnel claimed to be reporting any user complaints or compliance issues that they received concerning Yotta users.  Many of the issues raised by Evolve during these meetings were, in the scheme of things, relatively minor and inconsequential, such as an individual customer complaint.

52.     Because (a) Evolve had specifically told Yotta that "any present or future Compliance concerns" would be raised at these meetings, and (b) Evolve would regularly raise minor issues at these meetings, at all relevant times, Yotta believed that Evolve – which after all is a regulated bank – would disclose any and all compliance issues at these meetings.  For instance, if customer funds had been taken or were missing, Yotta always believed that, at the very least, Evolve would disclose and address the issue at the compliance meetings.  At no time did Evolve disclose during the compliance meetings (or otherwise) that customer funds had been taken or were missing.

53.     In addition to these weekly check-ins, as discussed above, Yotta received detailed, user-by-user transaction data on a continuous basis from Evolve and Synapse. Because it was custodying end users' funds, it was critical that Evolve report each and every transaction that it

handled involving end user funds.  For example, when an end user's paycheck was direct-deposited with Yotta, the funds would be received by Evolve, and Evolve would transmit that information to Synapse, which would display it for Yotta and the end user.

54.    Yotta received these reports from at least April 2020 through May 2024.

55.    Evolve and Synapse represented that all of the transactions involving end user funds that Evolve was processing and customer account balances were being accurately reported to Yotta and its end users on an essentially real-time basis.  And until that date, end users could spend or withdraw the entire balances that were being reported for their accounts.

56.    Evolve's legal counsel also confirmed the close relationship between Evolve and Synapse and the general presumption that users would have the ability to promptly withdraw all funds belonging to them.

57.    For example, on May 11, 2023, Evolve's counsel at Latham & Watkins LLP emailed Yotta its redlined edits to the Synapse Consumer Reserve Account Agreement.  Evolve edited the agreement as follows: "This Consumer User Reserve Account Agreement (this "Agreement") governs the non-interest bearing deposit account (the "Account") made available to you by ~~Synapse Financial Technologies, Inc. ("Synapse"), as a technology provider of~~ Evolve Bank & Trust ("Bank"), a member of the Federal Deposit Insurance Corporation (the "FDIC"), <u>in partnership with Synapse, as a technology service provider of Bank</u>."  Sections 3 and 4 of this Agreement detailed those situations in which Evolve and Synapse could prevent a customer from withdrawing funds from an account.  For instance, section 3.2 of the Agreement states that, with respect to ACH transfers, "You may only withdraw funds if you have made all the payments of the credit extended to you and your credit account is closed."  At no point did the agreement disclose that customers might not be able to withdraw their funds because Synapse or Evolve decided to take those funds for themselves or transfer them to another customer.

**Evolve Lies to Yotta About Missing User Funds**

58.    Yotta customer funds at Evolve would generate interest, and Evolve would pay much of that interest to Synapse who, in turn, would transmit significant amounts of the interest to Yotta.

In fact, Yotta and Evolve directly negotiated the interest amount that Yotta would receive. These interest payments were Yotta's main source of revenue and would be used to fund the prizes distributed to users as well as Yotta's operations.

59.     In September of 2023, these interest payments to Yotta were suddenly suspended.

60.     In emails dated September 20, 2023, September 30, 2023, and October 3, 2023 Moelis specifically asked multiple Evolve personnel, including Lenoir and Hank Word, Evolve's President of Open Banking, why interest was not being paid.

61.     On September 25, 2023, Word replied claiming that "we are addressing some contractual issues with Synapse" but promised that "this matter is being handled" and that the bank would "protect end users."

62.     On October 3, 2023, Lenoir replied, also claiming that "we are currently addressing some contractual issues with Synapse," but again promised that it would "protect end users" and assured Yotta that it could "transition to another bank" should it or its users desire to do so.

63.     And on November 2, 2023, Evolve's outside counsel, Jeffrey P. Naimon of Orrick, Herrington & Sutcliffe LLP stated in a letter to Yotta's counsel that the suspension of interest payments was the result of a "contractual disagreement that has occurred between Evolve and Synapse Financial Technologies, Inc.", that "we hope to resolve our contractual dispute with them in the next few weeks", and that "the Bank remains committed to providing updates to Yotta, as appropriate, regarding this situation."

64.     None of these individuals disclosed any problems with the Yotta user funds Evolve had in its possession.

65.     Indeed, Evolve and Synapse continued to purport to report each and every transaction that it affected with end user funds. This supposedly reliable data feed was intended to and did assure Yotta and its end users that the end users' funds were properly custodied in the users' Evolve accounts and available for withdrawal. And indeed, Yotta customer withdrawals continued to function perfectly well.

66.     But this was totally false.

67.     As Yotta would only learn later, in a letter sent to Synapse on September 25, 2023, Evolve claimed that Synapse had "materially breached" its agreement with Evolve by failing to ensure that "the balance in each FBO account equals 100% of the amount of funds Deposited by end Users in connection with such FBO account."

68.     As such, despite knowing on or before September 25, 2023 that user funds were missing, Evolve and Synapse never reported this information to Yotta and continued to report account transactions and balance info in order to assure Yotta and its users that user funds were 100% available and could be withdrawn or migrated to another bank.  Evolve and Synapse continued to transmit this information despite the fact that they knew the account balance information was false and the transaction information was, at the very least, incomplete.

**Evolve Steals From Customers**

69.     While Yotta did not know (and could not have known) at the time, Yotta's investigation has revealed  that its customers' funds are missing because of Evolve's own misconduct.

70.     Beginning no later than June 2017, Evolve began taking funds from the FBO accounts that commingled end user monies.

71.     For instance, on the following dates, Evolve debited FBO accounts for "Account Analysis Charge[s]:"

- January 27, 2020: $1,191,831.76

- February 27, 2020: $1,049,719.31

- March 24, 2020: $941,099.24

- May 29, 2020: $856,224.25

- May 29, 2020: $710,508.92

- June 26, 2020:  $436,768.58

72. A review of the contracts between Synapse and Evolve indicate that end users had no obligation to pay these amounts. This is confirmed by the fact that, in July 2020, Evolve began debiting a Synapse account titled "Evolve Fees" for the Account Analysis Charges instead of the FBO titled for end user accounts.

73. The Account Analysis Charges were not an isolated incident. Yotta's investigation indicates that Evolve misappropriated end user funds for other purposes.

74. Evolve used a third-party service provider called TabaPay, Inc. ("**TabaPay**") to process certain payments on its and Synapse's behalf.

75. Rather than pay the fees that TabaPay charged for these services from Synapse's "Evolve Fees" account, Evolve debited user FBO accounts for these fees. Neither Yotta nor its users had any obligation to pay these amounts or ever consented to such debits. As of September 2023, these improper debits totaled over $13 million, according to Synapse records.

76. Recognizing its theft of end user funds, Evolve increased the required amount in a separate "reserve" account supposedly for the purpose of addressing shortfalls in customer funds.

77. In fact, in the Synapse bankruptcy, Evolve has admitted that it took reserve account funds for itself rather than return the funds improperly taken from end users. Evolve has stated that it took $5,401,777.28 on one occasion and $2,500,000 on another occasion.

78. Statements that Evolve made to the Bankruptcy Court presiding over the Synapse bankruptcy suggest that Evolve contributed $35 million of reserve funds into the customer FBO account(s) and then seemingly subsequently withdrew the exact amount or a similar amount from the FBO account(s).

79. And the problem was only going to get worse.

80. In early October of 2023, Evolve changed how one of its largest fintech customers, Mercury Technologies, Inc. ("**Mercury**"), connected to its systems. Rather than connect to Evolve through Synapse, as Yotta and various other fintech companies did, Evolve arranged for Mercury to connect directly to Evolve's systems.

COMPLAINT

81.   Prior to this migration, according to records, Evolve held approximately $3.2 billion of Mercury customers' funds and $500 million of other fintech customers' funds in one or more commingled FBO accounts.

82.   This migration should not have impacted the total amount of money held on behalf of Mercury and its users.  But Yotta's investigation indicates that Evolve botched the migration process, causing Mercury and/or its users to receive almost $50 million more than they were entitled to.

83.   Evolve's September 2023 correspondence with Synapse indicates that, by September 2023 at the latest, it was aware that there was a deficit in all fintech accounts that connected to Evolve through Synapse.  As a result, before Evolve migrated Mercury's funds, it was perfectly aware that the FBO accounts did not have sufficient funds to migrate all of the funds that were supposed to be in Mercury end users' accounts.

84.   However, an analysis of financial records and communications indicates that Evolve migrated all of the funds that should have been held on behalf of Mercury end users without regard to the shortfall.  In effect, Evolve transferred Yotta end user funds to Mercury end users when it forced Yotta end users to absorb the shortfall in Mercury customer funds.

85.   A December 21, 2023 email chain between Synapse's CEO and Evolve's Chief Technology Officer, which copied others including Evolve's CEO, Synapse states that there was a "deficit" in end user funds.  Evolve agrees that "Synapse does not have enough funds to cover end user debits."  When Evolve refers to Synapse "hav[ing]" funds, it appears to be referring to a deficit in Evolve FBO account(s) in which end user funds were supposed to be held.  In the email chain, Synapse appears to state that "Taba Offset," "Account Analysis Offset," and "Mercury Issue Offset" are the three largest causes of the deficit.

86.   But again, despite the fact that Evolve and Synapse were purporting to report all transactions they were conducting with Yotta end user funds and the current account balances, their continuous data feed concealed the fact that Evolve was transferring Yotta end user funds to Mercury end users when it conducted the Mercury migration.  Neither Evolve nor Synapse ever informed Yotta or its users that money had gone missing and was not available to be withdrawn.  To the

1   contrary, the account balances that they were continuously providing to Yotta and end users were

2   falsely claiming users' funds were being safeguarded when, in fact, they had been misappropriated.

3       87.     Evolve planned and carried out its fraudulent scheme in California.  For instance,

4   Evolve CEO Scott Lenoir met with Synapse in California on January 22, 2018, February 27, 2019,

5   and August 2, 2021.  Evolve senior executive Hank Word met with Synapse in California on

6   September 3, 2019, August 2, 2021, September 8, 2022, and September 9, 2022.  Upon information

7   and belief, the purpose of these meetings and other meetings that Evolve attended in California was

8   to plan and carry out Evolve and Synapse's fraudulent scheme.

9   **Evolve Seizes Whatever Money It Has Not Yet Stolen**

10      88.     On or about May 11, 2024, Evolve suspended access to all monies belonging to Yotta

11  customers.

12      89.     Evolve provided no notice to Yotta or its customers that such a seizure was even

13  contemplated.

14      90.     Instead, Evolve sent a notice to Yotta stating as follows:

15

16      Synapse has taken the action of turning off system access for Evolve.
        This has further limited our visibility into activity related to your
        program. For these reasons, and **to maintain the integrity and security**
17      **of end user accounts**, Evolve will need to immediately freeze any
        activity that it believes may be related to Synapse Brokerage, including
18      but not limited to any debit or credit cards issued by Evolve.

19

20  (Emphasis added.)  This was yet another misrepresentation.  Evolve had known for quite a while that

21  it had taken Yotta customer funds and that it had breached the "integrity and security" of those funds.

22      91.     Since that date, Yotta customers have had no access to the over one hundred million

23  dollars in funds that they deposited with Evolve in good faith.

24      92.     Evolve also acknowledges – but does not explain – that a substantial amount of

25  customer money is missing.  In filings submitted in connection with the Synapse bankruptcy, the

26  trustee reports a "shortfall" totaling tens of millions of dollars.

27

28

**Data Breaches and Regulatory Actions Expose Evolve's Rotten Core**

93.    If the loss of their funds was not insulting enough, Evolve soon announced that it had also been unable to safeguard user's personal data as well.

94.    On June 26, 2024 Evolve announced that it was "currently investigating a cybersecurity incident involving a known cybercriminal organization that appears to have illegally obtained and released on the dark web the data and personal information of some Evolve retail bank customers and financial technology partners' customers."

95.    According to Evolve's Notice of Cybersecurity Incident online posting (the "Notice"), the compromised PII included individuals' names, Social Security numbers, dates of birth, account information and/or other personal information.

96.    Remarkably, Evolve waited to notify its users about the theft of their personal data until ***after it had been sold*** to criminals on the dark web.

97.    Either Evolve was so pathologically incompetent that it did not detect the penetration of its network and pilfering of its customers' most sensitive secrets, or it knew about the theft and chose not to tell customers, allowing criminals the ample opportunity to exploit those secrets without warning.

98.    Either way, Evolve's claims that its systems were "highly secure" and that user "data is stored, and money is transferred at the highest industry standard set by the Federal Reserve" were shown to be utterly false.

99.    In fact, less than two weeks earlier, on June 14, 2024, Evolve had entered into a Consent Decree with state and federal bank regulators, after an investigation had "identified deficiencies with respect to the Bank's risk management and compliance with applicable laws, rules, and regulations."

100.    While the specific nature of the deficiencies uncovered by the regulators is not identified, the Consent Decree represents an admission that Evolve's prior representations that it "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," and "enforce[s] federally mandated regulations," was false.

16

**Yotta Investigates the Missing Customer Funds**

101.    Until Evolve froze end user accounts in May 2024, Yotta and its end users believed Evolve's repeated implicit and explicit representations that all end users funds were being safeguarded and were available for withdrawal.  Before then, as explained above, Evolve failed to disclose – and affirmatively concealed – critically important material facts about Yotta's customer accounts despite a duty to do so.  Yotta could not have discovered the extent of Evolve's malfeasance and its injuries, all of which Evolve was well aware of, with reasonable care and diligence.

102.    In the wake of the April 2024 Synapse bankruptcy and the May 2024 freezing of Yotta customer accounts, in an effort to aid its end users, Yotta investigated what had happened to its users' funds.

103.    Over the course of that investigation, Yotta communicated with high-level executives from multiple businesses that were directly involved in these events.  Yotta was also able to obtain emails, letters, account statements, and other records.

104.    This Complaint is based on this information, as well as Yotta's independent analysis of that information.

**Its Customers Fleeced, Yotta's Business is Devastated**

105.    Evolve's misconduct has had a devastating effect on Yotta customers.

106.    Yotta has received thousands of messages from its customers, many of whom have lost substantially all of their assets to Evolve's treachery.  Many Yotta customers are faced with a sudden inability to pay their bills or otherwise provide for themselves.

107.    Many of these users are furious with Yotta, and they can hardly be blamed.  Even those who accept that Yotta played no role in seizing their funds and were unaware of Evolve's misconduct are unlikely to ever do business with Yotta again.

108.    Yotta's reputation in the market, once sterling, has been tarnished, potentially beyond repair.  Yotta's revenues have evaporated and its enterprise value, once substantial, has dwindled substantially.

109.    With no other remedy available to it, Yotta brings this case to vindicate its rights against the bank whose dereliction of duty threatens to bury Yotta's once-promising business.

17

1

2

3

**FIRST CAUSE OF ACTION**
**FRAUD**

4        110.    Plaintiff repeats and realleges the allegations set forth in paragraphs above as though

5   fully set forth herein.

6        111.    Defendant made intentional representations of fact to Plaintiff.

7        112.    These representations included:

8
9
- Essentially continuous representations, from 2020 to May 11, 2024 that each and every transaction that Evolve effected was being reported to Yotta and its end users on an essentially real-time basis;

10
11
- Essentially continuous representations, from 2020 to May 11, 2024 as to the essentially real-time account balances of Yotta customers;

12
13
- Bi-weekly oral representations, from late 2022 to early 2023 delivered by Evolve employees at Compliance Check-in meetings that there were no serious compliance issues or risk management problems impacting the availability of Yotta user funds;

14
15
16
17
- Written representations, delivered via email on September 24, 2020 that Evolve "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," that Evolve "enforce[s] federally mandated regulations," and that its technology team "[t]ediously test[s] and analyze[s] solutions before going live;"

18
19
20
- Written representations, posted on the Evolve website that Evolve's systems are "highly secure" and that user "data is stored, and money is transferred at the highest industry standard set by the Federal Reserve;"

21
22
23
- Oral representations by Evolve's Chairman Scot Lenoir on or about September 24, 2020, April 13, 2021, August 24, 2021, October 24, 2022, December 7, 2022, that Evolve had the organizational and technical ability to safeguard user funds;

24
25
26
- Written representations by Hank Word, Evolve's President of Open Banking on or about September 25, 2023 that problems with Synapse were merely the result of "some contractual issues with Synapse" that were "being handled" in a manner that would "protect end users;"

27
28
- Written representations by Lenoir, on or about October 3, 2023, that problems with Synapse were merely the result of "some contractual

issues with Synapse," and that Yotta could "transition to another bank" should it or its users desire to do so;

- Written representations by Evolve's outside counsel, Jeffrey P. Naimon of Orrick, Herrington & Sutcliffe LLP on or about November 2, 2023, that problems with Synapse were merely the result of "contractual disagreement that has occurred between Evolve and Synapse Financial Technologies, Inc." that could plausibly be resolved "in the next few weeks;"

- Evolve's written representation on or about May 11, 2014 that it was "maintain[ing] the integrity and security of end user accounts."

- Evolve's May 11, 2023 draft customer agreement's representation that customers could withdraw funds that they had deposited into their accounts.

113.    These representations were material and Plaintiff relied on them.  Plaintiff would not have agreed to use Plaintiff as a banking partner or recommend that its customers entrust their assets to Plaintiff absent these representations.

114.    These representations were false.  In truth:

- The supposedly comprehensive continuous reporting of transactions transmitted by Evolve to Yotta were false, as funds had secretly been misappropriated;

- The account balances were false and Yotta user funds were not genuinely accounted for and available from Evolve;

- There were serious compliance issues and risk management problems impacting the availability of Yotta user funds;

- Evolve did not have the organizational and technical ability to safeguard user funds;

- Evolve did not ensure that its clients met regulatory, compliance and risk mitigation requirements for all solutions, did not enforce federally mandated regulations and its technology team did not tediously test and analyze solutions before going live;

- Evolve's systems were not highly secure, user data was not stored, and money was not transferred at the highest industry standard set by the Federal Reserve;

- The problems with Synapse that impacted availability of interest payments in September of 2023 were not the result of a "contractual disagreement," made it impossible for users to "transition to another bank" and could not possibly be "resolved in a few weeks."

115.    Evolve knew that its representations were false, material, and would be relied upon by Plaintiff in deciding to use Evolve as a banking partner and trusted custodian of its customer's money.

116.    To the extent any of Evolve's representations were not literally false, they were materially misleading and incomplete in light of Evolve's prior statements and Evolve had a duty to correct them and/or not to use them to perpetrate a fraud by omission.

117.    If Plaintiff had known that Defendant was a dishonest and incompetent bank that could not perform the most basic job of a financial institution (*i.e.* keeping track of customer money) it would have immediately ceased all business with Defendant and taken steps to ensure that customer funds were immediately returned.

118.    Plaintiff has been damaged by Defendant's false representations.

119.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

120.    Accordingly, the Court should award damages against Defendant for fraud in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**<u>CONSPIRACY TO COMMIT FRAUD</u>**

121.    Plaintiff repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

122.    Evolve and Synapse conspired and agreed to commit fraud.

123.    In furtherance of the conspiracy, among other things, Evolve and Synapse (a) made the misrepresentations set forth above, (b) misrepresented Yotta users' account balances on an essentially continuous basis, (c) misrepresented the transactions that had occurred in end user accounts, as funds had secretly been misappropriated, and (d) misappropriated end user funds.

124.    Evolve's misconduct and misappropriation injured Plaintiff.

125.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

126.     Accordingly, the Court should award damages against Defendant for fraud in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### <u>NEGLIGENT MISREPRESENTATION</u>

127.     Plaintiff repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

128.     Defendant owed a duty of care to Plaintiff, to use reasonable care to protect, to secure its customer's funds and to provide access to those monies, to use reasonable care in providing to Plaintiff and its customers.

129.     Defendant had full knowledge of the types of harm that Plaintiff and its customers could and would suffer if failed to act in accordance with its duty.

130.     Defendant made negligent representations of fact to Plaintiff, including:

- Essentially continuous representations, from 2020 to May 11, 2024 that each and every transaction that Evolve effected was being reported to Yotta and its end users on an essentially real-time basis;

- Essentially continuous representations, from 2020 to May 11, 2024 as to the essentially real-time account balances of Yotta customers;

- Bi-weekly oral representations, from late 2022 to early 2023 delivered by Evolve employees at Compliance Check-in meetings that there were no serious compliance issues or risk management problems impacting the availability of Yotta user funds;

- Written representations, delivered via email on September 24, 2020 that Evolve "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," that Evolve "enforce[s] federally mandated regulations," and that its technology team "[t]ediously test[s] and analyze[s] solutions before going live;"

- Written representations, posted on the Evolve website that Evolve's systems are "highly secure" and that user "data is stored, and money

is transferred at the highest industry standard set by the Federal
Reserve;"

- Oral representations by Evolve's Chairman Scot Lenoir on or about
  September 24, 2020, April 13, 2021, August 24, 2021, October 24,
  2022, December 7, 2022, that Evolve had the organizational and
  technical ability to safeguard user funds;

- Written representations by Hank Word, Evolve's President of Open
  Banking on or about September 25, 2023 that problems with
  Synapse were merely the result of "some contractual issues with
  Synapse" that were "being handled" in a manner that would "protect
  end users;"

- Written representations by Lenoir, on or about October 3, 2023, that
  problems with Synapse were merely the result of "some contractual
  issues with Synapse," and that Yotta could "transition to another
  bank" should it or its users desire to do so;

- Written representations by Evolve's outside counsel, Jeffrey P.
  Naimon of Orrick, Herrington & Sutcliffe LLP on or about
  November 2, 2023, that problems with Synapse were merely the
  result of "contractual disagreement that has occurred between
  Evolve and Synapse Financial Technologies, Inc." that could
  plausibly be resolved "in the next few weeks;"

- Evolve's written representation on or about May 11, 2014 that it was
  "maintain[ing] the integrity and security of end user accounts."

- Evolve's May 11, 2023 draft customer agreement's representation
  that customers could withdraw funds that they had deposited into
  their accounts.

131.    These representations were material.

132.    Defendant knew that Plaintiff and its customers to rely upon these representations and
intended for them to do so.

133.    These representations were material and Plaintiff relied on them.  Plaintiff would not
have agreed to use Plaintiff as a banking partner or recommend that its customers entrust their assets
to Plaintiff absent these representations.

134.    These representations were false.  In truth:

- The supposedly comprehensive continuous reporting of transactions transmitted by Evolve to Yotta were false, as funds had secretly been misappropriated;

- The account balances were false and Yotta user funds were not genuinely accounted for and available from Evolve;

- There were serious compliance issues and risk management problems impacting the availability of Yotta user funds;

- Evolve did not have the organizational and technical ability to safeguard user funds;

- Evolve did not ensure that its clients met regulatory, compliance and risk mitigation requirements for all solutions, did not enforce federally mandated regulations and its technology team did not tediously test and analyze solutions before going live;

- Evolve's systems were not highly secure, user data was not stored, and money was not transferred at the highest industry standard set by the Federal Reserve;

- The problems with Synapse that impacted availability of interest payments in September of 2023 were not the result of a "contractual disagreement," made it impossible for users to "transition to another bank" and could not possibly be "resolved in a few weeks."

135. To the extent any of Evolve's representations were not literally false, they were materially misleading and incomplete in light of Evolve's prior statements and Evolve had a duty to correct them and/or not to use them to perpetrate a fraud by omission.

136. Evolve lacked reasonable grounds for believing that its representations were true and failed to exercise reasonable care in ascertaining whether the representations were accurate.

137. If Plaintiff had known that Defendant was a dishonest and incompetent bank that could not perform the most basic job of a financial institution (*i.e.* keeping track of customer money) it would have immediately ceased all business with Defendant and taken steps to ensure that customer funds were immediately returned.

138. Plaintiff has been damaged by Defendant's false representations.

139. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

23

140.    Accordingly, the Court should award damages against Defendant for fraud in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## <u>NEGLIGENT INTERFERENCE WITH CONTRACT</u>

141.    Plaintiff repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

142.    Plaintiff had a contractual relationship with its customers that had the probability of yielding future economic benefits.  At the time that Defendant froze its customers' accounts in May 2024, Plaintiff's customers should have had over $100 million in assets with Plaintiff.  Yotta had a right to receive interest on each and every dollar of such assets.

143.    Defendant was not a party to Plaintiff's contracts with its customers.

144.    Defendant had full knowledge of Plaintiff's contracts with its customers.

145.    Defendant owed a duty of care to Plaintiff, to use reasonable care to protect and secure its customer's funds and to provide access to those monies.

146.    Defendant had full knowledge of the types of harm that Plaintiff and its customers could and would suffer if failed to act in accordance with its duty.

147.    Defendant breached its duty by:

- Failing to keep accurate records of customer accounts;

- Knowingly transmitting inaccurate records of customer accounts to Yotta and to customers;

- Improperly debiting customer accounts for tens of millions of dollars in unauthorized charges;

- Seizing customer accounts and preventing customers from accessing funds belonging to them for (at least) months at a time;

- Failing to inform Yotta about drastic failures in accounting and risk management once they came to light;

- Continuing to hold and accept user funds after becoming aware of catastrophic failures in accounting and risk management, thereby increasing the consequences of the ultimate collapse.

24

148.   Defendant's interference with Plaintiff's contracts with its customers caused substantial damage to Plaintiff's business.

149.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

150.   Accordingly, the Court should award damages against Defendant for negligence in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### NEGLIGENCE

151.   Plaintiff repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

152.   Defendant owed a duty of care to Plaintiff, to use reasonable care to protect and secure its customer's funds and to provide access to those monies.

153.   Defendant had full knowledge of the types of harm that Plaintiff and its customers could and would suffer if failed to act in accordance with its duty.

154.   Defendant breached its duty by:

- Failing to keep accurate records of customer accounts;

- Knowingly transmitting inaccurate records of customer accounts to Yotta and to customers;

- Improperly debiting customer accounts for tens of millions of dollars in unauthorized charges;

- Seizing customer accounts and preventing customers from accessing funds belonging to them for (at least) months at a time;

- Failing to inform Yotta about drastic failures in accounting and risk management once they came to light;

- Continuing to hold and accept user funds after becoming aware of catastrophic failures in accounting and risk management, thereby increasing the consequences of the ultimate collapse.

155.   These breaches caused substantial damage to Plaintiff's business.

156.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

157.    Accordingly, the Court should award damages against Defendant for negligence in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("CA UCL")
#### (Ca. Bus. & Prof. Code §§ 17200, *et seq.*)

158.    Plaintiff repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

159.    Defendant is subject to the CA UCL.  The CA UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

160.    Evolve violated the "fraudulent" prong of the CA UCL as described in Plaintiff's First and Second Causes of Action.

161.    Evolve violated the "unlawful" prong of the CA UCL as described in Plaintiff's First, Second, Third, Fourth and Fifth Causes of Action, and by violating (i) the program, recordkeeping and reporting, and compliance requirements of the Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), as well as the rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Chapter X), the requirements of Regulation H of the Board of Governors of the Federal Reserve System (12 C.F.R. §§ 208.62 and 208.63), and other industry standards set by the Department of the Treasury and the Board of Governors; and (ii) the California Code of Regulations governing banks and trust companies, including Cal. Code Regs. tit. 10 § 10.3 governing Unsafe and Unsound Acts.

162.    Specifically, Evolve:

- Transmitted to Yotta supposedly comprehensive continuous reporting of transactions that were false, since funds had secretly been misappropriated;

- Transmitted to Yotta account balances were false, and Yotta user funds were not genuinely accounted for and available from Evolve;

- Had serious compliance issues and risk management problems impacting the availability of Yotta user funds;

- Did not have the organizational and technical ability to safeguard user funds as it claimed to the public and Yotta;

- Did not ensure that its clients met regulatory, compliance and risk mitigation requirements for all solutions, did not enforce federally mandated regulations and its technology team did not tediously test and analyze solutions before going live;

- Had systems that were not highly secure, user data was not stored, and money was not transferred at the highest industry standard set by the Federal Reserve; and

- Had problems with Synapse that impacted availability of interest payments in September 2023 that were not the result of a "contractual disagreement," made it impossible for users to "transition to another bank" and could not possibly be "resolved in a few weeks."

163.    Yotta has suffered lost money or property as a result of Evolve's CA UCL violations because it (i) would have immediately ceased all business with Evolve and taken steps to ensure that customer funds were immediately returned had it known the facts about Evolve's fraudulent, unlawful and woefully deficient systems and practices, and (ii) paid a price premium due to Evolve's false representations and omissions about its systems and practices.

164.    Under the CA UCL, Plaintiff is entitled to all damages proximately caused by Defendant's conduct.

### SEVENTH CAUSE OF ACTION
### RESTITUTION BASED ON QUASI-CONTRACT/UNJUST ENRICHMENT
(Ca. Civil Code §§ 1750, *et seq.*)

165.    Plaintiff repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

166.    Plaintiff conferred benefits on Defendant in deciding to use Evolve as a banking partner and trusted custodian of its customer's money.

167.    Defendant has knowledge of such benefits.

27

COMPLAINT

168.     Evolve has been unjustly enriched in retaining the revenues derived from Yotta deciding to use Evolve as a banking partner and trusted custodian of its customer's money and by retaining Yotta's customers' money.

169.     Retention of those moneys under these circumstances is unjust and inequitable because, as set forth above, Evolve falsely and misleadingly represented that it had the organizational and technical ability to safeguard user funds and was adequately doing so.

170.     These misrepresentations and omissions caused injuries to Yotta because it would not have used Evolve as a banking partner and trusted custodian of its customer's money had the true facts been known.

171.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff is unjust and inequitable, Defendant ought to pay restitution to Plaintiff for its unjust enrichment.

172.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiff is entitled to restitution in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays that this Court:

A.     Award nominal, compensatory, liquidated, statutory, and punitive damages to Plaintiff in an amount to be determined at trial;

B.     Award litigation costs and expenses to Plaintiff, including, but not limited to, reasonable attorneys' fees;

C.     Award any additional and further relief as this Court may deem just and proper.

COMPLAINT

1

2

### JURY TRIAL DEMAND

3

Plaintiff hereby demands a trial by jury on all issues so triable.

4

**DATED:**        New York, New York

5                   September 13, 2024

                              By:              /s/ Rishi Bhandari

6                                              Rishi Bhandari

7                                              MANDEL BHANDARI LLP

8                                              Rishi Bhandari
                                               80 Pine Street, 33rd Floor
9                                              New York, NY 10005
                                               T:  (212) 269-5600
10                                             F:  (646) 964-6667
                                               rb@mandelbhandari.com
11
                                               *Attorneys for Plaintiff Yotta Technologies*
12                                             *Inc.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT