RISHI BHANDARI (SBN 226055)
rb@mandelbhandari.com
**MANDEL BHANDARI LLP**
80 Pine Street, 33rd Floor
New York, NY 10005
Telephone: (212) 269-5600
Facsimile: (646) 964-6667

*Attorneys for Plaintiff Yotta Technologies Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOTTA TECHNOLOGIES INC., | Docket No: 3:24-cv-6456 |
| Plaintiff, | |
| -against- | **YOTTA TECHNOLOGIES INC.'S OPPOSITION TO DEFENDANT EVOLVE BANK & TRUST'S MOTION TO DISMISS** |
| EVOLVE BANCORP, INC., and EVOLVE BANK & TRUST, | |
| Defendants. | |

# **TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ....................................................................................1

II.     STATEMENT OF FACTS ...........................................................................................1

      A.      Yotta and its Business ......................................................................................2

      B.      Evolve and its Business ...................................................................................2

      C.      Evolve Markets Itself to Yotta as a Safe Place for User Funds ......................3

      D.      Evolve Repeatedly Represents that it is Diligently Safeguarding Yotta User Funds ....4

      E.      Evolve Lies to Yotta About Missing User Funds ............................................5

      F.      Evolve Steals From Customers .........................................................................6

      G.      Evolve Steals Reserve Funds ...........................................................................7

      H.      Evolve Carries Out Its Scheme from California ..............................................7

      I.      Evolve Seizes Whatever Money It Has Not Yet Stolen ...................................8

      J.      Regulatory Actions and Data Breaches Expose Evolve's Rotten Core .........8

      K.      Its Customers Fleeced, Yotta's Business is Devastated...................................8

III.    ARGUMENT ...............................................................................................................9

      A.      California Law Governs the Complaint............................................................9
            1.      Fraud, Conspiracy To Commit Fraud, Interference with Contract, Negligence, Restitution Claims....................................................................10

            2.      Negligent Misrepresentation and UCL Claims..............................................10

      B.      Yotta States a Claim for Fraud..........................................................................13
            1.      The Complaint Alleges a Single Fraudulent Scheme ......................................13

            2.      Evolve Stole Customer Money and Lied About It...........................................14

      C.      Yotta States a Claim for Conspiracy to Commit Fraud ...................................16

      D.      Yotta States Claims for Negligent Misrepresentation and Negligence .....................18

      E.      Yotta States a Claim for Negligent Interference with Prospective Economic Relations .........................................................................................20

      F.      Yotta Has Standing to Bring a UCL Claim .....................................................21

      G.      Yotta States a Claim for Quasi-Contract/Unjust Enrichment .........................23

i

IV.   LEAVE TO AMEND ...................................................................................................25

V.   CONCLUSION...........................................................................................................25

ii

# TABLE OF AUTHORITIES

**Cases**

*360 N. Rodeo Drive, LP v. Wells Fargo Bank, Nat'l Ass'n,*
No. 22-CV-767 (AS), 2024 WL 449401 (S.D.N.Y. Feb. 6, 2024)........................................ 20

*Anderson v. Aon Corp.,*
No. 06 C 6241, 2008 WL 4865574 (N.D. Ill. June 16, 2008) ................................. 11

*Angermeir v. Cohen,*
14 F. Supp. 3d 134 (S.D.N.Y. 2014)........................................................................ 17

*Avago Techs. U.S., Inc. v. Venture Corp.,*
No. C 08-03248 JW, 2011 WL 7479163 (N.D. Cal. May 23, 2011)...................................... 21

*Benavidez v. Cnty. of San Diego,*
993 F.3d 1134 (9th Cir. 2021) ................................................................................ 15

*Bhatia v. Silvergate Bank,*
725 F. Supp. 3d 1079 (S.D. Cal. 2024).................................................................... 24

*Chefs Diet Acquisition Corp. v. Lean Chefs, LLC,*
No. 14-CV-8467 (JMF), 2016 WL 5416498 (S.D.N.Y. Sept. 28, 2016) .............................. 24

*Ehret v. Uber Techs., Inc.,*
68 F. Supp. 3d 1121 (N.D. Cal. 2014) .................................................................... 22

*ESG Cap. Partners, LP v. Stratos,*
828 F.3d 1023 (9th Cir. 2016) ................................................................................ 17

*Frances T. v. Vill. Green Owners Assn.,*
42 Cal. 3d 490 (Cal. 1986)...................................................................................... 15

*Fresh Direct, LLC v. Blue Martini Software, Inc.,*
776 N.Y.S.2d 301 (N.Y. App. Div. 2004) .............................................................. 20

*Gustafson v. BAC Home Loans Servicing, LP,*
No. SACV 11-915-JST ANX, 2012 WL 4761733 (C.D. Cal. Apr. 12, 2012) ...................... 21

*Guzman v. Bridgepoint Educ., Inc.,*
305 F.R.D. 594 (S.D. Cal. 2015) ............................................................................ 10

*High Country Linens, Inc. v. Block,*
No. C 01-02180 CRB, 2002 WL 1998272 (N.D. Cal. Aug. 20, 2002)................................. 10

iii

*IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*,
    40 N.Y.3d 277 (N.Y. 2023) ................................................................................ 18

*In re Capacitors Antitrust Litig.*,
    No. 17-MD-02801-JD, 2020 WL 6462393 (N.D. Cal. Nov. 3, 2020) ..................................... 9

*In re Toyota Motor Corp.*,
    785 F. Supp. 2d 883 (C.D. Cal. 2011) ................................................................ 23

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
    No. MDL 06-1770 MHP, 2007 WL 9753228 (N.D. Cal. Aug. 16, 2007) ........................... 22

*Johnson & Johnson Fin. Corp. v. Sparber, Ferguson, Ponder & Ryan*,
    221 F.3d 1348 (9th Cir. 2000) ......................................................................... 18

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) ................................................................ 18

*JTH Tax, Inc. v. Gouneh*,
    721 F. Supp. 2d 132 (N.D.N.Y. 2010) ................................................................ 24

*Keilholtz v. Lennox Hearth Prods. Inc.*,
    268 F.R.D. 330 (N.D. Cal. 2010) ...................................................................... 22

*Larsen v. Vizio, Inc.*,
    No. SACV-14-1865-CJC(JCGx), 2015 WL 13655757 (C.D. Cal. Apr. 21, 2015) ............... 12

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
    10 F. Supp. 3d 504 (S.D.N.Y. 2014) ............................................................. 19, 20

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
    83 F. Supp. 3d 501 (S.D.N.Y. 2015) .................................................................. 24

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) .......................................................................... 12

*McCann v. Foster Wheeler LLC*,
    48 Cal. 4th 68 (Cal. 2010) ............................................................................. 10

*McGhee v. Arabian Am. Oil Co.*,
    871 F.2d 1412 (9th Cir. 1989) ......................................................................... 11

*Mosafer Inc. v. Broidy*,
    No. 2:21-CV-06320-MCS-JC, 2022 WL 793029 (C.D. Cal. Feb. 4, 2022) ................... 10, 12

*Norwest Mortg., Inc. v. Superior Ct.*,
    72 Cal. App. 4th 214 (Cal. Ct. App. 1999) .......................................................... 23

*Offor v. Mercy Med. Ctr.*,
  No. 215CV2219DRHSIL, 2021 WL 3909839 (E.D.N.Y. Sept. 1, 2021)..............................17

*Pacwest, Ltd. v. R.T.C.*,
  No. 94 CIV. 2498 (AGS), 1996 WL 325647 (S.D.N.Y. June 11, 1996) ...............................24

*Roberts v. Levine*,
  No. 19-CV-567-WQH-BLM, 2019 WL 5650626 (S.D. Cal. Oct. 31, 2019) ..............9, 10, 11

*Rubenstein v. Neiman Marcus Grp. LLC*,
  687 F. App'x 564 (9th Cir. 2017) ......................................................................................14

*See SCEcorp v. Superior Ct.*,
  3 Cal. App. 4th 673 (Cal. Ct. App. 1992) .........................................................................20

*Senne v. Kansas City Royals Baseball Corp.*,
  934 F.3d 918 (9th Cir. 2019) ............................................................................................10

*Servs., Inc. v. Sec. Mut. Life Ins. Co. of New York*,
  No. 06-CV-1164, 2010 WL 3907489 (N.D.N.Y. Sept. 30, 2010).........................................24

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (Cal. 2011).............................................................................................21

*Tidenberg v. Bidz.com, Inc.*,
  No. CV085553PSGFMOX, 2009 WL 605249 (C.D. Cal. Mar. 4, 2009)...............................23

*TRC & Assocs. v. NuScience Corp.*,
  No. 2:13-CV-6903-ODW CWX, 2013 WL 6073004 (C.D. Cal. Nov. 18, 2013) ..................22

*United States v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) ..........................................................................................14

*Venhaus v. Shultz*,
  155 Cal. App. 4th 1072 (Cal. Ct. App. 2007) ....................................................................20

*Vinci Brands LLC v. Coach Servs., Inc.*,
  No. 23-CV-5138 (LGS) (VF), 2024 WL 4370841 (S.D.N.Y. Oct. 2, 2024)........................18

*Wilson v. Frito-Lay N. Am., Inc.*,
  961 F. Supp. 2d 1134 (N.D. Cal. 2013) .............................................................................23

*Zagami v. Cellceutix Corp.*,
  No. 15 CIV. 7194 (KPF), 2016 WL 3199531 (S.D.N.Y. June 8, 2016)................................12

YOTTA'S  OPPOSITION TO DEFENDANT
EVOLVE BANK & TRUST'S MOTION TO DISMISS
3:24-CV-6456-TLT

**Treatises**

3A Fletcher Cyc. Corp. § 1135 ................................................................................................ 15

## I.     PRELIMINARY STATEMENT

Defendant Evolve Bank & Trust ("Evolve" or "Defendant"), which is a Fed-regulated bank, stole more than $75 million from their depositors, who were the customers of Plaintiff Yotta Technologies Inc. ("Yotta").  In order to conceal its misconduct, Evolve lied to Yotta and the depositors by, among other things, delivering false account balance information and consistently assuring Yotta that Evolve was a competent, regulated bank that was safeguarding the customer deposits.  Given Defendant's egregious misconduct, this case is not going to be resolved in a motion to dismiss.

Defendant knows this.  So, in order to make its motion to dismiss sound remotely credible, Defendant misrepresents the facts to the Court.  Defendant represents to the Court that (1) Synapse – rather than Defendant – misappropriated the customer funds (Br. at 7 ("deficiencies created by Synapse"), 17 ("Synapse's failure to fully fund the FBO accounts"), 18 ("Yotta cannot attribute Synapse's alleged misappropriation of funds to Evolve"), (2) "the end user account balances were not affected" by the theft (*id.* at 19), and (3) "Evolve transferred over $35,000,000—significantly more than the amount challenged—from the reserve account to the FBO account(s)" (*id.* at 7). However, in reality, (1) "Evolve misappropriated end user funds" (Compl. ¶ 73; see also *id.* ¶¶ 69-87), (2) Yotta's "customers' funds are missing because of Evolve's own misconduct" (*id.* ¶ 69), and (3) while Evolve misappropriated more than $75 million in end user funds, the reserve never exceeded $35 million and, although Evolve briefly transferred reserves to end users, it quickly misappropriated them a second time (*id.* ¶¶ 11-12, 77-78).

Defendant's motion to dismiss asserts roughly twenty different arguments in favor of dismissal.  The overwhelming majority of these arguments pretend that the allegations in the preceding paragraph do not exist.  The remaining arguments are similarly meritless.

## II.     STATEMENT OF FACTS

With the exception of facts concerning Yotta's presence in California, the facts are taken from the Complaint.  Information regarding Yotta's presence in California can be found in the

Proposed Amended Complaint, which is attached as Exhibit 1 to the Declaration of Rishi Bhandari ("Ex. 1").

### A.    Yotta and its Business

Founded in 2019, Yotta is a financial technology company or "fintech." Compl. ¶¶ 2, 23. It offers individual end users a savings product that allows customers to win prizes instead of receiving interest. *Id.* ¶ 25. Foreign governments use similar accounts to encourage people to save money. *Id.* ¶ 26. Indeed, Yotta customers have received more than $20 million in prizes. *Id.* End users loved using Yotta, and by late 2023, end users had over $100 million in Yotta's savings program. *Id.* ¶ 28.

Because Yotta is not itself a bank, it cannot personally accept customer deposits or issue card products. *Id.* ¶ 27. Instead, Yotta partnered with regulated, FDIC insured institutions to take custody of its customers' savings and to issue Yotta-branded debit and credit cards. *Id.*

Since Yotta has done business with customers, it has done so through its virtual office in San Francisco, California. Its Terms of Use states that "We, or our or Yotta means Yotta Technologies Inc. of 2261 Market Street #4313 San Francisco, CA 94114 and any related companies." Ex. 1 at ¶ 29. It also uses its San Francisco address to communicate with third-parties, including vendors. *Id.* Until early 2023, Yotta had a second office in New York, New York. *Id.* ¶ 32. However, Yotta closed that office in early 2023. *Id.* Since that time, its sole office has been its San Francisco office. *Id.*

### B.    Evolve and its Business

Evolve is a Tennessee-headquartered full-service bank with over forty locations in ten states, including California. *Id.* ¶¶ 18, 29. While it offers traditional banking products, such as consumer banking, mortgage origination, and SBA lending, in recent years, Evolve has sought to distinguish itself through its "Open Banking" business. *Id.* ¶ 30.

Evolve's "Open Banking" business, which it touts as "The Future of Banking" and "powering the fintech revolution" involves partnering with fintech companies to offer new financial products and create customizable user experiences. *Id.* ¶ 31. Evolve says that its program "is like extending

2

1   their banking charter to other companies." *Id.*  Evolve represented to Yotta and others that its

2   technology "is highly secure, and is customizable and flexible to fit your business' use case." *Id.* ¶

3   32.  And it specifically touts its strong customer security and corporate compliance as a selling-point

4   for its services:

> Evolve Open Banking is committed to the safety of personal and financial information of our partners and their end users. As such, we maintain our charter and status with the Federal Reserve, the central banking system in the United States. We have an obligation to always maintain compliance and security within our system, including regular system audits. This obligation ensures that data is stored, and money is transferred at the highest industry standard set by the Federal Reserve….
>
> The Evolve Opening Banking team works diligently alongside partners and regulators to ensure that compliance standards are met. Our partners trust us with their business, and we do not take their trust for granted. We have a great working relationship with regulators, and our systems are checked regularly both by Federal regulators and external and internal auditors. Our top priority is always the security of financial and personal information of both partner companies and end users.

14   *Id.* ¶ 33.

15        **C.    Evolve Markets Itself to Yotta as a Safe Place for User Funds**

16        Yotta was first introduced to Evolve at an October 2019 conference in Las Vegas.  *Id.* ¶ 34.

17   At that time, Kristen Kines, Evolve's Fintech Business Development Officer, described to Yotta's

18   CEO Evolve's expertise in Open Banking and claimed that Evolve would be a valuable banking

19   partner for Yotta.  *Id.* ¶¶ 34-35.

20        Synapse was a software company that acted as an intermediary between banks like Evolve

21   and fintechs like Yotta.  *Id.* ¶ 36.  It was headquartered in California.  *Id.* ¶ 40.  Synapse provided an

22   Application Programming Interface ("API") which allowed Yotta's software to safely and securely

23   transmit and receive information from Evolve.  *Id.* ¶ 37.  In reliance upon Evolve's representations

24   that it would safeguard end user funds, on February 13, 2020 Yotta entered into a contract allowing

25   it to use Synapse's software to interface with Evolve.  *Id.* ¶ 38.  Shortly thereafter, Yotta end users

26   began depositing their funds at Evolve.  *Id.* ¶ 39.

27

28

In lay terms, Evolve and Synapse would work together to service Yotta's end users.  *Id.* ¶ 40.
Customer funds were always custodied at Evolve.  *Id.*  Evolve's electronic systems would process
certain transactions, and Synapse would play a role in processing other transactions with funds
located at Evolve.  *Id.*  Evolve delivered a continuous data stream to Synapse's California
headquarters that was supposed to more-or-less instantaneously report on a customer-level any and
all transactions that it effected.  *Id.*  Pursuant to the parties' agreement, Synapse – from its California
headquarters – combined Evolve's data stream with its own customer transaction data, and delivered
the combined data to Yotta and customers.  *Id.*  The combined data stream was supposed to include
(a) each and every transaction in each and every customer's account and (b) each customer's current
account balance so that Yotta and the customer knew precisely how much money was in their
account.  *Id.*  Of course, all of the data – including balance information – was supposed to be accurate
because Yotta and its customers relied upon the data in the same way that bank account holders rely
upon similar information provided by their banks.  *Id.*  Over the course of this four-year relationship,
Evolve accepted and processed hundreds of millions of dollars from Yotta's customers.  *Id.* ¶ 7.

Yotta was not Evolve's only fintech customer.  *Id.* ¶ 41.  Evolve actually held funds for many
fintechs.  *Id.*  Many of those fintechs interfaced with Evolve through Synapse.  *Id.*  Evolve
commingled the end user funds of all Synapse-connected fintechs in one or more accounts for the
benefit of ("FBO") end users.  *Id.*

### D. Evolve Repeatedly Represents that it is Diligently Safeguarding Yotta User Funds

To ensure that Evolve could be trusted to custody its customers' funds, Yotta had numerous,
detailed communications with Evolve over the course of four years.  *Id.* ¶¶ 42-57.  As detailed in the
Complaint, Evolve always represented to Yotta that it was safeguarding customer funds and that it
would promptly raise any compliance issues with Yotta, including on the following occasions:

- In late September 2020 Evolve Chairman Scott Lenoir represented that Evolve had
  strong compliance, risk management, and operations departments that diligently
  guarded the assets of fintech customers.  *Id.* ¶¶ 43-44.

4

- Lenoir made similar representations to Yotta's CEO during calls on April 13, 2021 and December 7, 2022, and in-person meetings on August 24, 2021 and October 24, 2022. *Id.* ¶¶ 44-45. Yotta also received regular representations from others at Evolve that user money was being carefully watched. *Id.* ¶ 46.

- For at least several months beginning on or about December 5, 2022, Yotta and Evolve had twice monthly meetings, that were usually attended by, among others, Stephen Hogg, Evolve's Lead Quality Assurance Specialist, and Cecilia Russell, Evolve's Senior Vice President and Chief Compliance Officer. *Id.* ¶¶ 47-49. Evolve specifically told Yotta that "any present or future Compliance concerns" would be raised at these meetings, and Evolve would regularly raise minor issues at these meetings. *Id.* ¶ 52. However, at no time did Evolve disclose that it had misappropriated customer funds or that the data that it was sending to Yotta through Synapse was false. *Id.* ¶¶ 52, 57.

- From April 2020 through May 2024, as discussed above, Yotta received detailed, user-by-user transaction data on a continuous basis from Evolve and Synapse that was always represented as being accurate. *Id.* ¶¶ 53-54.

- On May 11, 2023, Evolve's counsel at Latham & Watkins LLP emailed Yotta its redlined edits to the agreement that Synapse, on behalf of Evolve, would enter into with Yotta end users. *Id.* ¶ 57. The agreement made clear that end users could withdraw their funds. *Id.* At no point did the agreement disclose that customers might not be able to withdraw their funds because Synapse or Evolve decided to take those funds for themselves or transfer them to another customer. *Id.*

### E.    Evolve Lies to Yotta About Missing User Funds

Yotta and Evolve had directly negotiated that Yotta would receive interest on the funds that Yotta end users deposited with Evolve. *Id.* ¶ 58. Yotta would use the interest to fund end user prizes. *Id.* In September of 2023, these interest payments to Yotta were suddenly suspended. *Id.* ¶ 59. In emails dated September 20, 2023, September 30, 2023, and October 3, 2023, Moelis specifically

asked multiple Evolve personnel, including Lenoir and Hank Word, Evolve's President of Open Banking, why interest was not being paid.  *Id.* ¶ 60.  On September 25, October 3, and November 2, Evolve and its outside counsel – Orrick Herrington & Sutcliffe LLP – represented that the interest was being held up by a contract dispute with Synapse and that Evolve would "protect end users."  *Id.* ¶¶ 61-63.  None of these communications disclosed that the Yotta user funds were missing and prior transactions involving the funds had gone un-reported.  *Id.* ¶¶ 64-65.  Meanwhile, Evolve continued to transmit account data through Synapse to Yotta and its end users that was designed to assure recipients that the money was safe at Evolve and available for withdrawal.

In reality, these representations were false because Evolve had stolen the customer funds.

### F.   <u>Evolve Steals From Customers</u>

While Yotta did not know (and could not have known) at the time, Yotta's investigation has since revealed that its customers' funds are missing because of Evolve's own misconduct.  *Id.* ¶ 69. Beginning no later than June 2017, Evolve began taking funds from the FBO accounts that commingled end user monies.  *Id.* ¶ 70.  For instance, Evolve debited FBO accounts for "Account Analysis Charge[s]" on numerous occasions, including but not limited to the following:

- January 27, 2020: $1,191,831.76
- February 27, 2020: $1,049,719.31
- March 24, 2020: $941,099.24
- May 29, 2020: $856,224.25
- May 29, 2020: $710,508.92
- June 26, 2020:  $436,768.58

*Id.* ¶ 71.  A review of the contracts between Synapse and Evolve indicate that end users had no obligation to pay these amounts.  *Id.* ¶ 72.  This is confirmed by the fact that, in July 2020, Evolve began debiting a Synapse account titled "Evolve Fees" for the Account Analysis Charges instead of the FBO titled for end user accounts.  *Id.* ¶ 72.

The Account Analysis Charges were not an isolated incident.  *Id.* ¶ 73.  Yotta's investigation indicates that Evolve misappropriated end user funds for other purposes.  *Id.*  Evolve took over $13

1   million in TabaPay processing fees from end users.  It is undisputed that end users had no obligation

2   to pay these fees.  *Id.* ¶¶ 74-75.

3          Correspondence indicates that, by September 2023, Evolve knew that it had a massive deficit

4   in the FBO account(s) that were supposed to be holding Yotta end users' funds.  *Id.* ¶ 83.  Despite

5   that deficit, in order to preserve the business of one of its largest fintech customers, Mercury

6   Technologies, Inc. ("Mercury"), Evolve transferred all of the funds that were supposed to be held by

7   Mercury customers to one or more accounts that were not part of the Synapse platform without regard

8   to the shortfall.  *Id.* ¶¶ 80-83.  In effect, Evolve transferred $50 million of Yotta (and potentially

9   other fintechs) end user funds to Mercury end users.  In doing so, Evolve forced Yotta end users to

10  absorb the shortfall in Mercury customer funds.  *Id.* ¶ 84.

11         **G.     Evolve Steals Reserve Funds**

12         In an effort to cover up its malfeasance, Evolve forced Synapse to fund a reserve account.

13  *Id.* ¶¶ 76, 78.  However, the reserve account was never sufficient to cover the shortfall created by

14  Evolve's theft:  while Evolve stole at least $75 million in customer funds, the reserve never exceeded

15  $35 million.  *Id.*  Making matters worse, Evolve has admitted that it took reserve account funds for

16  itself rather than return the funds improperly taken from end users.  *Id.* ¶¶ 77-78.  Evolve has stated

17  that it took $5,401,777.28 on one occasion and $2,500,000 on another occasion.  *Id.* ¶ 77.

18         **H.     Evolve Carries Out Its Scheme from California**

19         As discussed above, on a continuous basis, Evolve transmitted false customer transaction info

20  to Synapse in California so that Synapse could re-disseminate – from California – the fraudulent

21  information to Yotta and its end users.  *Id.* ¶ 40.  Evolve also routinely traveled to California to carry

22  out its scheme.  *Id.* ¶ 87.  For instance, Evolve CEO Scott Lenoir met with Synapse in California on

23  January 22, 2018, February 27, 2019, and August 2, 2021.  *Id.*  Evolve senior executive Hank Word

24  met with Synapse in California on September 3, 2019, August 2, 2021, September 8, 2022, and

25  September 9, 2022.  *Id.*

26

27

28

I.    **Evolve Seizes Whatever Money It Has Not Yet Stolen**

On or about May 11, 2024, Evolve suspended access to all monies belonging to Yotta customers.  *Id.* ¶ 88.  While Evolve told Yotta that it was seizing end user funds "to maintain the integrity and security of end user accounts," this was another misrepresentation.  Evolve knew perfectly well that it had misappropriated these funds long ago.  Even after reserves are taken into account, there is a shortfall of tens of millions of dollars of customer money.  *Id.* ¶¶ 9, 78, 92, 105-06.

J.    **Regulatory Actions and Data Breaches Expose Evolve's Rotten Core**

On June 14, 2024, Evolve entered into a Consent Decree with state and federal bank regulators, after an investigation had "identified deficiencies with respect to the Bank's risk management and compliance with applicable laws, rules, and regulations."  *Id.* ¶ 99.  The Consent Decree represents an admission that Evolve's prior representations that it "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," and "enforce[s] federally mandated regulations," were false.  *Id.* ¶ 100.

Similarly, Evolve permitted a cybercriminal organization to gain access to its customers' personal information and then proceeded to conceal the theft until after the information was sold to criminals on the dark web.  *Id.* ¶¶ 93-96.  Evolve's representations to Yotta that its systems were "highly secure" and that user "data is stored, and money is transferred at the highest industry standard set by the Federal Reserve" were shown to be utterly false.  *Id.* ¶ 98.

K.    **Its Customers Fleeced, Yotta's Business is Devastated**

Evolve's misconduct has had a devastating effect on Yotta customers.  *Id.* ¶ 105.  Yotta has received thousands of messages from its customers, many of whom have lost substantially all of their assets to Evolve's treachery.  *Id.* ¶ 106.  Many Yotta customers are faced with a sudden inability to pay their bills or otherwise provide for themselves.  *Id.*  Many of these users are furious with Yotta, and they can hardly be blamed.  *Id.* ¶ 107.  Even those who accept that Yotta played no role in seizing their funds and were unaware of Evolve's misconduct are unlikely to ever do business with Yotta again.  *Id.* ¶ 107.  Yotta's reputation in the market, once sterling, has been tarnished, potentially

beyond repair. *Id.* ¶ 108.  Yotta's revenues have evaporated and its enterprise value, once substantial, has dwindled substantially.  *Id.*

In addition, Evolve's scheme caused Yotta to incur significant expenses, including but not limited to expenses incurred investigating the scheme and servicing customers who were furious about the loss of their supposedly safe funds.  *Id.* ¶¶ 102-103, 106-108.

## III.    ARGUMENT

### A.    California Law Governs the Complaint

Evolve argues that Yotta's negligent misrepresentation and UCL claims are governed by New York law because this dispute has no connection to California.  Br. at 9-11.  Evolve is mistaken about the facts and the law.

The choice of law is governed by California's three-step governmental interest test:

> First, the Court determines whether the relevant laws are the same or different; [second,] if there is a difference, the Court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists; and [third,] if there is a true conflict, then the Court compares the nature and strength of each jurisdiction's interest and applies the law of the state whose interest would be more impaired if its law were not applied.

*In re Capacitors Antitrust Litig.*, No. 17-MD-02801-JD, 2020 WL 6462393, at *6 (N.D. Cal. Nov. 3, 2020).

California law applies unless the party advocating that another state's law meets its burden of showing that the foreign law should apply.  *Roberts v. Levine*, No. 19-CV-567-WQH-BLM, 2019 WL 5650626, at *5 (S.D. Cal. Oct. 31, 2019) ("The foreign law proponent has the burden to show that foreign law, rather than California law, should apply to the plaintiff's claims.").  A separate choice-of-law analysis is conducted for each claim.  *Roberts*, 2019 WL 5650626, at *5; *Mosafer Inc. v. Broidy*, No. 2:21-CV-06320-MCS-JC, 2022 WL 793029, at *10-12 (C.D. Cal. Feb. 4, 2022), *aff'd*,

9

No. 22-55265, 2023 WL 8295921 (9th Cir. Dec. 1, 2023) (analyzing each claim separately).

### 1. *Fraud, Conspiracy To Commit Fraud, Interference with Contract, Negligence, Restitution Claims*

Evolve does not argue that there are any differences between California and New York's fraud laws.  Br. at 9-11.  As a result, these claims are governed by California law.[1]  *Roberts*, 2019 WL 5650626, at *5 (Applying California law where "Plaintiff ma[de] no effort to identify the applicable rule of law in each potentially concerned state and [ ] show it materially differs from the law of California.")

### 2. *Negligent Misrepresentation and UCL Claims.*

Evolve does not show the supposed differences between New York and California law with respect to these two claims "make a difference in the litigation."  *Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594, 598, 613 (S.D. Cal. 2015).  As a result, these claims are governed by California law.  But even if Evolve had satisfied its burden with respect to the first step of the governmental interest test, there is no question that the second and third steps require this Court to apply California law since it has the greatest interest in the dispute.

"[U]nder California's choice-of-law principles, a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders."  *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 933 (9th Cir. 2019).  *Accord McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 97–98 (Cal. 2010).  For instance, in *High Country Linens, Inc. v. Block*, No. C 01-02180 CRB, 2002 WL 1998272, at *3 (N.D. Cal. Aug. 20, 2002), the plaintiff was a corporation headquartered in New York, had a California distribution facility, and had sales "throughout the country."  The plaintiff claimed that the defendants unfairly competed when they interfered with a relationship with a Chinese manufacturer and used infringing brand names.  *Id.* at *1-2.  The court held that California had the greatest interest because the "entire focus of this case is the allegedly illegal conduct of defendants, which was apparently orchestrated out of California."  *Id.* at *3.

---

[1] Unless noted otherwise, internal quotation marks, citations, and footnotes have been omitted.

Courts consistently find that the state in which the key portions of misconduct at issue occurred has the greatest interest in the dispute. *See, e.g., McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1426 (9th Cir. 1989) (Where Texas subsidiary recruited Oklahoma and California residents to work in Saudi Arabia and employment contracts were governed by Texas law, the court held that a fraud claim was governed by Saudi Arabia law because the "alleged misrepresentations regarding videotape clubs apparently were made in Saudi Arabia. Saudi Arabia has a significant interest in regulating conduct within its borders."); *Roberts*, 2019 WL 5650626, at *5 (holding that California law governed fraud claim brought by Florida plaintiff against California defendant where many of fraudulent communications were disseminated from California); *Anderson v. Aon Corp.*, No. 06 C 6241, 2008 WL 4865574, at *2, 4-5 (N.D. Ill. June 16, 2008) (Where fraud plaintiff resided in California but defendant made the misrepresentations in Illinois, Illinois law governed because "under California choice of law rules, courts in fraud cases apply the law of the jurisdiction where the misrepresentations were made.").

Here, far more of the misconduct at issue occurred in California than it did in New York. Evolve conspired with Synapse to operate what was, essentially, a ponzi scheme. Compl. ¶¶ 121-26. Evolve, which has branches in California and is headquartered in Tennessee, stole $75 million in end user funds. *Id.* ¶¶ 11-12, 69-87. Evolve had to cover up the theft. So, "Evolve delivered a continuous data stream" of false customer transaction and balance information to Synapse in California. *Id.* ¶¶ 40, 53. Then, Evolve's false data stream was re-transmitted from California to Yotta and its end users around the world. *Id.* The fraudulent scheme was complex, and Evolve had to routinely travel to California in order to effect the scheme, with the Complaint identifying seven such visits to California by Evolve's CEO and another executive. *Id.* ¶ 87.

Evolve argues in a footnote that a single 2021 document proves that Yotta has no contacts with California. Br. at 5 n.3; Ex. D. In reality, Yotta has at least as many contacts with California as it does with New York. Yotta's customers dealt with Yotta in California, as did many vendors. Ex. 1 at ¶ 29. Yotta's sole office was in California during much of the relevant period. *Id.* ¶ 32. Over 90,000 of Yotta's California end users received Evolve's continuous fraudulent account

1    balance and transaction statements, more than any other state. *Id.* ¶ 30.  And Yotta has had California

2    employees. *Id.* ¶31.

3          Evolve characterizes *Zagami v. Cellceutix Corp.*, No. 15 CIV. 7194 (KPF), 2016 WL

4    3199531, at *4 (S.D.N.Y. June 8, 2016), as "holding that misrepresentations 'occur… [in] districts

5    in which they are received.'" Br. at 11 (ellipsis and brackets in Defendants' brief).  This is a textbook

6    case of a litigant using an ellipsis and brackets to intentionally distort the meaning of a quotation.  In

7    full, the quotation reads "Misrepresentations 'occur' not only in the district in which they are made,

8    but also the district or districts in which they are received." *Zagami*, 2016 WL 3199531, at *4

9    (emphasis added).

10         Evolve also relies on class actions in which the class members made a one-time purchase of

11   a product or service because of a false advertisement.  In those cases, courts held that the state in

12   which the member actually purchased the good or service has the greatest interest in the dispute.  *See*

13   *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 585, 594 (9th Cir. 2012) (Holding that, "[u]nder the

14   facts and circumstances of this case," the "foreign states have a strong interest in the application of

15   their laws to transactions between their citizens and corporations doing business within their state.");

16   *Larsen v. Vizio, Inc.*, No. SACV-14-1865-CJC(JCGx), 2015 WL 13655757, at *3 (C.D. Cal. Apr.

17   21, 2015) ("Maine and other states have a compelling interest in protecting their consumers from in-

18   state injuries caused by a California corporation doing business within their borders and in

19   delineating the scope of recovery for the consumers under their own laws."); *Guzman*, 305 F.R.D. at

20   598, 617 ("Following the analytic framework emphasized in Mazza").

21         In this case, Evolve did not use a false advertisement to induce Yotta to make a one-time

22   consumer purchase.  Instead, Evolve perpetrated a fraudulent scheme from California over years in

23   order to steal and conceal Yotta's customers' funds and, in doing so, destroyed Yotta's business.

24   California has a far greater interest than New York in regulating Evolve's scheme.  *See Mosafer*,

25   2022 WL 793029, at *12 (In business conspiracy claim, Virginia "lacks any substantial interest in

26   applying its tort law to acts damaging Virginia citizens that occur outside its borders.").  Although

27   California law clearly applies to the claims, the instant motion to dismiss fails irrespective of whether

28                                                              12

California or New York law is applied.

**B.     Yotta States a Claim for Fraud**

### 1. The Complaint Alleges a Single Fraudulent Scheme

The Complaint alleges a single fraudulent scheme in which Evolve stole customer funds while it was promising that it was safeguarding customer funds. The Complaint provides specific times and places of Evolve's promises and specific times, dates, and amounts of Evolve's theft. As a result, it easily satisfies the pleading standards.

Unable to challenge the scheme that was actually plead, Evolve pretends that the Complaint alleges three separate schemes – a first scheme to lie about the funds available to end users and transactions with end users' funds, a second scheme to lie about Evolve's organization, compliance and technical abilities, and a third scheme about Evolve's theft, which for obvious reasons Evolve prefers to call a "contract dispute." Br. at 13-16. Evolve's arguments are non-sensical when analyzed under the single scheme that was actually pled.

For instance, Evolve claims that its representations to Yotta that the payment issue in the fall of 2023 stemmed from a mere "Contractual Dispute" and that Evolve was acting to "protect end users" with Synapse were entirely truthful. Br. at p. 16; Compl. ¶¶ 59-63. Evolve's argument makes sense only if you ignore the fact that the bank stole $75 million from end users. The payment problem was actually being caused by Evolve's theft and the resulting shortfall. Compl. ¶¶ 11, 12, 61. Evolve's representations were demonstrably false.

Evolve points to its representations from September 2020 through 2023 that "'Evolve had the organizational and technical ability to safeguard user funds'" Br. at 14 & 15-16; Compl. ¶¶ 42-57 (discussing 2020-2023 representations). Evolve claims that the Complaint "relies solely on a June 14, 2024 consent decree… to plead that those representations are false." Wrong. Evolve began stealing customer funds in January 2020 (Compl. ¶¶ 69-73), which is more than sufficient to show both that the 2020-2023 representations were false and that Evolve knew they were false at the time they were made.

Further, the fact that paragraph 19 of the Consent Decree prohibited Evolve from establishing

1   any new fintech partners, business lines, products, programs, or services confirms that the

2   deficiencies uncovered by the Fed related to the Open Banking business that serviced Yotta.[2] Compl.

3   ¶¶ 31-33.  Evolve also argues that the Consent Decree is not evidence that Evolve knew that any of

4   its representations regarding compliance were false before August 2023. In doing so, Evolve asks

5   the Court to engage in a factual dispute that is not proper on a motion to dismiss and to accept the

6   implausible assertion that Evolve was totally unaware its risk management functions were deficient

7   before the examination.  In any event, the fraud actually alleged – stealing customer moneys and

8   lying to Yotta about it – occurred from at least 2020 through 2024. *E.g., id.* ¶¶ 38-57, 69-84.  The

9   Consent Decree addressed misconduct that occurred during the fraud scheme.

10              **2.  *Evolve Stole Customer Money and Lied About It***

11              Although Evolve does not seriously challenge the allegations concerning its theft, it makes

12   four arguments that it did not lie about the theft.  First, Evolve argues that the allegations concerning

13   account data are insufficient because Yotta does not specify who made the representations, who

14   received them, or how they were fraudulent.  Br. at 13.  This is ridiculous.  Evolve delivered this data

15   to Yotta and its end users through Synapse, with whom Evolve conspired.  Compl. ¶ 40.  Evolve

16   represented that the data included "(a) each and every transaction in each and every customer's

17   account and (b) each customer's current account balance so that Yotta and the customer knew

18   precisely how much money was in their account." *Id.* ¶ 40.  In reality, the money was not available,

19   and Evolve concealed the transactions showing its misappropriation of the funds.  *Id. ¶* 86.

20   Accordingly, Yotta's complaint plainly satisfies the "who, what, when where, and how" required

21   under Fed. R. Civ. P 9(b).  *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 567 (9th Cir.

22   2017) (reversing the district court's dismissal of claims where plaintiff satisfied Rule 9(b)'s

23   particularity requirement by pleading the "who, what, when, where, and how"); *United States v.*

24   *United Healthcare Ins. Co.,* 848 F.3d 1161, 1180 (9th Cir. 2016) ("statements of the time, place and

25   nature of the alleged fraudulent activities are sufficient…a complaint need not allege a precise time

26   frame, describe in detail a single specific transaction or identify the precise method used to carry out

27   _____

28   [2] https://www.federalreserve.gov/newsevents/pressreleases/files/enf20240614a1.pdf

1    the fraud.").  As the Ninth Circuit has explained, a purpose of the heightened standard is to give

2    "defendants notice of the alleged misconduct so that they may defend themselves."  *Benavidez v.*

3    *Cnty. of San Diego*, 993 F.3d 1134, 1145 (9th Cir. 2021) (Rule 9(b) "does not require absolute

4    particularity or a recital of the evidence.")

5           Second, Evolve argues that Synapse was exclusively responsible for reporting Yotta end user

6    transactions and balances and Synapse had some important customer financial data.  Br. at 13.

7    Wrong but irrelevant.  Evolve was the Yotta users' bank; Yotta users' funds were always custodied

8    at Evolve.  *Id.* ¶ 40.  And as the custodian of the Yotta user's accounts, Evolve delivered a continuous

9    data stream of transaction and balance information.  *Id.*  Evolve obviously played a critical role in

10   providing accurate account data to end users.  But, even if the contract between Synapse and Evolve

11   completely absolved Evolve of any obligation to provide accurate data, Evolve would still be liable

12   for fraud because it participated in the fraud.  *See* 3A Fletcher Cyc. Corp. § 1135 ("It is the general

13   rule that an individual is personally liable for all torts the individual committed, notwithstanding that

14   the person may have acted as an agent or under directions of another."); *Frances T. v. Vill. Green*

15   *Owners Assn.*, 42 Cal. 3d 490, 505 (Cal. 1986) (same).

16          Third, Evolve argues that the account balances were not actually fraudulent because even if

17   there were insufficient funds in the FBO, the account balances provided to the end users were not

18   impacted and therefore were not false.  Br. at p.13, & 14, n.9.  With all due respect, this argument

19   turns the truth on its head.  The account balances were fraudulent for the very reason that they falsely

20   represented that funds were available when Evolve knew perfectly well that they were not.  An end

21   user's account balance represents the funds in their account and that could be withdrawn.  *Id.* ¶¶ 55-

22   57, 68.  The account balances were fraudulent because in fact the FBO had insufficient money to

23   actually pay the balances.  Indeed, it was this very shortfall that, according to Evolve, caused Evolve

24   to freeze and seize the money belonging to Yotta's customers.  Since the accounts were frozen, Yotta

25   customers have had no access to the over one hundred million dollars in funds that they deposited

26   with Evolve in good faith.  *Id.* ¶ 91.  If the account balances were true, Yotta's customers could

27   withdraw the money today.  They obviously cannot.

28

                                                15

1    Finally, Evolve claims that its fall 2023 misrepresentations to Yotta that the payment issue in

2    the fall of 2023 stemmed from a mere "Contractual Dispute" with Synapse must be dismissed

3    because the harms had already occurred.  Br. at 17.  Evolve is conflating user's injuries with the

4    injury to Yotta.  The purpose of this misrepresentation was to conceal Evolve's ponzi-scheme or

5    ponzi-like scheme so as to induce Yotta and its end users to continue keeping their funds at Evolve

6    and stop the scheme from unraveling.  By not disclosing to Yotta in September 2023 that the funds

7    were missing, Evolve was able to steal another $50 million of end user funds with the Mercury

8    migration in October 2023.  *Id.* ¶¶ 80-84.  Further, Yotta was injured in 2024 when Evolve's scheme

9    fell apart, Yotta's business was destroyed, and Yotta incurred costs investigating Evolve's fraud and

10   helping customers deal with the collapse.

11   **C.    Yotta States a Claim for Conspiracy to Commit Fraud**

12   Evolve incorrectly argues that Yotta has failed to sustain a claim for conspiracy to commit

13   fraud.  First, Evolve argues that this claim must fail because the underlying fraud claim fails.  With

14   one exception, Evolve's arguments here essentially amount to a rehashing of its faulty arguments

15   discussed above.

16   That exception is a new assertion by Evolve, on pages 18-19 of its brief, that Yotta's

17   allegations do not support a finding that Evolve committed anything more than mere mistakes

18   because Evolve could have accidentally taken the money out of the FBO account.  As set forth

19   throughout the Complaint, Evolve stole money from the Yotta end users in at least three ways – by

20   taking fees it was not entitled to, by giving excess funds to Mercury that Mercury was not entitled

21   to, and by taking money from the reserve fund for itself.  Compl. ¶¶ 69-85.  Evolve also concealed

22   that theft and the resulting shortfall in funds from Yotta for months and did so despite Yotta's

23   requests for information and updates about what was going on.  *Id.* ¶¶ 58-68.  And Evolve benefited

24   by this conduct by taking fees for its own benefit and by concealing the theft and resulting shortfall

25   so that Yotta's end users would continue depositing money.  *Id.* ¶¶ 13, 65.  Accordingly, the

26   Complaint alleges, Evolve knew that its representations were false, material, and would be relied

27   upon by Yotta.  *Id.* ¶115.

28

16

Under Fed. R. Civ. P. 9(b), malice, intent, knowledge, and other conditions of a person's mind need only be alleged generally. The allegations above are more than sufficient to establish Evolve's intent under that rule. In support of its argument, Evolve cites to a single case, *Offor v. Mercy Med. Ctr.*, No. 215CV2219DRHSIL, 2021 WL 3909839, at *4 (E.D.N.Y. Sept. 1, 2021), *aff'd*, No. 21-2115-CV, 2023 WL 2579040 (2d Cir. Mar. 21, 2023), that bears no relationship to this one. *Offor* concerns allegations by the plaintiff on a motion for summary judgment that evidence submitted by the defendant was fraudulent and amounted to fraud on the court. *Id.* at *4. The court disagreed, failing to find clear and convincing evidence of fraud. *Id.* ("The Court harbors substantial doubt that Defendants forged any of these exhibits and cannot find clear and convincing evidence of fraud.") *Offor* has no relevance, procedurally or factually, to Evolve's motion to dismiss.

Second, Evolve argues that the only allegations supporting the existence of an agreement to conspire are conclusory or made upon information and belief and do not support a claim for conspiracy. This is incorrect.

A "pleading of conspiracy, apart from the underlying act of fraud, properly measured under the more liberal pleading requirements of Rule 8(a)." *Angermeir v. Cohen,* 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 4 (2d Cir.1990); *see also ESG Cap. Partners, LP v. Stratos,* 828 F.3d 1023, 1029 (9th Cir. 2016) ("Appellant's nonfraud state law claims for conversion, unjust enrichment, unfair competition, aiding and abetting fraud, and conspiracy to commit fraud are sufficiently pled under" Rule 8(a).).

In any event, the Complaint includes specific allegations regarding the conspiracy. Evolve and Synapse worked together to service Yotta's end users (Compl. ¶ 40) and worked together to prepare a data stream that was supposed to more-or-less instantaneously report on a customer-level any and all transactions and which was supposed to include every customer's current balance. *Id.* Evolve and Synapse were both aware of and discussed among themselves the shortfall of funds in the FBO accounts as early as September 25, 2023. *Id.* ¶ 67. A December 21, 2023 email chain between Synapse's CEO and Evolve's Chief Technology Officer, which copied others including Evolve's CEO, Synapse discusses the "deficit" in end user funds. Yet both Evolve and Synapse

17

1   concealed this information from Yotta until Yotta launched an investigation after Evolve froze its

2   end user accounts in May 2024.  *Id.* ¶¶ 101-103.

3        These allegations are not conclusory nor made upon information and belief.  To the contrary,

4   these facts and circumstances lead to the reasonable inference that Evolve and Synapse agreed to

5   allow Evolve to steal funds and agreed to conceal the fact that Yotta's user funds were stolen.  *Id.* ¶

6   122.  *See, e.g. Johnson & Johnson Fin. Corp. v. Sparber, Ferguson, Ponder & Ryan*, 221 F.3d 1348

7   (9th Cir. 2000) (under California law, plaintiff can establish elements of conspiracy by alleging facts

8   that lead to the "reasonable inference" of those elements, including an agreement); *JP Morgan Chase

9   Bank v. Winnick,* 406 F. Supp. 2d 247, 259 (S.D.N.Y. 2005) (denying motion to dismiss where

10  defendants' conduct gave rise to an inference of their individual agreement to the objectives of the

11  fraud); *see Vinci Brands LLC v. Coach Servs., Inc.,* No. 23-CV-5138 (LGS) (VF), 2024 WL

12  4370841, at *9 (S.D.N.Y. Oct. 2, 2024) ("numerous allegations in the complaint collectively support

13  the plausible inference" of collusion).

14       Evolve also alleges that the conspiracy claims should be dismissed as duplicative.  They are

15  not because none of the other claims depend upon Yotta's allegation that Synapse agreed to allow

16  Evolve to steal funds and conceal the loss of Yotta users' funds.  Those additional allegations are

17  unique to the conspiracy claim.

18       **D.    Yotta States Claims for Negligent Misrepresentation and Negligence**

19       Evolve argues that Yotta's claim for negligent misrepresentation and negligence are barred

20  under New York law.  As set forth above, Evolve is wrong that New York law applies and, thus, this

21  argument fails.  However, even if New York law applies, it would not bar Yotta's claims.

22       **First**, Evolve argues that the economic loss doctrine bars Yotta's claims for negligent

23  misrepresentation and for negligence.  Not so.

24       New York's highest court recently held that the economic loss doctrine "does not have

25  application beyond the products liability context."  *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40

26  N.Y.3d 277, 290 (N.Y. 2023).  This is not a products liability case.  Evolve cites cases that predate

27  this decision and, thus, have been overturned.  *See* Br. at 19-20.

28

**Second**, Evolve argues incorrectly that Yotta's claim for negligent misrepresentation should be dismissed because Yotta's allegations do not establish that Evolve had a duty, as a result of a special relationship, to give correct information.  Evolve is wrong.

While New York requires allegations showing that the parties have a special relationship for a negligent misrepresentation claim, that standard is easily met here.  The three-factor test for a special relationship is "[1] whether the person making the representation held or appeared to hold unique or special expertise; [2] whether a special relationship of trust or confidence existed between the parties; and [3] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 525–26 (S.D.N.Y. 2014).

As to the first factor, Evolve appeared to have unique or special expertise.  Unlike Yotta, Evolve was a bank, which represented itself as having special expertise in fintech, "powering the fintech revolution."  Compl. ¶¶ 30-40.  Evolve represented to Yotta that it "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," that Evolve "enforce[s] federally mandated regulations" and that its technology team "[t]ediously test[s] and analyze[s] solutions before going live."  *Id.* ¶ 44.  As to the second factor, a special relationship of trust and confidence clearly existed because Yotta was entrusting Evolve with its customers' funds.  Evolve was the custodian of Yotta's end users' deposits, and as such provided detailed, up-to-date information about transactions and account balances.  *Id.* ¶ 40.  Evolve and Yotta held regular Compliance Check-in meetings so Evolve could "provide an open line of communication between Evolve and Yotta to address and resolve any present or future compliance concerns."  *Id.* ¶ 50.  As Evolve scrambled to conceal the lost funds (unbeknownst to Yotta) in the fall of 2023, Evolve nonetheless promised to Yotta that it would "protect end users," *i.e.* Yotta's customers.  *Id.* ¶ 61.  Finally, Evolve cannot dispute that it was aware of the ways in which its information would be used by Yotta.  Evolve specifically marketed itself to Yotta in order to persuade Yotta to have Yotta's end users direct their deposits to Evolve.  *Id.* ¶¶ 34-39.  Moreover, New York courts have found that a special relationship is more likely to exist if the misrepresented facts were peculiarly within the

1  Defendant's knowledge and where the Defendant had technological expertise on which the plaintiff

2  was relying.  *See LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 526 (S.D.N.Y.

3  2014) (finding it significant that defendants held greater expertise in the securities, even though

4  Plaintiff was a sophisticated bank, and that Defendants had special access to data underlying the

5  securities); *Fresh Direct, LLC v. Blue Martini Software, Inc*., 776 N.Y.S.2d 301 (N.Y. App. Div.

6  2004)  ("[T]he allegations in the complaint concerning the defendant's involvement in assessing the

7  plaintiff's software needs for several months before the contract was entered into, together with the

8  plaintiff's reliance on the defendant's expertise, were sufficient to plead the existence of the special

9  relationship necessary to sustain this cause of action.").

10       Finally, even in close cases (and this is not a close case) "the question whether the nature and

11  caliber of the relationship between the parties justifies the injured party's reliance on a negligent

12  misrepresentation is a context-specific issue of fact" that should not be decided against a Plaintiff on

13  a motion to dismiss.  *See 360 N. Rodeo Drive, LP v. Wells Fargo Bank, Nat'l Ass'n*, No. 22-CV-767

14  (AS), 2024 WL 449401, at *3 (S.D.N.Y. Feb. 6, 2024).

15       Therefore, even if New York law applied, and it does not, Yotta's claims would not be

16  dismissed.

17  **E.  <u>Yotta States a Claim for Negligent Interference with Prospective Economic</u>**

18  **<u>Relations</u>**

19       Evolve's sole argument for dismissing Yotta's claim for negligent interference with contract

20  is that it is not a cause of action in New York.  Whether negligent interference with contract is

21  recognized under New York law is irrelevant because (i) as set forth above, California law applies

22  to Yotta's claims, and (ii) California recognizes a cause of action for negligent interference with

23  prospective economic relations, the elements of which were pled by Yotta.  *See SCEcorp v. Superior*

24  *Ct.,* 3 Cal. App. 4th 673, 677 (Cal. Ct. App. 1992) (Reading "negligent interference with contractual

25  relations" claim as one for "negligent interference with prospective economic advantage.")

26       California courts unambiguously recognize a cause of action for negligent interference with

27  prospective economic relations.  *See, e.g. Venhaus v. Shultz*, 155 Cal. App. 4th 1072, 1081 (Cal. Ct.

28

App. 2007) (discussing claim for negligent interference with prospective economic advantage, reversing judgment and remanding for new trial where trial court's instructions to jury erroneously required that the interference with contract be intentional or willful); *Avago Techs. U.S., Inc. v. Venture Corp.*, No. C 08-03248 JW, 2011 WL 7479163, at *3 (N.D. Cal. May 23, 2011) (negligent interference with prospective contractual relations is recognized under California law).  The elements of such a claim are:

> (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship.

*Avago Techs.*, 2011 WL 7479163, at *3.  In Paragraphs 141-150 of the Complaint, Yotta sets forth all four elements.

### F.   Yotta Has Standing to Bring a UCL Claim

Evolve argues that the UCL does not apply to Yotta's claims as a matter of law because none of the "challenged conduct occurred in California" and Yotta has no connection to California.  Br. at 22-24.  Again, Evolve is mistaken as to the facts and the law.

California's Supreme Court has held that "[c]ertainly the UCL reaches any unlawful business act or practice committed in California."  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1208 (Cal. 2011).  *See also Gustafson v. BAC Home Loans Servicing, LP*, No. SACV 11-915-JST ANX, 2012 WL 4761733, at *5 (C.D. Cal. Apr. 12, 2012) ("[W]hile the UCL reaches claims made by out-of

21

1  state residents harmed by unlawful conduct occurring inside California, it does not apply to wrongful

2  conduct occurring outside of California.")

3      As a result, the UCL applies whenever a meaningful portion of the misconduct occurred in

4  California.  In *TRC & Assocs. v. NuScience Corp.*, No. 2:13-CV-6903-ODW CWX, 2013 WL

5  6073004, at *1, 5 (C.D. Cal. Nov. 18, 2013), the plaintiff, a retailer based in Ohio, alleged that

6  NuScience, a California manufacturer, and Lumina, a Florida distributor, deceptively marketed a

7  supplement.  The court rejected defendants' extraterritoriality argument.  *Id.*  It held that "the

8  relationship between Lumina and NuScience gives rise to a reasonable inference that Lumina had

9  some role in" "material misrepresentations originating in California with NuScience, traveling

10  through Florida, and ending up in Ohio with" plaintiff.  *Id.  See also Keilholtz v. Lennox Hearth*

11  *Prods. Inc.*, 268 F.R.D. 330, 340 (N.D. Cal. 2010) (Holding UCL applied to claim that home

12  fireplaces where deceptively marketed because fireplaces were manufactured in part in California);

13  *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1132 (N.D. Cal. 2014) ("Plaintiff has provided

14  sufficient factual allegations from which the Court can plausibly infer that Uber's alleged gratuity

15  misrepresentations emanated from California."); *In re Wells Fargo Home Mortg. Overtime Pay*

16  *Litig.*, No. MDL 06-1770 MHP, 2007 WL 9753228, at *4 (N.D. Cal. Aug. 16, 2007) ("Taken

17  together, this is sufficient evidence that the salient decision was the legal determination made by

18  Otsuka in San Francisco, not any decisions made by business personnel based on Otsuka's

19  memorandum. Accordingly, plaintiffs have adduced sufficient evidence to preserve their UCL claims

20  on behalf of non-California residents.")

21      The UCL similarly applies when a defendant's unlawful conduct injures the plaintiff in

22  California.  "In making the determination of whether to give a state statute extraterritorial effect, the

23  critical issues ... are whether the injury occurred in California and whether the conduct of the

24  defendant occurred in California. If neither of these questions can be answered in the affirmative,

25  then plaintiff will be unable to avail [itself] of these laws."  *TRC & Assocs.*, 2013 WL 6073004, at

26  *5.

27      The UCL applies to Yotta's claims both because it was injured in California and because the

28

misconduct at issue occurred in the State.  As discussed in Section III(A) above, (1) Yotta's customers dealt with Yotta in California and Yotta's sole office was in California during much of the relevant period, (2) over 90,000 of Yotta's California end users received Evolve's continuous fraudulent account balance and transaction statements, more than any other state, (3) Evolve continuously transmitted false account balance and transaction data to its partner, Synapse, in California for the express purpose of Evolve re-transmitting that data from California, (4) Evolve conspired with Synapse to perpetuate the fraudulent scheme from California, (5) Evolve routinely traveled to California to perpetuate its scheme, and (6) Evolve has branches in California.

Evolve's cases are not to the contrary.  They involve plaintiffs that had no connection to California and misconduct that occurred entirely outside of California.  *See Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1148 (N.D. Cal. 2013) (The "claims fail as a matter of law because nothing in Plaintiffs' complaint alleges that any of the out-of-state purchases were directed from California or had anything to do with California."); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 917 (C.D. Cal. 2011) (Rejecting the conclusory allegation that "the decision to ... engage in deceptive marketing was made, in part, in California."); *Tidenberg v. Bidz.com, Inc.*, No. CV085553PSGFMOX, 2009 WL 605249, at *5 (C.D. Cal. Mar. 4, 2009) ("Plaintiff does not allege any specific facts linking Defendants' contacts with California to the claims Plaintiff asserts against them."); *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214, 225 (Cal. Ct. App. 1999) ("[T]he claims of Category III members are for injuries suffered by non-California residents, caused by conduct occurring outside of California's borders, by defendants whose headquarters and principal places of operations are outside of California.")

### G.    Yotta States a Claim for Quasi-Contract/Unjust Enrichment

Evolve asserts that Yotta has not conferred a benefit onto Evolve and therefore has no claim for unjust enrichment.  This is false.  As a bank, Evolve is in the business of profiting off of customer deposits, and Yotta caused Evolve to receive over $100 million in customer deposits.  Evolve specifically marketed itself to Yotta in order to persuade it to direct such deposits to Evolve.  Ultimately, Evolve succeeded, and Yotta's customers deposited their funds with Evolve.  Compl. ¶¶

34-40.

The "benefit" required for an unjust enrichment claim is construed broadly and is not limited to money.  *See, e.g.,  Pacwest, Ltd. v. R.T.C.*, No. 94 CIV. 2498 (AGS), 1996 WL 325647, at *3 (S.D.N.Y. June 11, 1996), *aff'd sub nom. PacWest, Ltd. v. Resol. Tr. Corp.*, 108 F.3d 1370 (2d Cir. 1997) ("Unjust enrichment may occur not only where a person "receives money or property, but also where he otherwise receives a benefit.").

For example, a claim for unjust enrichment lies where the defendant improperly obtained plaintiff's confidential information, including plaintiff's customer's lists, and benefitted from use of the information.  *See, e.g., JTH Tax, Inc. v. Gouneh*, 721 F. Supp. 2d 132, 139 (N.D.N.Y. 2010) ("JTH has alleged that Gouneh and UST acquired its confidential customer lists through improper means and at its expense, that Gouneh and UST used and benefitted from the use of these lists, and that in equity and good conscience they should return both the lists and any benefits they acquired in using the list."); *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, No. 14-CV-8467 (JMF), 2016 WL 5416498, at *9 (S.D.N.Y. Sept. 28, 2016) ("the misappropriation of a trade secret — including customer lists — can cause the enrichment of the defendant at plaintiff's expense")*; Servs., Inc. v. Sec. Mut. Life Ins. Co. of New York*, No. 06-CV-1164, 2010 WL 3907489, at *12 (N.D.N.Y. Sept. 30, 2010) (defendants were "unjustly enriched by the wrongful and unauthorized use of Plaintiff's copyright protected and trade secret information and proprietary business methods in direct competition with Plaintiff"); *LivePerson, Inc. v. 24/7 Customer, Inc*., 83 F. Supp. 3d 501, 519 (S.D.N.Y. 2015) (complaint alleged cause of action for unjust enrichment where Defendant improperly obtained Plaintiff's intellectual property and confidential information).

Here, Evolve made false representations to Yotta regarding the security of its accounts, the accuracy of its technology, and the shortfall of funds in order for Yotta's end users to continue depositing funds in Evolve.  Compl. ¶¶ 34-68.  Evolve did so improperly to obtain access to Yotta's customers, make money from them, and steal their deposits.

Finally, Yotta's complaint is also in line with *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1126 (S.D. Cal. 2024), which addresses a bank's misconduct designed to encourage deposits

24

1  through a third-party and grow market share in an emerging financial market.  In *Bhatia*, customers

2  of a cryptocurrency exchange brought an unjust enrichment claim against a bank that served the

3  industry and allegedly had participated in fraud to attract customer deposits from the cryptocurrency

4  exchange.  The court denied the bank's motion to dismiss, finding that plaintiffs had adequately

5  alleged that the bank received and unjustly retained a benefit: "Defendants had a strong incentive to

6  continue accepting FTX customer deposits and executing the fraudulent transfers because they

7  earned income from transaction fees and interest on money deposited in FTX and Alameda accounts.

8  Before Defendants attracted FTX as a client, Defendants had an annual net income of only $7.6

9  million; but by 2021, Defendants had an annual net income of $75.5 million."

10  **IV.    LEAVE TO AMEND**

11          To the extent the Court identifies any deficiencies in Yotta's Complaint, Yotta respectfully

12  requests leave to amend the Complaint, including but limited to the amendments described in Exhibit

13  1 to the Bhandari Declaration.

14  **V.    CONCLUSION**

15          For all the foregoing reasons, Yotta respectfully requests this court deny Evolve's motion.[3]

16

17  **DATED:** New York, New York
January 23, 2025

18                                          By: /s/ Rishi Bhandari

                                            Rishi Bhandari

19
                                            MANDEL BHANDARI LLP
20                                          Rishi Bhandari
                                            80 Pine Street, 33rd Floor
21                                          New York, NY 10005
                                            T:  (212) 269-5600
22                                          F:  (646) 964-6667
                                            rb@mandelbhandari.com

23
                                            *Attorneys for Plaintiff Yotta Technologies*
24                                          *Inc.*

25

26  _____

[3] In light of the Court's January 23, 2025 Order voluntarily dismissing Evolve Bancorp, Inc. from
27  this action (Dkt. No. 41), the separate Motion to Dismiss (Dkt. No. 29) filed by Evolve Bancorp, Inc.
is moot.

28                                          25