PAGES 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge

YOTTA TECHNOLOGIES INC.          )
                                 )
          Plaintiff,             )
                                 )
VS.                              )  **NO. 3:24-cv-06456-TLT**
                                 )
EVOLVE BANCORP, INCORPORATED,    )
                                 )
          Defendant.             )
_____)


San Francisco, California
Tuesday, March 25, 2025


**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**

For Plaintiff:

                    MANDEL BHANDARI LLP
                    80 Pine Street, 33rd Floor
                    New York, NY 10005
          BY:  **RISHI BHANDARI, ATTORNEY AT LAW**

For Defendant:

                    Orrick, Herrington & Sutcliffe LLP
                    2100 Pennsylvania Ave, NW
                    Washington, DC 20037
          BY:  **AMISHA R. PATEL, ATTORNEY AT LAW**


**REPORTED BY:  April Wood Brott, CSR No. 13782**
               **Official United States Reporter**

| | |
|---|---|
| 1 | **Tuesday - March 25, 2025** |

**Tuesday - March 25, 2025**                                    **2:04 P.M.**

<u>P R O C E E D I N G S</u>

---oOo---

**THE COURTROOM DEPUTY:**  Now calling Case Number

24-cv-06456, Yotta Technologies Incorporated versus Evolve

Bancorp, Incorporated, et al.

Counsel, please state your appearances, beginning with the

plaintiff.

**MR. BHANDARI:**  Good afternoon, Your Honor.  My name is

Rishi Bhandari from Mandel Bhandari LLP, and I represent the

plaintiff, Yotta.

**THE COURT:**  Thank you.  Good afternoon.

**MS. PATEL:**  Good afternoon, Your Honor.  My name is

Amisha Patel from Orrick, Herrington & Sutcliffe, and I

represent Evolve Bank & Trust.

**THE COURT:**  Thank you.  Good afternoon.  And please be

sure that you speak into the microphone, a little slower for

our court reporter because we want to make sure our record is

clear and that her fingers and wrists remain for the afternoon.

I have quite a few questions for you, and I provided those

in advance.  I have some concerns, and I will start with just

some preliminary questions that I need resolved immediately.

When I took a look at the complaint, it indicated that

Yotta Technologies, based on information and belief, was a

California company or a New York company, and I found that

1    somewhat curious because I would presume they would know where

2    their nerve center is.  So if you can clarify, please.

3          **MR. BHANDARI:**  Yes, Your Honor.  Thank you.  So the

4    nerve center test, as set forth in *Hertz*, the 2010 superior

5    court case --

6          **THE COURT:**  Where is their headquarters?

7          **MR. BHANDARI:**  Excuse me?

8          **THE COURT:**  Where is their headquarters?

9          **MR. BHANDARI:**  So it was in New York until early 2023,

10   and then in early 2023, they closed that headquarters, and they

11   no longer have a headquarters.  So according to the *Hertz*

12   case --

13         **THE COURT:**  Okay.  So their headquarters up until 2023

14   was in New York.  Where was it in 2014 to the present?

15         **MR. BHANDARI:**  2014 to the -- it would be -- I'm not

16   100 percent sure about 2014, but starting in about 2019, when

17   the allegations in this complaint started, they were in New

18   York.  The headquarters were in New York.

19         **THE COURT:**  All right.  Thank you.

20         **MR. BHANDARI:**  Your Honor, may I add one thing to

21   that?

22         **THE COURT:**  You certainly can, but that was the

23   question I had.

24         **MR. BHANDARI:**  Okay.  So I think that that goes to

25   personal jurisdiction, and the personal -- the nerve center for

1    personal jurisdiction is really not the same test that's used

2    to determine which law applies, and there's been no motion for

3    personal jurisdiction.

4        **THE COURT:**  At this time, I'm going to -- I have some

5    very pointed questions --

6        **MR. BHANDARI:**  Okay.

7        **THE COURT:**  -- that I want to ask.  Then I'm going to

8    allow the moving party to make their arguments and then for you

9    to respond, and then for the moving party to have the final

10   word.

11       But these are some questions that I have that I need

12   resolved at the beginning, and since you know I have these

13   questions, you'll be able to address them later in your

14   argument.

15       The next question I have is from my read, Synapse,

16   S-Y-N-A-S-P-E -- I believe I'm spelling it correctly, or

17   P-S-E -- was not a named defendant, and there was an

18   implication that because of their Chapter 11 status, they could

19   not be named as a defendant, and I found that curious when I

20   review 11 U.S.C. 523 in sequence, when there are fraud

21   allegations.

22       Do you have any intention of adding Synapse,

23   S-Y-N-A-P-S-E, as a defendant?

24       **MR. BHANDARI:**  No, we do not, Your Honor, and on page

25   32 of the little handout which I gave to the courtroom deputy,

1    which has some slides in it, on page 32 we explained why

2    Synapse is not a necessary party to this action.

3         **THE COURT:**  All right.  So you have no intention of

4    adding them?

5         **MR. BHANDARI:**  Correct.

6         **THE COURT:**  All right.  Although they're part of the

7    alleged conspiracy to commit fraud?

8         **MR. BHANDARI:**  That's correct.

9         **THE COURT:**  All right.  Next question:  Are there any

10    related cases that are not in the state of California involving

11    Yotta Technologies, and contained therein, is there an

12    acknowledgment that the headquarters for Yotta Technologies is,

13    in fact, in New York?

14         **MR.  BHANDARI:**  So those are two different questions,

15    Your Honor.  I don't believe there are any related cases

16    involving Yotta.  The related cases that were -- or the cases

17    that were identified by my opposing counsel involve Evolve, but

18    Yotta is not a party -- is not a plaintiff in any of those

19    cases.

20         In terms of the headquarters, the headquarters of Yotta is

21    no longer in New York.  They shut that down, and according to

22    *Hertz*, the *Hertz* case, in a situation where there's remote --

23    where there's telecommuting people and it's remote, it's not

24    clearly necessarily where the nerve center is.  But it's either

25    in New York or California, and that's the reason why we pled it

```
1    that way in our complaint, because there's still absolutely and
2    total diversity between Yotta and Evolve --
3            THE COURT:  Next question.
4            MR. BHANDARI:  Sure.
5            THE COURT:  And please listen carefully.
6            MR. BHANDARI:  Okay.
7            THE COURT:  Are there any cases pending in New York in
8    which Yotta is the plaintiff and they're a similarly pled
9    fintech-type litigation in which Yotta is listed as having its
10   principal place of business and headquarters in New York?
11           MR. BHANDARI:  There is no pending litigation.  I'm
12   not sure if there was prior litigation where that might have
13   happened.  I'm not aware of any such thing.
14           THE COURT:  All right.
15           MR. BHANDARI:  I will say, if it's okay, Your Honor,
16   just one very short thing on that.  This case was filed in
17   2024.  At the time this case was filed, there would definitely
18   not have been any filing anywhere saying that Yotta's principal
19   place of business was in New York because at the time this case
20   was filed, Yotta's principal place of business was not in New
21   York.
22       Again, they were remote workers, and the only office that
23   they have, the one that's in the notice for consumers to be
24   able to contact, is located in the Northern District of
25   California.
```

1        **THE COURT:**  All right.  And final preliminary question

2    before we move into argument, there was an amended complaint

3    filed with the Court but -- as an exhibit but not filed as a

4    document.  The Court will not be acknowledging that, its

5    contents, since that was not a document that was filed with

6    leave of court or an amended complaint because if the amended

7    complaint had been filed, it would moot this proceeding.

8        What I find further curious is that it appears that that

9    exhibit was filed as supplemental, factual scenarios for the

10    Court to take into consideration.  For this motion, the Court

11    cannot do that because there was not an amended complaint

12    filed.  So that exhibit will be stricken for the purposes of

13    this hearing.

14        **MR. BHANDARI:**  Understood, Your Honor.

15        **THE COURT:**  All right.  Thank you.

16    All right.  Counsel, you may begin.

17        **MS. PATEL:**  Thank you, and may it please the Court.

18    There are a lot of facts here, which raises the threshold

19    question of whether this motion can be resolved at this stage.

20    Evolve's position is that it can and should because the

21    referenced facts are either pled in the complaint or

22    incorporated by reference therein.

23        The doctrine of incorporation by reference was created for

24    cases exactly like this one where Plaintiffs attempt to take

25    statements out of context and cobble together a claim that

1    would otherwise not be actionable.  As shown in the bank's

2    request for judicial notice, which Yotta did not oppose, Ninth

3    Circuit law is clear that the doctrine of incorporation

4    precludes such conduct.  The doctrine prevents plaintiffs from

5    selecting only portions of the documents that support their

6    claims while omitting portions of those very documents that

7    weaken or doom their claims.

8        The key facts that the Court should focus on, given the

9    robustness of the record, are as follows:  First, there is no

10   contractual privity between Yotta and Evolve.  Rather, Yotta

11   entered into a contract with Synapse to offer nontraditional

12   savings accounts at Evolve to Yotta end users.  Synapse had an

13   agreement with Evolve to provide banking services that Synapse

14   would use to support Yotta.

15       Under this arrangement, Synapse was responsible for

16   compiling and reporting end user balance and transaction

17   information to Yotta.  Synapse failed at its most critical

18   duty, which was to maintain accurate ledgering and to track the

19   movement of end user funds.  Synapse is now in bankruptcy

20   proceedings and thus immune from suit.

21       Because Yotta cannot sue Synapse, it is targeting Evolve

22   with this lawsuit, but the four corners --

23           **THE COURT:**  Why is it your belief Yotta cannot pursue

24   a suit against Synapse in light of the Court's acknowledgment

25   of the bankruptcy statute?

1          **MS. PATEL:**  Your Honor, this was a question that you

2     did propose to the parties, and our position is that while

3     Yotta can pursue an allegation of fraud against Synapse while

4     it's in bankruptcy, it cannot pursue liability against Synapse

5     because -- without leave of the bankruptcy court in those

6     proceedings.  That is a procedural mechanism in the statute.

7          And my hope, Your Honor, is that I answer some of the

8     questions that you pose to us along the way.

9          **THE COURT:**  You can continue.

10          **MS. PATEL:**  So as I was saying, the four corners of

11     the complaint make plain that it is Synapse's malfeasance that

12     is at the heart of this dispute and the part of the other

13     lawsuits pending in the other jurisdictions that this court

14     asked about.

15          Second, there are multiple independent and critical

16     deficiencies in the complaint that require dismissal.  First,

17     Yotta engages in a group pleading about actions by both Evolve

18     and Synapse together, and that appears to be an intentional

19     pleading strategy to attribute Synapse's wrongdoing to Evolve

20     and treat them interchangeably.

21          The complaint also contains no nonconclusory allegations

22     of false representations by Evolve received by Yotta in the

23     state of California and fails to include the requisite who,

24     what, where, when, and how required by 9(b).

25          The complaint further does not show that any alleged

1    representation was made by Evolve or that it was false or that

2    it was made with fraudulent intent or caused injury to Yotta.

3         Last, there are no nonconclusory allegations concerning

4    the purported conspiracy in the requisite elements to establish

5    such a claim.

6         All of these deficiencies highlight the critical

7    fundamental problem, that the allegations do not identify

8    anything that Evolve specifically did wrong, and thus fail the

9    basic requirements of Rule 8, as well as the heightened

10   pleading requirements of Rule 9(b), which indisputably apply

11   here.

12        Even more, Yotta's opposition shifts its

13   misrepresentation-based fraud theory to a theft-based one, none

14   of which is actually pled in the complaint or in the amended

15   complaint that Your Honor has stricken.

16        Taken apart or together, Evolve's position is that Yotta's

17   misrepresentation theories as pled in the complaint still fail

18   the particularity requirement.

19        And Your Honor, I'm happy to go further into the

20   additional claims, but I know you presented defendants in

21   particular with additional questions, and I'm happy to answer

22   them at this point.

23        **THE COURT:**  I think you should answer all questions

24   and make all arguments before surrendering the podium to the

25   plaintiff.

1          **MS. PATEL:**  Sure.  If it's okay with you, I'll turn to

2     the questions briefly.

3          **THE COURT:**  Please.

4          **MS. PATEL:**  So with respect to the nerve center, you

5     asked a series of questions regarding Evolve.  As pled in the

6     complaint, Evolve is a bank organized under the state laws of

7     Arkansas, and Evolve's bank charter is also from the state of

8     Arkansas, and it's incorporated there as a bank.

9          There's a judicially noticeable fact available on the FDIC

10    website regarding the bank's institutional details.  So the

11    bank's corporate headquarters is in Memphis, Tennessee, but the

12    bank's technical corporate headquarters are in West Memphis,

13    Arkansas.

14         Ultimately, the bank's principal place of business and

15    operational headquarters is in Memphis, Tennessee, and as a

16    result, in situations like this where a bank is chartered in

17    one place but operates primarily out of another state, it is

18    considered a citizen of both Arkansas and Tennessee.

19         You asked about Evolve's presence in the state of

20    California.  Evolve currently operates two limited-service home

21    loan center branches in Los Angeles and Orange.  This

22    information is also judicially noticeable on the FDIC website.

23    And related to this, Evolve's position is that Yotta has not

24    alleged, nor could it, that any representations or corporate

25    functions relevant to this lawsuit occurred in California.

1          I'll pause there and just ask if Your Honor has any

2     further follow-up on that issue in particular.

3          **THE COURT:**  I do.  With regards to the statement that

4     Yotta cannot point to any activities involving Evolve bank that

5     occurred within the state of California, where was the -- any

6     written agreements consummated, if any, and where do you

7     surmise that all of the activity took place?

8          **MS. PATEL:**  Your Honor, as I stated earlier, there is

9     no contractual agreement between Yotta and Evolve; therefore,

10    it wouldn't have been consummated anywhere.  Evolve's position

11    is that the central locus of the activity here is in New York.

12    If you look at the complaint, any contacts within the state of

13    California, all of the allegations in the complaint, all relate

14    to Evolve's communications with Synapse in California, not

15    Yotta, or they concern Evolve and Synapse, group, pled together

16    in California.

17         But our position, given what we know and the allegations

18    as pled -- our position is that the principal place of business

19    of Yotta is in New York.  Adam Moelis, the CEO, is located

20    there.  Meetings occurred there.  Phone calls occurred there.

21    Any representations that Evolve made were to New York.

22         **THE COURT:**  Well, counsel for the plaintiff says,

23    "Well, you know, everybody's remote now.  There is no

24    headquarters except for in cyberspace."  So what is your

25    position?

1          **MS. PATEL:**  I understand that, Your Honor, but a

2     company has to operate from somewhere, and so our view of the

3     nerve center test is a little different.  And the way that I

4     read *Hertz* is that it's where the directives are provided from

5     senior executives.  And in this case, Adam Moelis, primarily

6     being in New York, provides that the principal place of

7     business for Yotta should also be in New York, regardless of

8     whether they no longer have headquarters today.

9          **THE COURT:**  All right.  You may proceed, and then I'll

10     be focusing very attentively to any choice of law arguments

11     where there is no contract.

12          **MS. PATEL:**  Sure.  I will briefly just address the

13     voluntary dismissal question that you asked, just to go in

14     order.

15          You asked about Evolve Bancorp's relationship to Evolve

16     Bank & Trust.  Evolve Bancorp is a bank holding company that

17     wholly owns Evolve Bank & Trust.  The Yotta account agreement,

18     which is incorporated by reference into the complaint and

19     available at ECF number 27-2, shows that Yotta end users had an

20     account with Evolve Bank & Trust and not with Evolve Bancorp.

21          And because the complaint, as pled by Plaintiffs, did not

22     allege any acts by Evolve Bancorp specifically, Yotta agreed to

23     dismiss the complaint as to that entity instead of responding

24     to Bancorp's motion to dismiss that was filed at the same time

25     as the bank's.

1          **THE COURT:**  I neglected a question.  It may be in my

2     written questions, but now I want to know the answer a little

3     sooner.

4         Did Synapse and Evolve have a contractual relationship of

5     any kind?

6          **MS. PATEL:**  Yes, Your Honor, it did.

7          **THE COURT:**  And did Synapse thereafter have a

8     contractual relationship with Yotta but not with Evolve and

9     Yotta?

10          **MS. PATEL:**  Yes, Your Honor.  That is how the triangle

11    worked.  There was a line between Yotta and Synapse, and then

12    there was a line between Synapse and Evolve, and Synapse

13    connected the two component parts, but there was no direct

14    privity between Evolve and Yotta.

15          **THE COURT:**  All right.  Thank you.

16          **MS. PATEL:**  Moving on to your questions about choice

17    of law, our -- you asked in particular, "Do both New York and

18    California have an interest in applying the respective laws,

19    and does only one state have an interest?"

20        Evolve's position is that California has no meaningful

21    interest in applying its negligent misrepresentation law in

22    this case where the relevant events are plainly concentrated in

23    New York.  California's interest is negligible such that there

24    likely isn't even a true conflict under the step 2 of the

25    *Kearney* case that was identified by the Court.  New York is the

1    only real standard that Evolve believes applies here.

2        At minimum, New York has the stronger interest at step 3

3    of the *Kearney* test in particular because, as argued in

4    Evolve's motion to dismiss at pages 10 and 11, California does

5    not have an interest in applying its laws to an out-of-state

6    defendant for conduct that occurred outside the state of

7    California.

8        With respect to this choice of law issue, Evolve's

9    position is that Yotta is not a California plaintiff but rather

10    is an out-of-state plaintiff, and there are multiple

11    allegations that confirm that as well as information that the

12    Court is able to take judicial notice of.

13        In the complaint at paragraph 17, it states that Yotta is

14    a Delaware corporation, and as Your Honor noted upon

15    information and belief, its principal place of business is

16    California or New York.  Yotta's SEC filing at ECF 27-6

17    identifies New York as Yotta's principal place of business.

18    Again, Evolve requested judicial notice of this document, and

19    Yotta did not pose that request.

20        Third, Yotta likewise admits that it maintains a virtual

21    office in California.  Again, that allegation is at complaint

22    paragraph 17.  This presumably means that it has no physical

23    presence in California, and because Your Honor has stricken the

24    other pleading, I won't get into those allegations.

25        **THE COURT:**  No.  You may proceed.  I think you should

1    make as full a record --

2         **MS. PATEL:**  Sure.

3         **THE COURT:**  -- as you can.

4         **MS. PATEL:**  Sure.

5         **THE COURT:**  And even just for the benefit of the

6    record, if Synapse was pleaded as a defendant, what impact, if

7    any, would it have on diversity?

8         **MS. PATEL:**  Your Honor, if Synapse is inter-pled as

9    another defendant, we believe there would still be complete

10   diversity of the parties such that this court could exercise

11   jurisdiction.

12        With respect to Yotta's allegations, the proposed amended

13   complaint did include an allegation that it had some employees

14   that resided in California.  Again, that's a past-tense

15   statement, in our view further supporting the fact that Yotta

16   does not have presence in the state of California.  And perhaps

17   most importantly, neither the complaint nor the proposed

18   amended complaint alleges that a Yotta employee received an

19   alleged misrepresentation in the state of California.

20        Further, in the conflict of laws analysis, this is a case

21   that Plaintiffs also recognize.  It's the Ninth Circuit case of

22   *Mazza v. American Honda Motor Company*.  In that case, the Ninth

23   Circuit recognized that with respect to regulating or affecting

24   conduct within its borders, the place of the wrong has the

25   predominant interest, and as I explained earlier, Evolve's

1    position is that the place of the wrong is actually in New

2    York.

3         For misrepresentation claims, however, the place of wrong

4    under California law is where the misrepresentation was

5    received.  Again, as Evolve stated in both its motions and

6    reply, there are no facts pled to show that Evolve, as opposed

7    to Synapse, made any misrepresentations to anyone in

8    California.

9         The Ninth Circuit has also recognized that California's

10   interest in applying its law to residents of foreign states is

11   attenuated.  *Mazza* also acknowledges this.

12        And while Yotta contends now that it may be a California

13   resident, at least as to the representations that occurred when

14   it is undisputed that Yotta was a Delaware corporation with its

15   principal place of business in New York, the California Supreme

16   Court is clear that California does not retroactively have an

17   interest in conduct that predated its residency, and that

18   proposition comes from the *Kearney* case that Your Honor

19   identified.

20        Evolve's position is that New York, in contrast, plainly

21   has an interest in having its law applied here.  *Mazza* also

22   holds that foreign states have a strong interest in the

23   application of their laws to transactions between their

24   citizens and corporations doing business within their state.

25        I'll pause there, Your Honor, in case you have any

```
 1    additional questions on the conflicts of law issue.

 2            THE COURT:  One question.  With regards to the two

 3    states, what is your analysis in terms of the two laws and

 4    whether they are materially different?

 5            MS. PATEL:  Yes, Your Honor.  With respect to the

 6    majority of the claims, there are insufficient material

 7    differences for there to be a difference in the Court's

 8    analysis.

 9        And for purposes of convenience, we thought it might make

10    sense for the Court to apply New York law since there's no

11    difference because as to the negligent misrepresentation claim

12    and the UCL claim, we believe that New York law should apply in

13    those cases and that there are material differences in the

14    standards there.  I'm happy to go through them with you.

15            THE COURT:  I think you should.

16            MS. PATEL:  Okay.  One moment, please.

17        For negligent misrepresentation, New York requires proof

18    of a duty or special relationship.  That proposition is -- we

19    cite *Woodard* for that.  California does not require that proof

20    of a duty or special relationship.  And again, under this

21    difference, New York has a stronger interest.  California

22    acknowledges that it is the place of wrong that matters, and

23    here, the allegations clearly show that New York and not

24    California was the place of Evolve's purported representations.

25        Plaintiffs do try to get around this fact by noting that
```

1     Synapse processed and then sent along data streams in

2     California.  That's at complaint paragraph 40, but that

3     allegation tries to blur the lines between Evolve and Synapse

4     together and, again, highlights a fundamental problem with this

5     complaint, which is that Plaintiffs do not specifically allege

6     that Evolve alone did anything fraudulent or even sent anything

7     fraudulent to California.

8          With respect to the differences in the consumer protection

9     laws, California's UCL versus New York's general business law,

10    there are numerous differences.  One example is that the UCL

11    requires the named plaintiff to show actual reliance on an

12    alleged misrepresentation, whereas the New York general

13    business law does not have an explicit reliance requirement.

14         Here again, the Ninth Circuit has recognized that states

15    where the injury occurred has the stronger interest in their

16    consumer protection statutes being applied to their residents.

17    The UCL, California's UCL, also is not generally applied

18    extra-territorially for claims of nonresidents, which we

19    believe Yotta is not a resident of California.

20         **THE COURT:**  All right.  Any other areas that you feel

21    the Court should be aware of that were not covered by my

22    question?

23         **MS. PATEL:**  I just want to briefly address the

24    conflict issue that you raised regarding the allegation of

25    Mr. Jeff Naimon, who is a lawyer at Orrick, Herrington &

1    Sutcliffe.  There is an allegation at paragraph 63 and also in

2    paragraph 112 about Mr. Naimon's representations to Yotta.  You

3    asked, "Does Defendant anticipate that Mr. Naimon will be a

4    witness in the case?" and what impact will that have on

5    Orrick's representation.

6         Evolve does not anticipate that Mr. Naimon will be called

7    as a witness in this matter because the fraud claim that is

8    premised on his representation that Synapse and Evolve had a

9    contractual dispute is undisputedly true based on Yotta's own

10   allegation in complaint paragraph 67 and the documents

11   incorporated by reference at ECF 27-4, again, not opposed by

12   Yotta.  As a result, any fraud claim based on his statement

13   should be dismissed as a result of this at the pleading stage.

14        In any event, Evolve does not view Mr. Naimon as a

15   necessary witness, and even if he was, we believe that Orrick

16   could still represent the bank and it would not present a

17   conflict with our continued representation.  And out of an

18   abundance of caution, Orrick has also secured written consent

19   to continue representation of the bank in the event that were

20   to occur.

21             **THE COURT:**  Thank you.  All right.  Counsel for the

22   defendant, you're surrendering the podium at this time?

23             **MS. PATEL:**  I will at this time, and reserve some time

24   for rebuttal, Your Honor.

25             **THE COURT:**  Thank you.

1          All right.  Counsel for the plaintiff, I would encourage

2     you to begin by addressing the notations that the Court made

3     and counsel responded to regarding the bankruptcy proceeding

4     with Synapse.  And if they were included, would that destroy

5     the diversity if the Court were to accept that Yotta is a

6     California company, and then to go further and explain to the

7     Court personal and subject matter jurisdiction, your judicial

8     notice requests, and then any further arguments you'd like to

9     make, as well as answering all questions posed by the Court.

10          **MR. BHANDARI:**  Okay.  Thank you, Your Honor.

11          I'll start exactly where you had requested, which is to

12     talk about Synapse.  I believe this will be on page 21.  Do you

13     have these visuals, Your Honor?

14          **THE COURT:**  I do.

15          **MR. BHANDARI:**  Okay.  Thank you.  If I could direct

16     you to page 21 of this, and then that's -- yep.  I think I'm

17     going to address both the nerve center test, and I'm going to

18     address where Synapse is located and what that would do to

19     diversity jurisdiction, and I believe these slides help with

20     that.

21          The reason why we anticipated your question, Your Honor,

22     and we expected this to come up is because one of the arguments

23     that was made by Evolve is that there are no allegations that

24     the alleged misrepresentations were either received or

25     disseminated from California.  And they say that in their

1    motion to dismiss on page 23, and that's not correct.

2        The false account statements that were created by Evolve

3    were sent by Evolve to Synapse, which is located -- which was

4    located in California.  I believe my opposing counsel conceded

5    that a few moments ago, and we agree with that, and I've got a

6    few slides which will underscore that.

7        And secondarily, the impact of the misrepresentations

8    were, in fact, felt in California, and that is in part because

9    this is where Yotta is located, and if the location of Yotta is

10   in California and Synapse is also in California, then diversity

11   would, in fact, by destroyed.

12       We did not name Synapse, we are not planning to name

13   Synapse, and they are not a necessary party.  So Synapse's

14   location does not have any effect whatsoever on the subject

15   matter jurisdiction.

16           **THE COURT:**  And they don't have to be present or

17   involved in the litigation to prove conspiracy or to tie in

18   activity because there's -- what?  Objective information to

19   prove that?

20           **MR. BHANDARI:**  That's correct, Your Honor.

21           **THE COURT:**  One question.  What is Yotta's address in

22   California?

23           **MR. BHANDARI:**  It is --

24           **THE COURT:**  Mailing address?

25           **MR. BHANDARI:**  Yes.  It's in the terms and conditions.

1    Let me see if I have it with me.  Give me one moment.

2    Misrepresentation.

3              **THE COURT:**  I noted on the civil cover sheet it

4    indicated that Yotta's place of business was in Santa Clara

5    County, but it gave no address.

6              **MR. BHANDARI:**  Yes.  I believe that that is correct.

7    Give me one moment, Your Honor, if I have the address handy.

8    If not, we'll get that to the Court immediately afterwards, but

9    give me one moment.

10        Yes.  So here's the address.  The address, according to

11   its terms and conditions, is 2261 Market Street, Suite 4313,

12   San Francisco, California 94114.

13             **THE COURT:**  All right.  So that's not Santa Clara

14   County.

15             **MR. BHANDARI:**  Sorry, Your Honor.  My geography might

16   be a little bit off.  Is it -- is this -- what county are we in

17   right now?

18             **THE COURT:**  San Francisco.

19             **MR. BHANDARI:**  San Francisco County.  All right.

20   Well, that makes sense, Your Honor.  I apologize for that

21   mistake.

22        So going back to what we were saying, we do believe that

23   at the time that this complaint was filed, Yotta was present in

24   California.  And the nerve center test, you know, delineated in

25   the *Hertz* case really is a different sort of test for a

1    different kind of company than what Yotta was.  Yotta did have

2    remote employees, and the *Hertz* test actually -- although it

3    was 2010, it was kind of amazing how much foresight there was

4    in that case.

5        I think the third to last paragraph or somewhere very

6    close to the end, it said, "In this time of telecommuting,

7    where many people work remotely and are far-flung and the

8    coordination of activities by a company cannot be said to be in

9    a single place."  That would be hard (case.  So the *Hertz* case

10   -- it kind of anticipated at some point in the future, it was

11   going to have to contend with that.

12       But I would say the *Hertz* case also was crystal clear that

13   it was only a rule of administrative expedience relevant for

14   jurisdiction because the Court really wanted to make sure that

15   figuring out jurisdiction was easy.  And in this case, where,

16   no matter what, if Yotta's principal place of business was in

17   New York or if it's in California and Evolve's principal place

18   of business is Arkansas and Tennessee, there is absolutely --

19   there's total diversity.

20       So this is not a diversity question, and the nerve center

21   really doesn't factor in.

22       **THE COURT:**  Well, it's going to help me with the

23   choice of law question as well as personal jurisdiction,

24   minimal contacts, and where is the locus of the activity.

25       Why don't you set the table?  I think --

1          **MR. BHANDARI:**  Sure.

2          **THE COURT:**  -- you've been talking about a lot of

3    things, and if someone were to pick up this transcript, it

4    would be like throwing a bunch of playing cards in the air and

5    trying to figure out what the order is.

6          **MR. BHANDARI:**  Okay.

7          **THE COURT:**  Can you set the table with regards to this

8    fintech setup where, from what I understand, Yotta works with

9    Evolve, Evolve works with Synapse, Synapse is kind of your

10   middleman, and then there's some sweepstakes thing going on?

11   And there's reward points, and you can win a Tesla -- I don't

12   know who contributes to these prizes -- and then money just

13   disappeared.  So if you can kind of set the table of how all

14   this happened, just very briefly.

15         **MR. BHANDARI:**  Yes.

16         **THE COURT:**  So that the triangle is clear.

17         **MR. BHANDARI:**  Sure.  So I'd like to just direct you

18   to page 4 of the visuals, the visual aids that I've got, for a

19   little background to show what the triangle is.

20         Yotta is a company, fintech company, that had an idea.

21   And their idea was a lot of people have bank accounts where

22   they save only a little bit of money, maybe a few hundred or a

23   few thousand dollars, and banks for the most part pay tiny,

24   tiny amounts of interest, which really doesn't make a

25   difference in people's lives.

```
1         And so the idea of storing money in a bank where you're
2    just going to earn 0.01 percent interest, or even no interest,
3    is something that made people think savings wasn't really for
4    them.  It wasn't something that motivated them to be able to
5    put money in a bank.
6         So Yotta had this idea.  They said, "You know what?  Even
7    if you're only going to earn a tiny little bit of interest on a
8    relatively small account" -- your account is $500.  If you have
9    Chase, you might earn 0.001 percent, you know, back during the
10   period of low interest rates.  Even now I have an account which
11   doesn't earn even 1 percent at Chase for a checking account.
12        Yotta said, "What if that tiny little bit of interest got
13   added up, and everybody's tiny little bit of interest got added
14   up, and then at the end of each month, we'd have a sweepstakes,
15   and" --
16        THE COURT:  So the more people who set up these
17   savings accounts, the more money there is, the more points
18   there are, and the higher the sweepstakes?
19        MR. BHANDARI:  So each person gets points based on how
20   much they've saved, right?  Their points --
21        THE COURT:  Right, but you have to keep accumulating
22   people for it to work.
23        MR. BHANDARI:  Right.  And it will work no matter
24   what, but the prizes are going to be small, right?  If you only
25   have 10,000 people, the prizes would be a little bit smaller.
```

1    If you have 100,000 people -- and Yotta had over 90,000 people

2    just in California alone -- the prizes get bigger.  And so what

3    they were trying to do is figure out a way, using, you know,

4    kind of human psychology to encourage people to save even small

5    amounts when the banks weren't helping them do that because the

6    interest rates just were not enticing at all.

7        So in the few years that Yotta operated, they gave away

8    over 20 million dollars in prizes to Yotta customers.  So a

9    Yotta customer might only have $500 in the bank.  They might

10   have a thousand.  They might have $2,000, relatively small sums

11   in a savings or a checking account --

12       **THE COURT:**  What was the incentive?  Is it because I

13   have a savings account, and I convince five of my friends to

14   open a savings account?

15       **MR. BHANDARI:**  Yotta advertised.  They were out there.

16   They were telling people -- they were like, "If you want to

17   earn 0.1 percent interest or no interest" -- because a lot of

18   checking accounts charge you fees, believe it or not -- "not

19   only do they not give you any interest, they make you pay some

20   amount of money for the privilege of giving the bank your

21   money."

22       So what Yotta said is "Why would you do that?  This is

23   your precious money.  And just because you only have a few

24   hundred dollars or a few thousand dollars, that doesn't mean

25   you don't deserve to be treated well and to get something

1    that's really meaningful for the fact that you are entrusting

2    your money to a bank, and they're allowed to make money from

3    that by lending it out for home loans, by lending it out for

4    personal loans."

5          **THE COURT:**  But Yotta didn't hold the money.  The

6    money goes to the bank.

7          **MR. BHANDARI:**  Exactly.  So Yotta's like, "We're a

8    fintech.  We have this idea.  Now what's super important to us

9    is we do business with a bank that actually is going to one,

10   charge you no fees whatsoever," because if a bank starts

11   charging fees, then that undercuts the whole prize rewards

12   system.  There's no point in doing business with a bank that's

13   going to charge you fees.

14        So for Yotta, when they were figuring out which bank to

15   work with and they spoke to Evolve, Evolve was like, "Of course

16   we can take care of your clients' money.  We would love to

17   that.  If you're going to bring over tens of millions of

18   dollars, hundred million dollars, we'd be very happy to charge

19   them no fees whatsoever.

20        "And we custody their money to the highest degree of

21   security.  We comply with the highest degree of regulations

22   that the FDIC has because we're an FDIC-insured bank."  So in

23   our complaint, we actually do spell out these allegations.  I'm

24   going to put a little footnote in that because I'm going to

25   come to it in a second.

1       I want to finish setting the table though because -- and

2   the reason I'm putting a pin in that is because what Evolve is

3   trying to do is to dismiss our fraud claims against Evolve by

4   saying that we didn't plead the particularity.  We did plead

5   the particularity, and I'm going to come back and show you

6   exactly how we did.  But let me first just tell you how

7   everything was supposed to work.

8       So Yotta had many conversations directly with people from

9   Evolve.  The CEO of Evolve, a guy named Scot Lenoir -- he spoke

10  to the Yotta folks, and he said, "Listen, we're going to

11  custody the money safely.  We're going to do it to the highest

12  degree of compliance that the FDIC," you know, insisted upon

13  with their banks.

14      "We're not going to charge any fees, no fees at all for

15  your customers, and the interest that we get, that we earn,

16  we're going to split that three ways.  Evolve is going to be

17  part of it."  That's what got them interested in it.  They want

18  to get the interest from the tens of millions, and eventually

19  it became more than 100 million dollars.

20      **THE COURT:**  So you're basically saying that Evolve,

21  the custodian of the money, invests it somehow, draws interest,

22  splits the interest amongst the three entities?

23      **MR. BHANDARI:**  Exactly correct.  That's right, Your

24  Honor.  And so if you look here at the diagram we have on slide

25  number 4, that's exactly how this worked.  So Evolve is the

1    bank.  They're the ones who get all the money.  Yotta is the

2    one who finds the customers.  They're the ones who have this

3    idea.  They're the ones who administer the prizes.  They're the

4    ones who convince people that "You know what?  Even if you're

5    saving a small amount of money, this could be really exciting.

6    And the more money you save, the more tickets you get for

7    sweepstakes.

8         "So instead of paying fees to the bank for the privilege

9    of making money off your hard-earned cash, you're going to get

10   a chance to actually win very significant amounts of money that

11   can make a difference in your life."

12        **THE COURT:**  I'm hearing two words.  I'm hearing

13   "chance" and that you get to win.  That just sounds so close to

14   gambling.

15        **MR. BHANDARI:**  Your Honor --

16        **THE COURT:**  It just sounds --

17        **MR. BHANDARI:**  Your Honor, there were no fees being

18   charged, and that's why it's really important not to charge.

19   If it was scratch-off tickets, yes, that would be gambling.

20   But when your choice is either put your money in a bank which

21   is not going to pay you any interest at all or charge your fees

22   for the privilege of keeping your money there, or keep your

23   money in a bank where you will not pay any fees whatsoever --

24        **THE COURT:**  Or get any interest.

25        **MR. BHANDARI:**  Or get any interest, but have a chance

```
1    to be able to get some prizes.  That's what Yotta -- it's not

2    for everybody, right?  For some people, they're going to say,

3    "I'd rather get my 0.1 percent interest."  If you've got enough

4    money, you've got a million dollars in the bank, I think that

5    starts to make a lot of sense.  For other people --

6         THE COURT:  I could win a paper fan, or I could win a

7    Tesla.  That's the range.

8         MR. BHANDARI:  I don't think they gave away --

9    actually, I don't know what the low -- you make a good point.

10   I don't know what the low end was.  But I can tell you people

11   loved it.

12        THE COURT:  Okay.

13        MR. BHANDARI:  That's why they got over a hundred

14   million dollars in depositors who put their money and trusted

15   their money to Yotta, and Yotta trusted their money with Evolve

16   because of the promises that Evolve made.  And it was really

17   important -- remember, the key elements of why Yotta decided to

18   do business with Evolve is because Evolve told them

19   specifically there would be no fees.

20        And Evolve told them specifically that they were going to

21   comply with the highest standards of custody of client money.

22   That's what Yotta needed in the bank it was going to do

23   business with, and Evolve told it those things, which I will

24   reference in my complaint in a few minutes.

25        Now, everything's going great for a number of years.  Like
```

1    I said, Yotta gave away over 20 million dollars worth of prizes

2    to depositors who signed up with Yotta.  Evolve seemingly was

3    very happy because it was earning interest off of that money

4    through whatever investments it was making with over a hundred

5    million dollars in customer money.

6        And Synapse had a very small role, to be perfectly honest.

7    They were what's called the API, and you can read that in our

8    papers.  You can Google it.  API means application program

9    interface.  It was basically a service that allowed Evolve's

10   computers to talk to Yotta's computers.

11       So when a Yotta customer wanted to figure out how much

12   money they had in their account, they would go to the Yotta

13   website, and the Yotta website -- they would say, "I want to

14   see how much money I have in my account."  You might do the

15   same for whatever bank you use.  I, as I mentioned, probably --

16   I shouldn't talk much more about my own bank, but I use --

17       **THE COURT:**  I was going to ask you if you put money in

18   Yotta, but I thought that might not be wise.

19       **MR. BHANDARI:**  Well, I could answer that question if

20   you'd like, Your Honor.  I didn't know about Yotta at the time,

21   and like I said -- but I did.  I learned about Yotta only after

22   this stuff happened in the course of my business.

23       **THE COURT:**  That was not a fair question.  You may

24   proceed.

25       **MR. BHANDARI:**  Okay.  So Synapse had a limited role.

1    Its job was to help the computers from Evolve talk to computers

2    at Yotta.

3        And that way, whenever a Yotta end user wanted to figure

4    out how much money they had in their account, they could go to

5    the Yotta website; there would be some ping, ping, pong, pong,

6    pong, you know, internet things are happening; Yotta would make

7    some requests; they would be filtered through Synapse, the API,

8    which was supposed to have all the information that had been

9    given to it by Evolve; then it would be given back to Yotta in

10   a way that Yotta could understand it, that Yotta's computers

11   could understand it; and then that's what the end users would

12   see.

13       So Evolve knew that every piece of information it was

14   giving to Synapse in California was designed to be sent to

15   Yotta at some point so that the Yotta users could figure out

16   what their account balances were.  And also, think about this:

17   Importantly for Yotta, Yotta had to know how much money was in

18   its clients accounts so that it could figure out how much

19   prizes to give away.

20       If they're giving away 20 million dollars in

21   prizes because they think -- and these numbers are not real.  I

22   don't have the exact numbers.  But just for illustrative

23   purposes, if Yotta was giving away 20 million dollars in prizes

24   because its users had a hundred million dollars at Evolve and

25   it thought it was giving away the appropriate amount and it was

1    doing the sweepstakes correctly for each of the clients based

2    on that amount, Yotta had to need to know exactly how much

3    money each of its users had, both collectively and individually

4    in the Evolve bank account.

5         THE COURT:  So is it your position that Synapse was

6    only an extension cord between two conductors and did nothing

7    in between, did not keep up with prizes, did not provide

8    prizes, did not keep up with balances, but literally only is a

9    connecting device between two companies, and Evolve provided

10   the prizes as well as kept up with the ledger of the amount of

11   the accounts?

12        MR. BHANDARI:  I would say it a little bit

13   differently, Your Honor.  And if it's okay, I'd like to answer

14   that in two parts.

15        THE COURT:  Mm-hmm.

16        MR. BHANDARI:  First, I would like to direct you to

17   page 18 of our little slide show over here.  Page 18 is what

18   Evolve's counsel, what lawyers for Evolve -- how they described

19   Synapse.  So that's the first part of my answer, and then I'm

20   going to answer the second part where you asked about what

21   Evolve did.

22        So Evolve's counsel, on May 11th, 2023 -- I believe that's

23   exactly one year before Evolve decided to freeze all of Yotta

24   end users' accounts because it could not reconcile their

25   balances and had taken a bunch of their money improperly.  One

1    year before that happened, this is what Evolve's counsel said:

2    They emailed a redline consumer reserve account agreement,

3    Evolve, directly to the Yotta folks, and Evolve edited the

4    agreement as follows:

5        They said, "The consumer user reserve account agreement

6    governs the non interest-bearing deposit account, the account

7    made available to you by Synapse Financial Technologies Inc., a

8    technology provider of Evolve Bank."

9        And they changed that.  They said, "This consumer user

10   reserve account agreement governs the non interest-bearing

11   account made available to you by Evolve Bank."  They didn't say

12   Synapse was the one making it available.  Evolve Bank was

13   making it, a member of the FDIC in partnership with Synapse,

14   which was described as a technology service provider of the

15   bank.  That's all they were.

16       Now, it's true --

17       **THE COURT:**  So Synapse could not divert funds?  They

18   couldn't in any way manipulate the investor money before it

19   reached Evolve?

20       **MR. BHANDARI:**  I don't know the answer to that

21   because -- and I'll tell you why.  They're a service provider

22   in the same way that an accounting firm was Bernie Madoff's

23   service provider.  Now, the accounting firm might -- because

24   they were working with Bernie Madoff and they were trying to

25   make it so that he was able to fool all of his customers by

```
 1    doing the fake audits, and you're doing all that stuff, they

 2    might have had access to Bernie Madoff's accounts as well.

 3    They might have been able to steal money themselves.  They

 4    might have been able to divert it in different sorts of ways.

 5         So I don't know the answer, but it doesn't really matter.

 6    Our claim is Bernie Madoff committed fraud to his investors.

 7    Evolve committed fraud to Yotta.  That is what happened here,

 8    and that's really what the case is about.

 9         So if I was to set the table, I think this slide, which

10    quotes Latham & Watkins, Evolve's counsel, is the perfect way

11    to show just how strong the relationship between Evolve and

12    Yotta was and how it was Evolve's representations to Yotta that

13    made a difference, and it was Evolve who stole the money that

14    has caused the problem that is destroying the Yotta business.

15    It is Evolve's fault, not Synapse's fault, in its entirety.

16         But it's true Synapse had to work with them --

17         THE COURT:  And Evolve's conduct took place where?  In

18    Tennessee?  In Arkansas?

19         MR. BHANDARI:  Their nerve center was in Tennessee.

20    But I will point out --

21         THE COURT:  I'm just asking where this activity took

22    place.

23         MR. BHANDARI:  The activity took place in California.

24    Their nerve center was in Tennessee, but they traveled to

25    California to meet with the Synapse people.
```

1          **THE COURT:**  Southern California?

2          **MR. BHANDARI:**  They traveled to Southern California to

3    meet with the Synapse people, yes.  They knew that the

4    information they were providing in -- the false information

5    that they were providing about the account balances for the

6    Yotta users was going to be directed to 90,000 different

7    California customers.

8          So they were making false statements.  Maybe they thought

9    of the false statements in Tennessee.  Let's just assume that

10   that's correct for the purposes of this argument.  But they

11   sent those false statements to California so they could be

12   processed by Synapse using its API technology with the full

13   intention that after it goes to Synapse, it was going to be

14   accessed by Yotta.  And with the full intention that after --

15         And Yotta, as we said before, we believe, was a California

16   company at the time that this case was filed.  So with the full

17   intention that a California company was going -- if they read

18   the terms of service of Yotta, the address in the terms of

19   service said San Francisco, California.

20         And again, the *Hertz* case talks about the fact that one of

21   the factors in figuring out in hard cases where the nerve

22   center of a company is is where the public thinks the company

23   is doing business.  Now, and a lot of times, that's where the

24   headquarters is, but not always.  And this is an example of

25   where the public-facing address that Yotta had was a San

1    Francisco address, the one that I just read to you a few

2    moments ago.

3          So there are other allegations --

4          **THE COURT:**  Public-facing, but nerve center in New

5    York --

6          **MR. BHANDARI:**  Again, for a period of time, the nerve

7    center was definitely in New York.  I agree with that.  Right

8    now I do not think the nerve center is in New York, but --

9          **THE COURT:**  So Evolve --

10         **MR. BHANDARI:**  -- that --

11         **THE COURT:**  I'm sorry, Madame Court Reporter.

12    So Evolve is sending statements from Tennessee to

13    California.  Synapse, who's not an essential party to this,

14    then transmits --

15         **MR. BHANDARI:**  Correct.

16         **THE COURT:**  -- information to Yotta in New York, and

17    then the nexus to everybody is -- are the California customers?

18         **MR. BHANDARI:**  Yes, exactly right.

19         **THE COURT:**  And Synapse is in Southern California, and

20    meetings took place in Southern California.  No activity with

21    these companies in their presence took place physically in

22    Northern California?

23         **MR. BHANDARI:**  I don't know the answer to that.

24    Whether it was -- I know that Synapse was located in Southern

25    California, but I don't know if the meetings happened in

1    Southern California or they happened here in San Francisco or

2    elsewhere.  We know that they took place in California.  That's

3    what we alleged.

4        All right.  I think that sets the table for letting you

5    know what this case is about.  And now I'd like to address

6    their motion to dismiss, Your Honor, if that's okay.

7        You did have one other question, which if you'd like me to

8    address upfront before I do that --

9        **THE COURT:**  The questions I asked were pretty clear.

10   The bankruptcy --

11       **MR. BHANDARI:**  Yes.

12       **THE COURT:**  -- status, personal jurisdiction, subject

13   matter jurisdiction, and then to address the questions that the

14   Court posed to you.

15       **MR. BHANDARI:**  Okay.  So I think that those are going

16   to be answered in the course of my presentation, and if there

17   are any additional questions you have at the end, then I will

18   answer them.

19       So if we can go back to page 2 of this little

20   presentation, this really gives you -- I know I've spoken for a

21   while already, but this gives you a roadmap of what I believe

22   is the way to address the motion to dismiss arguments made by

23   Evolve.

24       There are four problems with Evolve's motion.  First,

25   they're trying to dismiss a fantasy complaint, one that they

```
1   literally just made up.  Evolve ignores allegations in the

2   complaint so it can argue that Yotta does not meet pleading

3   requirements.  And I'm going to have specifics for every single

4   one of these things, but I'm just telling you what the roadmap

5   is.

6              THE COURT:  Well, I'm just -- I tried to focus your

7   argument on the things that I need to know --

8              MR. BHANDARI:  Okay.

9              THE COURT:  -- which are my questions.

10             MR. BHANDARI:  Okay.

11             THE COURT:  And then I appreciate the slides because

12  there's close to, I believe, 38 slides, that I think will give

13  a great deal of clarity, and I will definitely read every

14  single slide.  But for my purposes --

15             MR. BHANDARI:  Okay.

16             THE COURT:  -- I want to make sure my questions are

17  answered.

18             MR. BHANDARI:  All right.  I'm going to rush through

19  everything that's not important then, and I'm not even going to

20  read them until I get to your specific questions.  As we're

21  going through them though, I will give a quick, brief

22  highlight --

23             THE COURT:  I'm letting you know you're going to

24  probably have a cutoff time.

25             MR. BHANDARI:  Okay.
```

1          **THE COURT:**  And so I'm trying to help you.

2          **MR. BHANDARI:**  Okay.  Thank you, Your Honor.

3          **THE COURT:**  By giving you focus.

4          **MR. BHANDARI:**  Let me -- okay.  Let me go through.  So

5     the first -- let me just jump ahead to your specific questions

6     then.

7          So slides 2, 3 through -- excuse me -- 3 through 16 show

8     that we did have detailed pleadings of allegations of every

9     single one of the things that we need to in order to make out a

10    fraud claim.  That's what slides 3 through 16 do.

11         The next thing to talk about is they try to -- Evolve

12    tries to shift the blame to its coconspirator, Synapse, which

13    is not a necessary party to this case.  So they say, if you go

14    to page 17 on this presentation, Synapse, not Evolve, was

15    responsible for maintaining the records of Yotta end user

16    account balances.  That's what they say, motion to dismiss page

17    13.

18         That is totally false.  If you look at the document that

19    they have submitted and want to have judicial notice taken of,

20    it's declaration A, and I believe it's document 27-2 in the ECF

21    system.  It's the Synapse financial consumer interest checking

22    account agreement.  This agreement defines Evolve Bank & Trust

23    as "bank," and it defines "we," "our," and "us" to refer to the

24    bank and Synapse.

25         And if you look at section 7.2.310, it says specifically

1    at that very bottom, section, "We" -- that means Evolve and

2    Synapse -- "are responsible for the accuracy of your account

3    statements, not the program banks.  You will receive periodic

4    information which will reflect the opening and closing balances

5    of your sub-deposit accounts at each program bank for the

6    applicable period."  Evolve promised to do that, and it failed.

7    It did not do that.  It gave false information about the

8    balance.

9        Page 20 basically sets forth the important legal argument

10    here, which is that Evolve is independently liable for

11    everything that it had a hand in doing.  A person who

12    participates in a tort is liable for the tort.  We cite that in

13    our papers, and it's also in the case cite over there on page

14    20.

15        Now, the next thing that they say is that there's no

16    allegations that the alleged misrepresentations were either

17    received in or disseminated in California.  They say that on

18    the motion to dismiss page 23, and this is at the 21st slide of

19    my presentation.  So this next slide -- I believe I've already

20    answered this, Your Honor.  The nerve test center, I don't

21    think, affects the choice of law decision here.

22        The choice of law decision is determined by what they said

23    on their previous page, which is there have to be allegations

24    that the misrepresentations were either received in or

25    disseminated from California.  That's the standard that they

1    believe applies in determining whether or not California law

2    applies.  It's not the nerve test for that.  That's a

3    jurisdictional question.

4        So let's look at our complaints, our complaint paragraph

5    6.  Yotta received detailed, up-to-the-minute financial

6    reporting from Evolve, which affirmatively represented that all

7    customer money was carefully accounted for.  Evolve would

8    provide the reporting through a system operated by Synapse

9    Financial Technologies Inc., a software company that Evolve

10   used to connect its computers to Yotta and other fintechs.

11   Synapse, as we know, is located in California.

12       If you look at page 24 of the presentation, this is the

13   bankruptcy filing, voluntary petition form, official Form 201,

14   which sets forth Synapse's principal place of business, which

15   is in Woodland Hills, California in Los Angeles County.

16       The next page, you had asked for what the status of the

17   bankruptcy is right now.  It's a Chapter 11 right now, and the

18   last filing that I was able to find online was filed on

19   February 12th, 2025, and it was for an emergency petition.  I

20   don't think it has any relevance to this, but I think it

21   answers one of your questions about status.

22       **THE COURT:**  Well, I guess my question was more or less

23   are they in the process of a reorg, reorganization?  Are they

24   in a Chapter 11 procedure where they have some things that they

25   need to satisfy or what they call a Chapter 11 plan, or are

1    they fully dissolved?

2         **MR. BHANDARI:**  They're in Chapter 11 right now.  I

3    don't know that they're going to be able to successfully get

4    out of Chapter 11.  It might be that at some point in the near

5    future, it's converted to a Chapter 11 proceeding where the

6    assets get sold off, but I don't know because they are not a

7    defendant in this case.  We have no plan to name them in this

8    case, and we have no obligation to do that because they're a

9    joint tortfeasor.

10        Just to point out, our complaint, again, very much does

11   explain -- contrary to what Evolve says in their motion to

12   dismiss, we did say that there was California connections

13   explicitly in our complaint.  In slide number 26, we say in

14   paragraph 87, "Evolve planned and carried out its fraudulent

15   scheme in California."

16        For instance, Evolve CEO, Scot Lenoir, met with Synapse in

17   California on January 22nd, 2018.  They had another meeting in

18   2019, another one in 2021.  Another senior exec met with

19   Synapse in California in 2019, 2021, 2022, and again in 2022,

20   and we believe that the purpose of those meetings was so that

21   they could carry out Evolve and Synapse's fraudulent scheme.

22        And we have a lot of reasons for why we believe it was a

23   fraudulent scheme.  You know, I could explain those things

24   about why we think the conspiracy is well pled in here as well,

25   but importantly, the impact of Evolve's misrepresentations were

1     felt in California.  This is not all from the first amended
2     complaint.  It's in our current complaint as well.  But Yotta's
3     customers dealt with Yotta in California.
4          **THE COURT:**  As I indicated, if it's part of the
5     amended complaint, it will not be considered.
6          **MR. BHANDARI:**  Right.  That's incorrect.  That's
7     incorrect.  The only thing -- so, like, as you see in number 6,
8     Evolve routinely traveled to California to perpetuate its
9     scheme.  That was what we just saw was paragraph 87 of our --
10    the regular complaint, not the amended complaint.
11         Evolve conspired with Synapse to perpetrate the fraudulent
12    scheme from California.  That's, again, in paragraph 87 and
13    paragraph 6 of our current complaint.  Evolve continuously sent
14    false user data to Synapse in California.  That's in many, many
15    parts of our complaint.
16         But if I could just direct you to page 7 of
17    this spreadsheet.  Paragraph 112 of our current complaint
18    specifically is directed at Evolve.  The paragraph 111 says,
19    "Defendants" -- and Defendants are defined as Evolve -- "made
20    various misrepresentations," and then paragraph 112 actually
21    lists the misrepresentations.
22         They say they were essentially continuous representations
23    from May 2020 to May 11, 2024, that each and every transaction
24    that Evolve affected was being reported to Yotta and its end
25    users on an essentially realtime basis.  Paragraph 114, we say

1    that these things are false.

2        I just want to show you one little thing.  They claim --

3    if you look at one of these bullet points, we say that written

4    representations delivered by email on September 24th, 2020, by

5    Evolve made certain representations that were false.

6        If you go to the next page, page 8, you see that Evolve

7    just decides to argue.  They pretend something is true that's

8    not.  They say, "Yotta fails to identify the sender or

9    recipient of the September 24th email where Evolve assured

10    Yotta about its compliance procedures."  That's on page 14.

11    But if you look at paragraph 44 of our complaint, it's right

12    there.

13        In a call that took place -- at 43 and 44.  "In a call

14    that took place in late September 2020, Moelis, the CEO of

15    Yotta, spoke to Evolve's chairman, Scot Lenoir."

16        Paragraph 44, "In written materials sent on September

17    24th, 2020, in advance of that call, Lenoir represented that

18    Evolve had a strong compliance, risk management, and operations

19    department that diligently guarded the assets of fintech

20    customers."

21        So, Your Honor, they pretend that the complaint doesn't

22    make these allegations when it does.  And I hope that this

23    presentation overall will help you see exactly where the

24    allegations are made throughout.

25            THE COURT:  No.  I'm following.  There are things that

are in the -- I can tell I'm going to have to go through the

PowerPoint juxtaposed to the originally filed complaint because

there are still some things that aren't entirely consistent for

me, and for example, whenever someone makes a categorical

statement, I always have to take a look.

    Yotta's sole office on page 2 in California, which isn't

necessarily a strong categorical statement based on just

today's discussions -- and I'm still finding it curious that

there was an amended complaint attached as an exhibit, which

had quite a few red lines through it, and I can't for the life

of me understand that if you're that confident about the

original complaint why there was an amended complaint attached

as an exhibit to the opposition.

       **MR. BHANDARI:**  Your Honor, it's --

       **THE COURT:**  So --

       **MR. BHANDARI:**  Belt and suspenders.  I'm sorry.

       **THE COURT:**  Well, at 3:15, your argument is going to

end.  So I want you to --

       **MR. BHANDARI:**  Okay.

       **THE COURT:**  -- focus on the remaining questions and

make sure that I'm clear, because I've read everything, and I

think you can tell I'm fluidly jumping around a little bit.

       **MR. BHANDARI:**  Yes.

       **THE COURT:**  But please answer those questions because

that was where I needed clarity.

1          **MR. BHANDARI:**  Okay.  So I'm going to go through just

2    your questions as best I can.  Nerve center, I think we've

3    discussed, Your Honor.  Is there anything else you would like

4    me to say on the nerve center?

5          **THE COURT:**  If you don't have anything further, you

6    may move to the next question.

7          **MR. BHANDARI:**  Okay.  The location of misconduct, so

8    I'll walk through again just to make sure we've hit this as

9    clearly as possible.  If we can go to page 21 of the --

10         **THE COURT:**  If you can just recite where the location

11   is, and then we can move to the next question.

12         **MR. BHANDARI:**  Okay.  You say, "Within the four

13   corners of the complaint, please explain whether there are

14   allegations that Defendants allege misconduct took place in

15   California."

16        And yes, we believe that there are.  So one, paragraph 6

17   says that Yotta received detailed, up-to-the-minute financial

18   reporting from Evolve which affirmatively represented that all

19   customer money was carefully accounted for.  Evolve would

20   provide the reporting through a system operated by Synapse, a

21   software company that Evolve used to connect its computers to

22   Yotta and other fintechs, and we have alleged elsewhere that

23   Synapse was located in California.

24        So if you go to paragraph 87 of our complaint, that's

25   where we specifically say that Evolve planned and carried out

1      its fraudulent scheme in California.

2              **THE COURT:**  And remember, counsel said who, what,

3      when, where, and how.

4          **MR. BHANDARI:**  Yes.  So that's the pleading

5      requirements, Your Honor.  So if we do that and we go to the

6      beginning of this...

7              **THE COURT:**  Keep in mind, I have the PowerPoint.

8          **MR. BHANDARI:**  Yes.  So I'll just direct you to where

9      we address the who, what, when, where, how.

10         So page 3 of the PowerPoint lays out all the specific

11     allegations we made about this what, the specific statements

12     made by Evolve and allegations regarding unlawful admissions

13     and allegations of tortious behavior by Evolve.  So that's the

14     what.

15         The paragraph -- if you go to page 8, this is an example

16     of the who.  Who actually made these allegations?  Who made

17     these misrepresentations?  We say that it's Scot Lenoir.  Sent

18     this email on September 24th, and then we have other

19     allegations in here where the attorney for -- from Orrick made

20     a misrepresentation to -- made a misrepresentation.

21         So on page 3, a lot of the allegations regarding specific

22     statements made by Evolve do specifically address the who, the

23     what, the where, and the when.  So we believe that if you look

24     at page 3 of our PowerPoint and you look at those particular

25     allegations, you'll get the answer to all those questions.

```
 1              THE COURT:  You may proceed.

 2              MR. BHANDARI:  What's that?

 3              THE COURT:  You may proceed --

 4              MR. BHANDARI:  Thank you, Your Honor.

 5              THE COURT:  -- to the next question.

 6              MR. BHANDARI:  So the next question is the contract

 7     connection and mutual interest.  My opposing counsel was

 8     correct there is no contract between Evolve and Yotta.  And so

 9     I do not think that the Robinson Helicopter case is directly on

10     point, but maybe I'm not understanding what the exact question

11     was of that, because my understanding of Robinson -- I'm so

12     sorry, Your Honor.  I'll tell you my thought, or you can tell

13     me if there's --

14              THE COURT:  No.  I just was going to follow up with

15     one last question, which everyone agrees there's no contract

16     between Evolve and Yotta, but there is a contract between

17     Synapse and Yotta?

18              MR. BHANDARI:  Correct, and there are lots of direct

19     conversations between Evolve and Yotta, and those

20     representations were false.

21          I will address the special relationship question you had.

22     I don't think it necessarily ties into the Robinson case, but

23     again, if I'm wrong on that, Your Honor, I'll answer that

24     question.

25          But slide number 37 of our presentation outlines all of
```

1    the different allegations we had in our complaint that allow

2    the Court to determine, in fact, there was a special

3    relationship between Evolve and Yotta such that a negligent

4    misrepresentation claim 100 percent does lie in California.

5        I will note that they say that New York has a lower

6    standard for negligent misrepresentation, but the facts are the

7    facts.  We believe California law applies, and we believe we

8    satisfy California law.  And if you look to page 37 of our

9    presentation, you'll see the allegations that establish a

10    special relationship under California law.

11        The question about the proposed amended complaint -- Your

12    Honor, you're right.  It was belt and suspenders.  We think

13    that we can satisfy all the requirements based on our current

14    operative complaint.  If, however, you were so inclined to

15    think differently and you thought you really needed to have an

16    allegation specifically in there about the 90,000 customers,

17    that's one of the things that's included in the amended

18    complaint.

19        There's no real dispute about that.  I don't think it's

20    something that would necessitate the dismissal of a complaint

21    because it's a fact that's true and it's consistent.  But, you

22    know, we put it in there as belt and suspenders.

23        Then you had questions for both of us, which I'll just

24    make sure we've answered.  So I think subject matter

25    jurisdiction -- it applies no matter what because there's total

1    diversity whether or not Yotta's located in New York or

2    California.  Personal jurisdiction -- they did not raise

3    potential jurisdiction in their 12(b)(6) motion.  So according

4    to rule 12(b)(h), they have now waived any personal

5    jurisdiction arguments, and they've likewise waived any venue

6    arguments.  They had to raise those in their first responsive

7    pleading or motion to dismiss.

8         **THE COURT:**  And the Court cannot sua sponte, do that

9    analysis?

10        **MR. BHANDARI:**  I would hope not, Your Honor.

11        **THE COURT:**  No.  My question is can the Court do that?

12        **MR. BHANDARI:**  I don't know, but I would hope not.  So

13   that's my answer both as to what I think the law is and what I

14   hope the law is and what I hope -- you know, if it's sua

15   sponte, I would ask that you not do that.  This is the right

16   venue for this case.  We believe, you know, we would get a fair

17   hearing here, and we would be very happy to move forward as

18   quickly as possible.

19        Synapse is not a necessary party for the reasons that I

20   outlined already.  The reason why it's not a necessary party is

21   because joint tortfeasors do not have to be named together.

22   That's the choice of Plaintiff, and you can't force the

23   plaintiff to do it, and here there's no --

24        **THE COURT:**  I understand.  I'm probably -- when I get

25   a case, I look at the jury instructions immediately and try to

1    figure out what people will have to prove to a jury and then

2    work my way backwards.  So that may just be a bad habit that I

3    brought with me from state court, but that's kind of how I look

4    at a case.  So I apologize if that's distracting.

5              **MR. BHANDARI:**  No.  I think --

6              **THE COURT:**  At the end of the day --

7              **MR. BHANDARI:**  -- I look at cases the same way.

8              **THE COURT:**  At the end of the day, I need to know what

9    a jury is going to have to toil with and whether we have the

10   necessary parties when I look at those jury instructions.

11             **MR. BHANDARI:**  Yes, Your Honor.  Our case is going to

12   be so simple.  It's going to be Evolve lied to Yotta, they made

13   numerous representations affirmatively, and then they concealed

14   things that they had a duty to share with Yotta when they knew

15   that the account statements were wrong, when they knew that

16   they weren't actually going to be resolving a contract dispute

17   with Synapse in a number of weeks, even though the Orrick

18   lawyer literally said that.

19        He said, "We expect to give you updates, and we'll have

20   this resolved in a matter of weeks."  He knew full well that at

21   that point, Synapse had already -- they had already taken a

22   bunch of money out.  He didn't mention at all that part of the

23   reason for the problem here is that Evolve was, like, "Oh,

24   Synapse.  You owe us money.  Since you're not paying us, we're

25   going to take it from these other people who we promised don't

1    have to pay any fees."

2       That's really their defense, Your Honor, in this case.

3          THE COURT:  And total losses?

4          MR. BHANDARI:  What's that?

5          THE COURT:  And total loss?

6          MR. BHANDARI:  The total loss?  I'm sorry.  I don't

7    understand that question.

8          THE COURT:  The loss of the people who invested?

9          MR. BHANDARI:  Oh, the loss of the depositors.  Yes.

10    Yes.  Exactly.  It's the loss of the depositors.

11          THE COURT:  Which is in a monetary amount?

12          MR. BHANDARI:  Over a hundred million dollars.  And

13    we're here not for all the depositors.  We're here because that

14    destroyed Yotta's business.  We had a business that people

15    loved.  We had spent millions of dollars attracting customers

16    to this business.  It was an idea --

17          THE COURT:  How much is Yotta out of?

18          MR. BHANDARI:  Yotta spent -- well, like I said, we

19    gave 20 million dollars in prizes, and then probably it cost

20    tens of millions of dollars in terms of running a company and

21    running this line of business, the advertising that we had to

22    do, the payments that we had to make.  And we lost the

23    enterprise value of our business too.

24       This was because they lied, because they literally said

25    that they were going to not charge any fees, and then they did

1    charge fees, and then that caused a customer shortfall that

2    destroyed our business.  That's what this case is about, Your

3    Honor.

4              **THE COURT:**  Thank you.

5              **MR. BHANDARI:**  Thank you.  I appreciate you.

6              **THE COURT:**  Response?

7              **MS. PATEL:**  Your Honor, I want to correct a couple

8    items that were raised during opposing counsel's argument.  I

9    know he directed you to, I believe, PowerPoint page --

10   apologies -- 4, but I'd like to direct you to PowerPoint page

11   23.

12        And if you look at that one, it's a slightly different

13   diagram, and you asked earlier whether or not Synapse

14   functioned as an extension cord.  Evolve submits that it

15   actually was the hub, and in fact, the allegations in the

16   complaint make clear that it was the hub.  It certainly was not

17   a connector.

18        The way the interest payments worked -- and you can see

19   the allegation in paragraph 58 -- was that Evolve paid Synapse

20   the interest, and then Synapse paid Yotta the interest.  And

21   the critical -- the critical allegation in page -- in paragraph

22   40 relating to the data stream that Evolve communicated to

23   Synapse -- there's a critical problem with that allegation.

24        If you continue to read further from what is quoted in

25   this presentation, it states that pursuant to the parties'

1    agreement from its California headquarters, Synapse combined

2    Evolve's data stream with its own customer transaction data and

3    delivered the combined data to Yotta end customers.  It's the

4    combined data stream that was supposed to include each and

5    every transaction and each and every's customer's account and

6    each customer's current balance so that Yotta and the customer

7    knew precisely how much money was in their account.

8        There's a fundamental problem throughout the complaint.

9    First, in this paragraph in particular, there's no allegation

10   of falsity.  The entire fraud claims are premised on the idea

11   that Evolve made false representations.  This complaint, as

12   pled, is deficient of Evolve making false representations that

13   Yotta relied upon to its detriment, and that Evolve knew that

14   the representations were false at the time they were made.

15       That simply does not exist in this complaint, and

16   counsel's attempts to try to backtrack that here shows the

17   ever-changing landscape that we're operating in.  There seems

18   to be moving goal posts throughout both Yotta's attempts at

19   pleading and through their arguments.

20       For example, Your Honor, counsel argued that Yotta relied

21   on Evolve's statements and were relying on Evolve's -- the

22   accuracy of the information Evolve conveyed to Yotta for

23   purposes of generating interest.  That allegation does not

24   exist in this complaint.  There's no reliance, there's no

25   falsity, and there's no material misrepresentation.

1          The other item I'd like to point out to you are the group

2     allegations.  So on page 10 of this presentation, you'll see in

3     allegation paragraph 65, the allegations proceed as indeed

4     Evolve and Synapse continue to purport to report each and every

5     transaction that it affected with end user funds.

6          Then in paragraph 68, another allegation.  Evolve and

7     Synapse continue to transmit that information.  I urge Your

8     Honor as she's going through the presentation to notice the

9     group pleading that is -- that infects the majority of this

10    complaint.

11         In slide 26, there are representations from counsel

12    relating to Evolve's conduct in California.  Again, those

13    allegations relating to the perpetuation of this alleged scheme

14    of fraud are conclusory and on information and belief.  There's

15    no clarity as to the who, what, when, where, and how, what

16    those statements were, who they were made to, what they said,

17    what the expected reliance was.

18         Again, these are deficiencies that are available

19    throughout the complaint.  And as Your Honor noted, you tend to

20    examine categorical statements.  In our view, there are a

21    number of categorical and conclusory statements throughout this

22    complaint that this court should not just take at face value.

23         I wanted to turn to just two issues that Your Honor raised

24    in her questions, mindful of the time.

25         With respect to the Synapse bankruptcy proceedings, I

1    believe counsel's citation to the bankruptcy docket is accurate

2    in terms of finding that information, but the Synapse

3    bankruptcy -- again, it is scheduled for its next status

4    conference on April 11th, and the trustees' last status report,

5    which was filed on February 12th, makes clear that it remains

6    in Chapter 11 proceedings for the sole purpose of resolving

7    matters related to the return of end users funds.

8        And that is a factual record that is apart from these

9    pleadings, but I just wanted to give the Court that information

10   for context.  The trustee would like to convert the proceedings

11   to a Chapter 7 for dissolution.  However, there's critical data

12   that Synapse has that is necessary for all of the banks that

13   were part of the Synapse ecosystem to complete reconciliation

14   and return end user funds.

15       And that brings me to the other question that Your Honor

16   asked regarding the related cases that Evolve identified in its

17   statement of related cases.  Since we identified the four

18   actions that were pending in the District of Colorado -- a

19   fifth was filed, in fact, later that same day -- all of the

20   Colorado matters have been consolidated into one action, and

21   the crux of issues in that litigation is the issue that is

22   identified in paragraph 10 of Yotta's complaint here, which is

23   where are the end user funds.

24       Evolve's reconciliation process revealed that Evolve

25   itself does not hold all end users funds, and the ecosystem

1    banks of Synapse may hold those end user funds.  And so

2    Evolve's position is that litigation will resolve a fundamental

3    question that is at issue here.  And again, Yotta stated that

4    it is not bringing this action on behalf of end users.  Those

5    actions are class actions on behalf of end users and the return

6    of funds, but I just wanted to make sure that you had a full

7    picture of that.

8            **THE COURT:**  All right.  Thank you.

9            **MS. PATEL:**  You're welcome.

10           **THE COURT:**  The matter is submitted at this stage.

11   The Court will take the matter under submission.  I anticipate

12   that somewhere between 7 to 14 days, the order will issue.

13       In the interim, if counsel files an amended complaint, the

14   Court indicated in its questions the last day by which an

15   amended complaint could be filed.  If one is filed, that would

16   moot both the arguments and the analysis in the moving papers

17   here.

18       If a second amended complaint is not filed prior to the

19   issuance of the Court's order, the Court's order will have

20   directives, and should there be leave to amend, it will

21   indicate the time frame, which will still be consistent with

22   the deadline that has already been announced.

23           **MS. PATEL:**  All right.

24           **MR. BHANDARI:**  All right.  Thank you, Your Honor.

25   Have a great day.

1          **THE COURT:**  You too.  Thank you.

2      (The proceedings concluded at 3:23 P.M.)

3                      ---o0o---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF REPORTER**

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.

4

5     DATE:  Wednesday, April 9, 2025

6
                          *April Wood Brott*
7     _____

8             April Wood Brott, CSR No. 13782

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25