RISHI BHANDARI (SBN 226055)
rb@mandelbhandari.com
DONALD CONKLIN (SBN 319949)
dc@mandelbhandari.com
**MANDEL BHANDARI LLP**
80 Pine Street, 30th Floor
New York, NY 10007
Telephone: (212) 269-5600
Facsimile: (646) 964-6667

*Attorneys for Plaintiff Yotta Technologies Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

YOTTA TECHNOLOGIES INC.,

              Plaintiff,

     -against-

EVOLVE BANCORP, INC., and
EVOLVE BANK & TRUST,

           Defendants.

Docket No: 3:24-cv-6456

**<u>FIRST AMENDED
COMPLAINT</u>**

**DEMAND FOR JURY TRIAL**

1

Plaintiff Yotta Technologies Inc. ("**Yotta**") by and through its attorneys, Mandel Bhandari LLP, for its Complaint against Defendants Evolve Bank & Trust ("**Evolve**"), respectfully alleges as follows on information and belief:

## NATURE OF THE CLAIMS

1.     This is a case about a bank that utterly failed in its most basic duties to its customers by misappropriating tens of millions of dollars in customer funds, lying in order to cover up its malfeasance, and running a ponzi scheme.

2.     During the relevant period, Yotta was a financial technology company (sometimes called a "**fintech**").  Yotta created software designed to help individuals better manage their finances and achieve better financial returns than they would receive using traditional banking products.

3.     Yotta is not itself a bank and does not hold customer deposits.  Instead, to the extent that its customers deposit money for safekeeping, those deposits go directly to regulated, FDIC insured institutions like Evolve.

4.     To ensure that Evolve could be trusted to custody its customers' funds, Yotta had numerous, detailed communications with Evolve over the course of four years.  Yotta met with executives at the highest levels of Evolve's organization, including its Chairman, Scot Lenoir, and received substantial representations about Evolve's technical skill, adherence to all applicable regulations, and best-in-class compliance with responsible banking industry practices with respect to the safekeeping of customer funds.

5.     In addition, Yotta held twice-monthly compliance meetings with Evolve to identify and address any customer complaints or regulatory guidance requiring corrective action.  Yotta held these meetings, in part, so that Evolve could bring any potential customer problems to its attention expeditiously and ensure that they were properly remedied.

6.     Yotta also received detailed up-to-the minute financial reporting from Evolve, which affirmatively represented that all customer money was carefully accounted for and available for withdrawal.  Evolve would provide the reporting through a system operated by Synapse Financial Technologies Inc. ("Synapse"), a software company that Evolve used to connect its computers to Yotta and other fintechs.

7.     Over the course of this four-year relationship, Evolve accepted and processed hundreds of millions of dollars from Yotta's customers.

8.     But on or about May 11, 2024, Evolve suspended access to all monies belonging to Yotta customers.

9.     Evolve acknowledges – but does not explain – that a substantial amount of customer money is missing.  In filings submitted in connection with the Synapse bankruptcy, the Synapse trustee reports a "shortfall" totaling tens of millions of dollars.

10.     Where did the money go?  Yotta's investigation indicates that Evolve simply stole it. In violation of its representations to Yotta and end users, responsible banking practices, and basic morality, Evolve stole more than $75 million from end users.

11.     Long prior to the collapse of Synapse, Evolve debited customer accounts for over $25 million according to Synapse's records.  These transactions were never authorized by customers. Evolve had no right to take this money from customers and never informed Yotta or its customers that it was doing so.  Although Evolve and Synapse purported to report all transactions involving customer funds, they concealed these transactions from Yotta and its customers.  They also inflated the account balances that they reported to Yotta and its customers to make it appear as if the misappropriated funds remained in customers' accounts.

12.     According to Synapse's records, Evolve also misappropriated almost $50 million in customer money in connection with "migrating" another fintech company from Synapse's software to Evolve's software.

13.     Evolve and Synapse were aware of this missing money (and more) by at least September of 2023.  Despite this, Evolve never told Yotta or its customers that their money was missing.  To the contrary, Evolve continued to represent that all customer money was available and that Yotta's customers could safely deposit more into the financial black hole that was Evolve.

14.     Had Yotta known the truth about Evolve's malfeasance, it never would have done business with Evolve, and Yotta's customers would have been spared a brutal theft at the hands of this bank.

15.     Because of Evolve's grotesque misconduct, Yotta's business has been decimated. Yotta's customers are rightly enraged at the loss of their funds.  Many remain unwilling to use Yotta's services going forward.   Yotta's reputation in the market, once sterling, has been tarnished, potentially beyond repair.  Yotta's banking-related revenues have evaporated and the enterprise value of its banking business, once substantial, has dwindled down to nearly nothing.

16.     Yotta brings this case to vindicate its rights against the bank whose dereliction of duty threatens to bury Yotta's once-promising business.

17.     For the avoidance of doubt, Evolve engaged in a single fraudulent scheme to (a) lie to Yotta and others about Evolve's controls, technology, and capability, (b) steal customers money, and (c) go to great lengths to conceal and lie about its theft, including by providing false and misleading transaction and account balance information to Yotta and its end users.  At the end of the day, this fraudulent scheme was a ponzi or ponzi-like scheme in which Evolve did anything and everything it could avoid the consequences of the deficit in end user funds caused by its theft.

## THE PARTIES

18.     Plaintiff Yotta Technologies Inc. is a corporation organized under the laws of Delaware.  Yotta's sole office is a virtual office located at 2261 Market Street #4313 San Francisco, CA 94114 and its employees and executives work remotely, including from California and New York.  Yotta's principal place of business is California.  If, in the alternative, Yotta's principal place of business is New York, that would not change any of the analysis below.

19.     Defendant Evolve Bank & Trust is a bank organized under the laws of Arkansas with locations in California.  Its corporate headquarters is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee, 38119.

20.     Defendant Evolve Bancorp, Inc. is a bank holding company organized under the laws of Arkansas whose corporate headquarters is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee, 38119.

4

## JURISDICTION AND VENUE

21.    As Yotta is a Delaware corporation with a principal place of business in California, and Evolve Bank and Trust and Evolve Bancorp, Inc. are organized under the laws of Arkansas and have their principal place of business in Tennessee, there is total diversity between Plaintiff and Defendants.  Even if Yotta's principal place of business were New York, there is total diversity between Plaintiff and Defendant.

22.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy in this action exceeds $75,000 and the parties are residents of different states.

23.    This Court has personal jurisdiction over Evolve because (i) of its continuous and systematic contacts with California, including its locations and substantial presence in California, its authorization to do business in California, its appointment of a local agent for service of process, and its prior litigation in the courts of this state, (ii) it purposefully directed its activities at California, including through its relationship and contacts with Synapse, which included numerous meetings in and contacts with California, and the subject matter of this lawsuit and Yotta's claims arise out of and are related to that relationship and those meetings, and (iii) Evolve engaged in the tortious conduct at issue here within this state.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) since a substantial part of the events or omissions giving rise to the claim occurred within this district.  As discussed in further detail below, Evolve perpetrated its fraud in San Francisco, California, and regularly visited San Francisco to further its fraudulent scheme.

## STATEMENT OF FACTS

**Yotta and Its Business**

25.    Yotta was founded in 2019.  At all relevant times, Yotta was a financial technology company.

26.    Yotta developed software designed to make it fun and easy for consumers to manage their finances and save money.

27.     In lieu of traditional interest payments, reward points, or cashback promotions, Yotta's products instead allowed its customers the opportunity to win substantial prizes. For example, the Yotta Savings Account gave users "tickets" in proportion to their savings that could be redeemed for entry into daily prize drawings. Similarly, an Evolve-issued Yotta MasterCard card gave users "tickets" in proportion to their monthly expenditures. Some of the prizes for the daily drawings were paid in cash, while others were paid in valuable consumer goods, such as a Tesla Model 3.

28.     These so-called "prize linked savings accounts" have been recognized as a valuable way of promoting personal saving by diverting money that would otherwise be spent on traditional gambling.[1] Foreign governments use similar accounts to encourage people to save money. Indeed, Yotta customers have received more than $20,000,000 in prizes.

29.     Because Yotta is not itself a bank, it could not personally accept customer deposits or issue card products. Instead, Yotta partnered with regulated, FDIC insured institutions to take custody of its customers' savings and issue Yotta-branded debit and credit cards.

30.     End users loved using Yotta, and by late 2023, they had over $100 million in Yotta's savings program. Yotta received the interest from its customers' bank accounts. That interest was Yotta's income stream and Yotta used it to pay for the prizes its customers won and to generate profits.

**Yotta's Presence in California**

31.     Since Yotta began doing business with customers, it has done so through its virtual office in San Francisco, California. Its Terms of Use states that "We, or our or Yotta means Yotta Technologies Inc. of 2261 Market Street #4313 San Francisco, CA 94114 and any related companies." It also uses its San Francisco address to communicate with third-parties, including vendors.

---

[1] *See e.g.*, Peter Coy, *A Smart Way to Turn Gambling into a Virtue*, THE NEW YORK TIMES, July 28, 2023, *available at* https://www.nytimes.com/2023/07/28/opinion/gambling-prize-linked-savings.html.

32. More than 90,000 of Yotta's end-users have been California residents, more than any other state.

33. Yotta has also had employees who resided in and worked from California.

34. For a period of time ending in early 2023, Yotta had an office in New York, New York. However, Yotta closed that office in early 2023. Since that time, its sole office has been its San Francisco office.

35. Yotta has also used a home located in New York, New York to communicate with certain third-parties other than customers.

**Evolve and Its Business**

36. Originally called "First State Bank," Evolve was founded in 1925 in Eastern Arkansas. Now based in Memphis, Evolve is a small, full-service consumer bank with over forty locations in ten states, including California.

37. While it offers traditional banking products, such as consumer banking, mortgage origination, and SBA lending, in recent years, Evolve has sought to distinguish itself through its "Open Banking" business.

38. Evolve's "Open Banking" business, which it touts as "The Future of Banking" and "powering the fintech revolution" involves partnering with fintech companies to offer new financial products and create customizable user experiences.[2] As Evolve describes it:

> Open banking uses technology like APIs to offer nonfinancial and financial businesses a network of financial products like accounts and transaction methods. This means third-party providers are allowed access to payment products so they can design and build new user experiences. From the bank perspective, Open Banking is like extending their banking charter to other companies.[3]

39. Why should a fintech like Yotta use Evolve to power its products rather than a different bank? Evolve has an answer for that:

---

[2] *See* https://www.getevolved.com/openbanking/the-future-of-banking/.
[3] *See* https://www.getevolved.com/openbanking/baas-vs-open-banking/.

> Why Partner With Evolve? Evolve Bank & Trust's BaaS environment is highly secure, and is customizable and flexible to fit your business' use case.

40. Indeed, Evolve specifically touts its strong customer security and corporate compliance as a selling-point for its services:

> Evolve Open Banking is committed to the safety of personal and financial information of our partners and their end users. As such, we maintain our charter and status with the Federal Reserve, the central banking system in the United States. We have an obligation to always maintain compliance and security within our system, including regular system audits. This obligation ensures that data is stored, and money is transferred at the highest industry standard set by the Federal Reserve.
>
> For partners who need security and compliance solutions, we offer KYC and KYB products and a library of best practices. These solutions offer our partners the ability to verify the identity of consumer and business end users, to reduce false account openings and mitigate fraud. KYC and KYB are important starting points in creating safe financial environments.
>
> The Evolve Opening Banking team works diligently alongside partners and regulators to ensure that compliance standards are met. Our partners trust us with their business, and we do not take their trust for granted. We have a great working relationship with regulators, and our systems are checked regularly both by Federal regulators and external and internal auditors. Our top priority is always the security of financial and personal information of both partner companies and end users.[4]

**Evolve Markets Itself to Yotta as a Safe Place for User Funds**

41. Yotta was first introduced to Evolve in October of 2019. At the time, Yotta was looking for a banking partner to serve as a custodian for customer accounts.

42. Meeting at a conference in Las Vegas, Nevada, Yotta's CEO, Adam Moelis, spoke to Evolve's Vice President, Fintech Business Development Officer, Kristen Kines. Kines described Evolve's expertise in Open Banking and claimed that Evolve would be a valuable banking partner for Yotta.

43. Yotta relied upon Evolve to safeguard end user funds.

44. Synapse was a software company that acted as an intermediary between banks like Evolve and fintechs like Yotta.

---

[4] *See* https://www.getevolved.com/baas-security/.

45.     On February 13, 2020 Yotta entered into a contract allowing it to use Synapse's software to interface with Evolve.

46.     Synapse provided an Application Programming Interface ("**API**") which supposedly allowed Yotta's software to safely and securely transmit and receive information from Evolve.

47.     Shortly thereafter, Yotta end users began depositing their funds at Evolve.

48.     In lay terms, Evolve was the end users' regulated bank and Synapse was a service provider that would help Evolve satisfy its obligations to provide competent banking services. Customer funds were always custodied at Evolve.  Evolve would process banking transactions for the end users, for example, deposits, withdrawals, debit card usage, and ACH and wire transfers, and provide data reflecting these transactions to Synapse, who would organize, tabulate, and present this data through a database.

49.     Evolve delivered a data stream to Synapse in California that was supposed to more-or-less instantaneously report on a customer-level any and all transactions that it effected.  Pursuant to the parties' agreement, Synapse analyzed and organized Evolve's data stream from its California headquarters.  Synapse delivered this data electronically and continuously to Yotta and customers. This data stream was supposed to include (a) each and every transaction in each and every customer's account and (b) each customer's current account balance so that Yotta and the customer knew precisely how much money was in their account and available for withdrawal.  Of course, all of the data – including balance information – was supposed to be accurate because Yotta and its customers relied upon the data in the same way that bank account holders rely upon similar information provided by their banks.  The data stream from Synapse to Yotta was supposed to work much the same way that a mobile phone application for Citibank or Chase would provide an account holder with up-to-the minute account balance information.  Evolve had access to the customer account data in the Synapse database.

50.     Yotta was not Evolve's only fintech customer.  Evolve actually held funds for many fintechs.  Many of those fintechs interfaced with Evolve through Synapse.  Evolve commingled the end user funds of all Synapse-connected fintechs in one or more accounts for the benefit of ("**FBO**") end users.  Evolve managed these FBO accounts and, pursuant to its agreement with Synapse, the

balance in each FBO was to equal "100% of the amount of funds Deposited by end Users in connection with such FBO account." In other words, the FBO account needed to have enough money to cover all the funds deposited by customers.

51. As discussed below, banking laws also required Evolve to make customers' funds available. Evolve represented to Yotta that it complied with Federal banking laws and regulations. Evolve's website, which Yotta reviewed, stated that Evolve "maintain[s]" its "charter and status with the Federal Reserve, the central banking system in the United States," and as such has an "obligation to always maintain compliance and security within our system, including regular system audits," ensuring "that data is stored, and money is transferred at the highest industry standard set by the Federal Reserve."[5] According to Evolve, it had "a great working relationship with regulators," and its "systems are checked regularly both by Federal regulators and external and internal auditors."

52. Moreover, the December 12, 2021 and May 2023 Customer Agreements that Evolve provided to Yotta stated that the accounts were subject to applicable Federal Law.

**Evolve Was Responsible for Yotta's Customers' Accounts**

53. In order to enroll in Yotta's program, customers had to open a bank account at Evolve.

54. To open an Evolve bank account, Yotta's end users had to enter into a Customer Agreement. More than 100,000 end users did so.

55. Evolve provided the Customer Agreement to Yotta, communicated directly with Yotta regarding changes to the Agreement, and required Yotta to make the Agreement available on Yotta's website or through its app. For example, (a) on April 7, 2023, Lenoir emailed Yotta CEO Adam Moelis about changes to the Customer Agreement, (b) on April 8, 2023, Rod Valle – Evolve's Head of Legal for Open Banking – emailed Moelis saying he would circle back with a draft of the Customer Agreement with updated language, (c) on May 3, 2023, Evolve's outside counsel – Parag Patel of Latha & Watkins – sent a draft of the Customer Agreement to Moelis, (d) on May 24, 2023, Lenoir emailed Moelis to ask if the notification of the updated Agreement language went out to end users, and the same day Lenoir emailed Moelis again asking for a copy of the notification when Yotta

---

[5] https://www.getevolved.com/baas-security/

sends it. Evolve controlled the terms of the Customer Agreement and Yotta relied on the representations that Evolve made in the Customer Agreement.

56. The December 12, 2021 and May 2023 versions of that Customer Agreement state that the Agreement was being provided by Synapse "on behalf of [Evolve] Bank." The Customer Agreement defines "we, our, and us" as Evolve Bank and Synapse.

57. The Customer Agreement states that Yotta users' accounts would be established in Memphis, Tennessee, which is Evolve's corporate headquarters.

58. The Agreement states repeatedly that there would be no fees charged by Evolve.

59. Section 5 of both versions of the Customer Agreement describes how funds would be made available to customers, specifying the number of days it would take each type of funds to become available. Section 5 allows Evolve to reject deposits and allows for certain delays in making funds available. It does not allow Evolve to refuse customers access to the money they deposited indefinitely.

60. Section 1.4 of both versions of the Customer Agreements explains that statements will be available for end users that will show each item, date of credit or debt, and the respective amounts, and Section 2.8 explains that it is Evolve who provides the services under the Agreement (including account statements) in part through one or more its service providers, including Synapse.

61. Section 7.1 of both versions provides that "[u]se of the Account is subject to applicable Federal laws and the laws of the State of Tennessee." As discussed below, applicable law required Evolve to provide timely and accurate transaction and account balance information.

62. Section 7.2.3.10 of the May 2023 version of the Agreement states that Evolve is "responsible for the accuracy of your Account Statements."

63. Section 7.2.2 of that same version explains that Evolve is agreeing to be the customer's agent and custodian "in safekeeping" all customer deposits.

64. Finally, both versions of the Customer Agreement state that the Agreement itself would be available on Yotta's website.

65. Evolve also issued debit and credit cards for Yotta's customers. Those cards were issued with Evolve's name on them and Evolve was responsible for processing and settling all transactions on these cards. These debit cards allowed Yotta end users to spend money from their accounts at Evolve, and Evolve was responsible for providing updated information reflecting transactions using these debit cards. Below is an example of the front and back of one such card[6]:

 

66. Evolve provided account numbers for Yotta end users, and transactions were processed by Evolve using these account numbers and Evolve's routing number, as appropriate.

67. Evolve would provide data reflecting these account-level transactions to its service provider, Synapse.

68. Synapse would process this data and then provide Yotta with account-level information on a continuous basis through Yotta's app. In other words, Yotta was provided with real-time, continuously updated, account balances and transaction history for its customers. Any

---

[6] Numbers on the back of the card have been redacted.

time Yotta employees viewed the dashboard for the app, they would get access to this data in real-time. Yotta checked this data daily.

69. Evolve also had access to the data in Synapse's database and could and should have reviewed the data to ensure that the account statements were accurate.

70. For example, if an end user made a bill payment to their phone company, the user would utilize an Evolve routing number and account number to initiate the transaction. Evolve would then make the payment to the phone company, and report the transaction to Synapse in California. Synapse would then calculate the new account balance in California, and, from California, transmit the transaction information and account balance information to Yotta and its end user. To take another example, if a user wanted to direct deposit her paycheck, the user would provide an Evolve routing number and account number to her employer. The employer would then deliver the funds to Evolve. Evolve would report the transaction to Synapse in California, and, in California, Synapse would calculate the new account balance and, from California, disseminate the transaction and account balance information to Yotta and its end user.

71. Once again, Evolve represented that it complied with federal banking laws and regulations. These include the requirement that Evolve safeguard end user funds and ensure that the funds were actually available for withdrawal (e.g., 12 U.S.C. § 4002., 12 C.F.R. § 229.10), that Evolve disclose fees at the time it opened accounts with end users (see, e.g., 12 C.F.R. 1030.4), that Evolve make an itemized disclose regarding the type and amount of the fees at the time the fees were charged (e.g., 12 C.F.R. § 1030.6), and that Evolve had a duty to provide depositors accurate information about transactions involving the depositors' funds and the depositors' account balances (see, e.g., 15 U.S.C.A. § 1693d; 12 C.F.R. § 1005.9(b)).

**Evolve Repeatedly Represents that It Is Diligently Safeguarding Yotta User Funds**

72. In numerous meetings, telephone calls, and written correspondences, Evolve represented to Yotta that it was in fact carefully safeguarding Yotta's assets.

73. For example, in a call that took place in late September 2020, Moelis spoke to Evolve's Chairman, Scot Lenoir.

74. In advance of that call, Lenoir sent an email to Moelis on September 24, 2020. That email attached three PDFs describing Evolve's strong compliance, risk management, and operations departments that diligently guarded the assets of fintech customers. In those PDFs, Lenoir represented that Evolve "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," that Evolve "enforce[s] federally mandated regulations," that its technology team "[t]ediously test[s] and analyze[s] solutions before going live," and that Evolve offered banking accounts from which "deposited funds can be withdrawn at any time."

75. Moelis had additional calls with Lenoir on April 13, 2021 and December 7, 2022 via Microsoft Teams and in-person meetings with Lenoir on August 24, 2021 in the lobby of the Royalton Hotel in New York City and October 24, 2022 at the Palazzo Hotel in Las Vegas. During those meetings, Lenoir repeatedly assured Moelis that Evolve could fully handle all aspects of the parties' relationship. During these calls and meetings, Lenoir never disclosed any improper fees being charged to the accounts, did not disclose that Evolve had improperly withdrawn money, and did not disclose that there was a shortage of funds in the FBO account to cover Yotta end user's deposits. Nor did Lenoir disclose that the transaction data and account balance information that Evolve was delivering to Yotta and its end users through Synapse was false and misleading.

76. In addition to periodic assurances from Lenoir, Yotta received regular representations from others at Evolve that user money was being carefully watched.

77. For at least several months beginning on or about December 5, 2022, Evolve and Yotta held Compliance Check-in meetings via Microsoft Teams approximately every other week.

78. On November 15, 2022, Cecilia Russell, Evolve's Senior Vice President and Chief Compliance Officer, emailed Moelis and Hank Word, Evolve's President of Open Banking, copying several other Yotta employees. In her email, Russell wrote that Evolve "would like to discuss scheduling regular recurring meetings where we can collaborate on compliance related topics," and explained that "we want this to be an open dialogue and to work with you…."

79. On November 16, 2022, Stephen Hogg, Evolve's Lead Quality Assurance Specialist, sent a meeting invite to Moelis regarding the first such meeting. In that invite, Hogg described their

purpose as "to provide an open line of communication between Evolve and Yotta to address and resolve any present or future Compliance concerns."

80.     These meetings were generally attended by Hogg and Russell from Evolve and on the Yotta side were generally attended by, among others, Alex Gerson, Yotta's Vice President of Operations, and Sidhant Bahl, Yotta's Head of Risk Strategy.

81.     The first two such meetings took place on or around November 16, 2022 and December 5, 2022.  During these weekly meetings Evolve personnel claimed to be reporting any user complaints or compliance issues that arose concerning Yotta users or their funds.  Many of the issues raised by Evolve during these meetings were, in the grand scheme of things, relatively minor and inconsequential, such as an individual customer complaint.

82.     Because (a) Evolve had specifically told Yotta that "any present or future Compliance concerns" would be raised at these meetings, and (b) Evolve would regularly raise minor issues at these meetings, at all relevant times, Yotta believed that Evolve – which after all is a regulated bank – would disclose any and all compliance issues at these meetings.  For instance, if customer funds had been taken or were missing, Yotta always believed that, at the very least, Evolve would disclose and address the issue at the compliance meetings.  At no time did Evolve disclose during the compliance meetings (or otherwise) that customer funds had been taken or were missing or that Evolve had insufficient funds in the FBO account to cover Yotta end users' accounts.

83.     In addition to these weekly check-ins, as discussed above, Yotta received detailed, user-by-user transaction data on a continuous basis from Evolve and Synapse via an Application Programming Interface or "API".  Because it was custodying end users' funds, it was critical that Evolve report each and every transaction that it handled involving end user funds.  For example, when an end user's paycheck was direct-deposited with Yotta, the funds would be received by Evolve, and Evolve would transmit that information to Synapse, which would display it for Yotta and the end user.

84.     Yotta received this data continuously via the API from April 2020 through May 2024.

15

85. As described in the Customer Agreement, Evolve was responsible for both the safekeeping of these funds and for the accuracy of this data even though it was delivered through its service provider, Synapse.

86. Evolve and Synapse represented that all of the transactions involving end user funds that Evolve was processing and all customer account balances were being accurately reported to Yotta and its end users on a real-time basis. Evolve additionally represented that end users could spend or withdraw the entire balances that were being reported for their accounts so long as any deposits had cleared. The data itself explicitly identified the "available" balance, as most banks do. As an example, if a customer made a large deposit there might be a delay before it became fully available. But once it cleared, the full amount in the account would be "available" to the customer.

87. Evolve's legal counsel also confirmed that the accounts were being provided by Evolve and that users would have the ability to promptly withdraw all funds belonging to them.

88. For example, on May 11, 2023, Evolve's counsel at Latham & Watkins LLP, Parag Patel, emailed Moelis its redlined edits to the Synapse Consumer Reserve Account Agreement. Evolve edited the agreement as follows: "This Consumer User Reserve Account Agreement (this "Agreement") governs the non-interest bearing deposit account (the "Account") made available to you by ~~Synapse Financial Technologies, Inc. ("Synapse"), as a technology provider of~~ Evolve Bank & Trust ("Bank"), a member of the Federal Deposit Insurance Corporation (the "FDIC"), <u>in partnership with Synapse, as a technology service provider of Bank</u>." Sections 3 and 4 of this Agreement detailed those situations in which Evolve and Synapse could prevent a customer from withdrawing funds from an account. For instance, section 3.2 of the Agreement states that, with respect to ACH transfers, "You may only withdraw funds if you have made all the payments of the credit extended to you and your credit account is closed." At no point did the agreement disclose that customers might not be able to withdraw their funds because Evolve decided to take those funds for itself or transfer them to another customer.

**Evolve and Yotta Had a Special Relationship**

89. Evolve marketed itself to Yotta by emphasizing Evolve's close relationship with its fintech partners.

90.     For example, Evolve explained that its Open Banking program was "like extending [Evolve's] banking charter to other companies."

91.     Evolve also wrote that its fintech partners "trust us with their business, and we do not take that trust for granted," and that Evolve works "diligently alongside partners and regulators to ensure compliance standards are met."

92.     Yotta spoke with senior Evolve officers, including Evolve's chairman, Scot Lenoir, Evolve's Vice President of Fintech Business Development, Kristen Kines, and Evolve's Senior Vice President and Chief Compliance Officer, Cecilia Russell.

93.     Yotta and Evolve's relationship was far closer and more complex than that of a typical depositor in a bank.

94.     According to Evolve's agreement with Synapse, Evolve had "full control and continued oversight over each Program, including without limitation all policies, activities and decisions with respect to such Program." Yotta was one such program. Among other things, as discussed above, Evolve controlled Yotta's customer agreement with its end users.

95.     Evolve held bi-weekly compliance meetings with Yotta. Evolve explained that these regular recurring meetings would allow Evolve and Yotta to "collaborate on compliance related topics," and to have an "open dialogue" regarding compliance concerns.

96.     Evolve requested and received Yotta's marketing materials and provided feedback on them purportedly to address compliance and regulatory concerns. Among other things, Evolve also reviewed Yotta's website and demanded changes to the website to ensure it was to Evolve's satisfaction.

97.     Evolve benefitted greatly from this relationship as Yotta end users were required to open accounts at Evolve. Yotta's customers opened over 100,000 Evolve accounts.

98.     According to Evolve's contracts with Synapse, Evolve "exclusively owned" the relationship with each end user.

99.     In deciding to work with Evolve, Yotta became wholly dependent on Evolve to ensure that its customers' assets were protected. Those assets were the core of Yotta's business, and its business model was dependent on the interest generated from those deposits.

17

100.    Evolve and Yotta directly negotiated the interest rates Yotta would receive from the end user's investments.  For example, on November 18, 2020, Scott Lenoir sent the following email to Adam Moelis:

> Hi Adam
>
> Sorry for the delay in responding. We have seen deterioration in rate even in the last several days. Today we can offer 25 bps. As we discussed we are looking at different alternatives and I am hoping we can talk more about rate after the first of the year.
>
> Let me know if this works. Would be glad to jump on the phone if necessary.
>
> Thanks

Similarly, on April 12, 2022, Lenoir emailed Moelis to again offer that Evolve would pay Yotta 0.25% per year on all Yotta end user deposits.

101.    Evolve understood that Yotta's business was dependent on the end users' deposits remaining secure and maintaining accurate accounting of those deposits.  Evolve had control over these end user assets and knew that if it stole or lost them, Yotta's business would be damaged or destroyed.  As described below, that is exactly what happened.

102.    Evolve could reasonably foresee that the theft or loss of those deposits, inaccurate reporting about them to Yotta and end users, and the failure to identify compliance issues threatening the security of those assets would result in damage or destruction of Yotta's business.

103.    Evolve owed Yotta a duty of care to safeguard end users' deposits and to provide accurate and timely information to Yotta about those assets and about any compliance issues or concerns related to them.

104.    During the relevant period, substantially all of Yotta's revenues came from Evolve. In exchange for Yotta acquiring the customers at no cost to Evolve, Evolve would pay Yotta interest on Yotta's end users' deposits.  In other words, Yotta provided Evolve with a hugely valuable service – customer acquisition – and Evolve paid Yotta for that service.

105.    Yotta's business was inextricably intertwined with and wholly dependent upon Evolve's business.  In economic terms, Evolve was outsourcing significant aspects of its business to Yotta.  While banks traditionally find their own customers, Yotta was fulfilling that role for Evolve.  In addition, Yotta was (a) providing customer-facing services, including customer care services, (b) providing marketing services that promoted services being performed by Yotta and Evolve (and Evolve's service providers like Synapse), and (c) funding fraud losses.  All of these services are traditionally performed by banks.

106.    Yotta is one of a finite universe of fintech companies who have been harmed by Evolve's misconduct.

**Evolve Lies to Yotta About Missing User Funds**

107.    Yotta customer funds at Evolve would generate interest, and Evolve would pay much of that interest to Synapse which, in turn, would transmit significant amounts of the interest to Yotta.  In fact, as discussed above, Yotta and Evolve directly negotiated the interest amount that Yotta would receive.  These interest payments were Yotta's main source of revenue and would be used to fund the prizes distributed to users as well as Yotta's operations.

108.    In September of 2023, these interest payments to Yotta were suddenly suspended.

109.    In emails dated September 20, 2023, September 30, 2023, and October 3, 2023, Moelis specifically asked multiple Evolve personnel, including Lenoir and Hank Word, Evolve's President of Open Banking, why interest was not being paid.

110.    In an email dated September 25, 2023 from Word to Moelis, Word replied claiming that "we are addressing some contractual issues with Synapse" but promised that "this matter is being handled" and that the bank would "protect end users."

111.    On October 3, 2023, Lenoir replied via email to Moelis, also claiming that "we are currently addressing some contractual issues with Synapse," but again promised that it would "protect end users" and assured Yotta that it could "transition to another bank" should it or its users desire to do so.

112.    And on November 2, 2023, Evolve's outside counsel, Jeffrey P. Naimon of Orrick, Herrington & Sutcliffe LLP stated in a letter to Yotta's counsel, McGregor Johnson of Stinson LLP,

19

that the suspension of interest payments was the result of a "contractual disagreement that has occurred between Evolve and Synapse Financial Technologies, Inc.", that "we hope to resolve our contractual dispute with them in the next few weeks", and that "the Bank remains committed to providing updates to Yotta, as appropriate, regarding this situation."

113. None of these individuals disclosed any problems with the Yotta user funds Evolve was supposed to have in its possession.

114. Indeed, Evolve and Synapse continued to purport to report each and every transaction that it affected with end user funds, as well as the end users' supposed available account balances. This apparently reliable data feed was intended to and did assure Yotta and its end users that the end users' funds were properly custodied in the users' Evolve accounts and available for withdrawal. And indeed, Yotta customer withdrawals continued to function perfectly well.

115. But this was totally false, as Yotta would only learn later.

116. In a letter sent to Synapse on September 25, 2023, Evolve claimed that Synapse had "materially breached" its agreement with Evolve by failing to ensure that "the balance in each FBO account equals 100% of the amount of funds Deposited by end Users in connection with such FBO account." In other words, by September 25, 2023 at latest (but surely earlier) Evolve knew that it did not have enough money in the FBO account to cover all customer deposits.

117. As such, despite knowing on or before September 25, 2023 that user funds were missing, Evolve and Synapse never reported this information to Yotta and continued to report account transactions and balance info in order to assure Yotta and its users that user funds were 100% available and could be withdrawn or migrated to another bank. Every time that Evolve satisfied its legal obligation under banking laws and Section 1.4 of the Customer Agreement to deliver available balance info to end users and Yotta, it was representing that those funds were actually available for withdrawal. However, Evolve knew perfectly well that it had stolen tens of millions of dollars of customer funds, that its reporting fraudulently omitted these theft transactions, that it was running a ponzi scheme, and that the account balances that it was providing to Yotta and end users were not actually available for withdrawal. Evolve and Synapse continued to transmit this information despite

the fact that they knew the account balance information was false and the transaction information was, at the very least, incomplete and misleading.

118.     Evolve and its counsel's repeated representations that the only problem was a "contractual dispute" were knowing and intentional misrepresentations carefully designed to conceal the fact that Evolve had stolen end user funds and was running a ponzi scheme.

**Evolve Steals From Customers**

119.     While Yotta did not know (and could not have known) at the time, Yotta's investigation has since revealed that its customers' funds are missing because of Evolve's own misconduct.

120.     Beginning no later than June 2017, Evolve began taking funds from the FBO accounts that commingled end user monies.

121.     For instance, on the following dates, Evolve debited FBO accounts for over $5 million of "Account Analysis Charge[s]:"

- January 27, 2020: $1,191,831.76

- February 27, 2020: $1,049,719.31

- March 24, 2020: $941,099.24

- May 29, 2020: $856,224.25

- May 29, 2020: $710,508.92

- June 26, 2020: $436,768.58

122.     End users should never had been charged these amounts.  Evolve represented to Yotta and to its customers that it would not charge fees to the customers.  Evolve's December 2021 and May 2023 Customer Agreements, prepared by Evolve and provided to Yotta for its customers to sign, stated that "There are no fees charged by [Evolve]" and "you are not responsible for paying fees to the bank."  Moreover, a review of the contracts between Synapse and Evolve indicate that Evolve was not permitted to make such charges, which may explain why, in July 2020, Evolve changed course and began debiting a Synapse account titled "Evolve Fees" for the Account Analysis Charges instead of the FBO titled for end user accounts.

123.    The Account Analysis Charges were not an isolated incident.  Yotta's investigation indicates that Evolve misappropriated end user funds for other purposes.

124.    Evolve used a third-party service provider called TabaPay, Inc. ("**TabaPay**") to process certain payments on its and Synapse's behalf.

125.    Rather than paying the TabaPay fees itself or debiting a Synapse account for the fees, Evolve debited user FBO accounts for these fees.  Again, Evolve represented to both Yotta and end users that it would not charge them fees, and neither Yotta nor its users had any obligation to pay these amounts or ever consented to them.  As of September 2023, these improper debits totaled over $13 million, according to Synapse records.

126.    Recognizing its theft of end user funds, Evolve increased the required amount in a separate "reserve" account supposedly for the purpose of addressing shortfalls in customer funds.  To be clear, at no point were the reserve funds ever sufficient to make up for the funds that Evolve had stolen.  While Evolve stole at least $75 million in customer funds, the reserve never came close to that figure.

127.    Further, the reserve funds did not cure Evolve's theft or misrepresentations because the reserve funds were not available for withdrawal by end users (as end user funds were required to be).  To the contrary, Evolve treated the reserve account as its own piggy bank.  On April 8, 2024, Evolve misappropriated $7,901,777.28 from the reserve account.

128.    And the problem was only going to get worse.

129.    In early October of 2023, Evolve changed how one of its largest fintech customers, Mercury Technologies, Inc. ("**Mercury**"), connected to its systems.  Rather than connect to Evolve through Synapse, as Yotta and various other fintech companies did, Evolve arranged for Mercury to connect directly to Evolve's systems.

130.    Prior to this migration, according to records, Evolve held approximately $3.2 billion of Mercury customers' funds and $500 million of other fintech customers' funds in one or more commingled FBO accounts.

131.    This migration should not have impacted the total amount of money held on behalf of Mercury and its users.  But Yotta's investigation indicates that Evolve intentionally handled the

22

migration process in such a manner as to cause Mercury and/or its users to receive almost $50 million more than they were entitled to.

132. Evolve had a huge incentive to give Mercury end users more money than they were entitled to. Mercury end users had more than six times the amount of funds deposited with Evolve than did all other fintechs combined. Evolve desperately wanted to ensure the massive Mercury deposits stayed with Evolve. In order to do that, it had to preserve its relationship with Mercury and its end users. As a result, telling Mercury that it had stolen the end user funds and lied about it for years was not an option for Evolve. Further, by servicing Mercury and its end users directly instead of doing it indirectly through Synapse, Evolve would capture the profits that Synapse earned by being an intermediary. As a result, Evolve intentionally transferred the Mercury end user funds that it was supposed to be holding, even though Evolve knew perfectly well that it had created a shortfall and was not actually holding many of those funds.

133. Evolve's September 2023 correspondence with Synapse indicates that, by September 2023 at the latest, it was aware that there was a deficit in all fintech accounts that connected to Evolve through Synapse. As a result, before Evolve migrated Mercury's funds, it was perfectly aware that the FBO accounts did not have sufficient funds to migrate all of the funds that were supposed to be in Mercury end users' accounts.

134. However, an analysis of financial records and communications indicates that Evolve migrated all of the funds that should have been held on behalf of Mercury end users without regard to the shortfall. In effect, Evolve transferred Yotta end user funds to Mercury end users when it forced Yotta end users to absorb the shortfall in Mercury customer funds.

135. A December 21, 2023 email chain between Synapse's CEO, Sankaet Pathak and Evolve's Chief Technology Officer, Chris Staab which copied others including Evolve's CEO, Synapse states that there was a "deficit" in end user funds. Evolve agrees that "Synapse does not have enough funds to cover end user debits." When Evolve refers to Synapse "hav[ing]" funds, it appears to be referring to a deficit in Evolve FBO account(s) in which end user funds were supposed to be held. In the email chain, Synapse appears to state that "Taba Offset," "Account Analysis Offset," and "Mercury Issue Offset" are the three largest causes of the deficit.

23

136.    But again, despite the fact that Evolve and Synapse were purporting to report all transactions they were conducting with Yotta end user funds and the current account balances, their continuous data feed concealed the fact that Evolve was transferring Yotta end user funds to Mercury end users when it conducted the Mercury migration.  Neither Evolve nor Synapse ever informed Yotta or its users that money had gone missing and was not available to be withdrawn.  To the contrary, the account balances that they were continuously providing to Yotta and end users were falsely claiming users' funds were being safeguarded when, in fact, they had been misappropriated.

137.    Evolve again represented to Yotta that the aggregate amount of Yotta customer funds was fully accounted for in the FBO account during an October 9, 2023 telephone call.  On that date, Hank Word from Evolve, Caroline Stapleton, Evolve's outside counsel at Orrick, Moelis and Alex Gerson from Yotta had a call during which Evolve told Yotta its calculation of the aggregate amount of interest due directly to end users.  (By the fall of 2023, Orrick attorneys participated in many of the communications between Yotta and Evolve.)  The interest was calculated by applying a fixed rate of interest to the amount of Yotta end user funds that Evolve was actually holding.  That calculation indicated that all the funds were available in the FBO account, when in fact they were not.  Evolve paid the inflated interest to the Yotta users in order to conceal the shortfall in the users' funds.

138.    Evolve was also lying to Yotta and its end users by entering into customer agreements with new users.  For instance, between October 1, 2023 and October 10, 2023, Yotta end users opened 1,693 new accounts with Evolve.  Those 1,693 end users entered into the May 2023 Customer Agreement with Evolve.  For instance, on October 7, 2023, END USER 1 through END USER 217 opened Evolve accounts that required them to enter into the Customer Agreement.  (Pseudonyms are being used for these end users in order to protect their privacy.)  As discussed above, each time that Evolve entered into that Agreement, it was representing to Yotta and the end user that the end users' funds would be available, the account statements would be accurate, and that Evolve would safeguard the end users' funds.  As discussed above, in the May 2023 Customer Agreement, Evolve promised Yotta and end users that funds would be available to end users (Sections 1.4, 5), Evolve is "responsible for the accuracy of [the end users'] Account Statements" (Section 7.2.3.10), and Evolve

24

was agreeing to hold the funds "in safekeeping" for the end user (Section 7.2.2).  Evolve made these representations despite its knowledge that it had taken end user funds that it was not allowed to take, that there was a massive shortfall in end user funds, and, that it was running a ponzi scheme. Moreover, Evolve made these representations despite knowing that the balances it was reporting were incorrect due to Evolve's poor controls.  As a result, Evolve knew that the moment that new end users deposited funds with Evolve, the funds would not be safeguarded, would not be available for withdrawal, and the account balances provided to end users would not accurately reflect the amount of available funds.

139.    Put simply, Evolve knew that it had improperly stolen money from the FBO account and was running a ponzi scheme.  Evolve knew that the account data Evolve provided to Yotta through Synapse reflected account balances that were inaccurate and misleading as a result of Evolve's theft.  Yet despite Evolve's representations to Yotta that Evolve was responsible for providing accurate account balances, it did not tell Yotta that the user account balances being reported were both wrong and misleading as the users could not withdraw their balances since there were insufficient funds to do so.

140.    Evolve planned and carried out its fraudulent scheme in California.  For instance, Evolve CEO Scott Lenoir met with Synapse in San Francisco, California on January 22, 2018, February 27, 2019, and August 2, 2021.  Evolve senior executive Hank Word met with Synapse in San Francisco, California on September 3, 2019, August 2, 2021, September 8, 2022, and September 9, 2022.  The purpose of these meetings and other meetings that Evolve attended in California was to plan and carry out Evolve's fraudulent scheme.

**Evolve Seizes Whatever Money It Has Not Yet Stolen**

141.    On or about May 11, 2024, Evolve suspended access to all monies belonging to Yotta customers.

142.    Evolve provided no notice to Yotta or its customers that such a seizure was even contemplated.

143.    Instead, on May 11, 2024, Hank Word, Evolve Bank & Trust President, Open Banking sent a notice to Yotta stating as follows:

25

> Synapse has taken the action of turning off system access for Evolve. This has further limited our visibility into activity related to your program. For these reasons, and **to maintain the integrity and security of end user accounts**, Evolve will need to immediately freeze any activity that it believes may be related to Synapse Brokerage, including but not limited to any debit or credit cards issued by Evolve.

(Emphasis added.) This was yet another misrepresentation. Evolve had known for quite a while that it had taken Yotta customer funds and that it had breached the "integrity and security" of those funds.

144. In follow-up email correspondence between Word and Moelis of Yotta on May 11, 2024, Word wrote that the suspension "was the best way to make sure no unexpected, unsafe, fraudulent, or other improper activity occurs within the program." In fact, such activity had already taken place and it was conducted by Evolve itself.

145. At the time the instant action was filed, Evolve had frozen Yotta end users accounts and, as a result of the freeze, the end users had no access to the over one hundred million dollars in funds that they deposited with Evolve in good faith. Since that time, Evolve has returned a tiny fraction of Yotta end users' funds. Evolve has failed to return approximately $80 million of Yotta end users' funds that it stole. This confirms the fact that the account balance information that was delivered to Yotta and its end users was always false: While Evolve repeatedly promised that those balances were available for withdrawal, they were not available for withdrawal because Evolve had stolen at least $75 million in end user funds.

146. Evolve also acknowledges – but does not explain – that a substantial amount of customer money is missing. In filings submitted in connection with the Synapse bankruptcy, the trustee reports a "shortfall" totaling tens of millions of dollars.

**Evolve Conceals Its Misconduct**

147. In addition to the dishonesty described above, Evolve went to great lengths to conceal its theft.

148. In order to conceal its theft from its auditors, Evolve lied to its auditors about the identity of the FBO accounts in which Yotta and other fintech's end user funds were supposed to be held. On or about February 19, 2024, Chris Staab of Evolve represented in writing to its auditor,

26

Claire Goran of Crowe LLP, that Yotta and other fintechs' funds were contained in an enumerated list of FBO accounts. This representation was false. Evolve claimed that the end users' funds were in FBO accounts that did not, in fact, contain end user funds. And Evolve hid certain FBO accounts that did contain end user funds from its auditors. Concealing the location of end user funds from its auditors made it difficult or impossible for the auditors to discover Evolve's theft and lack of controls.

149. Evolve lied to journalists about its theft and the status of customer funds. On or about July 11, 2024, a senior Evolve executive told CNBC that Evolve would be returning all of the end users' funds in weeks. Evolve knew that this statement was false and had no intention of returning all of the end users' stolen funds.

150. Evolve also lied to this Court and Yotta about Evolve Bancorp's role in its fraudulent scheme. On January 23, 2025, Evolve confirmed in a formal stipulation that "counsel for Defendant Evolve Bancorp have represented that Defendant Evolve Bancorp was not involved in any of the acts or omissions alleged in the Complaint." (ECF Dkt. #40.) At that time, Evolve knew that that representation was false. In reality, as discussed below, since 2017, Synapse was Evolve Bancorp's agent and the services that Synapse was providing to fintechs (including Yotta) and end users were being provided on behalf of Evolve Bancorp as well as Evolve Bank & Trust.

**Data Breaches and Regulatory Actions Expose Evolve's Rotten Core**

151. While Evolve was assuring Yotta that it was a best-in-class bank, at least as early as 2020, Evolve knew that that was not the case. Evolve knew as early as 2020 that it was stealing end user funds. At that time, it also knew that it made sure it lacked the controls necessary to prevent it from stealing end user funds. Further, other events confirm that Evolve lacked the necessary controls and was far from a competent bank.

152. In or around December 2021, regulators concluded that Evolve lacked the necessary controls to satisfy its legal obligations. Banks were and are required to ensure that they obtain sufficient information about their clients and transactions to ensure that the banks are not participating in criminal activity or doing business with persons who have been sanctioned by the United States Government. Regulators concluded that Evolve was violating these legal obligations.

In order to address the regulators' findings, Evolve began manually reviewing wire transfers. Evolve delayed reporting wire transfers to Yotta and other fintech end users so that it could conduct these manual reviews. The delays were so long that wire transfers were not being reported to Yotta and others until weeks after the wires were sent. Making matters worse, Evolve concealed from Yotta and others its new manual process as well as the fact that it was delaying reporting of wire transfers.

153. Similarly, by no later than 2022, regulators determined that the 2017 Agreement between Evolve and Synapse (described in further detail below) failed to protect end users. As a result, regulators insisted that Evolve and Synapse enter into a new agreement.

154. On June 26, 2024 Evolve announced that it was "currently investigating a cybersecurity incident involving a known cybercriminal organization that appears to have illegally obtained and released on the dark web the data and personal information of some Evolve retail bank customers and financial technology partners' customers."

155. According to Evolve's Notice of Cybersecurity Incident online posting (the "Notice"), the compromised PII included individuals' names, Social Security numbers, dates of birth, account information and/or other personal information.

156. Remarkably, Evolve waited to notify its users about the theft of their personal data until *after it had been sold* to criminals on the dark web.

157. Either Evolve was so pathologically incompetent that it did not detect the penetration of its network and pilfering of its customers' most sensitive secrets, or it knew about the theft and chose not to tell customers, allowing criminals the ample opportunity to exploit those secrets without warning.

158. Either way, Evolve's claims that its systems were "highly secure" and that user "data is stored, and money is transferred at the highest industry standard set by the Federal Reserve" were shown to be utterly false.

159. In fact, less than two weeks earlier, on June 11, 2024, Evolve had entered into a Consent Decree with state and federal bank regulators, after an investigation had "identified deficiencies with respect to the Bank's risk management and compliance with applicable laws, rules, and regulations."

160. That Consent Decree, which is incorporated by reference, explains that deficiencies were found in examinations issued on August 11, 2023, August 30, 2023, and January 10, 2024.

161. While the specific nature of the deficiencies uncovered by the regulators is not identified, the Consent Decree represents an admission that Evolve's prior representations that it "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," and "enforce[s] federally mandated regulations," was false.

162. Moreover, the Consent Decree reflects Evolve's total lack of appropriate safeguards and practices to operate its fintech business without exposing its customers, partners, and programs to excessive and improper risk. The Consent Decree directs Evolve to submit a plan that, among other things, includes steps to "enable the timely identification, measurement, and reporting of risk exposures associated with each fintech partner, product, program, service, business line, or customer…"

163. The Consent Decree also prevents Evolve from opening any additional fintech programs without explicit approval from the supervising agencies: "Effective immediately, the Bank shall not without the prior written approval of the Supervisors: (i) establish any new fintech partners, subsidiaries, business lines, products, programs, services, or program managers related to [Open Banking Division, "OBD"], or (ii) offer new products, programs, or services to an existing fintech partner, program manager, or subsidiary of OBD…"

**Yotta Investigates the Missing Customer Funds**

164. Until Evolve froze end user accounts in May 2024, Yotta and its end users believed Evolve's repeated implicit and explicit representations that all end users' funds were being safeguarded and were available for withdrawal. Before then, as explained above, Evolve failed to disclose – and affirmatively concealed – critically important material facts about Yotta's customer accounts despite a duty to do so. Yotta could not have discovered the extent of Evolve's malfeasance and its injuries, all of which Evolve was well aware of, with reasonable care and diligence.

165. In the wake of the April 2024 Synapse bankruptcy and the May 2024 freezing of Yotta customer accounts, Yotta investigated what had happened to its users' funds in an effort to aid its end users.

166. Over the course of that investigation, Yotta communicated with high-level executives from multiple businesses that were directly involved in these events. Yotta was also able to obtain emails, letters, account statements, and other records.

167. This First Amended Complaint is based on this information, as well as Yotta's independent analysis of that information.

**Its Customers Fleeced, Yotta's Business is Devastated**

168. Evolve's misconduct has had a devastating effect on Yotta customers.

169. Yotta has received thousands of messages from its customers, many of whom have lost substantially all of their assets to Evolve's treachery. Many Yotta customers are faced with a sudden inability to pay their bills or otherwise provide for themselves.

170. Many of these users are furious with Yotta, and they can hardly be blamed. Even those who accept that Yotta played no role in seizing their funds and were unaware of Evolve's misconduct are unlikely to ever do business with Yotta again.

171. Yotta's reputation in the market, once sterling, has been tarnished, potentially beyond repair. Yotta's revenues have evaporated and its enterprise value, once substantial, has dwindled substantially.

172. With no other remedy available to it, Yotta brings this case to vindicate its rights against the bank whose dereliction of duty threatens to bury Yotta's once-promising business.

**The Relationship Between Evolve and Synapse**

173. With the exception of the Second Claim for Conspiracy, irrespective of their relationship with Synapse, Evolve is independently liable for all of the claims alleged herein. Evolve operates its Open Banking Business, stole $75 million in end user funds, made misrepresentations to Yotta and its end users, concealed its malfeasance, and engaged in the tortious conduct detailed in this Complaint. Even if Synapse played a role in some or all of these torts, any person who participates in a tort is liable for the tort irrespective of whether others also participated.

174. Further, as a chartered and regulated bank, Evolve had non-delegable duties. Evolve was required to safeguard end user funds and ensure that the funds were actually available for withdrawal. *E.g.*, 12 U.S.C. § 4002., 12 C.F.R. § 229.10. At the time that it opened accounts with

end users, Evolve was required to disclose fees. *See, e.g.*, 12 C.F.R. 1030.4. Evolve was also required to make an itemized disclose regarding the type and amount of the fees at the time the fees were charged. *See, e.g.*, 12 C.F.R. § 1030.6. Evolve had a duty to provide depositors accurate information about transactions involving the depositors' funds and the depositors' account balances. *See, e.g.,* 15 U.S.C.A. § 1693d; 12 C.F.R. § 1005.9(b). Evolve could not make these duties magically disappear by entering into contracts with Synapse. Nor can regulated banks enter into contracts with depositors that permit the bank to steal funds, charge illegal fees, or send false and misleading account information.[7] Evolve breached all of these obligations, and is independently liable for its breaches.

**Evolve Is Liable for Its and Synapse's Conduct**

175. Evolve is independently and directly liable for the misconduct described above.

176. Evolve has incorrectly claimed that if there was any misconduct, it was Synapse's doing. As set forth above, this position is incorrect. However, even if Evolve were correct, blaming Synapse does not allow Evolve to evade liability because (a) Synapse committed the torts in its capacity as Evolve's agent, (b) Evolve aided and abetted Synapse's tortious conduct, and/or (c) Evolve conspired with Synapse.

**(a) Synapse Is Evolve's Agent**

177. In addition to Evolve's liability for its own conduct, it is liable for the actions of its agent, Synapse.

178. Evolve is also liable for torts committed by Synapse because (a) principals are liable for the torts of their agents committed within the scope of the agency, (b) at all relevant times, Synapse was the agent of Evolve, and (c) to the extent that the torts alleged herein were committed by Synapse, it did so within the scope of its agency.

179. Evolve Bank & Trust, Evolve Bancorp, and Synapse agreed that Synapse would serve as agent for both Evolve entities with respect to Yotta and for other fintechs and their end users.

---

[7] In fact, Evolve did not even attempt to do so here. As set forth in this First Amended Complaint, the Customer Agreement required Evolve to make deposits available to end users and to provide accurate account balance and transaction information. The Agreement also prohibited Evolve from charging end users' fees.

Under the Bank Services Agreement dated April 18, 2017 (the "2017 Agreement") between Evolve and Synapse, Evolve Bank & Trust and Evolve Bancorp both appointed Synapse to be their agent. The 2017 Agreement defines both entities collectively as the "Bank." The 2017 Agreement's recitals explain that Synapse (which the Agreement defines as the "Company") "is in the business of providing software services on behalf of financial institutions to customers of Company ('Platforms') integrating with Company's application protocol interface and other software services ('API') in order to provide banking services to end Users." The recitals state that "Bank desires to retain Company to provide certain software, management, and other software services to offer the Services to Platforms and Users." And the recitals explicitly state that both Evolve entities are appointing Synapse as its agent: "Bank wishes to appoint Company as its agent to handle certain Origination Services, Deposit Services and other bank services for Users and the marketing and providing of such Services to Users as further provided herein." Section 3 of the 2017 Agreement unambiguously appoints Synapse as the agent of the two Synapse entities: "Subject to the terms of this Agreement, Bank hereby appoints Company as Bank's authorized agent solely to market the Services to Platforms and Users, and to perform such operational and customer support services hereunder to support the Services in accordance with the terms of this Agreement." Section 5(e) of the 2017 Agreement provided the Evolve entities with the "right to control, oversee, and audit" the services provided by Synapse.

180. On or about September 23, 2022, Evolve Bank & Trust and Synapse entered into a Master Bank Services Agreement (the "2022 Agreement") that prospectively governed the relationship between Evolve Bank & Trust and Synapse. Because Evolve Bancorp was not a party to the 2022 Agreement, the 2017 Agreement remained in effect between Evolve Bancorp and Synapse until at least the Synapse bankruptcy in April 2024.

181. Section 35 of the 2022 Agreement states that "to the extent required by Applicable Law, [Evolve's] appointment of [Synapse] as [Evolve's] authorized representative will establish an agency relationship, limited strictly to the rights, duties and obligations as set forth herein." Because the Applicable Law required Evolve – as a chartered and regulated bank – to safeguard, accurately track and report, and make available for withdrawal or expenditure end user funds, the 2022

32

Agreement confirmed Synapse's status as Evolve's agent with respect to all of the matters at issue in this action.

182. The 2022 Agreement afforded Evolve the right to control Synapse and the services provided by it. Section 3(a) states that "Bank shall have full control and continued oversight over each Program, including without limitation all policies, activities and decisions with respect to such Program." The same section continues to state that the Bank Services offered under the 2022 Agreement "are products of [Evolve]." Further, Evolve "shall retain decisional authority and control over each Program in all material respects, and that [Synapse] shall not implement any changes to any aspect of the Program except as expressly stated herein." Similarly, Section 6(d) states that "[t]he Parties acknowledge and agree that the relationship with each End User shall be exclusively owned by [Evolve]." Section 7(a) continues to state that Evolve "shall (and shall have the right to) supervise, oversee, monitor and review [Synapse and its key vendor's] performance of services" including "reviewing reports and financials from or related to each Program." In fact, under Section 7(q), Evolve had the right to perform – either itself or through a third-party – the services that Synapse was required to perform under the 2022 Agreement.

183. In addition to Evolve's general right to control Synapse's performance, Evolve had countless specific control rights. For instance, Evolve had the right to (a) approve all Synapse marketing materials before they were utilized (§ 4), (b) require changes to marketing materials that Evolve had previously approved (§ 5(a)), (c) approve all agreements, notices, and statements sent to end users (§ 6(a)), (d) approve and make changes to Synapse's compliance policies (§ (7(k)), (e) approve corrective actions to be taken by Synapse (§ 7(f)), (f) require Synapse to engage a third-party to review Synapse's compliance efforts (¶ 7(f)), (g) require Synapse to enter into a customer care agreement with Evolve (§ 7(m)), (h) "inspect, audit, and examine" Synapse's "facilities, records, personnel, books, accounts, data, reports, papers and computer records" (§ 8(a)), (i) "inspect, audit, and examine" certain materials from Synapse's key vendors (*id.*), (j) require Synapse to provide additional information and/or assurances in the event Synapse has issues with its financial condition (§ 9(a)), (k) require Synapse to "maintain all staffing, operational, and financial resources that are necessary or appropriate" to perform its obligations to Evolve (§9(b)), (l) require Synapse to

33

terminate an end user's agreement or services (§ 11), (m) prohibit Synapse from permitting end users to engage in any transaction or activity that was not specifically authorized by Evolve (§ 16), (n) approve Synapse's vendors and rescind approval after it is granted (§ 17(d)), and (o) control the terms of Synapse's contracts with its vendors (§ 17(h)).

184.    In practice, Evolve actually exercised substantially all of its rights to control Synapse and its conduct.  Most notably, Evolve controlled Synapse's reporting of financial information to Yotta and end users by determining which transactions it would disclose to Synapse and how it would disclose those transactions.  As discussed in more detail below, Synapse claims that Evolve ensured that Synapse did not report its theft of end user funds (including the Account Analysis Charges and TabaPay fees) by concealing those transactions from Synapse.

185.    Evolve controlled which fintechs Synapse worked with.  Synapse was required to put together a robust packet of information for each potential fintech, and Evolve would review the material and make a unilateral decision as to whether to authorize Synapse to enter into a contract with the fintech.  Evolve would also exercise control over the terms of the contract.  Similarly, Evolve controlled the contracts that end users entered into, and would edit those contracts to ensure they included the terms that Evolve desired.  Evolve determined the standards and compliance required for Synapse and Yotta to sign up end users.

186.    In addition to its contractual right to control Synapse, Evolve used its financial power over Synapse to control it.  Substantially all of the revenues that Synapse received for servicing end users who banked at Evolve came from Evolve.  Evolve used this financial leverage to exert control over Synapse, including withholding revenues from Synapse beginning in the fall of 2023.

187.    Although the 2022 Agreement contemplated that, as Evolve's agent, Synapse would be responsible for calculating account balances and reconciling those account balances with the actual amounts in the Evolve FBO accounts, that was not the reality.  In practice, according to Synapse, Evolve often misled Synapse as to the identity of the FBO accounts in which end user funds were held.  Synapse also claims that Evolve concealed its theft of end user funds from Synapse – including the Account Analysis Charges and Tabapay fees.  According to Synapse, Evolve reported the legitimate end user transactions that it processed at a time and in a manner that made it impossible

34

to accurately report the Evolve's unlawful transactions to end users. As a result, if Synapse's claims are true, until September 2023, Evolve made it impossible for Synapse to accurately report account balances to end users or to reconcile those account balances with the amount in the FBO accounts. (By September 2023 at the latest, Synapse was aware of Evolve's theft of the Account Analysis Charges and TabaPay fees. Synapse and Evolve decided to conceal those transactions from Yotta and its end users by continuing to send transaction and account balance information suggesting that the misappropriated end user funds were being safeguarded at Evolve and available for withdrawal. Similarly, in late 2023, Synapse and Evolve both knew that Yotta end user funds had been given to Mercury end users, but misrepresented to Yotta and its end users that those funds were made available for withdrawal.)

188. The 2017 and 2022 Agreements were not the only instances in which Evolve formally appointed Synapse as its agent. For instance, on or about June 18, 2019, Evolve and Synapse both executed an Agency Appointment that authorized Synapse "to execute the necessary agreements for the establishment of such products by Synapse to be provided, held, and controlled and managed by" Evolve. The Agency Appointment was always intended to be shown to third-parties who would enter into agreements with Evolve that would be executed by Synapse on Evolve's behalf. Evolve authorized the Agency Appointment to be provided to numerous third-parties, including Yotta, and it actually was provided to numerous third-parties.

189. Even if Synapse did not have actual authority, it had ostensible authority or Evolve ratified its tortious conduct.

190. Evolve led Yotta to believe that Synapse was Yotta's agent, and Yotta reasonably believed that Synapse was Evolve's agent. Evolve repeatedly told Yotta that Synapse was Evolve's agent. Evolve controlled the text of the 2021 agreement between Synapse and Yotta end users. In that agreement, Evolve insisted "Synapse is an agent of [Evolve] for some purposes and will be responsible for carrying out some of our responsibilities under this Agreement as our agent." Similarly, in the 2020 Master Services Agreement between Synapse and Yotta – which Evolve also controlled – provided that Synapse has "Agency appointment for the purposes of contacting financial services to be delivered by such financial institutions." With respect to Yotta end users, the financial

35

institution was obviously Evolve.  Further, Evolve specifically authorized Synapse to tell fintechs like Yotta that it was Evolve's agent, and Synapse repeatedly told Yotta that it was acting as Evolve's agent.  These statements were confirmed by the fact that (a) Yotta end users were banked with Evolve, (b) Evolve had a duty to send out accurate financial statement that included all transactions and account balance information, (c) Evolve handled end users transactions using its own routing number and debit card BIN (including ACH, wire, and card transactions), (d) Synapse had no way of discovering those transactions unless Evolve reported them to Synapse, and, as a result, (e) Synapse's reporting of end user account information was necessarily on behalf of and authorized by Evolve.

191.    Evolve also regularly ratified, buttressed, and supported the statements and representations made by Synapse.  As discussed above, in an October 9, 2023 telephone call, Evolve and its counsel provided an interest calculation to Yotta that represented the amount of funds Evolve was holding on behalf of Yotta end users.  This constitutes a ratification by Evolve of Synapse's reporting.  Evolve approved and adopted the reporting despite the fact that Evolve knew that it had stolen the end user funds years ago, it lacked controls, and there was a massive deficit in end user funds.

192.    Evolve and Yotta frequently discussed issues involving individual end users' accounts.  During those discussions, both Evolve and Yotta would refer to Synapse's reporting related to the end users' accounts.  Although Evolve would occasionally correct specific amounts or transactions in the reporting, with those exceptions aside, Evolve always stood by and ratified the reporting that had been disseminated by Synapse.

### (b) Evolve Aided and Abetted Synapse's Tortious Conduct

193.    Alternatively, Evolve aided and abetted Synapse's tortious conduct because it knew that Synapse was engaged in tortious conduct and provided substantial assistance or encouragement to Synapse.

194.    At all relevant times, Evolve knew that end users' funds had been stolen, the misrepresentations set forth herein were being made to Yotta and its end users, and that it and

Synapse were operating a ponzi scheme or ponzi-like scheme. Evolve knew perfectly well that all of this misconduct was wrongful.

195. Evolve provided substantial assistance and encouragement to Synapse by, among other things, (a) making all of the misrepresentations set forth herein, (b) providing all of the banking services that were necessary to support the fraudulent scheme, including reporting false and misleading end user transaction data to Synapse, Yotta, and end users, and (c) actively working to conceal the scheme from Yotta, end users, auditors, regulators, journalists, and the Court.

**Synapse Is Not a Necessary Party**

196. This First Amended Complaint asserts several alternative theories of liability against Evolve. Synapse is not a necessary party under any of these alternative theories of liability.

197. First, Evolve is primarily liable for its own tortious conduct without regard to whether Synapse bears any responsibility. Under this theory of liability, Synapse is not a necessary party under Fed. R. Civ. P. 19(a)(1).

198. Second, Evolve and Synapse are joint tortfeasors on account of (a) the fact that both parties participated in the torts alleged and are thus joint and severally liable for the tort, (b) in its capacity as Evolve's agent, Synapse engaged in tortious conduct, and Evolve is liable for such torts, (c) Evolve and Synapse conspired to commit the tortious conduct alleged herein, and/or (d) Evolve aided and abetted Synapse's tortious conduct. Joint tortfeasors are not necessary parties under Rule 19. *See Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990) ("As potential joint tortfeasors with Synthes, Dr. LaRocca and the hospital were merely permissible parties."); *Clear-View Techs., Inc. v. Rasnick*, No. 13-CV-02744, 2015 WL 1307112, at * 4 (N.D. Cal. Mar. 23, 2015); *Panette v. Fillmore Ctr. Assocs., LP*, No. 17-CV-07036-TSH, 2018 WL 5296294, at *4 (N.D. Cal. Oct. 23, 2018) (holding that agents were not necessary parties).

**Incorporation by Reference**

199. For the avoidance of doubt, this First Amended Complaint incorporates by reference all of the contracts and agreements referred to herein.

## FIRST CAUSE OF ACTION
## <u>FRAUD</u>

200.     Yotta repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

201.     Evolve made intentional representations of fact to Yotta.

202.     These included:

- Evolve's representations that it would not charge any fees to Yotta's customers. Evolve made this representation in the Customer Agreements, prepared by Evolve, provided to Yotta on December 2021 and May 2023, and reaffirmed by Evolve each and every of the more than 100,000 times that Evolve and a Yotta end user entered into the Customer Agreements. The Agreements stated that "There are no fees charged by [Evolve]" and "you are not responsible for paying fees to the bank." In fact, this representation was false as Evolve charged over $5 million in fees for "Account Analysis Charges" and over $13 million in TabaPay fees to the FBO account holding Yotta customer funds. Yotta had no way of knowing that Evolve was debiting these fees on the bank end when it explicitly represented it would not do so. These fees contributed to the massive shortage in funds that caused Yotta customers to lose their money and Yotta to lose its business.

- Evolve's representations that it would safeguard user funds. These include oral representations that Evolve had the organizational and technical ability to safeguard user funds by Evolve's Chairman Scot Lenoir to Yotta employees, including Adam Moelis, on or about September 24, 2020, April 13, 2021, August 24, 2021, October 24, 2022, and December 7, 2022 via teams and in-person in hotels in New York and Las Vegas. Evolve also represented to Yotta in the

38

Customer Agreement from May 2023 that it was responsible for safekeeping user funds and complying with applicable laws, which required Evolve to ensure that users' funds were available to them. These representations were false because Evolve did not safeguard user funds and instead stole them, creating a shortfall. This resulted in Evolve running a ponzi scheme, Yotta users losing their money and Yotta losing its business. Moreover, Evolve's lack of controls and history of regulatory violations demonstrates that Evolve had engaged in a practice of such risky conduct that it was unable to safeguard such funds.

- Evolve's representations that Yotta customers could withdraw the funds they deposited into their accounts. Among other places, Evolve made these representations (a) in the PDF materials Lenoir sent to Moelis on September 24, 2020, which state that Evolve offered accounts where "deposited funds can be withdrawn at any time," (b) in the email sent from its counsel, Parag Patel, to Moelis on May 11, 2023, which detailed the situations in which customers would not have access to their funds, and (c) in Section 5 to the December 2021 and May 2023 Customer Agreement, which describes fund ability and Section 7.2.2 of the same agreement which states that Evolve would safeguard customer funds as the customer's agent. These statements were false because the funds were unavailable on account of Evolve's theft of them.

- Evolve's representations that it would provide accurate account information. Evolve represented to Yotta that it would provide accurate account statements in the May 2023 Customer Agreement, which Evolve sent to Yotta in May 2023 and reaffirmed each time it entered into the Agreement with an end user. Section 7.2.3.10 of

the Agreement states that Evolve is "responsible for the accuracy of your Account Statements." These representations were false because the account balances Evolve provided via Synapse were false and misleading and the statements omitted the theft transactions. Evolve knew the balances were wrong because of their poor controls.

- The continuous representations Evolve made to Yotta via the Synapse API from 2020 to May 11, 2024 on a real-time basis that purported to state each and every transaction on the account and the account balances. These representations were false because (a) they did not reflect the fees that Evolve had unlawfully debited from the account containing the user funds, and (b) the balances were false and misleading.

- Evolve's representations, posted on its website, that Evolve's systems are "highly secure" and that user "data is stored, and money is transferred at the highest industry standard set by the Federal Reserve." Yotta employees, including Adam Moelis, reviewed this website and relied on these representations before deciding to work with Evolve. These representations were false because Evolve intentionally structured its systems so that they would allow Evolve's theft from end users. Moreover, Evolve continued to make these representations despite the fact that (a) regulators concluded again and again that Evolve's controls were insufficient to protect end users, and (b) Evolve knew that these representations were false.

- Written representations in PDF documents, sent by email on September 24, 2020 by Scot Lenoir, Evolve's Chairman, to Adam Moelis of Yotta that Evolve "[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions," that

40

Evolve "enforce[s] federally mandated regulations," and that its technology team "[t]ediously test[s] and analyze[s] solutions before going live." For the reasons set forth above, these statements were false because Evolve knew that its systems were intentionally designed to allow the bank to steal from end users.

- Evolve's representations that its bi-weekly compliance meetings would address existing compliance issues. Specifically, in a November 15, 2022 email from Cecilia Russell (Evolve's Senior Vice President and Chief Compliance Officer) to Moelis copying several other Yotta employees, Evolve represented that the meetings were to "collaborate on compliance related topics," and would "be an open dialogue." On November 16, 2022, in a meeting invite sent to Moelis, Stephen Hogg, Evolve's Lead Quality Assurance Specialist represented that the purpose of the meetings was "to provide an open line of communication between Evolve and Yotta to address and resolve any present or future Compliance concerns." These representations were false because Evolve knew that it was going to continue to conceal major compliance issues it had created, namely that it had improperly stolen millions of dollars in customer money and that the Bank's fintech business was actually a ponzi scheme.

- Evolve's fraudulent representations and concealment regarding its theft and the resulting shortage. At these biweekly compliance meetings Evolve fraudulently represented that it would raise all compliance issues, but instead the bank concealed the stolen funds and shortfall. The first two such meetings took place on or around November 16, 2022 and December 5, 2022. These meetings were generally attended by Hogg, Russell, Gerson, and Bahl. Many of

41

the issues raised by Evolve during these meetings were, in the grand scheme of things, relatively minor and inconsequential, such as an individual customer complaint. Evolve's representations at these meetings indicated that there were no serious compliance issues or risk management problems impacting the availability of Yotta user funds. By promising Yotta that it would raise all compliance issues and then only raising relatively small compliance issues, the participants in these meetings fraudulently concealed Evolve's theft and ponzi scheme.

- Written representations by Evolve President Word on or about September 25, 2023 in an email to Moelis that problems with Synapse were merely the result of "some contractual issues with Synapse" that were "being handled" in a manner that would "protect end users." These were false because (a) the problem was that Evolve had stolen end user funds and there was a resulting shortfall as opposed to a "contractual issue" with Synapse, and (b) the issues were in fact not being handled in a manner that would protect end users since those users were now the victims of a ponzi scheme.

- Written representations by Lenoir, on or about October 3, 2023, in an email to Moelis, that problems with Synapse were merely the result of "some contractual issues with Synapse," and that Yotta could "transition to another bank" should it or its users desire to do so. These representations were false for the same reasons as Word's email above, and for an additional reason: Yotta users could not transfer to another bank because there were not enough funds available.

- Written representations by Evolve's outside counsel, Naimon of Orrick, on or about November 2, 2023 to Yotta's counsel, McGregor

42

Johnson of Stinson LLP, that problems with Synapse were merely the result of "contractual disagreement that has occurred between Evolve and Synapse Financial Technologies, Inc." that could plausibly be resolved "in the next few weeks." These representations were false for the same reason.

- Evolve's written representation, sent by Word on or about May 11, 2024 that it was "maintain[ing] the integrity and security of end user accounts." Additionally, Evolve's representation in follow-up email correspondence between Word and Moelis on May 11, 2024, in which Word wrote that the suspension "was the best way to make sure no unexpected, unsafe, fraudulent, or other improper activity occurs within the program." These were misrepresentations. In fact, such activity had already taken place and it was conducted by Evolve itself. Evolve had known for quite a while that it had taken Yotta customer funds and that it had breached the "integrity and security" of those funds

- Evolve's false representation to Yotta that it complied with Federal banking laws and regulations. The December 12, 2021 and May 2023 Customer Agreements Evolve provided to Yotta and that Evolve entered into with more than 100,000 end users stated that the accounts were subject to applicable Federal Law. Similarly, Evolve's website, which Yotta reviewed, stated that Evolve "maintain[s]" its "charter and status with the Federal Reserve, the central banking system in the United States," and as such has an "obligation to always maintain compliance and security within our system, including regular system audits," ensuring "that data is stored, and money is transferred at the highest industry standard set by the Federal Reserve." According to Evolve, it had "a great

43

working relationship with regulators," and its "systems are checked regularly both by Federal regulators and external and internal auditors." In reality, Evolve knew that it had violated laws and regulations that (a) required Evolve to safeguard funds, make funds available to end users, and accurately report transaction and account balance information and (b) prohibited Evolve from charging undisclosed fees to end users.

203. These representations were material and Yotta relied on them. Yotta would not have agreed to use Evolve as a banking partner or recommend that its customers entrust their assets to Evolve absent these representations.

204. These representations were false. In truth:

- The supposedly comprehensive continuous reporting of transactions transmitted by Evolve to Yotta was false, as funds had secretly been misappropriated;

- Evolve charged fees despite its representation in the Customer Agreements that it would not do so and its representations in the account statements that no fees had been charged;

- The account balances were false and Yotta user funds were not genuinely accounted for and available from Evolve;

- There were serious compliance issues and risk management problems impacting the availability of Yotta user funds;

- Evolve did not have the organizational and technical ability to safeguard user funds;

- Evolve did not ensure that its clients met regulatory, compliance and risk mitigation requirements for all solutions, did not enforce

federally mandated regulations, and its technology team did not tediously test and analyze solutions before going live;

- Evolve's systems were not highly secure, user data was not stored, and money was not transferred at the highest industry standard set by the Federal Reserve;

- The problems with Synapse that impacted availability of interest payments in September of 2023 were not the result of a "contractual disagreement," made it impossible for users to "transition to another bank," and could not possibly be "resolved in a few weeks;"

- Evole had stolen rather than safeguarded end user funds;

- Evolve had violated rather than complied with applicable laws and regulations; and

- Evolve had concealed critical compliance issues rather than disclosing them.

205.    Evolve knew that its representations were false, material, and would be relied upon by Plaintiff in deciding to use Evolve as a banking partner and trusted custodian of its customer's money.

206.    To the extent any of Evolve's representations were not literally false, they were materially misleading and incomplete in light of Evolve's prior statements and Evolve had a duty to correct them and/or not to use them to perpetrate a fraud by omission.

207.    If Yotta had known that Evolve was a dishonest and incompetent bank that could not perform the most basic job of a financial institution (*i.e.* keeping track of customer money), it would have immediately ceased all business with Evolve and taken steps to ensure that customer funds were immediately returned.

208.    Yotta has been damaged by Evolve's false representations.

209. Evolve's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Yotta, entitling Yotta to punitive damages.

210. Accordingly, the Court should award damages against Evolve for fraud in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

211. Yotta repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

212. Evolve and Synapse conspired and agreed to commit fraud.

213. In furtherance of the conspiracy, among other things, Evolve and Synapse made the misrepresentations set forth above and misappropriated end user funds.

214. Evolve's misconduct and misappropriation injured Yotta.

215. Evolve's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Yotta entitling Yotta to punitive damages.

216. Accordingly, the Court should award damages against Evolve for fraud in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

217. Yotta repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

218. Evolve owed a duty of care to Yotta, to use reasonable care to protect and secure its customer's funds and to provide access to those monies, and to use reasonable care in providing to Yotta and its customers accurate and timely information about those assets and any compliance issues that could result in their loss.

219. Evolve had full knowledge of the types of harm that Yotta and its customers could and would suffer if failed to act in accordance with its duty.

220. Evolve made negligent representations of fact to Yotta, including those set forth above in paragraph 202.

221. These representations were material and Yotta relied on them.

222. Evolve knew that Yotta and its customers to rely upon these representations and intended for them to do so.

223. Yotta would not have agreed to use Evolve as a banking partner or recommend that its customers entrust their assets to Evolve absent these representations.

224. These representations were false, including for the reasons set forth above in paragraph 204.

225. To the extent any of Evolve's representations were not literally false, they were materially misleading and incomplete in light of Evolve's prior statements and Evolve had a duty to correct them and/or not to use them to perpetrate a fraud by omission.

226. Evolve lacked reasonable grounds for believing that its representations were true and failed to exercise reasonable care in ascertaining whether the representations were accurate.

227. If Yotta had known that Evolve was a dishonest and incompetent bank that could not perform the most basic job of a financial institution (*i.e.* keeping track of customer money) it would have immediately ceased all business with Evolve and taken steps to ensure that customer funds were immediately returned.

228. Yotta has been damaged by Evolve's false representations.

229. Evolve's conduct is morally reprehensible.

230. Evolve's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Yotta, entitling Yotta to punitive damages.

231. Accordingly, the Court should award damages against Evolve for negligence in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## <u>NEGLIGENCE</u>

232.    Yotta repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

233.    Evolve owed a duty of care to Yotta, to use reasonable care to protect and secure its customer's funds and to provide access to those monies.

234.    Evolve and Yotta had a special relationship as set forth above.

235.    Evolve had full knowledge of the types of harm that Yotta and its customers could and would suffer if failed to act in accordance with its duty.

236.    Evolve breached its duty by:

- Failing to keep accurate records of customer accounts;

- Knowingly transmitting inaccurate records of customer accounts to Yotta and to customers;

- Improperly debiting customer accounts for tens of millions of dollars in unauthorized charges;

- Seizing customer accounts and preventing customers from accessing funds belonging to them for (at least) months at a time;

- Failing to inform Yotta about drastic failures in accounting and risk management once they came to light;

- Continuing to hold and accept user funds after becoming aware of catastrophic failures in accounting and risk management, thereby increasing the consequences of the ultimate collapse.

237.    These breaches caused substantial damage to Yotta's business.

238.    Evolve's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Yotta, entitling Yotta to punitive damages.

239.    Accordingly, the Court should award damages against Evolve for negligence in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("CA UCL")
### (Ca. Bus. & Prof. Code §§ 17200, *et seq.*)

240.     Yotta repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

241.     Evolve is subject to the CA UCL.  The CA UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

242.     Evolve violated the "fraudulent" prong of the CA UCL as described in Plaintiff's First and Second Causes of Action.

Evolve violated the "unlawful" prong of the CA UCL as described in Plaintiff's First, Second, Third, Fourth and Fifth Causes of Action, and by violating (i) the program, recordkeeping and reporting, and compliance requirements of the Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), as well as the rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Chapter X), the requirements of Regulation H of the Board of Governors of the Federal Reserve System (12 C.F.R. §§ 208.62 and 208.63), and other industry standards set by the Department of the Treasury and the Board of Governors; (ii) the California Code of Regulations governing banks and trust companies, including Cal. Code Regs. tit. 10 § 10.3 governing Unsafe and Unsound Acts; (iii) Cal. Pen. Code § 404; (iv) the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.* and Regulation E, 12 C.F.R. § 1005.1, *et seq.*; (v) Regulation J, 12 C.F.R. 210.25, *et seq.*; (vi) the Expedited Funds Availability Act, 12 USC. ¶ 4001, *et seq.*, the Check Clearing for the 21st Century Act, 12 U.S.C. § 5001, *et seq.*, and Regulation CC, 12 CFR. 229, *et seq.*; (vii) the Federal Deposit Insurance Corporation Improvement Act of 1991, 12 U.S.C. 3201 *et seq.*, the Dodd–Frank Wall Street Reform and Consumer Protection Act, *id.*, and Regulation DD, 12 C.F.R. § 1030.1, *et seq.*; and (viii) other similar laws.

243.     Specifically, Evolve:

- Transmitted to Yotta supposedly comprehensive continuous reporting of transactions that were false, since funds had secretly been misappropriated;

- Transmitted to Yotta account balances were false, and Yotta user funds were not genuinely accounted for and available from Evolve;

- Had serious compliance issues and risk management problems impacting the availability of Yotta user funds;

- Did not have the organizational and technical ability to safeguard user funds as it claimed to the public and Yotta;

- Did not ensure that its clients met regulatory, compliance and risk mitigation requirements for all solutions, did not enforce federally mandated regulations and its technology team did not tediously test and analyze solutions before going live;

- Had systems that were not highly secure, user data was not stored, and money was not transferred at the highest industry standard set by the Federal Reserve; and

- Had problems that impacted availability of interest payments in September 2023 that were not the result of a "contractual disagreement," made it impossible for users to "transition to another bank" and could not possibly be "resolved in a few weeks."

244.    The UCL governs Evolve's illegal conduct because (a) its misrepresentations were created in California, disseminated from California, and received in California, and (b) Yotta was injured in California.  One of a bank's most critical functions is providing depositors accurate information about transactions involving the depositors' funds, fees charged to the depositors, and the depositors' account balances.  Evolve has a non-delegable legal obligation to perform this function and could not – through contract or otherwise – relieve itself of this legal obligation.  Evolve decided that it would perform this function through Synapse in California.  Evolve would continuously deliver end users' transaction data to Synapse in California.  By employing its legal rights and economic ability to control Synapse and unilateral control over which transactions were reported to Synapse and how those transactions were reported, Evolve exercised complete control over Synapse in its reporting functions.  In California, Synapse – under Evolve's control – would input the information provided by Evolve into its systems, use the provided information to compute account balances, and then disseminate the transaction and balance information to Yotta and users.

50

For the avoidance of doubt, all of these operations occurred in California. As discussed above, Evolve knew that the transaction and account balance information that it and Synapse were providing to end users was false. Evolve participated in and completely dominated the preparation, calculation, and dissemination of these representations. This false information was delivered to more than 90,000 of Yotta's end users who were California residents. More of Yotta's end users reside in California than any other state.

245. Yotta was also injured by Evolve's malfeasance in California. Since early 2023, Yotta's sole office has been a virtual office in California. It has always done business with its end users through its California office. Yotta has also had employees who resided in and worked from California. For purposes of the UCL, Yotta resides in and was injured in California.

246. Yotta has suffered lost money or property as a result of Evolve's CA UCL violations because it (i) would have immediately ceased all business with Evolve and taken steps to ensure that customer funds were immediately returned had it known the facts about Evolve's fraudulent, unlawful and woefully deficient systems and practices, and (ii) paid a price premium due to Evolve's false representations and omissions about its systems and practices.

247. Under the CA UCL, Plaintiff is entitled to all damages proximately caused by Defendant's conduct.

**SIXTH CAUSE OF ACTION**
**RESTITUTION BASED ON QUASI-CONTRACT/UNJUST ENRICHMENT**
**(Ca. Civil Code §§ 1750, *et seq*.)**

248. Yotta repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

249. Yotta conferred benefits on Evolve in deciding to use Evolve as a banking partner and trusted custodian of its customer's money.

250. Yotta marketed to prospective banking customers. To participate in Yotta's programs, end users were required to open a bank account. As a result of Yotta's efforts, end users opened over 100,000 Evolve accounts. Yotta spent in excess of $20 million persuading end users to open Evolve bank accounts, deposit funds with Evolve, and maintain their deposits at Evolve.

51

251.    End users also opened Evolve debit and credit cards.

252.    Evolve described itself as the owner of the relationship with end users.

253.    Yotta's end users deposited money in Evolve because they were participating in Yotta's program.

254.    Evolve profited from the end users Yotta brought to it.

255.    Evolve was enriched by the acquisition of these customers and had full knowledge that it was receiving this benefit.

256.    Yotta's business was inextricably intertwined with and wholly dependent upon Evolve's business.

257.    Evolve stole end users' money, stopped paying Yotta the interest it owed Yotta, and decimated Yotta's business.

258.    Evolve has been unjustly enriched in retaining the revenues derived from Yotta deciding to use Evolve as a banking partner and trusted custodian of its customer's money and providing more than one hundred thousand customers to Evolve, by retaining Yotta's customers' money, and by failing to pay Yotta interest due.

259.    Retention of those monies, including Evolve's profits, under these circumstances is unjust and inequitable because, as set forth above, Evolve falsely and misleadingly represented that it had the organizational and technical ability to safeguard user funds and was adequately doing so and instead stole, illegally transferred away, and refused to return user funds.

260.    These misrepresentations and omissions caused injuries to Yotta because it would not have used Evolve as a banking partner and trusted custodian of its customer's money had the true facts been known.   Yotta could have partnered with a different bank that would not steal its customer's funds and destroy its business.

261.    Evolve's conduct caused Yotta's business to lose essentially all value.

262.    Because Evolve's retention of the non-gratuitous benefits conferred on it by Yotta is unjust and inequitable and such conduct should be deterred, Evolve ought to pay restitution to Yotta for its unjust enrichment.

263.     As a direct and proximate result of Evolve's unjust enrichment, Yotta is entitled to restitution in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays that this Court:

A.     Award nominal, compensatory, liquidated, statutory, and punitive damages to Plaintiff in an amount to be determined at trial;

B.     Award litigation costs and expenses to Plaintiff, including, but not limited to, reasonable attorneys' fees;

C.     Award any additional and further relief as this Court may deem just and proper.

FIRST AMENDED COMPLAINT

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

**DATED:**    New York, New York
June 4, 2025

By:            /s/ Rishi Bhandari
Rishi Bhandari

MANDEL BHANDARI LLP
Rishi Bhandari
80 Pine Street, 33rd Floor
New York, NY 10005
T:  (212) 269-5600
F:  (646) 964-6667
rb@mandelbhandari.com

*Attorneys for Plaintiff Yotta Technologies Inc.*