1

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF CALIFORNIA

3  ------------------------------------x

4  YOTTA TECHNOLOGIES INC.,

5                          Plaintiff,    Docket No.

6      -against-                    3:24-cv-6456

7  EVOLVE BANCORP, INC., and

8  EVOLVE BANK & TRUST,

9                          Defendants.

10 ------------------------------------x

11                     Remote Deposition

12                     December 11, 2025

13                     10:30 a.m.

14

15              ** CONFIDENTIAL **

16

17      VIDEOTAPE RULE 30(b)(6) DEPOSITION of

18 EVOLVE BANCORP, INC., by CHRISTOPHER VENDETTI,

19 taken by Plaintiffs, held via videoconference,

20 before THOMAS HUBBARD, a Shorthand Reporter

21 and Notary Public within and for the State of

22 North Carolina.

23             GREENHOUSE REPORTING, INC.

24         313 West 118th Street - Unit 4C
              New York, New York 10026
25             (212) 279-5108

2

```
1  A P P E A R A N C E S:

2

3  MANDEL BHANDARI LLP

4  Attorneys for Plaintiff

5       80 Pine Street

6       New York, New York 10005

7  BY:  EVAN MANDEL, ESQ.

8

9  ORRICK, HERRINGTON & SUTCLIFFE LLP

10 Attorneys for Defendant Evolve Bank & Trust

11      The Orrick Building

12      405 Howard Street

13      San Francisco, CA 94105-2669

14 BY:  SARAH DAVIS, ESQ.

15      BETTY KIM, ESQ.

16      AMISHA R. PATEL, ESQ.

17 ALSO PRESENT:

18      THOMAS DEVINE, Legal Video Specialist

19

20

21

22

23

24

25
```

3

```
1                    I N D E X
2  WITNESS                 EXAMINATION BY    PAGE
3  CHRISTOPHER VENDETTI    MR. MANDEL          7
4
5                  E X H I B I T S
6  EXHIBIT # DESCRIPTION                     PAGE
7  65      Rule 30(b)(6) notice to Defendant  16
8          Evolve Bank & Trust
9  66      Document EBT-YOTTA-0032398          36
10 67      Email from JP                       39
11 68      Microsoft Teams chat about          43
12         Synapse being overdrawn on a
13         fees account
14 69      Evolve's Objections                 56
15 70      September 7, 2023 email from        69
16         Mr. Staab
17 71      Email chain beginning               77
18         EBT-YOTTA-0052810
19 72      Document 1231, REDACTED - CONFIDENTIAL  81
20 73      EBT-YOTTA-0010152                   98
21 74      EBT-YOTTA-0011063 through 66,      105
22         June 19 email from Mike Young
23          to Vendetti
24
25
```

4

```
 1              I N D E X (Continued.)
 2                E X H I B I T S
 3   EXHIBIT # DESCRIPTION                    PAGE
 4   75        Number 1015 EBT-YOTTA-0011365   111
 5             through 369
 6   76        EBT-YOTTA-0032493               117
 7   77        EBT-YOTTA-0033534               121
 8   78        EBT-YOTTA-0044535 through 537   124
 9   79        EBT-YOTTA-0044835               128
10   80        Number 1078, March 14, 2023,    129
11             email from Mike Racic.
12             Subject Re: Balances
13   81        Number 107, July 27, 2023       132
14             email from Mike Racic to
15             Scot Lenoir, Subject is Re: list.
16   82        August 1, 2023 email referring  141
17             to reconciliation documentation,
18             draft July 2023, REDACTED - CONFIDENTIAL
19             REDACTED - CONFIDENTIAL documentation
20   83        EBT-YOTTA-0120681               146
21   84        Document Synapse stating        155
22             $57 million deficit in
23             Synapse end-user funds
24   85        EBT-YOTTA-0053708               156
25   86        EBT-YOTTA-0231561
```

5

```
 1              I N D E X  (Continued.)

 2                E X H I B I T S

 3  EXHIBIT # DESCRIPTION                        PAGE

 4  87        May 1, 2024 email from            186

 5            Mr. Lenoir to Mr. Pathak

 6  88        ECF 10 in Synapse Bankruptcy      187

 7  89        EBT-YOTTA-0037064                 190

 8  90        EBT-YOTTA-0219102                 192

 9  91        2024 Consent Decree               221

10  92        ███ REDACTED - CONFIDENTIAL ███  dated  239

11            June 18, 2019

12  93        December 18, 2023 letter from     260

13            Orrick to Synapse

14  94        EBT-Yotta-0133558, August 15, 2024 275

15            email from Ignacio Sandoval to

16            Thomas Puyn and others

17  95        Number 1169, an email             280

18            EBT-Yotta-0054234

19

20          INFORMATION AND/OR DOCUMENT REQUEST

21               PAGE          LINE

22               233            9

23
```

```
24    (Index continued on the following page.)

25
```

6

1              I N D E X (Continued.)

2        INFORMATION AND/OR DOCUMENT REQUEST

3                PAGE          LINE

4                233            9

5

6      DIRECTION NOT TO ANSWER/MARKED FOR RULING

7                PAGE          LINE

8                 72            11

9                227            23

10               223            10

11               228            9

12               228            19

13               229            5

14               229            12

15               229            18

16               229            24

17               230            5

18               231            20

19               232            8

20

21

22

23

24

25

7

1            THE VIDEOGRAPHER:  Good morning.  We

2    are going on the record at approximately 10:35

3    a.m. on December 11, 2025.

4            Here begins a Rule 30(b)(6) deposition

5    of Christopher Vendetti for Evolve Bank & Trust

6    in the matter of Yotta Technologies Inc. v.

7    Evolve Bancorp, Inc. and Evolve Bank & Trust

8    before the U.S. District Court, Northern

9    District of California, Docket Number

10   3:24-cv-06456.  This deposition is being

11   conducted remotely using virtual technology.

12           My name is Tom Devine, and I'm the

13   legal video specialist with Greenhouse

14   Reporting.

15           The Court Reporter is Tommy Hubbard,

16   also with Greenhouse Reporting.  I would ask

17   counsel appearing remotely now to please state

18   their appearances beginning with the noticing

19   attorney after which Tommy will swear in the

20   witness and we may proceed.

21           MR. MANDEL: My name is Evan Mandel. I

22   represent the Plaintiff, and I am from Mandel

23   Bhandari, LLP.

24           MS. DAVIS: Good morning. Sarah Davis,

25   and Betty Kim and Amisha Patel from Orrick,

8

1  Herrington & Sutcliffe for Evolve Bank & Trust
2  and the witness. Before we get started, I would
3  like to designate the transcript confidential.
4         MR. MANDEL: I think everyone has noted
5  their appearance.
6         THE REPORTER:  Have the witness hold
7  up their driver's license so you can confirm
8  identity.  Tom the videographer will take a
9  screenshot.  Because this is a remote deposition
10 the Court Reporter, I, will not be physically
11 present with the witness whose deposition is
12 being taken.
13         The parties agree not to challenge the
14 validity of an oath administered by the Court
15 Reporter, myself, even if the Court Reporter is
16 a notary of a state other than where the
17 deponent is currently physically located.
18          Would each attendee starting with the
19 examining attorney please indicate your
20 agreement by stating your name, your firm
21 affiliation, and the party or parties you
22 represent and your agreement on the record?
23         MR. MANDEL:  Evan Mandel from Mandel
24 Bhandari, LLP on behalf of Plaintiff, we agree.
25         MS. DAVIS:  Sarah Davis with Orrick

9

1  agree on behalf of Evolve Bank & Trust and the

2  witness, we agree.

3          MS. KIM: Betty Kim on behalf of

4  Orrick, Herrington & Sutcliffe, on behalf of

5  Evolve Bank & Trust and the witness, I agree.

6  (Whereupon Christopher Vendetti is administered

7  the oath and agrees to the stipulation that the

8  remote oath has the full force and effect as

9  though the reporter was present in the same

10  room with the witness.)

11                  EXAMINATION

12  BY MR. MANDEL:

13          Q. Mr. Vendetti, have you ever been

14  deposed before?

15          A. Yes.

16          Q. On how many occasions?

17          A. One.

18          Q. ███████ REDACTED - CONFIDENTIAL ███████

19          MS. DAVIS:  This is a confidential

20  proceeding.

21          A. ███████ REDACTED - CONFIDENTIAL ███████

22          Q. Was it a civil case? Maybe you do

23  not understand the question.  Let me back up.

24  Let me just lay out a few ground rules which I'm

25  sure your lawyers went over with you, but I just

10

 1  want to make sure we are on the same page.

 2          First, you can take a break anytime

 3  you would like.  If you need to use the

 4  bathroom.  You need a drink of water.  You need

 5  coffee.  You need food.  You just need a break

 6  for the sake of you're tired and you need a

 7  break, any reason at all you are entitled to

 8  take a break.

 9          Just let me know. I'm happy to take a

10  break. The only exception to that is if a

11  question is pending, I will just ask that you

12  answer that question and then we can go ahead

13  and take that break.

14          The other important ground rule is

15  that if you don't understand one of my

16  questions, please just let me know, and that

17  might have been what was happening when I asked

18  you whether it was a civil case.

19          Maybe the term civil case you don't

20  know exactly what that means.  If there is ever

21  a question you don't understand, please just ask

22  me for clarification, and I am happy to clarify

23  it.

24          If you don't ask me for clarification,

25  I am going to assume you understand it. Do those

11

```
 1   ground rules make sense?

 2           A.  Yes.

 3           Q.                    REDACTED - CONFIDENTIAL

 4              REDACTED - CONFIDENTIAL

 5           A.   REDACTED

 6           Q.                    REDACTED - CONFIDENTIAL

 7   REDACTED - CONFIDENTIAL

 8           A.   REDACTED - CONFIDENTIAL

 9           Q.                    REDACTED - CONFIDENTIAL

10   REDACTED - CONFID

11           A.   REDACTED

12           Q.                    REDACTED - CONFIDENTIAL

13           A.                    REDACTED - CONFIDENTIAL

14              REDACTED - CONFIDENTIAL

15              REDACTED - CONFIDENTIAL

16              REDACTED - CONFIDENTIAL

17   REDACTED - CONFIDENTIAL

18           Q.             REDACTED - CONFIDENTIAL

19           A.   REDACTED - CONFID

20           Q.                    REDACTED - CONFIDENTIAL

21           A.                    REDACTED - CONFIDENTIAL

22   REDACTED - CONFIDENTIAL

23           Q.                    REDACTED - CONFIDENTIAL

24              REDACTED - CONFIDENTIAL

25           A.   REDACTED - CONFIDENTIAL
```

12

1      Q. What was that prior job?

2      A. I worked at a paper company.

3      Q. What paper company?

4      A. Verso Paper Company.

5      Q. Can you spell that for us?

6      A. V-E-R-S-O.

7      Q. What did you do at Verso?

8      A. I was their SEC reporting analyst.

9      Q. Was Verso a public company?

10     A. They were.

11     Q. How long did you work at Verso?

12     A. I think right at five years.

13     Q. Where did you work prior to Verso?

14     A. Terminix.

15     Q. What kind of company is that?

16     A. A pest control company.

17     Q. How long did you work there?

18     A. A year and a half.

19     Q. What did you do there?

20     A. I was a staff accountant.

21     Q. Did you have any full time jobs

22  before Terminix?

23     A. No.

24     Q. Did you graduate from college?

25     A. I did.

13

```
 1          Q. When did that happen?
 2          A. 2008.
 3          Q. What college and what was your
 4  degree in?
 5          A. The university was Harding
 6  University. My degree was in accounting.  Evan,
 7  one thing. I just need to correct my record. So
 8  in 2017 I was working at Wright Medical
 9  Technology.
10          Verso Paper would have been about
11  three years before that.  I forgot I was at
12  Wright Medical.      REDACTED - CONFIDENTIAL
13        REDACTED - CONFIDENTIAL        That's where
14  I was at, but it was just years later after I
15  left Verso.
16          I was at Wright Medical employed there
17  and then I went from Wright Medical to Evolve
18  Bank & Trust in the fall of 2017.
19          Q. Whenever you need to correct
20  something today, just let me know.
21          A. Sure.
22          Q. Could you spell?  Was it Wright
23  Medical?
24          A. Yes, and that's W-R-I-G-H-T.
25          Q. Did you say you worked there for
```

14

1  three years?

2          A. Correct.

3          Q. What did you do there?

4          A. I started out doing SEC reporting

5  there as well for, I think, the first two years,

6  and in the last year I was in their corporate

7  accounting group doing international accounting.

8          Q. Wright Medical is also a public

9  company?

10          A. Correct.

11          Q. Before working at Evolve, had you

12  ever worked for a bank?

13          A. No.

14          Q. Had you ever worked for a FinTech?

15          A. No.

16          Q. Am I correct that you said that you

17  started at Evolve in 2017?

18          A. Correct.

19          Q. What was your job at that time?

20          A. I was the controller for their SBA

21  division.

22          Q. What is the SBA division?

23          A. It's a Small Business Association

24  lending that works with the SBA government

25  division to provide loans to individuals.

15

1         Q. How long did you work in the SBA

2  division?

3         A. About a year and a half.  Maybe two

4  years.

5         Q. What was your next position at

6  Evolve?

7         A. I became the controller for their

8  payment processing slash open banking division.

9         Q. What were your responsibilities in

10  that capacity?

11         A. To maintain the financial accounting

12  records for that division.

13         Q. How long did you remain in that

14  position?

15         A. Up until October 2025.

16         Q. Are you currently employed at

17  Evolve?

18         A. Yes.

19         Q. What position did you move to in

20  October 2025?

21         A. I am the Senior Vice President of

22  Finance for the open banking division.

23         Q. Who do you report to?

24         A. The CFO, Mark Mosteller.

25         Q. Who does Mr. Mosteller report to?

16

1          A. The board of directors.

2          Q. When you were the controller for

3     payment processing and open banking, who did you

4     report to?

5          A. Mark Mosteller.

6          Q. I am showing you what has been

7     marked as Plaintiff's Exhibit 65.

8     (Whereupon, Plaintiff Yotta's Exhibit 65 is

9     marked for identification. Rule 30(b)(6) notice

10    to Defendant Evolve Bank & Trust.)

11         Q. Do you see this document here?

12         A. I do see the document.

13         Q. For the record, Plaintiff's Exhibit

14    65 is a Rule 30(b)(6) Notice to Defendant Evolve

15    Bank & Trust. Are you testifying today as

16    Evolve's corporate designee?

17         A. Yes.

18         Q. Are you prepared to testify as to

19    all the topics in Exhibit A to this deposition

20    notice?

21          MS. DAVIS: Objection. You have our,

22    objections, Evan.  We designated him on the

23    topics designated in our objection notice.  If

24    you want to go ahead with that.

25          THE REPORTER:  Sarah, you came a bit

17

1  garbled.  Could you repeat, please?

2        MS. DAVIS:  This is Sarah Davis for

3  Orrick, and I was saying that I was objecting,

4  and saying that Mr. Mandel has our objections to

5  the 30(b)(6) notice which states the topics that

6  he has been designated on.

7        Q. Mr. Vendetti, which of these topics

8  on this notice are you testifying on here today?

9        MS. DAVIS: Objection. Evan, this is

10  something that it makes no sense to quiz him on

11  this exhibit when we haven't fully stated out in

12  our objections which one we have designated him

13  on.

14        Q. Mr. Vendetti, you may answer the

15  question.

16        A. I would have to see the list that

17  has their objections on it.

18        Q. Looking at this you can't see.  Let

19  me go through it. Are you testifying as to 1(a)?

20        MS. DAVIS: Objection, Evan.  Just look

21  at our objections. It is exactly how we have

22  stated of what we were designating him on, and

23  the corporation has designated him as the

24  representative and we have specified what topics

25  we are designating him on.

18

1      Q. Mr. Vendetti, you may answer the

2  question.

3          A. Yes, I would need to see the list of

4  the exhibits with their objections on it.

5          Q. You can't say whether you are

6  testifying as to 1(a)?

7          MS. DAVIS: Evan, asked and answered.

8  Pull up the objections. That is what he is

9  designated on. The corporation has designated

10 him. It makes no sense to try to go through this

11 process when we have a clear list of what he has

12 been designated on.

13          Q.  Mr. Vendetti, do you know whether

14 you are testifying on Topic 1(b)?

15          A.  Evan, I only know the ones that

16 are going to be listed on the exhibit that have

17 their objections on.  I don't know them by name.

18          Q.  If I went through all of these, can

19 you see here on the screen, I'm just describing

20 the topic.  Topic 1(b), is shortfalls in FBO

21 accounts holding FinTech funds. Are you

22 designated on that topic?

23          MS. DAVIS: Objection.  Same objection,

24 Evan.  We have laid out our objections in the

25 objections and we have stated what we were

19

1  designating him on which is a subset of these

2  things. It's not a memorization test.

3          Pull up the objections. You can see

4  exactly what he has testified on, and you can

5  ask him that, and he will say, "I anticipated on

6  what we have agreed to testify on." This makes

7  no sense.

8          MR. MANDEL: I am going to object to

9  the speaking objections at this point.  You've

10  now said...

11          MS. DAVIS: I am not doing a speaking

12  objection. I am literally telling you.  Why are

13  you doing this?  We can go off the record if you

14  want, but this makes no sense. It is not a

15  memory test.

16          MR. MANDEL:  This is coaching the

17  witness.  I am going to continue asking my

18  questions. You cannot stop me from asking

19  questions. I know that you are trying to stop me

20  from to stop me from asking my questions. It's

21  totally improper. I am going to continue to ask

22  my questions.

23          Q. Mr. Vendetti, with respect to 1(b),

24  are you testifying on shortfalls in FBO accounts

25  holding FinTech funds?

20

1          MS. DAVIS: Same objection.

2          A. Evan, I would like to see the

3    exhibits that have their objections to it.

4          Q. Are you testifying as to Topic 1(c)?

5          MS. DAVIS: Same objection.

6          A. Evan, I would like to see the

7    exhibit that has their objections to it.

8          Q. Are you testifying as to Topic 1(d)?

9          MS. DAVIS: Same objection.

10          A. I would like to see the exhibit that

11    has their objections.

12          Q. If I go all the way through 1(r)

13    will you give me the same answer?

14          MS. DAVIS: Same objection.

15          A. Yes, sir.

16          Q. How about Topic 2, are you

17    testifying on Topic 2?

18          MS. DAVIS: Same objection.

19          A.  I would like to see the exhibit

20    with the objections on it.

21          Q.  Yes. I understand what you want to

22    see, but, Mr. Vendetti, I am allowed to ask the

23    questions I want to ask. I don't have to ask the

24    questions that Evolve wants me to ask.

25          That's how this process works.  I'm

21

1  going to ask this question again. Can you tell

2  me yes or no whether you have been designated on

3  Topic 2?

4         MS. DAVIS: Evan, stop harassing the

5  witness. Our objections have been stated. This

6  is not a fact question. This is what the company

7  has designated him on. So same objections.

8         Q. Mr. Vendetti, you may answer the

9  question.

10        A. Evan, no, I don't.  Without seeing

11 the list, I did not memorize these to know what

12 I am being put forth for.

13        Q. Would your answer be the same for

14 Topics 3, 4, 5, through 12?

15        A. Yes, sir.

16        Q. I have been doing this 20 years, and

17 I have never had a witness not know what topics

18 are they are designated on.  I am going to be

19 honest. I am totally floored.  But I'm just

20 going to keep going.

21        MS. DAVIS:  Just open the objection

22 list.  That clearly states out what he has been

23 designated on.

24        Q.  Were there any problems or issues

25 with any of the transactions or account

22

1  information that Evolve reported to Synapse?

2          MS. DAVIS: Objection.  Vague.

3          A. Yes, I'm sorry.  I don't fully

4  understand your question. Can you rephrase it?

5          Q. Sure. Which part of it do you not

6  understand?

7          A. I just don't understand what you are

8  asking.

9          Q. Would Evolve ever transmit any

10  account information to Synapse?

11          MS. DAVIS:  Objection.  Vague.

12          A.  Transmit account information.  Like

13  what are you -- I am still not clear what you

14  are asking.

15          Q. Did Evolve have a relationship with

16  Synapse?

17          A. Yes.

18          Q. Was Synapse a service provider to

19  Evolve?

20          A. We had a contract with Synapse to

21  provide banking services to Synapse and Synapse

22  used those banking services to provide them to

23  the programs of their customers.

24          Q. Was Synapse Evolve's service

25  provider?

23

1          A. I don't know quite like the

2    definition of what that would be, but to my

3    knowledge, Synapse was not a service provider

4    for Evolve. Evolve contracted with Synapse, and

5    Synapse used their services to reach their

6    customers.

7          Q. In connection with that relationship

8    between Evolve and Synapse, would Evolve ever

9    provide any information about transactions in

10   the Synapse users' accounts at Evolve?

11         A. Evolve would send transactional data

12   to Synapse for the accounts that they held at

13   Evolve.

14         Q. What transactional data would Evolve

15   send to Synapse?

16          MS. DAVIS:  Objection.  Vague.

17         A. What transactional data would they

18   send to?  What was your question?

19         Q. What transactional data would Evolve

20   send to Synapse?

21          MS. DAVIS:  Same objection.

22         A. Evolve would send transactional data

23   to Synapse for the transactions that Synapse

24   processed through Evolve.

25         Q. What types of transactions were

24

1  those?

2          A. Whatever transactions that Synapse

3  sent us to process.  It could be something like

4  an ACH file transaction, a wire origination.

5          Q. Any check transactions?

6          A. Yes.  Like remote deposit capture.

7  Transactions like that.

8          Q. Any other types of transactions

9  about which Evolve would send information to

10  Synapse?

11          A. I don't think so.  I think that's

12  between ACH, wire, and check. Those are the

13  transactions that happen at the bank that we

14  processed for.

15          Q. How about debit transactions?

16          A. What do you mean debit transactions?

17          Q. Transactions made with a debit card?

18          A. Those would come from a processor.

19          Q. Would the processor deliver

20  transaction data about debit card transactions

21  directly to Synapse?

22          A. That is a question for Synapse

23  because that is a relationship that they would

24  hold. We don't hold the processor relationship

25  on the debit card side.

25

1          Q. Did Evolve ever transmit any

2    information about debit card transactions to

3    Synapse?

4          A. The only way that we would have

5    debit card information would be the settlement

6    wire from the payment network for their

7    respective debit card and that would be in those

8    wire transmittals I just discussed.

9          Q. How about credit card transactions?

10   Would Evolve ever transmit any credit card

11   transaction data to Synapse?

12         A.  It would be the same thing.  Just

13   discussed about a debit card is going to rely

14   with the processor and then we would pass the

15   settlement wire which would be the same thing in

16   a wire transaction.

17         Q.  How would Evolve transmit that

18   transaction data to Synapse?

19         A. The ACH transaction data?

20         Q. Yes.  I mean if there are different

21   answers for ACH, wire, or RDC, let's go through

22   them one at a time, but if Evolve would transmit

23   all of the data the same way, then we can just

24   cover it in one question.

25         A. For the actual transactions, for

26

1  ACH, we would deliver a file to them.  That

2  would be either in a JSON format or a CSV format

3  and we would drop it to their secured file

4  transfer sites, and they would pick it up, and

5  that would be true for ACH, wire, and check.

6         Then, in addition to that, we would

7  provide them account activity. So that means

8  their actual bank account we would give them a

9  record of every debit and credit that affected

10 their account and we would pass that information

11 to them in an account activity file and that

12 would also be neither a CSV or a JSON format

13 delivered the same way secure file transfer.

14        Q.  How frequently would that

15 information be delivered by Evolve to Synapse?

16        A. Multiple times a day.

17        Q. Would it be more or less continuous

18 throughout the day or would it be a handful of

19 times throughout the day or somewhere in

20 between?

21        A. I don't recall. I know for some of

22 it it would be event driven, so it has a file

23 that will process.  The output would go back to

24 Synapse. So if they would have the records

25 affected in a timely manner.

27

1      Q. Were there ever any problems or

2  issues with the transaction data that Evolve

3  would transmit to Synapse?

4           MS. DAVIS: Objection.  Vague.

5           A. I am not aware of any.

6      Q. Between 2019 and 2025, you are not

7  aware of any problems or issues with the

8  transaction data that Evolve delivered to

9  Synapse?

10          MS. DAVIS:  Asked and answered.

11          A. No.  Not in the sense that something

12 is wrong with the transactional data that I'm

13 aware of.

14          Again, I work in finance. I am not in

15 the file delivery piece of it.  If there was

16 something, I just may not know about it.

17     Q.  Would Synapse ever deliver any data

18 to Evolve?

19          A. Yes.  Synapse would provide some

20 data to us.

21     Q. What data would Synapse provide to

22 Evolve?

23          A. They would provide debit card

24 transaction. As you mentioned earlier, since

25 they had the relationship with the processor

28

1  they would send us those transactions, and then

2  they would provide to us what we would call a

3  FinTech ledger file, or a ledger file, and that

4  would tell the balances for the end-users for

5  all their platforms at a point in time.

6          Q. Any other info that they provide to

7  you?

8          MS. DAVIS: Objection.  Vague. Are you

9  asking for transaction data? Evan, can you be a

10  little more specific?

11         MR. MANDEL:  Yes, I am asking about any

12  other information relating to users' accounts.

13         MS. DAVIS: Same objection.  Vague.

14         A. Yes.  Outside of what I just

15  described, I don't know of any recurring file

16  transfers that related to anything else.

17         Q. How frequently would Synapse deliver

18  that information to Evolve?

19         MS. DAVIS: Objection.  Vague.

20         A.  Which information?

21         Q. Let's start with the debit card

22  information.

23         A. I don't know the frequency. I know I

24  looked at it on a monthly basis, but that

25  monthly basis would have a file for every day.

29

1  So I don't know if this is delivered every day

2  or if it was delivered in batches weekly, but we

3  would get the data.

4          Q. How about the FTL ledger file?

5          A. The FTL ledger file would have been

6  a daily file.

7          Q. Would Evolve check the information

8  that it was receiving from -- let me ask a

9  slightly different question. Would the data that

10 Synapse delivered to Evolve be automatically

11 opened or automatically integrated into Evolve's

12 system or would someone have to manually open or

13 import or integrate that information?

14          MS. DAVIS: Object on scope, but you

15 can answer, if you know.

16          A. The debit card information it was

17 not ingested automatically. It would be a manual

18 action to review it. For the FTL data, it would

19 get ingested automatically, but it would be

20 ingested into a database. So it is just being

21 stored in its own local database that could be

22 queried.

23          Q. The debit card info that had to be

24 downloaded manually, would Evolve download that

25 manually every day or were there days where it

30

1  didn't bother to download the data?

2          MS. DAVIS: Same objection.  Scope. You

3  can answer, if you know.

4          A. It is not download.  It's delivered

5  every day. It sits in a file so we utilize it.

6  It just wasn't being ingested into a database.

7          MS. DAVIS:  Are you using that for

8  business days or are you using that for everyday

9  so that we have a clear record on that?

10          MR. MANDEL:  That's a perfectly

11  reasonable question. I am talking about every

12  day.  Not just business days.

13          Q. I am wondering whether there are any

14  days, whether they business days or non-business

15  days, when someone was not manually downloading

16  the debit card info?

17          A.  Again, the information wasn't -- it

18  is not manually downloaded, right, so they drop

19  it and it sits on our final servers for all time

20  until, if we were to remove it or archive it, so

21  it is always there.  So it's not about

22  downloading.  It is just about accessing it.

23          Q. Would that data be accessed on the

24  day it arrived or sometimes it wouldn't be

25  accessed on the day that it arrived?

31

1          A. Again, I don't know.  When I used

2    it, it was on a monthly cadence.

3          Q.  I am showing you Exhibit 66 --

4    actually, before I do that.  Were FinTech users

5    permitted to maintain negative balances in their

6    accounts?

7          MS. DAVIS: Objection.  Scope. Can

8    answer, if you know?

9          A.  I don't know, with certainty.  I am

10   not going to because how the program like a

11   FinTechs are sent out with running it or

12   allowing end-users to run it.

13         Q.  REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15         MS. DAVIS: Same objection.  Scope.

16   You can answer, if you know.

17         A.  REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL

20         Q.  REDACTED - CONFIDENTIAL

21         A.  REDACTED - CONFIDENTIAL

22   REDACTED - CONFIDENTIAL

23   REDACTED - CONFIDENTIAL

24   REDACTED - CONFIDENTIAL

25   REDACTED - CONFIDENTIAL

Greenhouse Reporting, Inc.                    (212) 279-5108
www.GreenhouseReporting.com

32

1      REDACTED - CONFIDENTIAL

2      REDACTED - CONFIDENTIAL

3      REDACTED - CONFIDENTIAL

4      REDACTED - CONFIDENTIAL

5      REDACTED - CONFIDENTIAL

6      REDACTED - CONFIDENTIAL

7      REDACTED - CONFIDENTIAL

8      REDACTED - CONFIDENTIAL

9      REDACTED - CONFIDENTIAL

10     REDACTED - CONFIDENTIAL

11     REDACTED - CONFIDENTIAL

12     REDACTED - CONFIDENTIAL

13     REDACTED - CONFIDENTIAL

14     Q. You said the system was called

15 Jackie something?

16     A. Jack Henry.

17     Q. I'm sorry.  Jack Henry?  What was

18 the last part?

19     A. SilverLake.  The company is Jack

20 Henry Association.

21     Q. Did Jack Henry Association sell you

22 the software or is this a storage facility that

23 they offer?  Would you just describe the

24 mechanics of exactly what the Jack Henry system

25 is?

33

1          MS. DAVIS: Objection.  Scope. You can

2    answer, if you know.

3          A. Jack Henry is banking software that

4    is sold to a lot of financial institutions. I

5    don't know.  It was here prior to me arriving.

6          Q. Could Evolve's Jack Henry system

7    send machine readable information to Synapse?

8          MS. DAVIS: Objection, scope.  Calls

9    for speculation.

10          A. Yes.  I don't know the answer there.

11          Q. Who at Evolve would know the answer

12   that question?

13          MS. DAVIS: Objection.  Calls for

14   speculation.  You can answer if you know.

15          A.  I don't.

16          Q. Did Synapse ever request information

17   from the Jack Henry system in machine readable

18   format?

19          MS. DAVIS: Objection.  Are you asking

20   if they asked Jack Henry or perhaps Evolve?  I

21   am a little unclear.

22          MR. MANDEL:  I could not hear you,

23   Sarah.

24          MS. DAVIS:  Sorry.  Are you asking if

25   they asked Jack Henry or if they have somebody

34

1  at Evolve?

2       MR. MANDEL:  Somewhat at Evolve.

3       A.  Maybe I am not clear.  When you

4  say machine readable, help me out there?

5       Q. Sure.  Sure. By machine readable, I

6  mean like an Excel file or a CSV file or some

7  file that could be in which the information

8  could be automatically integrated into some kind

9  of database system?

10       A. Restate your question again, Evan,

11  since I know that now.

12       Q. Sure.  Did Synapse ever request that

13  Evolve provide information from the Jack Henry

14  system in a machine readable format?

15       A. Yes.

16       Q. Did Evolve satisfy that request?

17       A. To my knowledge, yes.

18       Q. Were there any limitations

19  whatsoever on Evolve's ability to provide

20  information from the Jack Henry system in a

21  machine readable format?

22       MS. DAVIS:  Objection.  Vague.

23       A. Yes, help me out.  Say it again?

24       Q. Let me rephrase it.  Sure. Let me

25  phrase it. I understand your testimony that

35

1  Evolve provided Synapse with some machine

2  readable information from Jack Henry.

3          What I am now asking is:  were there

4  any instances in which Synapse requested certain

5  information from Jack Henry that was in a

6  machine readable format and Evolve was unable to

7  satisfy those specific requests?

8          MS. DAVIS: Objection.  Misstates some

9  prior testimony, but you can go ahead.

10          A. I am not sure.  To my knowledge, if

11  they requested the information and it is

12  available on Jack Henry we would provide it to

13  them.

14          Q. You would provide it in a machine

15  readable format; correct?

16          A. Yes, as often as we could unless

17  they requested a PDF statement which wouldn't be

18  in machine readable format, but we would still

19  provide it if it was requested.

20          Q. Did Synapse ever request PDFs?

21          MS. DAVIS: Objection.  Vague.

22          A. Yes.  I don't know.

23          Q. Did Evolve ever provide PDFs from

24  the Jack Henry system to Synapse?

25          MS. DAVIS: Objection, vague, and also

36

1  I think scope.

2          A.  Yes.  I don't.  I can't say with

3  certainty yes or no on that.

4          Q. I show you Plaintiff's Exhibit 66.

5  This begins on EBT-YOTTA-0032398.

6  (Whereupon, Plaintiff Yotta's Exhibit 66 is

7  marked for identification. Document beginning on

8  EBT-YOTTA-0032398.)

9          Do you recognize this document, Mr.

10 Vendetti?

11          Ms. DAVIS:  Can you help him so he can

12 get the whole document so he can review it?

13 Even, can you say which one it was again?  I'm

14 sorry.

15          MR. MANDEL:  Sure.  It begins on

16 32398.

17          MS. DAVIS:  I'm not seeing it.

18          MR. MANDEL:  Is it not in the chat? I

19 think it is the fourth document.  I think it is

20 1032 are the first four numbers?

21          MS. DAVIS:  Just give us a moment. I

22 am downloading all the documents now.

23          A. I can see it now. What was your

24 question?

25          Q. Sure.  ▮▮▮▮ REDACTED - CONFIDENTIAL ▮▮▮▮

37

1       REDACTED - CONFIDENTIAL

2       A.       REDACTED - CONFIDENTIAL

3       Q.       REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5            MS. DAVIS: Objection.  Scope.  You can

6    answer if you know.

7       A.       REDACTED - CONFIDENTIAL

8       REDACTED - CONFIDENTIAL

9       Q.       REDACTED - CONFIDENTIAL

10       REDACTED - CONFIDENTIAL

11   REDACTED - CONFIDENTIAL

12       A. I don't recall.

13       Q.       REDACTED - CONFIDENTIAL

14       REDACTED - CONFIDENTIAL        What

15   did you understand that to mean?

16            MS. DAVIS: Objection.  Calls for

17   speculation.

18       A.  I am not sure at all.  When I was

19   looking at this is just from five years ago. I

20   am  just not hundred percent sure from this

21   conversation what he is talking about.

22       Q.       REDACTED - CONFIDENTIAL

23       REDACTED - CONFIDENTIAL

24       REDACTED - CONFIDENTIAL

25            MS. DAVIS: Objection.  Calls for

38

1  speculation.

2           A. Yes.  I am unsure.

3           Q. Do you recall anything about this

4  document?

5           MS. DAVIS: Objection.  Have you

6  reviewed the whole thing?

7           A.  I have looked at the whole thing

8  yet.

9           Q. Setting aside the document, do you

10 recall anything about problems with the ACH

11 database?

12          MS. DAVIS: Objection.  Vague. You are

13 talking about in November of 2020, Evan?

14          MR. MANDEL:  At any time.

15          A.          REDACTED - CONFIDENTIAL

16     REDACTED - CONFIDENTIAL

17     REDACTED - CONFIDENTIAL

18     REDACTED - CONFIDENTIAL

19     REDACTED - CONFIDENTIAL

20          REDACTED - CONFIDENTIAL

21     REDACTED - CONFIDENTIAL

22     REDACTED - CONFIDENTIAL

23 REDACTED - CONFIDENTIAL

24          REDACTED - CONFIDENTIAL

25     REDACTED - CONFIDENTIAL

1       REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3                  REDACTED - CONFIDENTIAL

4           REDACTED - CONFIDENTIAL

5       REDACTED - CONFIDENTIAL       That would be

6    outside of my knowledge.

7             Q. I turn your attention to Plaintiff's

8    Exhibit 67. This begins on page

9    EBT-YOTTA-0035269 and continues through 270.

10   (Whereupon, Plaintiff Yotta's Exhibit 67 is

11   marked for identification.  Email from JP.)

12            MS. DAVIS:  Can you say the first

13   four? Evan, can you say the first four? It's

14   hard to find in the chat without that.

15            MR. MANDEL:  1042.

16            MS. DAVIS: You have it in front of

17   you?

18            A.  Evan, if you can scroll up.  I

19   just want to make sure I have the same one.

20            MR. MANDEL:  Let me know when you have

21   had the chance to review it.

22            A.  I am still reviewing it.  I have

23   reviewed it.

24            Q. In the email from JP that is on the

25   bottom of page one, it states towards the end of

40

1  the first line, third paragraph, "We asked

2  Evolve to propose and develop internal

3  improvements that will complement Synapse's

4  efforts as we don't believe for a daily

5  reconciliation to be a complete solution.

6          "We have seen scenarios where Evolve

7  misses sending Synapse's transactions (thus

8  creating the missing payments) and other sorts

9  of anomalies we have no control on."

10          Were there ever any instances in which

11  Evolve failed to send Synapse transactions?

12          MS. DAVIS:  Objection.  Scope. You can

13  answer, if you know.  Sorry.  Yes.  If you know,

14  you can answer.

15          A. I don't have firsthand knowledge,

16  but in reviewing this document it looks like

17  number three item states that they didn't

18  receive some transactions.

19          Q. Separate and apart from what is

20  written on this document, do you have any

21  understanding as to whether Evolve failed to

22  send Synapse transactions?

23          MS. DAVIS: Objection.  Scope.

24          A. Like me thinking about a specific

25  time, I don't have a time where I know "Oh, we

41

1   didn't send transactions."

2          Q. Without getting into specific

3   instances from a high level, are you aware that

4   there were certain transactions that Evolve

5   failed to send to Synapse?

6          MS. DAVIS: Same objection.  Scope.

7   You can answer, if you know.

8          A. I don't know.  I don't know if

9   Evolve failed to send transactions. I know we

10  worked with Synapse just as this email is

11  describing to help them with questions they had

12  about data we would send them.

13          I don't know if it was a result of

14  they were missing transactions because we didn't

15  send them or if we sent them and they never

16  picked them up or registered those files.

17          Q. But you are aware there were certain

18  transactions that Evolve processed that didn't

19  wind up being integrated into Synapse's system;

20  is that correct?

21          MS. DAVIS: Objection.  Misstates prior

22  testimony.

23          A. Yes.  What I was saying is that I

24  know we work with Synapse a lot to help them

25  with data.  They would come back with questions

42

1  like these or something else and we would work

2  with them too, and if they didn't have the data,

3  to provide data.  If they needed more help or

4  context, then we would provide that.

5          Q. When Synapse came to Evolve with

6  those issues, did Evolve ever investigate why

7  Synapse didn't have the transactions that Evolve

8  processed?

9          MS. DAVIS: Objection.  Vague.

10         A. I think there were times where if

11  something, and not every time, but on some

12  instances they would investigate.

13         Q. What did those investigations

14  conclude?

15         MS. DAVIS: Objection.  Vague.

16         A.  Yes, I don't recall.

17         Q.  Who at Evolve would have performed

18  those investigations?

19         MS. DAVIS: Objection.  Vague.

20         A. If it is the investigations, it

21  would be related to transactional data.  It

22  would be operations team. If it was anything

23  related to a date of delivery it would be the IT

24  department.

25         Q. Who in the IT department would have

43

1 handled that?

2         MS. DAVIS: Objection.  Calls for

3 speculation.

4         A. Yes, I don't.

5         Q. Who in the operations team would

6 have handled that?

7         MS. DAVIS: Same objection.

8         A. I don't know.

9         Q. I am turning your attention to

10 Plaintiff's Exhibit 68 which begins on

11 EBT-YOTTA-0036664 through 66.

12 (Whereupon, Plaintiff Yotta's Exhibit 68 is

13 marked for identification. Microsoft Teams chat

14 about Synapse being overdrawn on a fees

15 account.)

16         MR. MANDEL: And this is number 1046.

17 Let me know when you have had a chance to look

18 at this document. Mr. Vendetti.

19         A. I have reviewed it.

20 BY MR. MANDEL:

21         Q.  Am I correct that this is a

22 Microsoft Teams chat about Synapse being

23 overdrawn on a fees account?

24         MS. DAVIS: Objection.  Document speaks

25 for itself.

44

1          A. Yes.  I don't know what medium this

2     is in.

3          Q. What kind of messaging systems would

4     you use at Evolve?

5          A. Teams, and then before that,

6     whatever.  I think it was Skype before Teams

7     came around.

8          Q. Other than Teams or Skype, did you

9     use any other messaging systems?

10          MS. DAVIS: Objection.  Scope.

11          A. It not for internal communication

12     like this.

13          Q. Was this likely a Skype or Microsoft

14     Teams chain?

15          A. Yes.

16          Q. Am I correct that this messaging

17     chain relates to Synapse being overdrawn by

18     about $800,000 on the fees account?

19          MS. DAVIS: Objection.  Document speaks

20     for itself.

21          A. That is what the document shows.

22          Q. REDACTED - CONFIDENTIAL

23     REDACTED - CONFIDENTIAL

24          MS. DAVIS: Objection.  Vague.

25          A. REDACTED - CONFIDENTIAL

45

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

```
 1
 2
 3
 4        Q. Does Evolve have the ability to
 5   prevent Synapse from being overdrawn on an
 6   account?
 7             MS. DAVIS: Objection.  Vague.
 8             A.  Evolve has the ability to prevent
 9   accounts from being overdrawn by rejecting
10   transactions.
11        Q.  With respect to Synapse's fee
12   accounts, would Evolve reject transactions that
13   would cause an overdraw?
14             MS. DAVIS: Objection.  Vague.  You say
15   fee accounts?  Can you clarify, Evan?
16             MR. MANDEL:  I will let the question
17   stand.
18             A. I'm sorry.  Ask it again.  Sorry.
19        Q. Sure.  Let me ask a slightly
20   different question.  Would Evolve ever block
21   transactions that would cause any Synapse
22   account to be overdrawn?
23             MS. DAVIS:  Objection.  Vague.
24             A. Are you asking wouldn't they or have
25   they?
```

46

```
 1          Q.   Have they?

 2          A.   I am not aware of any.

 3          Q.   REDACTED - CONFIDENTIAL

 4      REDACTED - CONFIDENTIAL

 5          MS. DAVIS: Objection.  Scope.

 6          A.   REDACTED - CONFIDENTIAL

 7      REDACTED - CONFIDENTIAL

 8          Q.   REDACTED - CONFIDENTIAL

 9      REDACTED - CONFIDENTIAL

10          A.   REDACTED - CONFIDENTIAL

11      REDACTED - CONFIDENTIAL

12          Q.   REDACTED - CONFIDENTIAL

13  REDACTED - CONFIDENTIAL

14          MS. DAVIS: Objection.  Scope.

15          A.   REDACTED - CONFIDENTIAL

16      REDACTED - CONFIDENTIAL

17          Q.   REDACTED - CONFIDENTIAL

18  REDACTED - CONFIDENTIAL

19          MS. DAVIS: Objection.  Scope.

20          A. Yes, I'm not -- rephrase maybe.

21          Q.   REDACTED - CONFIDENTIAL

22      REDACTED - CONFIDENTIAL

23  REDACTED - CONFIDENTIAL

24          MS. DAVIS: Objection.  Vague.  Scope.

25          A.   REDACTED - CONFIDENTIAL
```

47

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6         Q. Right.    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL

8         MS. DAVIS: Objection.  Scope.

9         A.    REDACTED - CONFIDENTIAL

10        Q.    REDACTED - CONFIDENTIAL

11    REDACTED - CONFIDENTIAL

12        MS. DAVIS: Objection.  Scope.

13        A.    REDACTED - CONFIDENTIAL

14        Q. Going back to Plaintiff's Exhibit

15   68. Here you state you would like to cure the

16   overdraft by transferring from their REDACTED - CO

17   account; is that correct?

18        A. That is what the document says.

19        Q. Then Mr. Word told you that that

20   account was end-user money; correct?

21        MS. DAVIS: Objection.  Document speaks

22   for itself.

23        A.  Yes, that's what the document says.

24        Q.  Did Evolve ever transfer FBO

25   account money to cover an overdraft in a Synapse

48

1  account?

2          MS. DAVIS:  Objection.  Vague.

3          A. I don't recall a time that we did

4  transfer money from an account like an end-user

5  account to cover an overdraft.

6          Q.    REDACTED - CONFIDENTIAL

7  REDACTED - CONFIDENTIAL

8  REDACTED - CONFIDENTIAL

9          MS. DAVIS:  Just to be clear.  Evan,

10 you are talking about a Synapse corporate

11 account?  Can you just be a little more precise

12 on this.

13         MR. MANDEL:  The question stands.

14         A.  Ask it again then.

15         Q. Sure.    REDACTED - CONFIDENTIAL

16 REDACTED - CONFIDENTIAL

17 REDACTED - CONFIDENTIAL

18         MS. DAVIS:  Objection.  Vague.

19         A. REDACTED - CONFIDENTIAL

20         Q.   REDACTED - CONFIDENTIAL

21         MS. DAVIS:  Same objection.

22         A.    REDACTED - CONFIDENTIAL

23 REDACTED - CONFIDENTIAL

24 REDACTED - CONFIDENTIAL

25 REDACTED - CONFIDENTIAL

49

1      Q.      REDACTED - CONFIDENTIAL

2  REDACTED - CONFID

3      MS. DAVIS:  Objection.  Scope.

4      A.  REDACTED - CONFIDENTIAL

5      Q.      REDACTED - CONFIDENTIAL

6      REDACTED - CONFIDENTIAL

7      REDACTED - CONFIDENTIAL

8  REDACTED - CONFIDENTIAL

9      MS. DAVIS: Objection.  Misstates the

10 document.

11     A.      REDACTED - CONFIDENTIAL

12     Q. You don't understand that question?

13     A. No, sir, I don't.

14     Q. In October 2021, did you think that

15 you could use end-user funds to cover an

16 overdraft in a Synapse account?

17      MS. DAVIS: Objection.  Scope.

18      A. I did not think I could. I was

19 asking because prior to the default account for

20 charging the fees which is what this account is

21 representing was coming from the REDACTED account,

22 because Synapse held their corporate deposits in

23 their FBO account.

24      Q. In October 2021, Synapse held its

25 corporate deposits in an FBO account; is that

50

1  correct?

2         A. I was saying prior to this.  I don't

3  know if in October 2021 if they still did or

4  not, but previously they were in the ▮REDACTED▮

5  account.

6         Q. At some point in time, did Synapse

7  stop holding its corporate deposits in an FBO

8  account?

9         MS. DAVIS: Objection.  Calls for

10 speculation.

11        A. Yes, I am not sure.  I don't know

12 the timeline of that.

13        Q. I am asking at any point in time.

14 Not at what point in time.  I just mean at any

15 point in time, did Synapse stop keeping its

16 corporate deposits in FBO accounts?

17        MS. DAVIS: Same objections.  Calls for

18 speculation.

19        A. Yes, I don't know.

20        MS. DAVIS:  Evan, in the next 10 or 15

21 minutes, can we have a short break?

22        MR. MANDEL:  Sure.  Sure.

23 BY MR. MANDEL:

24        Q.    ▮REDACTED - CONFIDENTIAL▮

25 ▮REDACTED - CONFIDENTIAL▮

51

1    REDACTED - CONFIDENTIAL

2         A.    REDACTED - CONFIDENTIAL

3         Q.       REDACTED - CONFIDENTIAL

4            REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6         MS. DAVIS: Objection.  Misstates

7    testimony.

8         A.        REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10        Q. When Evolve learned that Synapse was

11   commingling its corporate funds with end-user

12   funds, did it ask or instruct Synapse to stop

13   that commingling?

14        MS. DAVIS:  Objection.  Scope.  You

15   may answer, if you know.

16        A. Not to my knowledge.

17        MR. MANDEL: Why don't we take a break?

18        THE VIDEOGRAPHER:  The time is 11:40

19   and we are going off the record.

20   (Upon Resuming.)

21        THE VIDEOGRAPHER:  The time is

22   approximately 11:52 a.m.  We are back on the

23   record.

24        MR. MANDEL:  Welcome back, Mr.

25   Vendetti.

52

1          Q.  I am showing you what has

2    previously been marked as Plaintiff's Exhibit

3    23.  Let me know you had a chance to look at it.

4          A. What is the number on this one?

5          Q. It is 1051.

6          A. I have it up.

7          Q. Am I correct that the first

8    paragraph states that Synapse has identified

9    quite a few discrepancies in its ledger?

10         A. Let me review.

11         MS. DAVIS:  Objection.  Vague. Sorry

12   Evan, what was your question?

13         Q. Sure. Am I correct that the first

14   paragraph refers to there being Synapse having

15   uncovered quite a few discrepancies in its

16   ledger?

17         A. That is what the document states.

18         Q. The next paragraph it states,

19   "First, I have attached a list of checks we do

20   not have a record of, but are showing on your

21   side."  What does that issue relate to?

22         MS. DAVIS: Objection.  Calls for

23   speculation.

24         A. Yes.  Just as it states.  They send

25   us a list of checks that they don't have a

53

1    record of, but had gone through their account.

2           Q. Did those checks that Synapse did

3    not have a record of cause any problems with the

4    ledger?

5           MS. DAVIS:  Objection.  Vague.

6           A. Evan, I don't know.

7           Q. Mr. Vendetti, is one of the topics

8    in which you are testifying on here today

9    discrepancies in the ledger?

10           A. Is that one of topics that I have

11    been put forth for?

12           Q. I'm sorry?  What was that, Mr.

13    Vendetti?  I didn't hear you.

14           A. I'm sorry. I was asking:  Is that

15    one of the topics that I am being put forth for,

16    or it is being kind of objected to.

17           Q. Unfortunately, your lawyer and I

18    can't answer questions for you.  You have to

19    answer the questions.  Do you know one way or

20    the other whether you are here to testify about

21    discrepancies in the ledger?

22           MS. DAVIS: Objection.  Put the thing

23    in front of him and he will be able to answer

24    the question, Evan.

25           A. Yes, I can't answer from memory on

54

1    that.

2           Q. Can you say any of the topics that

3    you are here to testify on?

4           MS. DAVIS: Objection.  Argumentative.

5    Asked and answered.  Put forth the exhibit and

6    I'm sure he can give you the language that he

7    has  been here to testify about.

8           Q. Mr. Vendetti, you may answer the

9    question.

10          A. Oh, I mean, I don't -- the things I

11   am put forth for are the items that I am here to

12   talk about.  I don't need to see the list, like

13   I said, for the ones that have been objected to.

14          Q. Sure.  I am just trying to

15   understand what you know here today.  Can you

16   identify a single topic from memory that you

17   have been designated on?

18          MS. DAVIS: Same objection.

19          A. Yes.  I didn't put any effort into

20   memorizing the topics from that list. I just

21   know that I am here to be produced for certain

22   topics and so I have been objected to.

23          Q. What did you do to prepare for

24   today's deposition?

25          MS. DAVIS: Objection.  I caution the

55

1  witness not to reveal any attorney-client

2  privileges. You can still answer.  Could you

3  reask question, Evan.

4          MR. MANDEL:  The witness may answer the

5  question.

6          A.  Restate your question then.

7          Q. What did you do to prepare for

8  today's testimony?

9          MS. DAVIS: Are you unclear about

10 whether you can answer and what you can answer?

11         A. Yes.

12         Q. I will rephrase the question.

13 Without telling me what you and your lawyer said

14 to each other, did you have one or more meetings

15 with your lawyers to prepare for today's

16 deposition?

17         A. Yes.

18         Q. How many such meetings did you have?

19         A. One.

20         Q. How long did that meeting last?

21         A. A day.

22         Q. Was that yesterday?

23         A. Yes.

24         Q.  This is just a yes or no question.

25 Did you review documents in that meeting?

56

1           A. Yes.

2           Q. Outside of that meeting, did you do

3    anything to prepare for today's testimony?

4           A.  No.

5             MR. MANDEL:  I am going to show you --

6             MS. DAVIS:  We can't see your screen.

7    Just so you know, Evan.

8             MR. MANDEL: Thank you. I am just going

9    to show you your objections.  Do you need this

10   added to the chat?

11            MS. DAVIS:  You could probably just put

12   it up unless you are asking questions that are

13   not going to be on what you show him. Then

14   otherwise, yes, you would need to put it in the

15   chat.

16            MR. MANDEL: I am marking at Exhibit 69

17   Evolve's objections.

18   (Whereupon Plaintiff Yotta's Exhibit 69 is

19   marked for identification. Evolve's Objections.)

20            Q. Going to page 12. This is page 11 is

21   Topic 1(a), discrepancies and or inaccuracies.

22            MS. DAVIS: Evan, you are not showing

23   anything right now.

24            MR. MANDEL: Oh, I'm sorry.

25            Q. Topic 1(a).  I will let you read

57

1    that to yourself.  Just the title. You don't

2    have to read the whole paragraph and then I will

3    scroll down to what you guys say.

4           You say on page 12, "Evolve will

5    designate a witness to testify about

6    discrepancies and or inaccuracies with respect

7    to ledgers for the Synapse related FBO accounts,

8    Synapse related FBO transactions, or balances,

9    or Yotta end-user transactions or balances."

10          Are you Evolve's designee with respect

11   to this topic?

12          A. I mean?  I'm sorry?  Where were

13   you just reading at? Sorry?  I can't see where

14   you were.  I'm sorry.  I see that now.  What was

15   your question again?

16          Q. Are you the designee with respect to

17   Topic 1(a)?

18          A. I believe so.

19          MS. DAVIS: Objection as previously

20   stated in our objection.

21          Q. Throughout this set of objections

22   here when they say "We are going to designate a

23   witness as to a topic," are you the witness for

24   all the topics on this notice or in these

25   objections?

58

1          MS. DAVIS:  You need to clarify for

2   what we provided the witness.  Is that what you

3   said, Evan?

4          MR. MANDEL:  I couldn't hear you.

5          MS. DAVIS:  Yes.  I just want to be

6   clear that it is for everywhere we have said to

7   designate a witness?

8          MR. MANDEL:  Correct.  Let me rephrase

9   the question.

10          Q. Am I correct that throughout these

11   objections here, Evolve has said that they are

12   going to designate a witness as to certain

13   topics?

14          MS. DAVIS: Objection.  The document

15   speaks for itself.

16          A. Yes, I agree. So whatever the

17   document says that is what I am here for.

18          Q. You are the designee with respect to

19   all of the topics that Evolve has agreed to

20   provide a designee on; correct?

21          A. Yes.

22          Q. Excellent.  Going back to

23   Plaintiff's Exhibit 23.  In the paragraph that

24   says, "First, it refers to checks that Synapse

25   does not have a record of, but it is showing up

59

1  in the Evolve transaction files," did that issue

2  with the checks create a problem with the

3  Synapse ledger?

4          MS. DAVIS: Objection.  Misstates the

5  document.

6          A.  Yes.  I don't know -- I mean what

7  the document says here is that it speaks for

8  itself, so they have checks that they don't have

9  on their side.

10          Q. What caused that problem?

11          A. I don't know.  That would be

12  between, or that is a question for the Synapse

13  side because the bank is processing transactions

14  that we receive.

15          Q. Am I correct that Evolve doesn't

16  know what caused that problem?

17          A. That is not what I said.  I don't

18  know what caused that problem.

19          Q. You don't believe you are the

20  designee with respect to this problem in this

21  transaction reporting here?

22          MS. DAVIS: Objection.  Misstates the

23  testimony.

24          A. Yes.  No, what I am saying is your

25  question was -- well, restate your question.

60

1          Q.  My question now is do you

2    understand you to be the designee as to any

3    problems with the reporting of transactions?

4          MS. DAVIS: Objection.  Harassing.

5          A.  Am I designated for that, for all

6    transactions?

7          Q. I am just asking you, Mr. Vendetti,

8    whether you know or not, and if you don't know,

9    you can say you don't know.

10          A. Yes.  I don't know if I am the

11    designee for all of the transactions. I would

12    have to go read through of all of the pieces.

13          Q. Did these checks that Synapse

14    doesn't have a record of, but Evolve does, did

15    that cause any problems in the ledger that

16    tracked Synapse's end-user funds?

17          MS. DAVIS:  Objection.  Assumes facts.

18          A. It did not cause the problem on our

19    side.  We recorded the transactions that were

20    passed to us on Synapse's side.

21          Based on the document that I am

22    looking at, it looks like it was causing a

23    problem for them because they did not show the

24    records that we sent to them that were processed

25    on the accounts.

61

1          Q.  Did it cause a problem with the

2    ledger or not?

3               MS. DAVIS:  Objection.  Vague.  You

4    can answer.

5          Q. You may answer, Mr. Vendetti.

6          A. Right.  The answer there is I don't

7    know.  That is a question on the Synapse side.

8    If they don't have the records, then they would

9    need to adjust their ledger to reflect the

10   records.

11         Q. Turning your attention to the next

12   paragraph. Do you have any understanding about

13   what that next paragraph is about?  Let me

14   rephrase the question.

15              Turning your attention to the next

16   paragraph, does Evolve have any understanding as

17   to what that paragraph is about?

18         A. Based on reading it, it sounds like

19   they show Synapse on their side has checks that

20   are not cleared and on our side we are showing

21   them that they have been clearing, meaning, they

22   are processed through the bank and then Synapse

23   is inquiring if we could send the filename that

24   shows us several checks.

25         Q. What caused this problem?

62

1          A. I am unsure.

2          Q. How was this problem solved, if it

3 was solved?

4          A. We would send them a data extract to

5 say, "Here is the check files," so they could

6 process it on their side.

7          Q. Did that solve the problem?

8          A. I don't know. I don't have the

9 resolution in front of me.

10          Q. Did this problem cause the ledger to

11 be inaccurate in any way?

12          MS. DAVIS: Objection.  Vague.

13          A. This problem would cause if -- the

14 problem this could cause would be, for example,

15 Evan, if you sent a check out, Synapse would

16 have taken the money and put the money as a

17 pending transaction on your account and Evolve

18 would have cashed the check whenever it was

19 presented to whoever it is going to and then we

20 would have sent that record to Synapse to

21 reflect that pending transaction has settled.

22          In here they are saying those checks

23 were returned and so that pending transaction

24 was removed.

25          So if the checks had been settled

63

1    Synapse would need to take that settled file

2    that it is describing there and then adjust the

3    ledger to reflect all the checks that had

4    actually settle when Synapse said that they did

5    not settle.

6         Q. Did Synapse do that?

7         A.  I don't know. It doesn't say.

8         Q. Did anyone from Evolve make any

9    effort to make sure that this problem was fixed?

10        MS. DAVIS: Objection.  Vague.

11        A. Which problem?

12        Q. The problem that is being referred

13   to in this paragraph about the checks that

14   Evolve shows is settled and Synapse is not?

15        A. Again, I don't have the follow up

16   conversation on here, so I couldn't say yes or

17   no.

18        Q. I am showing you Plaintiff's Exhibit

19   25.  This is 1058.

20        A. Evan, I see this is seven pages. Do

21   you want me to read the document or how do you

22   want to go about this?

23        Q. I am really only going to ask about

24   the top email in the chain. I am happy to point

25   you to the relevant section.  Could you read the

64

1  top email to yourself?

2          A. Yes. I have read it.

3          Q. The third bullet point refers to

4  there being a discrepancy between the wires and

5  Synapse's system and the Jack Henry system;

6  correct?

7          MS. DAVIS: Objection.  Misstates.  The

8  document speaks for itself.

9          A. Yes.  It is saying Synapse reported

10 discrepancies between the wire files for ins and

11 outs and the transactions that impact the JHA

12 accounts.

13         Q. What caused those discrepancies?

14         A. I don't know. It is not listed here.

15         Q. Were those discrepancies solved at

16 some point in time?

17         MS. DAVIS: Objection.  Vague.

18         A. Which discrepancies?

19         Q. The ones that you just testified

20 about?

21         A.  Again, like I don't know if they

22 were or not. I don't have the follow-up here.

23         Q. Did those discrepancies create any

24 problems with the ledger?

25         MS. DAVIS: Objection.  Vague.

65

1          A. I don't know if they caused problems

2    or not because it doesn't say if they were

3    affecting their ledger or not based on this

4    email.

5          Q. Did these discrepancies cause the

6    account statement sent to Yotta and other

7    end-users to be incorrect?

8          A. I don't know.

9          Q. The last bullet point here says,

10   "Reported these discrepancies also applied to

11   checks." What caused that check discrepancy

12   between the Synapse system and the Jack Henry

13   system?

14         A. Again, it doesn't say what it is or

15   why it was caused.

16         Q. Was that discrepancy ever resolved?

17         A. Again, the follow up email does not

18   appear, so I don't know.

19         Q. Did that discrepancy cause the

20   account statement sent to Yotta end-users to be

21   false?

22         MS. DAVIS: Objection.  Vague.  Calls

23   for speculation.

24         A. Right.  I couldn't tell you that.

25         Q. Turning your attention to

66

1   Plaintiff's Exhibit 24.  This is 1101, but it is

2   very short.  I will give you a minute to read it

3   to yourself.

4           A. Okay.

5           Q. Am I correct that here Synapse is

6   requesting from Evolve certain information

7   related to incoming credits to the Synapse

8   end-users' accounts?

9           A. Correct.  They are asking for

10  certain information.

11          Q. Am I correct that Synapse says that

12  it cannot reconcile these transactions without

13  this additional information?

14          MS. DAVIS: Objection.  The document

15  speaks for itself.

16          A. It just says they can't reconcile

17  them onto a one-to-one transaction.

18          Q. What does that mean?

19          A. What this is speaking to is when

20  checks are deposited via RDC which means remote

21  deposit capture they get batched, so you might

22  have 50 checks get deposited.

23           So how that comes across is going to

24  show one line item in their account activity and

25  let's say the total was $100,000 of deposits, so

67

1  they get one record that shows $100,000

2  deposits.

3          It's made up of fifty checks.  So in

4  the account activity file it shows that one

5  record.  So subsequently, we would send them the

6  50 checks and the data extract in machine

7  readable formats for them to ingest and match

8  up, but they would need to do a one to many

9  match, and they are wanting us to send them post

10  the transactions to their account on a

11  one-to-one record.

12          Q. Did Evolve provide the transaction

13  reporting that Synapse is requesting in this

14  document?

15          A. I don't know. I would need to see

16  the follow-up for it.

17          Q. Would it have been possible for

18  Synapse to conduct the one-to-one reconciliation

19  without the data it is requesting?

20          A. It would be possible for them to

21  reconcile the transactions without the data they

22  are requesting.

23          Q. How would they have done that?

24          A. The batch has a unique identifier to

25  it that ties into the supporting records

68

1    underneath it.

2         Q. Did Evolve suggest that Synapse

3    reconcile a transaction using those unique

4    identifier numbers?

5         A. I am not sure. I don't know if they

6    saw this document.

7         Q. Was Synapse ever able to

8    successfully reconcile these transactions?

9         MS. DAVIS: Objection.  Vague.

10        A. Which transactions?

11        Q. The ones being referred to in this

12   email?

13        A. Again, it doesn't state the

14   follow-up here, so I don't know where they

15   landed on us.

16        Q.  Did the failure to reconcile the

17   transactions referred to in Plaintiff's Exhibit

18   24 cause any problems with the ledger?

19        MS. DAVIS: Objection.  Misstates

20   document.  Assumes facts.

21        A. Yes.  How I read this is is I don't

22   see anything mentioned of ledger here. It is

23   more of them trying to reconcile which means

24   they are trying to match the records that they

25   have on their side to what was processed with

69

1    the bank.

2          Q. Sure.  I am not asking you what it

3    says here, Mr. Vendetti, about the ledger. I am

4    asking you as the corporate designee with

5    respect to ledger discrepancies.

6          Did the problem that is being

7    discussed in this email in Plaintiff's Exhibit

8    24 cause any problems with respect to the ledger

9    for user accounts?

10          MS. DAVIS: Objection.  Misstates

11    facts.  Misstates the document.

12          A. Based on what I am seeing here it

13    doesn't look like it causes a problem to the

14    ledger because he is, and like I said, they are

15    trying to reconcile. It is not talking about

16    applying credits or debits to the ledger. It has

17    just been trying to match up reconciliation to

18    our side.

19          Q.  I am turning your attention to the

20    next document. This is 1127.  We are going to

21    mark it as Plaintiff's Exhibit 70.  It is a

22    September 7, 2023, email from Mr. Staab,

23    S-T-A-A-B, to a number of individuals.

24    (Whereupon, Plaintiff Yotta's Exhibit 70 is

25    marked for identification. September 7, 2023

70

1  email from Mr. Staab.)

2       Q. Turning your attention to page 3 of

3  this document.  Did REDACTED - CONFIDENTIAL have any

4  involvement with respect to tracking or

5  reconciling Synapse end-user funds?

6       MS. DAVIS:  Objection.  Make sure you

7  take the time to read the document.

8       A. Yes, give me one moment. Let me read

9  this real quick.

10      Q.  I am going to give you as much time

11 as you want to read it, but before you do that,

12 I am going to tell you about the one sentence I

13 am really going to ask about.

14      In the second from last paragraph,

15 under REDACTED - CONFIDENTIAL the third line down it says,

16      REDACTED - CONFIDENTIAL

17      REDACTED - CONFIDENTIAL

18      That is the sentence I am really going

19 to ask about, but take all the time you need to

20 review the document.

21      A. Thank you. I read it.

22      Q. What involvement, if any, did REDACTED - CO

23 REDACTED - CONFID have with respect to the Synapse end-user

24 accounts?

25      A.  REDACTED - CONFIDENTIAL

71

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6    REDACTED - CONFID

7         Q.  What did    REDACTED - CONFIDENTIAL

8         A.         REDACTED - CONFIDENTIAL

9         REDACTED - CONFIDENTIAL

10        Q.  Are you just reading that from this

11   document or is that something you know

12   independent of this document?

13        A.  I was reading that from this

14   document.

15        Q.  Apart from this document, do you

16   have any information about what  REDACTED - CONFIDENTIAL

17   REDACTED - CONFIDENTIAL

18        A.  I don't.

19        Q.  Do you not understand yourself to be

20   designated as to    REDACTED - CONFIDENTIAL

21   REDACTED - CONFIDENTIAL

22        MS. DAVIS:  Objection.  Harassing.

23   Make sure you answer audibly.

24        A.  Sorry.  Am I designated on that?

25        Q.  Mr. Vendetti, the point is to see

72

1  what you know.  So we cannot answer the question

2  for you.

3              I an just asking.  If you say you

4  don't know whether you are designated on that

5  subject, that's your answer.

6              A. Yes, I don't know then.

7              Q. In preparation for your work here

8  today, did you do anything to familiarize

9  yourself with  ███ REDACTED - CONFIDENTIAL ███

10 ██ REDACTED - CONFIDENTIAL ██

11             MS. DAVIS: Objection.  I am going

12 instruct the witness not to answer about any

13 attorney-client privilege communications.

14             If you can answer beyond that, you

15 can, but there is no community attorney-client

16 privilege.

17             A. Yes.

18             Q. Sorry?  What was your answer, Mr.

19 Vendetti?

20             MS. DAVIS: He doesn't have any

21 attorney-client privilege.  Non-attorney-client

22 privilege communications to respond to.

23             Q. Let's bring it back to the sentence

24 that I first mentioned towards the bottom of

25 page 3 of Plaintiff's Exhibit 70.

73

1        The middle there it says, REDACTED - CONFIDENTIAL

2        REDACTED - CONFIDENTIAL

3        REDACTED - CONFIDENTIAL    Do you have any

4    understanding as to what that means?

5        A. I do.    REDACTED - CONFIDENTIAL

6        REDACTED - CONFIDENTIAL

7        REDACTED - CONFIDENTIAL

8        REDACTED - CONFIDENTIAL

9        REDACTED - CONFIDENTIAL

10        REDACTED - CONFIDENTIAL

11        REDACTED - CONFIDENTIAL

12        REDACTED - CONFIDENTIAL

13        REDACTED - CONFIDENTIAL

14        REDACTED - CONFIDENTIAL

15        REDACTED - CONFIDENTIAL

16        REDACTED - CONFIDENTIAL

17        REDACTED - CONFIDENTIAL

18    REDACTED - CONFIDENT

19        Q. Were there    REDACTED - CONFIDENTIAL    with

20    respect to        REDACTED - CONFIDENTIAL

21    REDACTED - CONFIDENTIAL

22        A.        REDACTED - CONFIDENTIAL

23        Q. Were there?

24        A.        REDACTED - CONFIDENTIAL

25        REDACTED - CONFIDENTIAL

74

1     REDACTED - CONFIDENTIAL

2     REDACTED - CONFIDENTIAL

3     REDACTED - CONFIDENTIAL

4          Q. Did those REDACTED - CONFIDENTIAL cause the

5     ledger that tracked Synapse end-user funds to be

6     incorrect?

7          A. A REDACTED - CONFIDENTIAL wouldn't cause.  To

8     my knowledge,  REDACTED - CONFIDENTIAL would not cause

9     the ledger to be incorrect.

10         Q. Would a REDACTED - CONFIDENTIAL cause the

11    account statement sent to Yotta and other

12    Synapse end-users to be incorrect?

13         MS. DAVIS: Objection.  Calls for

14    speculation.

15         A. Yes.  I don't know.

16         Q. Were the account statements sent to

17    Yotta end-users; correct?

18         MS. DAVIS: Objection.  Vague.  Calls

19    for speculation.

20         A. Yes, I couldn't answer yes or no or

21    not.

22         Q. I'm sorry?  Could you just repeat

23    that answer?

24         A. I'm sorry. I could not answer yes or

25    no if this account statement sent to Yotta is

75

1  correct or not.

2          Q. You don't know whether they were

3  correct or not?

4          A. That's correct.

5          Q. Are you aware of any account

6  statements being sent to Yotta end-users that

7  were incorrect?

8          A. Only the ones that were published on

9  the open pages or the reconciliation by Evolve.

10          Q. I'm sorry. I am having trouble

11  hearing.  I haven't had this problem all week. I

12  heard the reconciliation, but then I didn't hear

13  what you said after that.

14          A. Oh, I'm sorry. I was saying only on

15  the website, the open pages that were published

16  on the reconciliation by Evolve they referenced

17  a Yotta statement that showed balances being

18  zero and then the next month them having a

19  starting balance even though the previous month

20  had no balance and then no transactions.

21          Q. Other than those statements, those

22  Yotta account statements published on the

23  reconciliation website, you are not aware of any

24  other incorrect Yotta account statements; is

25  that right?

76

1           A. That's correct.

2           Q. Did you do anything today to prepare

3 on the question of whether the Yotta account

4 statements were correct or incorrect?

5           MS. DAVIS:  Outside of his legal

6 counsel?  Is that your question?

7           MR. MANDEL:  I an just asking the

8 question.  If you guys are going to assert the

9 privilege you can assert the privilege.

10          I think I am entitled.  He doesn't

11 seem to have any information about core topics.

12 If you want to tell him not to answer these

13 questions based on privilege you go right ahead,

14 but unfortunately, at this point I need to know

15 what he has done to prepare.

16          MS. DAVIS:  I am going to instruct you

17 not to respond to anything that we discussed

18 yesterday as that is subject to attorney-client

19 privilege.

20          THE WITNESS: So then no.

21          MS. DAVIS:  To be clear.  No?  You

22 don't have any information aside for what was

23 said ...

24          MR. MANDEL: Objection.  Objection,

25 Objection.  Ms. Davis, you are not allowed to

77

1  ask questions here today. You know that.

2  Let's move on.

3          MS. DAVIS:  I just want to clarify

4  the record, Evan.

5          MR. MANDEL:  You can.  That is what

6  cross-examination is for.  That is exactly what

7  it is for.

8          There has been a lot of speaking today

9  and I object to it. I have a feeling it is going

10 to cause this deposition to take much longer

11 than it should take.

12         There have been way too many speaking

13 objections and I am raising it now and I hope it

14 will stop.

15         Q.  Turning your attention to

16 Plaintiff's Exhibit 71 which is 1130, and this

17 is a long, long chain that begins on

18 EBT-Yotta-0052810 through 856.

19         You should take as much time as you

20 need to familiarize yourself with it. I don't

21 think I am going to go through it line by line.

22 I have really a general question as to what this

23 chain relates to.

24 (Whereupon, Plaintiff Yotta's Exhibit 71 is

25 marked for identification. Email chain beginning

78

1  EBT-YOTTA-0052810.)

2          A. Give me a few moments.  I will read

3  through some of it.

4          Q. Take as much time as you need.

5          A. I think I am familiar with this now.

6          Q. What does this document relate to?

7          A.    REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10   REDACTED - CONFIDENTIAL

11         Q. You said  REDACTED - CONFIDENTIAL ?

12         A. Yes.

13         Q. Did that relate to any Synapse

14  end-users?

15         A.    REDACTED - CONFIDENTIAL

16   REDACTED - CONFIDENTIAL

17   REDACTED - CONFIDENT

18         Q. What were the challenges that you

19  were facing with that software?

20         MS. DAVIS: Objection.  Scope.

21         A. In this particular instance we are

22  discussing    REDACTED - CONFIDENTIAL

23   REDACTED - CONFIDENTIAL

24   REDACTED - CONFIDENTIAL .

25         Q. Were you ever able to do that?

79

1          A. Yes.

2          Q. Did Evolve ever sweep Yotta or other

3   Synapse end-user funds to other banks?

4          A. Yes.

5          Q. During what period of time did

6   Evolve do so?

7          A.  I am not sure when we started it,

8   but it was throughout the relationship to my

9   knowledge.

10          Q. Did that sweeping cause any problems

11  with the ledger of end-user accounts?

12           MS. DAVIS: Objection.  Vague as to

13  time.

14          A.  A certain time period?

15          Q. At any time Evolve was sweeping the

16  Synapse end-user funds?

17          A. Evolve sweeping of funds would not

18  have an impact on the end-users ledger.

19          Q. Why not?

20          A. It doesn't affect.  It is not a

21  ledger transaction. It is just taking money and

22  moving it off the balance sheet.  The account

23  balance stays the same as far as Synapse's

24  concerns and it doesn't pass the transaction

25  record to the end-user for the ledger.

80

1          It is just a one-item transaction that

2    looks like a bulk funds movement, but no money

3    is moving on like the Synapse ledger side.  It

4    is just a purely Evolve balance sheet management

5    function.

6          Q. Did Evolve sweeping of Synapse

7    end-user funds cause any account statements to

8    be incorrect?

9          A. Account statements for?

10          Q. Synapse end-users?

11          A. I don't know the answer to that.

12          Q. How could Evolve's sweeping have

13    caused the account statements for the Synapse

14    end-users to be incorrect?

15          MS. DAVIS: Objection.  Misstates prior

16    testimony.

17          A. Yes.  Again, just to restate

18    earlier. When Evolve does a sweeping transaction

19    it is not an end-user level transaction.  There

20    is not a way to attribute it to an end-user, so

21    it should not impact any user's balance or their

22    statement.

23          Q. Did Evolves sweeping of end-user

24    funds to other banks cause or contribute to any

25    shortfall in end-user funds?

81

1          A. Not to my knowledge.

2          Q. Who with Evolve know the answer to

3     that question?

4          A. I don't know that anyone would have

5     an answer for that because, again, it is not

6     affecting a balance. It is purely just the

7     balance is never reduced or increased based on a

8     sweeping transaction.  The balance and account

9     stays the same.

10          Q. Sure.  I am showing you document

11     1231.  This is going to be Plaintiff's 72.  It

12     begins on EBT-Yotta-0123387 through 390.

13          You should spend as much time reading

14     as you want.  I think all of my questions are

15     really going to relate to beginning in the

16     middle of the third page BRG-16 through the end.

17     (Whereupon, Plaintiff Yotta's Exhibit 72 is

18     marked for identification. Document 1231, BRG

19     Report.)

20          A. I will review.

21          Q. Have you had a chance to review it,

22     Mr. Vendetti?

23          A. I am sorry.  I am almost there.  I

24     am on the last page right now.

25          Q. Take your time.

82

1          A.   Okay.

2          Q.   Did Evolve ████████ REDACTED - CONFIDENTIAL ████

3     ████████ REDACTED - CONFIDENTIAL ████████

4     █REDACTED - CONFIDENTIAL█?

5               MS. DAVIS:   Objection.   Scope.

6          A.   ████████ REDACTED - CONFIDENTIAL ████

7     ████████ REDACTED - CONFIDENTIAL ████████

8     █REDACTED - CONFIDENTIAL█

9          Q.  When did Evolve ████ REDACTED - CONFIDENTIAL ████

10    █REDACTED - CONFIDENTIAL█?

11         A.   █REDACTED - CONFIDENT█, I believe.

12         Q.  Why did Evolve ████ REDACTED - CONFIDENTIAL ████

13    █REDACTED - CONFIDENTIAL█?

14         A.  I think this was the ████ REDACTED - CONFIDENTIAL ████

15    ████████ REDACTED - CONFIDENTIAL ████████

16    ████████ REDACTED - CONFIDENTIAL ████████

17    ████ REDACTED - CONFIDENTIAL ████.

18         Q.  There was ████ REDACTED - CONFIDENTIAL ████? █REDACTED - CO█

19    ████████ REDACTED - CONFIDENTIAL ████████

20    ████ REDACTED - CONFIDENTIAL ████

21         A.   █REDACTED - CONFIDENTIAL█

22         Q.  On what ████████ REDACTED - CONFIDENTIAL ████

23    █REDACTED - CO█?

24               MS. DAVIS: Objection.   Scope.

25         A.   ████████ REDACTED - CONFIDENTIAL ████

83

1       REDACTED - CONFIDENTIAL

2              Q.    Am I correct that REDACTED - CONFIDENTIAL

3              REDACTED - CONFIDENTIAL

4       REDACTED - CONFIDENTIAL        ?

5              MS. DAVIS: Objection.  Document speaks

6       for itself.

7              A. Yes.    REDACTED - CONFIDENTIAL

8              REDACTED - CONFIDENTIAL

9              REDACTED - CONFIDENTIAL

10      REDACTED - CONFIDENTIAL

11             Q. Scrolling down to the third page

12      which ends in 389.  Next to REDACTED - CONFIDENT, it says,

13             REDACTED - CONFIDENTIAL

14             REDACTED - CONFIDENTIAL        What does that

15      mean?

16             A. That is    REDACTED - CONFIDENTIAL

17             REDACTED - CONFIDENTIAL

18             REDACTED - CONFIDENTIAL

19             REDACTED - CONFIDENTIAL        .

20             Q. Would that be problematic in any

21      way?

22             A. No.        REDACTED - CONFIDENTIAL

23             REDACTED - CONFIDENTIAL

24             Q. Were there any other reasons why REDACT

25             REDACTED - CONFIDENTIAL

84

1          REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL ?

3              MS. DAVIS: Objection.  Vague.

4          A.  Yes.  Can you reask that, I guess?

5          Q.  Sure. Let me ask this question.  In

6    early 2024, was there any discrepancy between

7    the amount that was actually in the Synapse FBO

8    accounts and the amount that was on the Synapse

9    FinTech ledger?

10             MS. DAVIS:  Objection.  Vague.

11         A. Sorry?  So you said in 2024 what?

12   When?  Say it again.  Sorry.

13         Q. In early 2024, did the Synapse

14   ledger correctly show the amount of funds that

15   were actually being held in the Synapse FBO

16   accounts?

17             MS. DAVIS: Objection.  Vague as to

18   ledger.  Vague as to Synapse FBO accounts.

19         A.  Yes.  Which accounts? What do you

20   mean?

21         Q. Mr. Vendetti, do you seriously not

22   understand that question?

23             MS. DAVIS: Objection.  Harassing.

24   Argumentative.

25             A. Yes.  I am just trying to understand

85

1   the question, yes.

2           Q. Let me ask a slightly different

3   question. In early 2024, was there a massive

4   shortfall of Yotta and other Synapse end-user

5   funds?

6           A.  I don't think I am fully aware of

7   those ones.

8           Q. Are you partially aware of a

9   shortfall in Synapse and Yotta end-user funds in

10  early 2024?

11          MS. DAVIS:  Objection.  You can

12  answer.

13          A. Yes, like I said, not fully. So in

14  early 2024, by that time, that was after the

15  Synapse migration to Brokerage.

16          The only user deposits Evolve would

17  have held at that time would have been end-user

18  deposits that didn't migrate to Brokerage.

19          At that time we would have already

20  had set up some sort of reserve for any

21  potential shortfall which we didn't know if

22  there was or was not at the time, but we had

23  guarded against it just in case.

24          Q.  Am I correct that Evolve doesn't

25  know? Well, let me ask a different question. Was

86

1   there ever a shortfall in end-user funds at any

2   time between 2020 and 2024?

3           MS. DAVIS:  Objection. Vague.

4           A. I am not aware of one.

5           Q. Was Evolve always holding the exact

6   amount of funds that it was supposed to be

7   holding on behalf of Yotta end-users?

8           A. Evolve was holding the amount of

9   funds that were deposited at Evolve.

10          Q. We will come back to those issues

11  later.  Coming back to REDACTED - CONFIDENTIAL where it states

12  REDACTED - CONFIDENTIAL

13  REDACTED - CONFIDENTIAL

14          Could there be REDACTED - CONFIDENTIAL? Were there

15  REDACTED - CONFIDENTIAL? Well, let me just back up.  In early

16  2024, were there any differences between the

17  FinTech ledger and the amount of funds being

18  held in the Evolve FBO account?

19          MS. DAVIS:  Objection.  Vague.  Do you

20  mean Synapse FBO account?

21          A. Yes, are you referring to which

22  ledge and which FBOs?

23          Q. Synapse.

24          A.  So Synapse.  Restate your question

25  again. Sorry.

87

1        Q. Was there any difference between the

2   Synapse FinTech ledger and the amount of funds

3   being held in the Synapse FBO accounts in early

4   2024?

5        MS. DAVIS: Objection.  Vague as to

6   which FBO.  Which Synapse entity.

7        A. There you are.  Are you talking

8   about Synapse, the money?  I am trying to

9   understand your question, Evan.

10        In early 2024, right, Synapse had

11   migrated so they have a Brokerage entity and

12   then they have Synapse still that has end-user

13   deposits being held at Evolve for the end-users.

14        So that Brokerage deposits are coming

15   through, however they are going back out because

16   we are no longer holding those deposits for

17   those end-users and so Synapse send us a FinTech

18   ledger that represented those instances.

19        Knowing that context, tell me your

20   question.  Are you asking about Synapse

21   Financial Technology?  Are asking about Synapse

22   Brokerage and then are you are asking for which

23   ledger?

24        Q. Would Synapse maintain a ledger of

25   all amounts of Synapse end-user funds that were

88

1  being held at Evolve?

2          MS. DAVIS:  Objection.  Same

3  objection.  Vague as to Synapse.

4          A. Synapse would send us a ledger that

5  showed deposits for end-users that were being

6  held.  Again, that is Synapse Financial

7  Technology for deposits held there at Evolve and

8  they would send in that same ledger have

9  Brokerage deposits - not deposits --  Brokerage

10 funds that were passing through.

11          Q. Was the amount of funds that that

12 ledger said Evolve was supposed to be holding on

13 behalf of Synapse end-users the same amount that

14 Evolve was actually holding on behalf of Synapse

15 end-users?

16          MS. DAVIS: Objection.  Vague as to

17 time.

18          A. Yes.  What time period?

19          Q. These are all early 2024.

20          MS. DAVIS: Same objection.

21          A. Yes.  Are you talking in which month

22 or a day? I don't ...  yes.

23          Q. It is January 2024.

24          MS. DAVIS:  What was the question?

25 Can you repeat the question?

89

1              MR. MANDEL:   The question stands.

2              MS. DAVIS:   Can the court reporter

3    please read back the question.

4    (Whereupon, the record was read back.)

5              MS. DAVIS:   Yes.   Same objection as

6    vague.

7              A.  I don't know because so daily, like

8    I'm not looking at you know there is overdrawn

9    during this time period.   That was being done by

10   like Chris Staab and Hank Word during this time

11   and their teams.

12             Q.   We have got a long day and there

13   are a lot of speaking objections.   If the answer

14   is, "I don't know," you can just say "I don't

15   know," Mr. Vendetti.   It sounds like, am I

16   correct, your answer to that question is, "I

17   don't know."

18             MS. DAVIS:   Do Evan, do not put words

19   in his mouth and stop being harassing. You are

20   asking very vague questions and he is doing his

21   best to answer them.

22             MR. MANDEL:   I object to the

23   interruption and I am going to get the judge on

24   the phone if the coaching...

25             MS. DAVIS: That is fine if you want to

90

1  get the judge on the phone.  I am not coaching.

2  I am asserting valid objections to your

3  overbroad, vague and harassing questions.

4          MR. MANDEL: You should not be saying

5  anything other than "Objection as to form."

6          MS. DAVIS:  I am not coaching.  That

7  is not correct.

8          MR. MANDEL:  I will get the

9  transcript. I will show the judge the

10  transcript.

11          MS. DAVIS:  I am perfectly

12  comfortable.

13          MR. MANDEL:  Please do not interrupt

14  me where the witness is just parroting back what

15  you are saying. It is transparently

16  inappropriate.

17          Q. Mr. Vendetti, was your answer to

18  that question "I don't know." Well, actually,

19  let me ask a slightly different question. Do you

20  know the answer to my last question or not?

21          MS. DAVIS: Objection.  Asked and

22  answered and you cut him off.

23          A. Yes, I'm not.  I don't know the

24  answer to your question.

25          MS. DAVIS:  Evan, we have been going

91

1    for about an hour. Why don't we take a break?

2            MS. DAVIS: Yes.  Let's finish this

3    document then we can take a break.

4            Q.  Am I correct that REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL?

8            MS. DAVIS: Objection.  Misstates the

9    document.

10           A. Yes.  How I read this document is

11   that REDACTED - CONFIDENTIAL

12   REDACTED - CONFIDENTIAL. This is then

13   saying, REDACTED - CONFIDENTIAL and

14   the REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL

16   REDACTED - CONFIDENTIAL

17   REDACTED - CONFIDENTIAL.

18           Q. Under REDACTED - CONFIDENTIAL, it says, REDACTED - CONFIDENTIAL. REDACTED - CONFIDENT

19   REDACTED - CONFIDENTIAL

20   REDACTED - CONFIDENTIAL

21   REDACTED - CONFIDENTIAL

22   REDACTED - CONFIDENTIAL

23           MS. DAVIS: Objection.  Scope.

24           A. REDACTED - CONFIDENTIAL

25   REDACTED - CONFIDENTIAL

92

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3        Q.   How did   REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL?

6        MS. DAVIS:  Objection.  Vague.

7        A.   REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10       Q.   REDACTED - CONFIDENTIAL

11    REDACTED - CONFIDENTIAL

12    REDACTED - CONFIDENTIAL

13    REDACTED - CONFIDENTIAL

14    REDACTED - CONFIDENTIAL

15       MS. DAVIS:  Where are you, Evan?

16       A.   REDACTED - CONFIDENTIAL

17 Sorry, Evan.  Ask it again?

18       Q.   REDACTED - CONFIDENTIAL

19    REDACTED - CONFIDENTIAL

20    REDACTED - CONFIDENTIAL

21    REDACTED - CONFIDENTIAL

22 REDACTED - CONFIDENTIAL

23       MS. DAVIS:  Objection.  Scope.

24       A.   REDACTED - CONFIDENTIAL

25    REDACTED - CONFIDENTIAL

93

1       Q.      REDACTED - CONFIDENTIAL

2   REDACTED - CONFID

3       MS. DAVIS:   Objection.   Scope.

4       A.      REDACTED - CONFIDENTIAL

5       REDACTED - CONFIDENTIAL

6   REDACTED - CONFIDENTIAL

7       Q. My question is just a little bit

8   different.   REDACTED - CONFIDENTIAL

9       REDACTED - CONFIDENTIAL

10      REDACTED - CONFIDENTIAL

11      A.      REDACTED - CONFIDENTIAL

12      REDACTED - CONFIDENTIAL

13      Q. When you say, and I'm sorry, did you

14  say   REDACTED - CONFIDENTIAL

15      REDACTED - CONFIDENTIAL   ?

16      A. I said   REDACTED - CONFIDENTIAL

17      REDACTED - CONFIDENTIAL

18      REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL .

20      Q.  REDACTED - CONFIDENTIAL

21      A.      REDACTED - CONFIDENTIAL

22      REDACTED - CONFIDENTIAL

23      REDACTED - CONFIDENTIAL

24      REDACTED - CONFIDENTIAL

25      Q.      REDACTED - CONFIDENTIAL

94

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4         MS. DAVIS:   Objection.   The document

5    speaks for itself.

6         A. Yes.   That is what it says.

7         Q.   REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9         MS. DAVIS:   Objection.   Scope.

10        A.   REDACTED - CONFIDENTIAL

11   REDACTED - CONFIDENTIAL

12   REDACTED - CONFIDENTIAL

13        Q. Were Yotta end-user funds placed

14   that Evolve FDIC insurance from 2019 to 2024?

15        A.   I would have to look.   I would say

16   between 2019 through at least the end of

17   September, but when I moved to Brokerage, I

18   don't recall if that grant had been end-users

19   like FDIC insurance because at that point,

20   again, we were just a payment processing entity

21   for them so funds are passing through.

22        Q. Did Evolve or Synapse or anyone do

23   anything that jeopardized the FDIC insurance on

24   Yotta end-user funds being held at Evolve

25   between 2019 and 2023?

95

1          MS. DAVIS:   Objection.   Vague.   Scope.

2          A. What do you mean to jeopardize how?

3          Q. For instance, did the failure to

4    perform a daily reconciliation on the Yotta

5    end-user balances jeopardize FDIC insurance?

6          A. So how I take your question is that

7    FDIC insurance is more about making sure we have

8    the correct information to know that the funds

9    belong to, and so that information, I believe,

10   based on the ledger, was complete because we had

11   the end-user's names, the relevant places where

12   they live, the addresses, so those records were

13   intact.

14          Q. Did you have to have correct account

15   balances in order to maintain FDIC insurance?

16          A. We would need correct account

17   balances if there was an FDIC insurance payout,

18   meaning, like an event happen that required FDIC

19   insurance.

20          Q. Does the bank only need to know the

21   individual user's account balance on the date

22   that the FDIC insurance is triggered or in order

23   for there to be FDIC insurance the bank has to

24   always maintain correct account balances for

25   each user?

96

1          MS. DAVIS:  Objection.  Compound.

2    Scope.  Calls for a legal conclusion.

3          A. Yes, I was going to say I can't

4    speak to that. I am not a legal expert on that.

5          Q.  [REDACTED - CONFIDENTIAL]n

6    [REDACTED - CONFIDENTIAL]

7    [REDACTED - CONFIDENTIAL]

8    [REDACTED - CONFIDENTIAL]

9    [REDACTED - CONFIDENTIAL]

10   [REDACTED - CONFIDENTIAL]

11   [REDACTED - CONFIDENTIAL]

12   [REDACTED - CONFIDENTIAL]

13        A.  [REDACTED - CONFIDENTIAL]

14   [REDACTED - CONFIDENTIAL]

15   [REDACTED - CONFIDENTIAL]

16   [REDACTED - CONFIDENTIAL]

17        Q.  [REDACTED - CONFIDENTIAL]

18   [REDACTED - CONFIDENTIAL]

19   [REDACTED - CONFIDENTIAL]

20        A.  [REDACTED - CONFIDENTIAL]

21        Q.  [REDACTED - CONFIDENTIAL]

22   [REDACTED - CONFIDENTIAL]

23        A.  [REDACTED - CONFIDENTIAL]

24   [REDACTED - CONFIDENTIAL]

25        MR. MANDEL:  We can take a break now.

97

1  How long would you guys like?

2          MS. DAVIS: Do you want to do ten

3  minutes then we can break around 1:00 for lunch,

4  will that work?  Is that right? So ten minutes

5  now?

6          MR. MANDEL:  Yes.

7          THE VIDEOGRAPHER:  The time is 1:03

8  p.m.  We are going off the record.

9  (Upon Resuming.)

10          THE VIDEOGRAPHER: The time is

11  approximately 1:21 p.m.  We are back on the

12  record.

13          Q. Mr. Vendetti, was it necessary to

14  reconcile Synapse's ledger with Evolve's FBO

15  balances in order to be able to use the ledger

16  to sweep end-user funds to other banks?

17          MS. DAVIS:  Objection.  Vague.

18          A. Is your question, Synapse, did they

19  have to reconcile in order for us to sweep

20  funds?

21          Q. Did anyone have to reconcile in

22  order for Evolve to sweep funds?

23          A. So the sweeping functions, I am

24  going to answer those in context just so I can

25  make sure we are getting there.

98

1          This sweep function that Evolve does,

2     again, is we partner with banks and as a select

3     bank partnership that we have that we would move

4     funds off balance sheet to those banks, and so

5     no reconciliation has to take place for that to

6     the effect, we just know, for example, say you

7     have $100,000 in a bank account and we want to

8     sweep $50,000 of it, we just move $50,000 off

9     balance sheet and then it comes back.

10          So regardless of reconciled or not, we

11     are just moving a dollar on and off the balance

12     sheet and it is not end-user impacting at all.

13          MS. DAVIS:  Evan, your camera. Did you

14     know?

15          MR. MANDEL:  What!?  I'm sorry.  Thank

16     you.

17          Q.  I am showing you Plaintiff's

18     Exhibit 73.  It is very short.

19     EBT-YOTTA-0010152.    REDACTED - CONFIDENTIAL

20          REDACTED - CONFIDENTIAL

21          REDACTED - CONFIDENTIAL

22     REDACTED - CONFIDENTIAL

23          REDACTED - CONFIDENTIAL

24     (Whereupon, Plaintiff Yotta's Exhibit 73 is

25     marked for identification. EBT-YOTTA-0010152.)

99

1    A.    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10    REDACTED - CONFIDENTIAL

11    REDACTED - CONFIDENTIAL

12    REDACTED - CONFIDENTIAL

13    Q.    REDACTED - CONFIDENTIAL

14    REDACTED - CONFIDENTIAL

15    REDACTED - CONFIDENTIAL

16    A.    REDACTED - CONFIDENTIAL

17    REDACTED - CONFIDENTIAL

18    REDACTED - CONFIDENTIAL

19    REDACTED - CONFIDENTIAL

20    REDACTED - CONFIDENTIAL

21    REDACTED - CONFIDENTIAL

22    REDACTED - CONFIDENTIAL

23    REDACTED - CONFIDENTIAL

24    REDACTED - CONFIDENTIAL

25    Q.    REDACTED - CONFIDENTIAL

100

1    REDACTED - CONFIDENTIAL

2         MS. DAVIS:   Objection.   Vague.

3         A.    REDACTED - CONFIDENTIAL

4         Q.         REDACTED - CONFIDENTIAL

5         A.         REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10   REDACTED - CONFIDENTIAL

11         REDACTED - CONFIDENTIAL

12   REDACTED - CONFIDENTIAL

13   REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL

16   REDACTED - CONFIDENTIAL

17   REDACTED - CONFIDENTIAL

18         Q.         REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL

20   REDACTED - CONFIDENTIAL

21         MS. DAVIS: Objection.   Calls for

22   speculation.

23         A.         REDACTED - CONFIDENTIAL

24         Q.         REDACTED - CONFIDENTIAL

25         A.         REDACTED - CONFIDENTIAL

101

1     Q.    REDACTED - CONFIDENTIAL

2     A.    REDACTED - CONFIDENTIAL

3     REDACTED - CONFIDENTIAL

4     Q.    REDACTED - CONFIDENTIAL

5     REDACTED - CONFIDENTIAL

6     MS. DAVIS:  Objection.  Vague.

7     A.    REDACTED - CONFIDENTIAL

8     REDACTED - CONFIDENTIAL

9     REDACTED - CONFIDENTIAL

10    REDACTED - CONFIDENTIAL

11    REDACTED - CONFIDENTIAL

12    Q.    REDACTED - CONFIDENTIAL

13    REDACTED - CONFIDENTIAL

14    REDACTED - CONFIDENTIAL

15    A.    REDACTED - CONFIDENTIAL

16    REDACTED - CONFIDENTIAL

17    Q.    REDACTED - CONFIDENTIAL

18    REDACTED - CONFIDENTIAL

19    A.    REDACTED - CONFIDENTIAL

20    REDACTED - CONFIDENTIAL

21    Q.    REDACTED - CONFIDENTIAL

22    REDACTED - CONFIDENTIAL

23    REDACTED - CONFIDENTIAL

24    MS. DAVIS:  Objection. Vague.

25    A.    REDACTED - CONFIDENTIAL

102

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    Q.    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    A.    REDACTED -

8    Q.    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10    REDACTED - CONFIDENTIAL

11    A.    REDACTED - CONFIDENTIAL

12    REDACTED - CONFIDENTIAL

13    REDACTED - CONFIDENTIAL

14    REDACTED - CONFIDENTIAL

15    Q.    REDACTED - CONFIDENTIAL

16    REDACTED - CONFIDENTIAL

17    A.    REDACTED - CONFIDENTIAL

18    REDACTED - CONFIDENTIAL

19    REDACTED - CONFIDENTIAL

20    REDACTED - CONFIDENTIAL

21    REDACTED - CONFIDENTIAL

22    REDACTED - CONFIDENTIAL

23    Q.    REDACTED - CONFIDENTIAL

24    REDACTED - CONFIDENTIAL

25    A.    REDACTED - CONFIDENTIAL

103

1    REDACTED - CONFIDENTIAL

2        Q.    REDACTED - CONFIDENTIAL

3        REDACTED - CONFIDENTIAL

4        A. REDACTED -

5        Q.    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7        A.    REDACTED - CONFIDENTIAL

8        Q. In order to have FDIC insurance, is

9    it necessary for Evolve to correctly track on a

10   daily basis end-user account balances?

11       MS. DAVIS: Objection.  Scope.

12       A. It is necessary for Evolve to have

13   the correct information for the end-users that

14   is required to meet FDIC requirements.

15       Q. But do the FDIC requirements mandate

16   that Evolve have the end-user account balance on

17   a daily basis?

18       MS. DAVIS: Objection.  Scope.

19       A. Yes.  I would have to look at the

20   requirements.

21       Q. Am I correct, you don't know one way

22   or the other?

23       A. No one way or the other on which?

24   Sorry?

25       Q. You don't know one way or the other

104

1  whether, in order to ensure, you have actual

2  FDIC insurance of all that is required to on a

3  contemporary continuous basis know the balances

4  of each of its end-users?

5          MS. DAVIS:  Same objections.

6          A. Correct, yes.

7          Q. Did Evolve on a daily

8  contemporaneous basis know the correct account

9  balances of all the Yotta end-users?

10          A. We had the FinTech ledger file for

11  Synapse which would detail end-user balances.

12          Q. Were the individual end-user

13  balances contained in the Synapse FTL file

14  always accurate?

15          MS. DAVIS:  Objection.  Vague as to

16  period.

17          A. Yes.  What time period?

18          Q. Between 2019 and the end of

19  September 2023?

20          A. To our knowledge they were

21  materially correct.

22          Q. Is Evolve aware of any instance in

23  which the Synapse FTL file was incorrect between

24  2019 and September 2023?

25          A. Not that I recall.

105

1      Q. When was the first time Evolve

2  observed a discrepancy between the amount of

3  funds the FTL ledger said Evolve should be

4  holding on behalf of end-users and the amount

5  that Evolve was actually holding in the FTL

6  accounts?

7      A. I don't recall the time because

8  whenever -- it was earlier on when I think we

9  started reviewing closely their FTL files and

10  comparing their FTL balances that there was a

11  difference, meaning, like their FTL file showed

12  a different balance and what like our FBO had at

13  the time.

14  (Whereupon, Plaintiff Yotta's Exhibit 74 is

15  marked for identification, EBT-YOTTA-0011063

16  through 66, June 19 email from Mike Young to

17  Vendetti.)

18      Q. I am showing you Plaintiff's Exhibit

19  74. This begins on Bates numbered page

20  EBT-YOTTA-0011063 through 66.

21      You should spend as much time as you

22  would like looking at this. My real question is

23  just going to be in this email here on the

24  bottom of page one.

25      It's a June 19 email from Mike Young

106

1  to you and he says, "I can put looking into this

2  further on my to do for tonight, but I am seeing

3  a differential of $4M (we are under what you

4  list) on Friday comparing to what's on the

5  dashboard."

6          My first question is:  Am I correct

7  in understanding that this refers to a $4

8  million discrepancy between how much the ledger

9  shows Evolve should be holding and how much

10 Evolve is actually holding?

11         MS. DAVIS:  Take your time.

12         A.  Give me one second.  Okay, I think

13 I am good.

14         Q. Does this document refer to a $4

15 million discrepancy between the amount of funds

16 that ledger says Evolve is supposed to be

17 holding and the amount of funds Evolve is

18 actually holding?

19         A. Yes.  This is showing that based on

20 the document reading here is saying that they

21 are showing $4 million of difference where

22 Evolve has $4 million more than what Synapse is

23 showing.

24         Q. Is that a problem that Evolve is

25 holding $4 million more than Synapse is showing

107

1  should be holding?

2        A. No.  That would not view this as a

3  problem. I would view this as something to

4  research.

5        Q. Was this researched?

6        A. I don't have the final conclusion

7  here, but it looks like Mr. Young here was going

8  to look into it.

9        Q. Are you aware or is Evolve aware of

10 any discrepancy between the FTL ledger and the

11 amount actually being held by Evolve that

12 predates June 19, 2019?

13       A. I don't recall off the top in my

14 head. I will have to see.  I don't know when we

15 started doing this or referencing things like

16 this. I'm not 100% sure, Evan.

17       Q. There are so many documents I have

18 here that talk about a discrepancy, different

19 amounts at different times, but of different

20 discrepancies.  Some are nine figures.  Some are

21 ten figures.  Some are eight figures.  Some are

22 seven figures.

23        We will go through some of those

24 documents, but from a high level, did Evolve

25 ever research what was causing the discrepancies

108

1  between the FTL ledger and the amount actually

2  being held at Evolve?

3          A. We would work with Synapse to try to

4  research those things because, again, we are

5  exchanging data files back and forth to each

6  other.

7          So some of the times when we in

8  communicating with them we were just trying to

9  understand if we are reading the file right and

10  if they sent the file right.

11          So there were teams of investigations

12  going back and forth to work in on these

13  differences and to better understand them.

14          Q. Did Evolve ever determine what was

15  causing the differences?

16          MS. DAVIS: Objection.  Vague.  Go

17  ahead.

18          A. For some of them, and again, I don't

19  know which differences you are speaking of, but

20  so for this one, for instance, again, it is not

21  concluded here.

22          Mike's thought is that it's a

23  differential related to debits on their end, and

24  not on our end yet, and so going back to that

25  debit card example, this could be an example of

109

1  that where card transactions are happening in

2  real time on the Synapse ledger and impacting

3  those end-user's balances which would represent

4  $4 million being not present on the Synapse

5  ledger, but the settlement wire won't hit our

6  bank until the next business day just because of

7  how the payment networks work which is why we

8  would be $4 million higher than them.

9           Q. Would you call that a timing

10  difference?

11           A. I would, yes.

12           Q. Were timing differences one of the

13  causes between the discrepancy between the

14  Synapse ledger and the amount actually being

15  held by Evolve?

16           A. I don't know.  I know there is

17  always a differential between an FTL and FBO

18  account because of timing differences.

19           Q. Other than timing differences, did

20  Evolve identify any other causes for the

21  differential between the FTL ledger and the

22  amount actually being held by Evolve?

23           MS. DAVIS:  Objection. Vague.

24           A. I am trying to think through a time.

25  I think most of the times when I have worked

110

1  with the team on this there has been a party of

2  these things that has been related to timing. I

3  don't recall a time when it was something more

4  than timing.

5          Q. Sitting here today Evolve cannot

6  recall any causes for the disparity between the

7  FTL ledger and the amount of actually being held

8  to Evolve other than timing differences;

9  correct?

10          A. Like in the course of the whole time

11 or between '19 and '20 or when are we talking?

12          Q. I am talking between 2019 and 2024.

13          A. Well, no.  In 2024 when Synapse

14 Brokerage was in effect, there were differences

15 known that were not timing related because they

16 just appeared to be transactions or money

17 movements that didn't follow actual

18 transactions, meaning, ledger money moved on

19 ledger, but there wasn't a transaction

20 associated with it through the Fed or through

21 Evolve that would support that transaction.

22          Q. Let's set aside the Synapse

23 Brokerage period. Let's talk about the period

24 between 2019 and September 2023.

25          Did Evolve ever identify any causes,

111

1  other than timing issues, between the

2  discrepancy between the FTL ledger and the

3  amount actually being held at Evolve?

4          A. Again, I don't recall anything other

5  than, and going to your point, that Evolve

6  identified other than timing differences, I

7  don't recall them.

8          Q. Did Synapse ever identify any causes

9  for that discrepancy other than timing

10  differences?

11          A. Well, so going off things that were

12  reviewed today, like some of those check items

13  would not be timing differences. Those appear to

14  be items that just didn't get ledgered on their

15  side correctly.

16          Q. Anything else?

17          A. Not to my recollection right now.

18  (Whereupon Plaintiff Yotta Exhibit 75 is marked,

19  Number 1015, EBT-YOTTA-0011365 through 369, a

20  long chain. )

21          Q. I am showing you Plaintiff's Exhibit

22  75.  It's 1015 if that helps.  It begins on

23  EBT-YOTTA-0011365 through 369, and it is like a

24  long chain.

25              You should take your time to review

112

1  it.  I am going to tell you what I am going to

2  walk you through. I can just show you a couple

3  of things if that makes it easier on you.

4           On the last page there is an email

5  from you to Mike Young where you state, "the

6  Synapse file dated 8/1/2019, is showing a

7  balance of $326 million and the balance I am

8  seeing for all the Synapse accounts is $303

9  million."

10          Really, my only question of that is

11  whether that shows a $23 million shortfall and

12  then I have got a question about one other

13  sentence in this email that I will tell you

14  about now and then I will let you read it.

15          You state here in the middle of page

16  2, which is 366, "I am not expecting it to

17  match. I just thought Evolve was always supposed

18  to show more than your ledger."

19          So those are the only two parts of

20  this that I am going to ask questions about, but

21  take as much time as you would like to

22  familiarize yourself.

23          A. Okay, thank you.  I have read it.

24          Q. Am I correct that the last page of

25  this document is referring to there being a $23

113

1  million shortfall in end-user funds?

2         A. Well, so this is looking at all the

3  Synapse accounts and it is comparing it to their

4  FTL file, so it is showing a difference between

5  what the bank is holding and what Synapse is

6  showing on their ledger of the $23 million with

7  respect to its end-user funds.

8         I cannot tell based on the balances I

9  am showing on that screenshot where it just says

10  EBT balances because I can't see the account

11  names there.

12         Q. When you wrote as of August 1, 2019,

13  the Synapse file is showing a balance of $326

14  million, were you saying the FTL ledger is

15  showing that there should be $326 million in

16  end-user funds at Evolve?

17         A. That is what the FTL file is

18  representing that there should be $326 million

19  of funds at Evolve.

20         Q. Then you state, "the balance I am

21  seeing for all the Synapse accounts is $303

22  million." By that did you mean that that Evolve

23  was holding $303 million of Synapse end-user

24  funds?

25         A. Evolve was holding $303 million of

114

1  funds. Some of those would be Synapse.  Some of
2  them would be Synapse end-user money and some of
3  them would be other accounts.
4          Q. I understand. So some of that would
5  be Synapse corporate money; correct?
6          A. Potentially.  Again, because I am
7  not trying to like be evasive. I can't see the
8  account name, so I don't know like what accounts
9  those represent, but that is also put to your
10  point.
11          Like some of it is in user money. Some
12  of it could be corporate money.  Some of it
13  could be settlement clearing money. It could be
14  different buckets of Synapse related funds.
15          Q. In the next email up you state, "I
16  am showing that Evolve has less money than the
17  Synapse ledger file."
18          By that, did you mean that Evolve was
19  holding less money than the Synapse ledger file
20  said Evolve should be holding?
21          A. That's correct.
22          Q. Turning up to the second page of
23  this document where you state, "I am not
24  expecting it to match. I just thought that
25  Evolve was always supposed to show more than

115

1  your ledger."

2          What did you mean by that?

3          A. Just as earlier stated, like I don't

4  ever expect an FTL file to match up to the FBO

5  balance because there is always going to be some

6  sort of a timing differential there.

7          In this instance my understanding at

8  the time was that the bank Evolve should always

9  show more funds than what is on their FTL file.

10          Q. Why should Evolve always show more

11  funds than is on the FTL file?

12          A. If Evolve was always showing more

13  funds in the FTL file that means we always have

14  enough funds for whatever is represented in the

15  FTL file.

16          Q. But might it show that Evolve has

17  too much?  Too many funds?

18          A. Yes.  If we are showing more funds

19  in the FTL file that means that there is more

20  money at the bank than on the FTL file.

21          Q. Would Evolve be concerned if its

22  records showed that it was holding more funds

23  than it was supposed to be holding?

24          MS. DAVIS:  Objection. Vague.

25          A. In this instance, again, like

116

1  because it goes both ways, right, like we will

2  have less money or more money based on the FTL

3  file.

4            It is not necessarily a problem that

5  we have more or less.  It is more of like is the

6  ledger reconciled to match up with that point in

7  time for end-user funds or FBO fund stuff.

8            Q. Were Synapse and Evolve ever able to

9  reconcile the ledger with the amount actually

10  being held?

11           MS. DAVIS: Objection.  Vague.

12           A. There are many times we work

13  together to explain the differential anytime we

14  would see it.  Whether it ever got down to zero,

15  I don't recall.

16           Q. Did it ever get down to a

17  differential that Evolve could explain the cause

18  of or Synapse could explain the cause of?

19           MS. DAVIS:  Objection.  Vague.

20           A. In the '19 to 2023 September

21  period, I know there were several working

22  sessions or, again, like teams going back and

23  forth on it and I don't recall how materially

24  close we got to it, but there was a lot of work

25  done to it and we would work on it with them.

117

1          Q. I am showing you what has been

2    marked as Plaintiff's Exhibit 76.  It's a single

3    page. It's EBT-YOTTA-0032493.

4    (Whereupon Plaintiff Yotta Exhibit 76 is marked,

5    EBT-YOTTA-0032493.)

6              In December of 2020, was Synapse

7    reconciling the end-user accounts on a daily

8    basis?

9          MS. DAVIS: Objection.  Calls for

10   speculation.

11         A. Yes.  I am not sure.

12         Q. Did Evolve believe in December 2020

13   that Synapse was reconciling the accounts on a

14   daily basis?

15         A. I don't recall.  I just don't know

16   if, as a corporation, if we believed they knew

17   they were reconciling daily or not.

18         Q. Were there periods of time where

19   Synapse was not reconciling on a daily basis?

20         A. Sorry.  You cut out a little bit.

21   Could you repeat?

22         Q. Sure. Were there periods of time

23   where Synapse was not reconciling on a daily

24   basis?

25         A. I don't know because Synapse didn't

118

```
1   send us daily confirmations they were or were

2   not reconciling, so I don't know if they had

3   jobs running every day.  If it was a manual

4   process, I just don't know that answer.

5           Q. Did Evolve ask Synapse whether it

6   was reconciling on a daily basis?

7            MS. DAVIS:  Objection.  Vague.

8           A. I am sure at some point we did. I

9   think in that prior email I asked Mike Young if

10  they were doing some sort of reconciliation on a

11  daily or weekly basis to it. I don't know if he

12  confirmed it or not.

13          Q. Was Synapse required to reconcile on

14  a daily basis?

15          A. REDACTED - CONFIDENTIAL

16  REDACTED - CONFIDENTIAL

17  REDACTED - CONFIDENTIAL

18  REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL

20          Q. REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL

22          A. REDACTED - CONFIDENTIAL

23  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25          Q. Am I correct that Evolve was never
```

119

1  able to determine whether Synapse was

2  reconciling on a daily basis?

3          A. Right.  To my knowledge that's

4  accurate.

5          Q. Let's see.  REDACTED - CONFIDENTIAL in his

6  email, REDACTED - CONFIDENTIAL, states, "I have talked

7  about this with them for a long time."

8          Had REDACTED - CONFIDENTIAL talked for a long time

9  with Synapse about its failure to reconcile on a

10 daily basis?

11         A. Based on the document that is what

12 it says. I am not aware of the conversations

13 that REDACTED - CONFIDENTIAL had with Synapse.

14         Q. Then she states, "We could be

15 looking at some serious complaints and

16 violations from this if slash when these

17 customers decided to submit anything."

18         What violations would Evolve be

19 subject to on account of Synapse not reconciling

20 on a daily basis?

21         MS. DAVIS:   Objection.  Calls for

22 speculation.

23         A. Yes.  So based on the document I see

24 here, the violations and complaints, it looks

25 like it is in reference to the late ACH returns.

120

1          My reading of this with the context

2   is that ██REDACTED - CONFIDENTIAL██ is concerned because ██REDACTED██

3   ██REDACTED - CONFIDENTIAL██, I believe, works in compliance.

4          I believe she is concerned that

5   end-users will complain, meaning, submit

6   complaints to our regulatory bodies because they

7   have ACH returns that were not impacted timely

8   on their accounts.

9          Q. Do the regulations require that ACH

10  transactions be impacted on a timely basis?

11         MS. DAVIS:  Objection.  Scope.  Go

12  ahead.

13         A. Yes.  So NACHA regulations do.  If

14  you are a member of NACHA then there are certain

15  benchmarks that you have to hit to be a part of

16  that organization and maintain good standing of

17  it and one of them is timely ACH returns.

18         Q. In fact, do Federal regulations

19  require all transactions in FinTech accounts and

20  other electronic accounts to be processed and

21  reported on a timely basis?

22         MS. DAVIS:  Objection.  Scope.  Also a

23  legal conclusion.

24         A. Yes, I'm not sure there.

25         Q. Was there any regulatory requirement

121

 1  that proper ledger balances be maintained?

 2          MS. DAVIS: Objection.  Scope.

 3          A. I don't -- yes, I'm not sure.  I am

 4  not aware of a regulation for that.

 5          Q. I am showing you Plaintiff's 77.

 6  This is EBT-YOTTA-0033534.  Let me know when you

 7  have had a chance to review it.

 8  (Whereupon Plaintiff Yotta Exhibit 77 is marked,

 9  EBT-YOTTA-0033534.)

10          A. I am reviewing it now.

11          Q. In point three you state, "I still

12  have not seen a Synapse reconciliation for their

13  total balances since August 2020."

14              Was that statement true?

15          A. As I read it here, I believe so.  I

16  don't remember if that was, if I saw anything

17  between now and then, but since I put it here, I

18  would imagine that is the case.

19          Q. Does Evolve have any reason to

20  believe that Synapse did any reconciliations

21  whatsoever between August 2020 and March 1,

22  2021?

23          A. You asked?  Sorry?  Ask that again?

24          Q. Sure. Did anyone at Evolve see any

25  evidence or indication that Synapse had done any

122

1   reconciliations between August 2020 and March 1,

2   2021?

3           A. I personally don't recall it, so I

4   don't know if I have seen evidence of that.

5           Q. Point one.  Am I correct that point

6   one refers to Synapse being unable to provide a

7   2020 end of year balance for end-user accounts?

8           A. This is relating to all of their

9   accounts.  Just for context.  REDACTED - CONFIDENTIAL

10  REDACTED - CONFIDENTIAL

11  REDACTED - CONFIDENTIAL

12  REDACTED - CONFIDENTIAL

13  REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL

15  REDACTED - CONFIDENTIAL

16  REDACTED - CONFIDENTIAL

17  REDACTED - CONFIDENTIAL

18  REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL

20  REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL

22  REDACTED - CONFIDENTIAL

23  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25  REDACTED - CONFIDENTIAL

123

1    REDACTED - CONFIDENTIAL

2                    REDACTED - CONFIDENTIAL

3            REDACTED - CONFIDENTIAL

4        REDACTED - CONFIDENTIAL

5        Q. And Synapse was unable to provide

6    those statement balances for the end of year

7    2020; correct?

8        A. At this time when I wrote this they

9    were having trouble with it. They did come

10   around and get it correct.

11       Q. You state this is concerning. Why

12   was it concerning?

13       A. To me this was concerning because

14   they were having trouble just grabbing their

15   statement balance        REDACTED - CONFIDENTIAL        .

16       Q. Was this a red flag?

17       MS. DAVIS:  Objection.  Vague.

18       A. Red flag for what?

19       Q. Was their inability to provide a

20   basic end-of-year statement balance a sign that

21   something much more serious might be going on at

22   Synapse?

23       A. To me, I don't know. I will just

24   tell you my side.  When I put this in concerning

25   or something that I am having trouble with and

124

1  they are slightly concerning, is that as a

2  finance professional when I was talking with

3  their finance professionals that they didn't

4  know how to access the account balance from

5  Evolve.  That was the concerning piece.

6            So it is irrespective of their ledger

7  because I was dealing with the finance folks who

8  were ███████ REDACTED - CONFIDENTIAL ███████.

9  (Whereupon Plaintiff Yotta Exhibit 78 is marked,

10  EBT-YOTTA-0044535 through 537,)

11            Q. Turning your attention to

12  Plaintiff's Exhibit 78.  This begins on

13  EBT-YOTTA-0044535 through 537.  It is 1065.

14            But I am really going to be only

15  asking about your email on the top of page 2

16  where you state, "The balances tend to differ a

17  couple $100 million on the daily." Tell me when

18  you had a chance to review it.

19            A. Yes, I will review it here.  I have

20  reviewed it, Evan.

21            Q. At this point in time was there a

22  difference of a couple $100 million between the

23  amount the FTL ledger Evolve was supposed to be

24  holding in the amount that Evolve was actually

25  holding?

125

1            MS. DAVIS:  Objection.  Vague.

2            A. This is speaking only to -- so it is

3   taking their FTL file and I was looking at just

4   two of their end-user accounts and that is where

5   I was observing this difference which I was

6   asking Victor about.

7            Q. Am I correct that in these two

8   end-user accounts there was a couple $100

9   million difference between the amount that the

10  ledger said should be in the accounts, the

11  amount that was actually in the accounts?

12            A. Correct, yes, with the file they had

13  sent us that day.

14            Q. Were you able to figure out what

15  caused that discrepancy?

16            A. Looking at this document, so again,

17  this was us inquiring with them because the

18  variance was so large.  We are again trying to

19  figure out, "Are we reading your file right or

20  you not sending it right?"

21            I don't know if you have read the

22  whole document or not, but again, I asked them,

23  "Is this only EBT specific deposits or would

24  there be other banks in here," meaning, the file

25  they are sending us shows deposits that don't

126

1    reside at Evolve.

2            Then in two, they --  Victor mentions

3    that it may be just an EBT specific file, but he

4    wasn't sure, and then two, Mike Racic --

5            No, I'm sorry, Victor, on the last

6    email up there, mentioned that, again, I was

7    looking at two accounts and I should have really

8    been pulling in all their accounts to get a

9    closer match to it because the FTL represents

10   funds that are not just in the FBO accounts, but

11   also transactional operational accounts.

12           Q. Did you do an analysis after this

13   email chain?

14           A. I don't recall if I did or not.  I

15   don't have it in front of me, so I don't

16   remember exactly if we did it and where that

17   landed.

18           Q. Sitting here today, you don't know

19   whether Evolve was able to identify a cause

20   between this, or causes, between this couple

21   $100 million variance between the ledger and the

22   amount actually in the accounts?

23           A. I don't know that we got it down to

24   the penny. I know at one point that I remember

25   them coming back to me and telling me that the

127

1  file that we were receiving did include other

2  banks' money in it, so it wouldn't have

3  represented, meaning, that their FTL file was

4  not just representing funds held at Evolve.

5          Q. Did that issue explain the whole

6  couple $100 million differential?

7          A. I don't recall.

8          Q. Do you know of any other causes of

9  that couple $100 million differential?

10          A. That I wasn't using the full all the

11  accounts?  Again, I was using two of the main

12  accounts.

13          Q. Sure.  I understand that issue, but

14  can you recall any other causes of that

15  differential?

16          A. During this time period between '19

17  and '23, no.

18          Q. Well, this is referring to a

19  particular day, right?

20          A.  Yes.

21          Q.  I am talking about this particular

22  differential on this particular day.

23          A.  So outside of the file containing

24  money that potentially wasn't ever at Evolve,

25  and me not including all the accounts those are

128

1  the two differentials that I have noted, and as

2  well as the basic timing differences that would

3  exist.

4          Q. Any other causes that you are able

5  to identify?

6          MS. DAVIS:  Asked and answered.

7          A. Yes.  I don't have any more to add

8  there.

9  (Whereupon Plaintiff Yotta Exhibit 79 is marked,

10  Bates numbered page EBT-YOTTA-0044835.)

11          Q. Turning your attention to

12  Plaintiff's Exhibit 79 which is Bates numbered

13  page EBT-YOTTA-0044835.

14          A. Yes, I see it.

15          Q. Am I correct that this document

16  refers to a $560 million discrepancy between the

17  ledger and the amount actually being held?

18          A. That is correct.

19          Q. What was the cause of this $560

20  million discrepancy?

21          A.  I don't know. I don't have the

22  resolution here.

23          Q.  Sitting here today, do you have any

24  recollection of this $560 million discrepancy?

25          A. No.  Outside of this email, I

129

1  remember vaguely this conversation reading this

2  email, but I don't remember after that where it

3  landed.

4          Q. This discrepancy reflected a

5  shortfall, right?  It wasn't a surplus?

6          A. That's correct.  The total ledger

7  deposits were showing more than what existed in

8  the DDA accounts.

9          Q. Was this $560 million shortfall a

10 cause for major concern or was this more of a

11 routine issue?

12         A. I was concerned about and that's why

13 I asked them to please give me an explanation

14 for it.

15         Q. What is the largest variance you can

16 recall between the amount on the ledger and the

17 amount in the FBO accounts for Synapse users?

18         A. Outside?  I mean outside of reading

19 this one right here, I don't know of another

20 one.

21 (Whereupon Plaintiff's Yotta Exhibit 80 is

22 marked, Bates numbered page, Number 1078, March

23 14, 2023, email from Mike Racic. Subject Re:

24 Balances.)

25         Q. Turning your attention to

130

1   Plaintiff's Exhibit 80, which is 1078.  Take all

2   the time you need to read it.  It is a March 14,

3   2023, email from Mike Racic. Subject Re:

4   Balances.

5           A. Let me read through real quick.

6           THE VIDEOGRAPHER:  Sorry to ask again,

7   but that's Exhibit 80?

8           MR. MANDEL:  Yes.

9           A. I have reviewed it.

10          Q. Thank you. So on the page one on the

11  bottom email from Mike Racic, it states "that on

12  Thursday, the ledger showed that balances

13  increased by $567 million.  What the cash

14  balance report from Evolve shows that the

15  balance went up by approximately $9 million," is

16  that right?

17          A. Yes, that's what I read.

18          Q. Then the email states that that's a

19  variance of approximately $558 million; correct?

20          A. Correct.

21          Q. Then on the next line, our next

22  paragraph, it states "that on another day the

23  ledger shows balance is decreased by $286

24  million, but Evolve's cash balances show that

25  the balance went up by $742 million and that

131

1  that is a variance according to the email of

2  $1.028 billion;" is that right?

3          A. That is what the document states.

4          Q. Was Evolve or Synapse ever able to

5  identify what was causing the $500 million and

6  billion dollar variance being described in this

7  document?

8          A. I think it is attributed below to

9  where we were looking at timing differences.

10 Just for context?  I am sure you read about

11 this.

12          This is related to that regional

13 banking crisis around this time and so there was

14 a lot of volume that was being pushed through

15 because a lot of FinTech customers similar to

16 Synapse and its platforms as well as just other

17 portfolio customers of the bank were impacted by

18 SVB, and so that caused a lot of movements and

19 money that day with, meaning, we are processing

20 transactions.  Synapse is processing

21 transactions.

22          So we identified at this point in

23 time noting this that we think there is a big

24 variance here related to timing and that is what

25 it is discussing here.

132

1          So I think this leveled off.  I don't

2    have the rest of it here.  By the way, this

3    leveled off later in the month once everything

4    settled down with the SVB.

5          Q. Other than timing differences, did

6    anything else cause these $500 million and $1

7    billion variance?

8          A. I am not aware of anything beyond

9    timing for this.

10         Q. Do timing differences explain the

11   entire variance?

12         A. Again, I don't know if that is the

13   entire variance or not. I just know if it was a

14   large contributor to it.

15   (Whereupon Plaintiff Yotta Exhibit 81 is marked,

16   Number 107.  I will give you a minute to review

17   this. It is a July 27, 2023 email from Mike

18   Racic to Scot Lenoir, L-E-N-O-I-R.  Subject is

19   Re: list.)

20         Q.  Turning your attention to

21   Plaintiff's 81.  This is 1107.  I will give you

22   a minute to review this. It is a July 27, 2023

23   email from Mike Racic to Scot Lenoir,

24   L-E-N-O-I-R.  Subject is Re: list.

25         MS. DAVIS: Evan, while he looks at

133

1  this, is this as a good stopping point in about

2  15 minutes for lunch?

3         MR. MANDEL: Yes, I think that is an

4  excellent idea.

5         A. I have reviewed it.

6         Q. Am I correct that Plaintiff's

7  Exhibit 81 contains a list of the differences

8  between the amount on the ledger and the amount

9  in the FBO accounts in July 2023?

10        A. Where at?

11        Q. On page 3,4,5.  Basically, after

12  the first two pages. Well, let me turn your

13  attention.  I'm sorry. I am on page 3 of the

14  document.

15        Does this compare the amount of end

16  user funds on the FTL ledger and the amount that

17  Evolve was actually holding on July 17?

18        A. Yes. So what this is doing this is a

19  Synapse prepared document that is documenting

20  their core balance person which starts at that

21  $4.5 billion and they walk down on transactions

22  to get to the total net balance, and then below

23  that they describe balances held out Evolve $4.2

24  billion followed by their other partner banks

25  and that gets into a total and they show a

134

1   differential of $42.66 million.

2           Q. This is showing that there is a $42

3   million shortfall of end-user funds as compared

4   to the FTL ledger; right?

5           A. This is showing that there is more

6   funds on their core than what is represented by

7   all of their bank partners.

8           Q. By core, do you mean the Synapse

9   ledger?

10          A. That is correct.

11          Q. So the ledger shows that Synapse's

12  bank partners should be holding $42 million more

13  than they are actually holding?

14          MS. DAVIS: Objection.  Misstates the

15  document.  Go ahead.

16          A. At this point in time this is

17  showing that Synapse held $4.5 million, and that

18  their banking partners held $4.491 million.

19          Q. That's a difference of $42 million;

20  correct?

21          A. That is correct.

22          Q. And that $42 million difference is

23  from July 17, 2023?

24          A. That is the date the document

25  states.

135

1          Q. If you turn to the next page, am I

2    correct it states that on July 18, Synapse's

3    ledger shows that its bank partners should be

4    holding $64 million more than those bank

5    partners are actually holding?

6          MS. DAVIS: Objection.  Misstates the

7    document.

8          A. So this document is just, again,

9    trying to bridge like what their core balances

10   are versus what is out here in their banking

11   partner's network.

12         Q. Just for the record, what do you

13   mean by core?

14         A.  The core here is that Synapse's

15   actual core system that they are using to keep

16   track of their ledger. This is not the FTL file

17   that we have ingested. This is a Synapse

18   production based on their data.

19         Q. Is Synapse's core what the Synapse

20   system states its ledger should be?

21         MS. DAVIS:  Objection.  Calls for

22   speculation.

23         A. Yes.  So ask it again?

24         Q. Let me ask a slightly different

25   question. What is the difference between the

136

1    amount that Synapse's core shows should be held

2    on behalf of end-users, and the amount Synapse's

3    ledger states should be held on behalf of

4    end-users?

5         MS. DAVIS: Objection. Form.

6         A. They would represent the same thing

7    conceptually the timing of when one is generated

8    is probably the differential, meaning, if I were

9    to grab their FPL ledger, it is not going to tie

10   to whatever is here because they are done at

11   different points.

12        Q. This page that refers to the $64

13   million figure on July 18, does that mean

14   according to Synapse's records there was a $64

15   million shortfall in end-user funds on July 18?

16        A. I don't know if it is related to

17   end-user funds, but it is showing Synapse had

18   more money than their banking partners on their

19   ledger.

20        Q. Does that indicate a surplus or

21   shortfall or something else?

22        A. The description on the document is

23   that it is a deficit, meaning, that their ledger

24   has more funds than the banking partners.

25        Q. On July 19, that deficit figure is

137

1  $78 million; correct? I can show you this on the
2  page. I'm sorry.  Here is July 19, if it helps.
3          A. Yes.  That's what the document says.
4          Q. On July 20, the deficit is $125
5  million; is that right?
6          A. Yes, that is the number I see.
7          Q. On July 21, there is a $136 million
8  deficit; correct?
9          A. Correct. That is the number I see.
10         Q. On July 24, this document indicates
11 that there is a $24 million deficit that; is
12 that right?
13         A. Correct.
14         Q. On July 25, it indicates that there
15 is a $63 million deficit; is that right?
16         A. July 25?  Yes, I see a deficit of
17 $63.93.
18         Q. Moving up to the first page of this
19 document, Mr. Lenoir writes on July 26 to Mr.
20 Pathak, the last bullet point, "Until the
21 reconciliation is cleaned up you need to wire us
22 $150 million from the other banks. I would
23 expect that wire to be done today."
24         Why was Evolve demanding that Synapse
25 wire $150 million to it?

138

1          A.  I would have to speculate to answer
2    that question.
3          Q.  You don't know?
4          A. Yes.
5          Q.  I am definitely not asking you to
6    speculate, so if you don't know, you can just
7    tell me you don't know. The first part of that
8    sentence, Mr. Lenoir states, "Until the
9    reconciliation is cleaned up." Do you know what
10   that is a reference to?
11         A.  I believe it is referencing the
12   documents below.
13         Q.  Is it referencing the deficits in
14   the documents below or something else?
15         A.  I don't know.
16         Q.  In July 2023 was Synapse correctly
17   reconciling end-user funds on a daily basis?
18         MS. DAVIS: Objection.  Calls for
19   speculation.
20         A.  Yes.  I don't know the answer. They
21   were doing a reconciliation of some effort
22   because it is listed here. I just don't know to
23   what level they were doing it.
24         Q.  In Evolve's view in July 2023, were
25   there any problems with Synapse's reconciliation

139

1    or reconciliation efforts?

2              MS. DAVIS: Objection.  Vague.

3              A.  Ask that again?

4              Q. Sure. In July 2023, in Evolve's

5    view, were there any problems with Synapse's,

6    reconciliation or reconciliation efforts?

7              A. There were problems.  We wanted them

8    to reconcile closely like the deficit there like

9    it's when they were talking about $4.5 million

10   like $42 million is like a small percentage, but

11   like for us that is still $42 million so we

12   wanted that to be tighter and be able to be

13   explained more.

14             Q. What kind of variance was acceptable

15   to Evolve?

16             A. I am not sure we had an exact

17   threshold that I could speak to here.

18             Q. If the variance were $5 million

19   instead of $40 million to $100 million, would

20   that have been acceptable to Evolve?

21             A. It would have been better. I don't

22   know though if that is acceptable or not.

23             Q. ████████ REDACTED - CONFIDENTIAL ████████

24   ████████ REDACTED - CONFIDENTIAL ████████

25             A. ████████ REDACTED - CONFIDENTIAL ████████

140

REDACTED - CONFIDENTIAL

REDACTED - CONFID

3            Q.  I'm sorry?  Did you say REDACTED - CONFIDENTIAL

4  REDACTED - CONFIDENTIAL ?

5            A.  Yes, sir.

6            Q.  Who was the executive management in

7  2023?

8            A.  Scot Lenoir, chairman of the board,

9  and Scott Stafford would have been the president

10 and Mark Mosteller would have been  the CFO, and

11 I think Cecilia Russell was chief compliance

12 officer. So they would make up the executive

13 team.

14            Q.  Did they ever make a determination

15 as to what an acceptable level of variance was?

16            A.  If they did, I wasn't privy to know

17 what it was.

18            Q.  You said Evolve wanted a better

19 explanation for the variance; is that correct?

20            A.  Correct.

21            Q.  Evolve was not satisfied with the

22 level of explanation for the variance that

23 Synapse was providing; right?

24            A.  Yes.  Ideally just in any kind of

25 reconciliation it's okay to have differences. We

141

1  just expect a difference to be explained. That

2  is just a standard reconciliation practice.

3          Q. Plaintiff's 82 begins on

4  EBT-YOTTA-0050497.

5          MS. DAVIS:  Evan, can we take a break?

6          MR. MANDEL: We can break. Let me just

7  ask like one or two. I am not going to get into

8  this document all. I just want to understand

9  whether this was the policy.

10         MS. DAVIS:  Okay.

11         MR. MANDEL:  It goes through 566.

12         MS. DAVIS: You know?  I'm sorry.

13         MR. MANDEL:  Take a break. Let's take

14  a break.

15         MS. DAVIS:  I have a personal

16  emergency.

17         THE VIDEOGRAPHER: The time is 2:30

18  p.m.  We are going off the record.

19  (Upon Resuming.)

20         THE VIDEOGRAPHER:  The time is

21  approximately 3:16 p.m.  We are back on the

22  record.

23  (Whereupon Plaintiff Yotta Exhibit 82 is marked,

24  August 1, 2023 email referring to reconciliation

25  documentation and said here's a draft and this

142

```
1   is labeled    REDACTED - CONFIDENTIAL

2        REDACTED - CONFIDENTIAL        .)

3   BY MR. MANDEL:

4        Q.  Before we left this was marked as

5   Plaintiff's Exhibit 82.  This is an August 1,

6   2023 email referring to reconciliation

7   documentation and said "Here's a draft," and

8   this is labeled    REDACTED - CONFIDENTIAL

9        REDACTED - CONFIDENTIAL        .

10            REDACTED - CONFIDENTIAL

11       A.   REDACTED - CONFIDENTIAL

12       Q.      REDACTED - CONFIDENTIAL

13   REDACTED - CONFIDENTIAL

14       A.      REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL

16       Q.      REDACTED - CONFIDENTIAL

17       A.       REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19       Q.       REDACTED - CONFIDENTIAL

20           REDACTED - CONFIDENTIAL

21   REDACTED - CONFIDENTIAL

22       A.        REDACTED - CONFIDENTIAL

23            REDACTED - CONFIDENTIAL

24            REDACTED - CONFIDENTIAL

25         REDACTED - CONFIDENTIAL
```

143

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9        Q. Prior to, and call it November 2023,

10   REDACTED - CONFIDENTIAL

11   REDACTED - CONFIDENTIAL

12   REDACTED - CONFIDENTIAL?

13       A.    REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL

16   REDACTED - CONFIDENTIAL

17   REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19       Q.    REDACTED - CONFIDENTIAL

20   REDACTED - CONFIDENTIAL

21   REDACTED - CONFIDENTIAL

22   REDACTED - CONFIDENTIAL

23   REDACTED - CONFID

24       MS. DAVIS: Objection.  Misstates

25   testimony.

144

1       A. REDACTED - CONFIDENTIAL

2   REDACTED - CONFIDENTIAL

3   REDACTED - CONFIDENTIAL

4   REDACTED - CONFIDENTIAL

5       Q. REDACTED - CONFIDENTIAL

6   REDACTED - CONFIDENTIAL

7       A. REDACTED - CONFIDENTIAL

8   REDACTED - CONFIDENTIAL

9   REDACTED - CONFIDENTIAL

10  REDACTED - CONFIDENTIAL

11  REDACTED - CONFIDENTIAL

12  REDACTED - CONFIDENTIAL

13      Q. REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL

15      A. REDACTED - CONFIDENTIAL

16      Q. We can move on to the next document.

17  This is Plaintiff's 83.   It begins on

18  EBT-Yotta-0120681.

19  (Whereupon, Plaintiff Yotta's Exhibit 83 is

20  marked for identification. EBT-YOTTA-0120681.)

21      MS. DAVIS: Evan, is this one?  We are

22  not seeing this one in the chat.  Can you put

23  that in there?

24      MR. MANDEL: Sure.

25      Q. My question is really. Let me know

145

1    when you have had a chance to look at it.

2           A. This is 83, correct?

3           Q. Yes.

4           A. I have read it.

5           Q. What does this line on the first

6    page mean where you state, REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL  What does that mean?

9           A.        REDACTED - CONFIDENTIAL

10   REDACTED - CONFIDENTIAL

11   REDACTED - CONFIDENTIAL

12   REDACTED - CONFIDENTIAL

13   REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL

16   REDACTED - CONFIDENTIAL

17   REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL

20   REDACTED - CONFIDENTIAL

21   REDACTED - CONFIDENTIAL

22   REDACTED - CONFIDENTIAL

23   REDACTED - CONFIDENTIAL

24   REDACTED - CONFIDENTIAL

25   REDACTED - CONFIDENTIAL

146

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENT

7    Q.   I am turning your attention to what

8  we will mark as Plaintiff's 84.   This is 1133.

9  This is a September 14, 2023, email for Mr.

10  Lenoir to Mr. Pathak.

11    It attaches an email. Am I correct

12  that in this email Evolve has concluded that

13  there is a $57 million deficit in the Synapse

14  end-user accounts, and as a result, Evolve is

15  demanding that Synapse transfer $57 million to

16  Evolve to cover that deficit?

17  (Whereupon, Plaintiff Yotta's Exhibit 84 is

18  marked for identification. September 14, 2023,

19  email for Mr. Lenoir to Mr. Pathak.)

20    MS. DAVIS:  Take you time to read it.

21    A. Yes.   I am going to review the

22  document.

23    Q. Oh, take your time.  Have you had an

24  opportunity to review it. Mr. Vendetti?

25    A. Yes, sir.  I just finished.

147

1    Q. Am I correct that in this document

2  Evolve is advising Synapse that Evolve has

3  concluded that there is a $57 million deficit in

4  Synapse end-user funds?

5    A. This document is showing that

6  Synapse, the total in their FTL file compared to

7  our FBO account funds is a deficit of $57

8  million.

9    Q. Because Evolve has concluded there

10  is a deficit of $57 million it is demanding that

11  Synapse transfer to Evolve $57 million to cover

12  that deficit; correct?

13    A.  That's correct.

14    Q.  This is not the first time that

15  Evolve believed that there was a deficit in

16  Synapse's end-user funds; correct?

17    A. Well, it is not the first time as we

18  noted previously through their reconciliation

19  examples back in July, and at other times, that

20  there has been a difference between the FBOs and

21  the FBO account balances.

22    Q. I am not asking about a difference

23  in the balances. I am asking about a deficit in

24  end-user funds.  Synapse told Evolve in 2022

25  that there was a deficit in end-user funds;

148

1  correct?

2          MS. DAVIS: Objection.  Misstates

3  facts.

4          A. Yes, I don't remember.  I remember

5  there being a difference, and just so I am

6  speaking clearly to make sure I understand.  A

7  deficit is where the money doesn't exist and it

8  is not there.

9          The difference is we have a difference

10 in two balances and the reconciliation needs to

11 prove out what that difference is to tell if

12 there is actually a deficit existing or if it is

13 just in transit-type items.

14          Q. I appreciate that distinction.  I

15 think you have testified extensively that there

16 was a difference between the FTL ledger and the

17 amount in the FBO accounts going all the way

18 back to 2019; correct?

19          A. Correct.

20          Q. I am not asking about differences.

21 Now I am asking about deficits and end-user

22 funds. Am I correct that Synapse will lead to

23 Evolve in 2022 that there was a deficit in

24 end-user funds?

25          A. I am going to say I don't know

149

1  because I don't recall it saying end-user funds.

2  Like I know when we talked about FBO accounts,

3  in the total of the FBO accounts of the Synapse

4  program accounts there was a difference between

5  ledger and what the bank held.

6           Q. When was the first time that Evolve

7  concluded that there was a deficit in end-user

8  funds?

9           A.  Again, I am not sure, like again,

10  going back to the word deficit.  As we have

11  talked through extensively like you mentioned

12  through this conversation, and I think we went

13  back to 2019 where we started looking at FTL

14  files and looking at the total FBO account

15  balances, we recognized, "Hey, there is a

16  difference here. Let's better understand it with

17  Synapse and then work with them to figure out

18  what this difference is so that we can all sleep

19  at nighttime."

20           Q. Yes.  I am not talking about

21  differences. I am talking about deficits.  When

22  was the first time that Evolve concluded that

23  there was a deficit in Synapse end-user funds?

24           A. I don't know that.  Like I don't

25  know the date of it if we ever did conclude that

150

1    there was a deficit in end-user funds.

2           Q. Is it your testimony that Evolve

3    never concluded there was a deficit in end-user

4    funds?

5           MS. DAVIS:  Objection.  Misstates the

6    testimony.

7           A. I am just saying I don't recall us

8    definitively saying if there was a deficit in

9    end-user funds, and when I say that, meaning,

10   the funds that Evolve held for end-users of the

11   Synapse program, I don't recall the time or if

12   there was a time when we said there was a

13   deficit between what Evolve held for end-users

14   versus what they were owed.

15          Q. Did Synapse ever tell Evolve that

16   there was a deficit in end-user funds?

17          A. I can't recall.  I feel like there

18   was a time, probably sometime in this time

19   period, as we were coming up to when they

20   switched over to Brokerage where there is

21   communications with Synapse.

22           I don't recall. I feel like there was

23   some sort of notification from them, but I just

24   don't remember the timing of it.

25          Q. Did Synapse perform a genesis

151

1  reconciliation in 2022?

2          A. When you say a genesis

3  reconciliation, what does that mean?

4          Q. Is that a term that Synapse used to

5  describe a reconciliation that it performed?

6          A. I am not familiar with that term or

7  that action you are describing.

8          Q. Did Synapse perform any

9  reconciliation in late 2022 that concluded that

10 there was a deficit in Synapse end-user funds?

11         A. I don't recall.  I know at some

12 point, and again, I don't know the timing of it.

13 I know that Synapse's board hired Crowe to

14 investigate or to research into their funds.

15         I know through that there was a

16 transaction or transactions that were outlined

17 that showed that end-user funds had been moved

18 out of end-user accounts to Synapse accounts.

19         Q. Were the Crowe findings shared with

20 Evolve?

21         A. Not in detail.  Just that one item I

22 mentioned is what I am aware of.

23         Q. Was any other findings or

24 conclusions of Crowe shared with Evolve?

25         A. Beyond what I said, I am not aware

152

1   of anything else.

2          Q. Prior to September 14, 2023, did any

3   Evolve executives conclude that there was a

4   deficit in Synapse end-user funds?

5          A. I don't recall that happening.

6          Q. Prior to September 14, 2023 did the

7   Evolve board conclude that there was a deficit

8   in Synapse end-user funds?

9            MS. DAVIS: Objection.  Scope.

10         A. Not to my knowledge.

11         Q. Did anyone at any time advise the

12  Evolve board that there was a deficit in Synapse

13  end-user funds?

14           MS. DAVIS:  Objection.  Scope.

15         A. I am not aware of communications to

16  the board, so I don't know what was communicated

17  to them.

18         Q. You are not aware of what was

19  communicated to the board about shortfalls or

20  deficits in end-user funds?

21         A. That's correct.

22         Q. Are you Evolve's corporate designee

23  with respect to deficits or shortfalls in

24  end-user funds?

25           MS. DAVIS:  Same objection as before.

153

1          A.  Again, I would need to see the

2    exhibit list to see if that is what I am noted

3    for.

4          Q.  But sitting here today without

5    referring to an exhibit you don't know one way

6    or the other whether you are the corporate

7    designee with respect to shortfalls in Synapse

8    end-user funds; is that correct?

9          MS. DAVIS:  Same objections.  Asked

10   and answered.

11         A.  That's correct.

12         Q.  When Evolve sent Plaintiff's Exhibit

13   84 to Synapse stating that there was a $57

14   million deficit in Synapse end-user funds, did

15   Synapse disagree with that conclusion?

16         A.  I don't have a follow up here, so I

17   am not sure what their response was.

18         Q.  After Evolve sent this September 14

19   letter, am I correct that Evolve swept

20   approximately $16 million from Synapse's fee

21   account to some type of reserve account?

22         A.  Swept? I would say transferred from

23   there, yes.

24         Q.  Am I correct that at that time

25   Evolve also stopped paying the rebate to

154

1  Synapse?

2          A. We still accrued it and we still

3  paid it. We just transferred everything to a

4  reserve account.

5          Q. But that cash was not made available

6  to Synapse at that time; correct?

7          A. It was not made available to them in

8  respect that they can't use it to use if for any

9  corporate operation or anything but put it into

10 a reserve account to hold until it wasn't needed

11 in any return to Synapse.

12         Q. Right.  Was impact if any did Evolve

13 think transferring that $16 million and not

14 making the rebate available for ongoing Synapse

15 operations would have on Synapse?

16          MS. DAVIS:  Objection.  Calls for

17 speculation.

18         A. Yes.  I am not sure.

19         Q. Was Evolve at all concerned that

20 cutting off Synapse's main source of revenue,

21 would adversely impact its operations?

22          MS. DAVIS:  Objection.  Scope.

23         A. I don't know the answer there.

24         Q. Turning your attention to

25 Plaintiff's Exhibit 85.  Plaintiff's Exhibit 85

155

1  begins on EBT-Yotta-0053708 through 712.

2  (Whereupon, Plaintiff Yotta's Exhibit 85 is

3  marked for identification. EBT-YOTTA-0053708.)

4          A. Is this in the chat? I don't see

5  this one, 1154.

6          Q. Yes. It is 1154.  Is it not in the

7  chat?

8          A.  I could be missing.  Hold on.

9          Q. It is the fourth one the bottom.

10         A.  Sorry.  I didn't see these.

11         Q.  That's okay.  I am only going to

12 ask about a couple sections of this. Are you

13 familiar with this document?

14         A. Not yet.  I need to read through it.

15         Q. I am only going to ask about

16 paragraphs 2 through 5, if that helps.

17         A. Let me get a read. Okay.

18         Q. Is this  REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL

20 REDACTED - CONFIDENTIAL?

21         A.  REDACTED - CONFIDENTIAL

22 REDACTED - CONFIDENTIAL

23 REDACTED - CONFIDENTIAL

24         Q. Have you ever seen REDACTED - CONFIDENTIAL

25 before?

156

A. ███████████ REDACTED - CONFIDENTIAL ███████████

███████████ REDACTED - CONFIDENTIAL ███████████

REDACTED - CONFID

Q. REDACTED - CONFIDENTIAL   Am I correct that

███████████ REDACTED - CONFIDENTIAL ███████████

███████████ REDACTED - CONFIDENTIAL ███████████?

A. ███████████ REDACTED - CONFIDENTIAL ███████████

Q. Did Evolve want Synapse to wind down
its operations?  Actually, let me rephrase that.
Did Evolve want Synapse to wind down its program
with Evolve?

A. ███████████ REDACTED - CONFIDENTIAL ███████████

███████████ REDACTED - CONFIDENTIAL ███████████

███████████ REDACTED - CONFIDENTIAL ███████████

███████████ REDACTED - CONFIDENTIAL ███████████

███████████ REDACTED - CONFIDENTIAL ███████████

███████████ REDACTED - CONFIDENTIAL ███████████

███████████ REDACTED - CONFIDENTIAL ███████████

Q. When did Evolve decide that it
wanted Synapse to get its balances off of
Evolve?

A. I think that started in September of
2022, and we sent them a termination notice of
non-renewal.

Q. Was there more urgency to Evolve's

157

1  desire for Synapse to get its balances off of

2  Evolve by October 2023?

3          A. The urgency was because they hadn't

4  done any formal off-boarding in the year that we

5  had given them and so their urgency was their

6  expiration of their agreement has happened.

7  █████████████ REDACTED - CONFIDENTIAL █████████████

8  █████████████ REDACTED - CONFIDENTIAL █████████████

9          Q. Was the deficit in Synapse's

10 end-user funds a factor in Evolve's desire to

11 get Synapse balances off of Evolve?

12         A. I am unsure. I just know at this

13 point in time their agreement had fully expired

14 and we were all aiming for this to be wound

15 down, but Synapse didn't take appropriate

16 actions to wind it down timely prior to this.

17         Q. If there was a deficit in Synapse

18 end-user funds, how was Synapse going to get off

19 of Evolve's platform?

20         A. I don't fully understand that

21 question.  What do you mean?

22         Q. Sure. I mean the last exhibit we

23 looked at stated it stated that Evolve believed

24 there was a $57 million deficit in Synapse

25 end-user funds; correct?

158

1          A. The last document showed that there

2     was a difference of $57 million between the FBO

3     accounts and the ledger.

4          Q. Are you saying that the last

5     document didn't conclude that there was a

6     deficit?

7          A. I am just saying I don't use the

8     word deficit.

9          Q. Let's forget about the word that it

10    used.  I believe you have testified multiple

11    times, and I could be wrong, but I believe you

12    have testified multiple times that by September

13    2023, Evolve concluded that there was a deficit

14    in Synapse's end-user funds.

15          Is that true or not true?

16          A. I don't recall. I know that we were

17    concerned with them coming out to the wind down

18    of this, and as stated in the previous document

19    we looked at we asked them to fund additional

20    funds here and then we started building up a

21    reserve.  Based on that new case there was truly

22    a deficit when they did finally wind down.

23          Q. Got it.  So am I correct that Evolve

24    didn't know one way or the other in September

25    and October 2023, whether there was a deficit in

159

1  Synapse end-user funds?

2          MS. DAVIS: Objection.  Misstates,

3  prior testimony.

4          A. Yes.  What I am saying is that we

5  were putting money into a reserve account for

6  when they went down in case there was a deficit.

7          Q. I am asking a different question,

8  Mr. Vendetti.  This has been happening a lot. I

9  am asking whether Evolve believed there was a

10 deficit.  Not what Evolve was doing in case

11 there might be a deficit?

12          I am asking a very simple question.

13 In September and October 2023, did Evolve

14 believe there was a deficit in Synapse end-user

15 funds?

16          MS. DAVIS:  Asked and answered.

17          A. Sorry?  Say it again?  Sorry.

18          Q. Sure.  In September and October

19 2023, did Evolve believe that there was a

20 deficit in Synapse end-user funds?

21          MS. DAVIS: Again, asked and answered.

22 Go ahead.

23          A. Yes.  I don't know if believe is the

24 right word. I think we didn't know. We didn't

25 know at the time and we were being cautious to

160

1  set funds up in case there was a deficit.

2        So I would say that we were unsure, but

3  we were planning being on the safe side given as

4  we have seen throughout this whole presentation

5  when we look at a point in time balances there

6  was always a moving delta.

7        Q. If Evolve didn't know whether there

8  was or was not a deficit in Synapse end-user

9  funds in September or October 2023, it certainly

10 didn't know the magnitude of that deficit;

11 correct?

12       MS. DAVIS:  Objection.  Misstates

13 prior testimony.

14       A. Yes. So what's the question there?

15       Q. Sure.  If Evolve didn't know whether

16 there was or was not a deficit, then Evolve

17 certainly didn't know what the amount of any

18 deficit might be; right?

19       MS. DAVIS: Objection.  Misstates prior

20 testimony.

21       A. Yes.  So we didn't like, again, we

22 don't know what we don't know which is why we

23 did the course of action that we described

24 earlier about setting up the reserve account.

25       Our thought in that is that we

161

1  believed that reserve amount would cover any

2  potential difference if there was one.

3          Q. Got it.  If there was a deficit in

4  end-user funds, how was Synapse going to get its

5  end-user balances off or out of Evolve?

6          A. If there was a deficit, what would

7  happen is that Synapse would begin their wind

8  down plan and migrating balances over and they

9  would have to move that money.

10          So if there was not enough money to

11  be moved, then the account would show as a

12  shortfall, right, the FBO with the funds

13  wouldn't be there so they would, meaning, they

14  would send us a file to process and when we go

15  to process it our system would say, "There is

16  not enough money here in the account to process

17  the file," and that would be the flag, "Hey,

18  there is not enough funds here to process the

19  file they are asking us to do."

20          Q. Then if that happened, what was

21  Evolve's plan, if it had one?

22          A. If something like that happens, what

23  we do is we go review the accounts and then

24  determine if there is funds available throughout

25  the program to move them to fund that end-user

162

1  balance or that file.

2       Q. Did that ever happen in connection

3  with the wind down of Synapse?

4        MS. DAVIS: Objection.  Vague.

5       A. Yes.  I am not familiar with the

6  time where we didn't move the files that they

7  asked us to.

8       Q. Let's go on to the next paragraph

9  here, REDACTED - CONFIDENTIAL of Plaintiff's Exhibit 85. Am

10 I correct in this paragraph REDACTED - CONFIDENTIAL

11 REDACTED - CONFIDENTIAL ?

12     A. REDACTED - CONFIDENTIAL

13 REDACTED - CONFIDENTIAL

14 REDACTED - CONFIDENTIAL

15     Q. REDACTED - CONFIDENTIAL

16 REDACTED - CONFIDENTIAL

17     A. REDACTED - CONFIDENTIAL

18 REDACTED - CONFIDENTIAL

19     Q. Are you Evolve's corporate designee

20 with respect to reserve funds?

21     A. If I am listed as that, I don't

22 recall if that is what I am listed to do.

23     Q. Did you do anything to prepare to

24 testify about Synapse end-user reserve funds?

25     A. Yes.

163

1      Q. What did you do?

2        MS. DAVIS:  Objection. You are

3   instructed not to reveal any communications with

4   counsel.  You can tell me if you met with

5   counsel.

6      A. I met with counsel.

7      Q. Other than meeting with counsel, did

8   you do anything to prepare to testify about

9   reserve funds?

10     A. No.

11     Q. Am I correct that REDACTED - CONFIDENTIAL

12   REDACTED - CONFIDENTIAL

13   REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL?

15       MS. DAVIS: Objection.  Misstates and

16   assumes facts.

17     A.    REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL

20     Q.  Was Evolve   REDACTED - CONFIDENTIAL

21   REDACTED - CONFIDENTIAL e

22   REDACTED - CONFIDENTIAL?

23     A.     REDACTED - CONFIDENTIAL

24   REDACTED - CONFIDENTIAL

25   REDACTED - CONFIDENTIAL

164

1      Q. So Evolve was  ██ REDACTED - CONFIDENTIAL ██

2      ████████████ REDACTED - CONFIDENTIAL ████████████

3      ████████████ REDACTED - CONFIDENTIAL ████████████

4   ██ REDACTED - CONFIDENTIAL ██; correct?

5         MS. DAVIS: Objection.   Argumentative.

6      A.   ████████ REDACTED - CONFIDENTIAL ████████

7      ████████████ REDACTED - CONFIDENTIAL ████████████

8      ████████████ REDACTED - CONFIDENTIAL ████████████

9      ██████ REDACTED - CONFIDENTIAL ██████

10     Q. You don't know  ██ REDACTED - CONFIDENTIAL ██

11  ██ REDACT ██; correct?

12     A.   ████████ REDACTED - CONFIDENTIAL ████████

13     ████████ REDACTED - CONFIDENTIAL ████████

14     ██████ REDACTED - CONFIDENTIAL ██████

15     Q. In paragraph  ██ REDACTED - CONFIDENTIAL ██

16     ████████████ REDACTED - CONFIDENTIAL ████████████

17     ████████ REDACTED - CONFIDENTIAL ████████

18     ████████ REDACTED - CONFIDENTIAL ████████

19  ██ REDACTED - CONFIDENTIAL ██; correct?

20     A.   ██ REDACTED - CONFIDENTIAL ██

21     Q.   ████████ REDACTED - CONFIDENTIAL ████████

22     ████████ REDACTED - CONFIDENTIAL ████████

23     A.   ████████ REDACTED - CONFIDENTIAL ████████

24     ████████ REDACTED - CONFIDENTIAL ████████

25     ████████ REDACTED - CONFIDENTIAL ████████

165

1  REDACTED - CONFIDENTIAL

2  REDACTED - CONFIDENTIAL

3  REDACTED - CONFIDENTIAL

4  REDACTED - CONFIDENTIAL

5  Q. Did Evolve  REDACTED - CONFIDENTIAL

6  REDACTED - CONFIDENTIAL?

7  A.  REDACTED - CONFIDENTIAL

8  REDACTED - CONFIDENTIAL

9  REDACTED - CONFIDENTIAL

10  REDACTED - CONFIDENTIAL

11  REDACTED - CONFIDENTIAL

12  Q. Did Evolve  REDACTED - CONFIDENTIAL

13  REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL?

15  A.  REDACTED - CONFIDENTIAL

16  REDACTED - CONFIDENTIAL

17  REDACTED - CONFIDENTIAL

18  REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL

20  Q. How  REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL

22  REDACTED - CONFIDENTIAL?

23  A.  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25  REDACTED - CONFIDENTIAL

166

REDACTED - CONFIDENTIAL

Q. Turning your attention to the next page, REDACTED - CONFIDENTIAL . REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL Why did REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL ?

A. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

Q. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

MS. DAVIS: Objection. Calls for a legal conclusion.

A. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

Q. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

MS. DAVIS: Objection.

A. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

Q. Turning your attention to

167

1    Plaintiff's 86.

2            MS. DAVIS:  Do you have the document?

3            MR. MANDEL:  I am sorry.  I haven't

4    shown it, have I? This is 1208.

5            It begins on Bates number page

6    EBT-Yotta-0231561 through 1567.  Let me know

7    when you have had a chance to review it.

8    (Whereupon, Plaintiff Yotta's Exhibit 86 is

9    marked for identification, EBT-YOTTA-0231561.)

10           A. Let me review it. I have reviewed

11   it.

12           Q. Do you know who Caroline Stapleton

13   is?

14           A. I do.

15           Q. Am I correct that she is an Orrick

16   lawyer?

17           A. That is correct.

18           Q. She is or was a lawyer for Evolve?

19           A. That's correct.

20           Q. To Evolve's knowledge, has Ms.

21   Stapleton said anything that was false?

22           A. When?

23           Q. At any point in connection with

24   representing Evolve and these issues related to

25   Yotta and Synapse and missing end-user funds?

168

1          A. I can't answer that fully because I
2   don't know what all Ms. Stapleton has said.
3          Q. Sitting here today, are you aware of
4   Ms. Stapleton saying anything that was false?
5          A. Not to my knowledge.
6          Q. To your knowledge, has Ms. Stapleton
7   ever lied on behalf of Evolve?
8          MS. DAVIS: Objection.  Harassing.
9   Scope.
10          A. Yes.  Not to my knowledge.
11          Q. Did Evolve ever instruct Ms.
12   Stapleton to lie?
13          MS. DAVIS: Objection.
14          A. Not to my knowledge.
15          Q. The last page of this document, and
16   am I correct that this is an email chain from
17   December 2023?
18          A. That is what the document states.
19          Q. This is the period of time when
20   Evolve was trying to get Synapse to get its user
21   monies out of Evolve; correct?
22          A. This would have been the time that
23   Synapse Brokerage has come into existence and so
24   we are in the process of moving their platforms
25   to wherever they are designating us to.

169

1          Q.  On the last page here it says,

2   "Following these transactions the account ending

3   in ▮REDACTED-CON▮ has a balance of approximately negative

4   $42 million."  Is that statement accurate?

5          A. I don't have the end of day balance

6   for that account, so I can't say if it is or

7   not.

8          Q. Between October 1, 2023 and say

9   December 31, 2023, were a lot of Synapse

10  accounts experiencing significant negative

11  balances?

12         A. Without the balance sitting in front

13  of me, I couldn't say yes or no on that.

14         Q. Sitting here today, you don't

15  remember whether these negative balances were a

16  significant issue in late 2023; correct?

17         A. That's correct.

18         Q. Do you have any idea what caused

19  this negative $42 million balance in ▮REDACTED-CON▮?

20         A. Not a direct root cause. I mean an

21  overdraft balance is caused by too many debits

22  on an account where there weren't enough credits

23  to result in a negative balance.

24         Q. Did this negative $42 million

25  balance result from a shortfall or deficit in

170

1   end-user funds?

2          A. I don't know because I would have to

3   see all their accounts. This is just looking at

4   one account, the ███████ account, and they held a

5   suite of accounts at Evolve.  I don't know the

6   balances that those total.

7          Q. Did a shortfall or deficit in

8   end-user accounts cause any of the accounts At

9   Evolve to go negative?

10         MS. DAVIS:  Can you reask the question

11  again, Evan?

12         Q. Sure.  Sitting here today are you

13  aware of any instance in which a shortfall in

14  Synapse end-user funds caused a balance of one

15  or more of all accounts to go negative?

16         MS. DAVIS:  Objection.  Form.

17         A. Yes.  I don't know how to answer

18  that.  I don't know how to answer that because

19  without seeing the accounts, I don't know which

20  accounts are negative, which accounts are

21  positive, and how it totaled up.

22         Q. Was there any point in time when

23  Evolve was watching its accounts and said, "We

24  are now seeing what is going on with these

25  accounts and now we know that there is a deficit

171

1    in Synapse end-user funds."

2            MS. DAVIS: Objection.  Vague.  Did you

3    say at any time, Evan?  Sorry.

4            Q. Yes.

5            A.  At this point in time, no, right,

6    we are like going forward after and I am not

7    going to say the dust does settle from Synapse

8    because we had them all settled, but when we did

9    the incur reconciliation, and the results of

10   that came out it didn't show a deficit of Evolve

11   funds for end-users like the reserve was there

12   to cover those amounts for balances that were

13   for Evolve depositors that we held for those

14   end-users.

15           Q. Turning your attention to the next

16   paragraph, it states, "Finally, the most recent

17   FTL sent by Synapse shows numerous platforms

18   that previously had been migrated off Evolve,

19   and accordingly, we are no longer Evolve's FTL.

20   Several of these platforms have now appeared to

21   have significant record counts and millions in

22   end-user balances including Yotta and

23   REDACTED - CONFIDENTIAL ."

24           Was that statement true or false?

25           A. I don't know at this point in time,

172

1  but I know during the course of time between

2  October and May, there were instances where

3  funds were moved off of the FTL, and those

4  programs to our knowledge had left the bank, and

5  then they would come back on the FTL.

6           Q. What would cause that to happen?

7           A.  It would be purely like a Synapse

8  ledgering because we don't control that piece.

9  So it is data we are receiving from Synapse.

10          Q. So if Evolve could never determine

11 the cause of that because it is created by

12 Synapse in Evolve's view?

13          A. Because of what?

14          Q. Sure.  Is it your testimony that

15 Yotta and other platforms being migrated off of

16 Evolve and then there are transactions coming

17 back onto the FTL was an issue that was caused

18 by Synapse?

19          MS. DAVIS:  Objection.  Form.

20          A. Can you reask that?  I'm sorry.

21 I'm not 100% there. I want to make sure I answer

22 the question you are trying to get to.

23          Q. Let me ask a different question.

24 What caused those platforms' transaction

25 activity to appear on the FTL after the user

173

1  balances were supposedly migrated off of Evolve?

2       A. The only way they would appear on

3  the FTL is by Synapse ledgering them and sending

4  us that FTL with that data on it.

5       Q. Via accounts from FinTech end-users

6  in the late 2023 period?

7       MS. DAVIS:  Objection.  Form.

8       A. Not that I are aware of.

9       Q. What about ██ REDACTED - CONFIDENTIAL ██?

10      A. What about them?

11      Q. Were there be ██ REDACTED - CONFIDENTIAL ██

12  ██ REDACTED - CONFIDENTIAL ██?

13      A. ██ REDACTED - CONFIDENTIAL ██

14      Q. Are you Evolve's corporate designee

15  with respect to the Mercury migration?

16      A. That is what I am designated for.

17      Q. Do you know one way or the other?

18      A. I do not.

19      Q. Let's turn to the first page of

20  Plaintiff's Exhibit 86, and here Mr. Pathak

21  states, "They total around $54 million slightly

22  over which is a little over the $51 million OD

23  currently, and the ACH debits you are holding

24  will make the discrepancy worse not better."

25           Do you have an understanding as to

174

```
 1  what that means?
 2          A. How I read this is it is saying that
 3  there is currently a $51 million OD and ACH
 4  debits were holding, meaning, the files that we
 5  aren't processing will make it worse because
 6  they are going to continue to debit, meaning,
 7  making that $51 million OD increase.
 8          Q. Was there a $51 million overdraw on
 9  Synapse end-user accounts in late 2023?
10          A. Without the accounts sitting in
11  front of me in the end-to-date balances, I can't
12  say yes or no on.
13          Q. Do you have any reason to believe
14  Mr. Pathak's statement is incorrect?
15          A. Again, I don't know because I would
16  have to see.  I don't know if he is talking
17  about one account because earlier we were
18  referencing the ▮REDACTED - CO▮ account or if we are
19  talking about the suite of accounts.
20          Q. Let's just go over these amounts.
21  Here, Mr. Pathak states, "These are the issues
22  in dispute. ▮REDACTED - CONFIDENTIAL▮." ▮REDACTED - CONFIDENTIAL▮
23  ▮              REDACTED - CONFIDENTIAL              ▮
24  ▮REDACTED - CONFIDENT▮
25          A. ▮            REDACTED - CONFIDENTIAL            ▮
```

175

1        REDACTED - CONFIDENTIAL

2        REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4            Q. Was that an account that was

5    supposed to hold end-user funds?

6            A. No.  It is a settlement account like

7    a transactional bearing account.

8            Q. Do you know what account number that

9    was?

10           A. For the REDACTED - CONFIDENTIAL, I think it ends

11   REDACTED - CONFIDENTIAL.

12           Q. You are saying REDACTED - CO never held

13   end-user funds; correct?

14           A. To my knowledge it was not

15   designated as an end-user account to hold funds,

16   meaning, going back to the account mappings,

17   there would not have been accounts that were

18   matched to REDACTED - CO.

19           Q. I am sorry.  You said account?  I

20   didn't hear the last part of your answer. What

21   about matching to REDACTED - CO?

22           A. Earlier you asked about who sets up

23   the accounts, and maps them, and I was saying

24   account REDACTED - CO to my knowledge did not have any

25   via accounts maps to it, meaning, that it was

176

1   not designated to hold end-user funds.

2           Q.  What was the purpose of account

3   ▮▮▮▮?

4           A.  To clear transaction settlements.

5           Q.  Was it clearing transaction

6   settlements of end-user funds?

7           A.  It was clearing transactions that

8   end-users -- I don't know if that is the same

9   thing.  As an example.  If someone, any user, is

10  spending money somewhere, then when it comes to

11  the network to settle, it is going to hit the

12  ▮▮▮▮ account and then the funds from end-user

13  account that were used for that will be moved by

14  Synapse to clear the ▮▮▮▮ account.

15          Q.  Does ▮▮▮▮ hold anything other than

16  end-user funds?

17          MS. DAVIS:  Objection.  Misstates the

18  testimony.

19          A.  Yes.  It shouldn't.  Like I said

20  earlier, it is not designated to hold end-user

21  funds. It is transactional clearing, so it is

22  designed to receive a debit transaction ▮▮▮▮

23  ▮▮▮▮ and then to be cleared by the

24  corresponding funds that initiated that

25  transaction.

177

1    Q. If a Yotta end-user spent $10 on his

2 debit card, that $10 would flow from an FBO

3 account into REDACTED-CON and then it would ultimately

4 be processed and ultimately the bulk of it would

5 wind up with a merchant; is that right?

6    A. Yes.  Round about.  Yes.

7    Q. Was REDACTED-CON supposed to just serve any

8 purpose other than processing Synapse end-user's

9 debit card transactions?

10    A. I don't know beyond that. I know

11 what it was set up for. I don't know how it was

12 used throughout the life of its cycle.  So I

13 couldn't account for every transaction.  I can

14 just tell you how it was initially set up to be

15 used.

16    Q. How much    REDACTED - CONFIDENTIAL

17 REDACTED - CONFIDENTIAL ?

18    A.    REDACTED - CONFIDENTIAL

19    Q.    REDACTED - CONFIDENTIAL

20    A.    REDACTED - CONFIDENTIAL

21    Q. Are you Evolve's designee with

22 respect to the Tabapay fees claim in this case?

23    A. If that is what I am designated for?

24 I don't know.

25    Q. The account analysis charges.  Were

178

1  account analysis charges incorrectly taken from

2  end-user funds?

3          A. Account analysis charges were taken

4  from the ▮REDACTED▮ account, but they were taken from

5  Synapse's corporate account funds that were held

6  in the ▮REDACTED▮ account.

7          Q. How do you know which funds in the

8  ▮REDACTED▮ account they were taken from?

9          A. That would have been the

10  responsibility of Synapse to ledger those

11  appropriately. We just passed the transaction to

12  them.

13          Q. So out all of all those is that the

14  account analysis charges were taken out of

15  account ▮REDACTED▮; correct?

16          MS. DAVIS: Objection.  Misstates the

17  testimony.

18          A. What I am saying is with the

19  account, the funds were debited from ▮REDACTED▮ with

20  the knowledge being that we were debiting

21  Synapse corporate funds that resided in ▮REDACTED▮.

22          Q. Whose knowledge was that?

23          A. Evolve's knowledge.

24          Q. Did Evolve pass that knowledge on to

25  Synapse in some way?

179

1          MS. DAVIS: Objection.  Vague.

2          A.  Yes.  What do you mean?

3          Q.  Sure.  You are saying that someone

4  at Evolve had in their mind that the account

5  analysis charges that were taken out of account

6  ▆REDACTED▆, were supposed to come from Synapse

7  corporate funds; correct?

8          MS. DAVIS: Objection.  Misstates

9  testimony.

10          A. I am saying it was Evolve's

11  collective understanding that the account set up

12  for ▆REDACTED▆ was being debited on the account

13  analysis charges with the understanding that

14  Synapse would ledger those accordingly to offset

15  their corporate funds to pay for their services

16  and fees from the bank.

17          Q. Who at Evolve had that

18  understanding?

19          A. The collective.  So Hank, myself,

20  Scot Lenoir.

21          Q.  During what period of time were

22  account analysis charges being taken out of

23  ▆REDACTED▆?

24          A.  I think from the time from my

25  recollection, so I am just going to give you

180

1  what I recall is from when they started with us,

2  which would have been in '17, I think it ended

3  either in late '19 or maybe like early in 2020.

4          It is around the time that Synapse had

5  a finance professional that I started

6  interfacing with and we moved to changing it to

7  a different set of like a fee account.

8          Q. You are saying that you knew between

9  2017 and late 2019 or 2020 that every time an

10  account analysis charge was being debited from

11  REDACTED-CO, that it was supposed to be debited from

12  Synapse's corporate funds; correct?

13          MS. DAVIS: Objection.  Misstates

14  testimony.

15          A. I am saying from that time period we

16  were debiting REDACTED-CO accounts and passing that

17  information to Synapse for them to ledger to

18  debit the corporate funds on their ledger to

19  represent those funds being moved out.

20          Q. Mr. Vendetti, I am asking a

21  different question. My question is what you

22  knew.

23          You said, "It was our collective

24  knowledge that this money was coming from

25  Synapse's corporate funds," and I said, "Who?"

181

1    and you said, "It was our collective knowledge."

2    And I said, "Well, who?" and you said "It was

3    Mr. Word and Mr. Lenoir and me," and Mr. Word,

4    as I am sure you know has pled the 5th Amendment

5    and we expect Mr. Lenoir to plead the Fifth

6    Amendment and the Court will do what it will do

7    with that.

8            But with respect to you, Mr. Vendetti,

9    I am asking:  Is it your testimony that you

10   personally knew between 2017 and late 2019 and

11   early 2020 that every time account analysis fees

12   were being taken out of account ▓▓▓ that those

13   fees were supposed to come from Synapse's

14   corporate funds?

15           MS. DAVIS:  Objection.  Asked and

16   answered.  Harassing the witness.  Yes, you can

17   answer.  Just ask the same question so feel

18   free.

19           A. Yes.  So just as previously stated,

20   the funds were debited from ▓▓▓ with the

21   understanding that they are coming from the

22   Synapse corporate funds held in ▓▓▓.

23           Q. Between 2017 and 2020, did you know

24   which account the account analysis charges were

25   being taken from?

182

1          A. As previously stated, yes, the ▓▓▓▓.

2          Q. You knew that between 2017 and early

3    2020?  Right?

4           MS. DAVIS:  Objection.  Asked and

5    answered.

6          A.  Correct.

7          Q. Every time that happened it was your

8    understanding that those fees were coming from

9    Synapse's corporate fees; correct?

10          MS. DAVIS:  Corporate funds.

11          A.  Corporate funds, yes.

12          Q. Corporate funds.  Thank you. Do you

13   know the amount of account analysis charges that

14   were taken from ▓▓▓▓?

15          A. Based on the document that I am

16   looking at it is $12,424,608.52.

17          Q. The next line there is a reference

18   to negative balance overdrawn accounts. Do you

19   know what that is a reference to?

20          A. I am not trying to be rude, but the

21   negative balances in overdrawn accounts like

22   that kind of it speaks for itself. So it is OD

23   accounts at that time.

24          Q. Do you know what caused those

25   accounts to be overdrawn?

183

1          A. I don't.

2          Q. The next line is MasterCard Force

3    Post. Do you know what that is a reference to?

4          A. That one, I do not.

5          Q. The next one is REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL    ?

8          A.    REDACTED - CONFIDENTIAL

9          Q. The next issue is ACH Double

10   Submission Issue from June 2023.  Do you know

11   what that is a reference to?

12         A. I don't.

13         Q. The next is a $2.5 million RDC

14   Issue. Do you know what that is a reference to?

15         A. I do not.

16         Q. Then the last issue is missing "RW"

17   Status Notifications, Fed Wire issue. Do you

18   know what that is a reference to?

19         A. I don't.

20         Q. In late 2023 or early 2024 there

21   were discussions involving Tabapay potentially

22   purchasing Synapse; correct?

23         A. Correct.

24         Q. Am I correct that Evolve

25   participated in those discussions?

184

1              MS. DAVIS: Objection.  Vague.

2              A. In which discussions?

3              Q. Did Evolve, Tabapay, and Synapse

4    discuss the amount of the end-user funds

5    shortfall?

6              A. Are you asking if all three of them?

7    I don't understand.

8              Q. Yes.  Are you aware? I mean there

9    are countless documents on the subject. Maybe

10   you just don't know anything about them, and if

11   so, that's fine. Well, it's not fine, but it is

12   what it is.

13             But there are countless emails with

14   Mr. Lenoir and Mr. Word and Tabapay and Mr.

15   Pathak discussing what the amount of the

16   shortfall in Synapse end-user funds is. Are you

17   familiar with that dialogue at all?

18             A. Yes.

19             MS. DAVIS:  Objection.  May I show

20   them a document. Feel free to show him document,

21   but I don't want your testimony about what

22   documents are.

23             A. I was just going say.  If you have

24   some documents, we can go through a couple of

25   them and let me get some of my context for it

185

1  and maybe we can speak on it.

2          Q. Before we get to that let me just

3  ask you.  Have you seen any of those documents

4  before?

5          A. I would have to see the documents

6  you are referencing to now.

7          Q. Through the course of any such

8  conversation, did Evolve reach any conclusions

9  as to the amount of a shortfall in Synapse

10  end-user funds?

11          MS. DAVIS: Objection.  Vague.

12          A. Through which conversations?

13          Q. Conversations between Synapse,

14  Evolve and Tabapay?

15          MS. DAVIS:  Same objection.  Vague.

16          A. Again, I mean, if you have a

17  document we re going to look at we can go

18  through that.

19          Q. There are dozens of these documents,

20  but if you are not really familiar with any of

21  them it is going to be a waste of time and we

22  have already got an enormous amount of material

23  to go through.  So I am just trying to be as

24  efficient as possible here. Do you have any

25  familiarity with those conversations at all?

186

1          A. I have some familiarity with them.

2          Q. I am showing you what is being

3   marked as Exhibit 87.

4          MS. DAVIS:  You are not showing the

5   document, Evan.

6          MR. MANDEL:  That is correct.  I am

7   showing the document.  You can spend as much

8   time as you want reading this. I will tell you

9   what my question is going to be.

10          Plaintiff's 87 is of May 1, 2024 email

11   from Mr. Lenoir to Mr. Pathak and others.

12   Subject Re: Review FBO funding and on the second

13   page here, Mr. Aaron Riley states, "Therefore we

14   see a total difference of just shy of $53

15   million."  I read this to mean he sees a $53

16   million shortfall.

17          MS. DAVIS:  Evan, you are going a

18   little fast.  Where are you?

19   (Whereupon, Plaintiff Yotta's Exhibit 87 is

20   marked for identification. May 1, 2024 email for

21   Mr. Lenoir to Mr. Pathak.)

22          Q. I am on page 2 of this document. The

23   very last line of the email states, "Therefore

24   we see a total difference of," just shy of $53

25   million.

187

1          MS. DAVIS:  I am trying to find it.

2   Did you show that document already?  This is not

3   Bates.

4          MR. MANDEL: Sure.  It is 1233.

5          MS. DAVIS:  Here we go.  Sorry.  Thank

6   you.

7          Q. Really, I am not even asking about

8   this document specifically. I am just showing it

9   to you to see if it helps you, Mr. Vendetti.

10          My real question is:  At any point in

11   this extended conversation between Evolve,

12   Synapse, and Tabapay, did Evolve conclude that

13   there was in fact a shortfall in Synapse

14   end-user funds?

15          A. Let me read through real quick.

16   Okay, Evan.  What is your question again?

17          Q. At any point in the conversation

18   between Tabapay, Synapse and Evolve, did Evolve

19   reach a conclusion that there was a shortfall in

20   Synapse end-user funds?

21          MS. DAVIS: Objection.  Vague.  Is that

22   the Synapse ecosystem or at Evolve?

23          MR. MANDEL:  The question stands.

24          A. Is that at the ecosystem or at

25   Evolve?

188

1          Q. Either.

2          A. So reading this, I don't see the

3    conclusion that you are describing.  I see that

4    note down there that is showing a difference.

5          And then when you look at the document

6    here it is saying the DDA trial balance has

7    $12.4 million, and so that represents funds held

8    at Evolve for Synapse end-users.

9          The other balances referenced are in

10   relation to their brokerage program. So those

11   are just fee transaction clearing.  Not in

12   end-user balances held.

13         Q. I am correct then that it is your

14   testimony that Evolve never reached a conclusion

15   in these discussions with Synapse and Tabapay

16   that there was a shortfall in end-user funds?

17         MS. DAVIS: Objection.  Misstates

18   testimony.  Still vague.

19         A. My testimony is in looking at this

20   document, I do not see where Evolve reached a

21   conclusion that end-user funds are short at a

22   goal.

23         Q. Do you have any knowledge about

24   those discussions other than this document?

25         A. Which discussions?

189

1          Q. The discussions between Evolve,

2    Tabapay, and Synapse about Tabapay's potential

3    purchase of Synapse?

4          A. I have knowledge of those

5    conversations happening because I am aware that

6    Tabapay was potentially looking to purchase

7    Synapse.

8          Q. In the context of those discussions,

9    did Evolve ever reach a conclusion that there

10   was a deficit in Synapse end-user funds?

11         MS. DAVIS: Same objection.  Vague.

12         A. I am not aware if Evolve ever

13   reached a conclusion during this conversation

14   with Tabapay and Synapse that there was a short

15   end-user funds held at Evolve.

16         Q. I am showing you Plaintiff's Exhibit

17   88 which is ECF document Number 10 in the

18   Synapse bankruptcy.  My only question in this

19   document is about the settlement agreement and

20   release between Evolve and Synapse. Am I correct

21   that this document was signed by Mr. Lenoir?

22   (Whereupon, Plaintiff Yotta's Exhibit 88 is

23   marked for identification, ECF 10 in Synapse

24   Bankruptcy.)

25         A. That is correct.

190

1    Q. Turning to paragraph one of this

2   agreement, FBO account funding on the third line

3   it states, "Evolve shall fund the FBO accounts,

4   shall ensure that all account balances of

5   end-users in FBO accounts are fully funded and

6   shall provide reasonable evidence to Synapse of

7   same." Are you at all familiar with this?

8         A. I am not.

9         Q. I am going to not ask any further

10  questions about it.  Going to Plaintiff's

11  Exhibit 89.  This is Bates numbered page

12  EBT-Yotta-0037064.  Tell me when you have had a

13  chance to review it.

14  (Whereupon, Plaintiff Yotta's Exhibit 89 is

15  marked for identification. EBT-YOTTA-0037064.)

16        A. I have read it.

17        Q. In the second from last paragraph

18  Mr. or Ms. Anderson states, "We continue to see

19  many transactions where Evolve has credited the

20  FBO and the Synapse customers are not being

21  credited until months later. (Most of these

22  aren't getting credit until Evolve gets

23  involved.) Was that an issue that Evolve and

24  Synapse were having in 2022?

25        A. Based on the document before me that

191

1   issue is happening here.

2          Q. Other than what's in this document,

3   do you have any information about that issue?

4          A. I don't.

5          Q. If customers weren't being credited

6   until months later then their account statements

7   were incorrect; right?

8          MS. DAVIS:  Objection.  Assumes facts.

9          A. Yes, I don't know if their account

10  statements were correct or not.

11         Q. So a customer could have been

12  getting credited monthly and their account

13  statements could still be correct; right?

14         A. I don't know if their account

15  statements are correct or not.

16         MR. MANDEL:  Why don't we take a break?

17         THE VIDEOGRAPHER:  The time is 4:39

18  p.m..  We are going off the record.

19  (Upon Resuming.)

20         THE VIDEOGRAPHER: The time is 4:56

21  p.m. We are back on the record.

22         Q.  I am showing you Plaintiff's

23  Exhibit 90. This is EBT-YOTTA-0219102.  It is an

24  Excel spreadsheet.  Do you recognize this

25  document?

192

1  (Whereupon, Plaintiff Yotta's Exhibit 90 is

2  marked for identification. EBT-YOTTA-0219102.)

3          A. Sorry.  I am trying to view it.  I

4  can do it here, but I don't have like -- I can't

5  open it on this computer.  There's not Excel on

6  here.

7          MS. DAVIS: Just so it is clear for the

8  record.  He can't view it on the screen here to

9  see the version on the screen.

10          MR. MANDEL: I'm sorry, I couldn't hear

11  you, Sarah.

12          MS. DAVIS:  Yes.  Sorry.  I was just

13  saying that we were kind of talking and it was a

14  little bit off record and I wanted to make clear

15  that he cannot see the Excel on his exhibit

16  screen. So we are kind of moving a computer that

17  has Excel so he can view it better.  You have

18  got that?

19          MR. MANDEL: Let's keep moving. We will

20  come back to that when the computer is ready.

21          MS. DAVIS: I think it's ready, Evan.

22          MR. MANDEL: Oh, all right.

23          MS. DAVIS: Yes. Moving screens.

24          Q. Is this document the Ankura

25  reconciliation?

193

1          A.  I believe this is the Ankura

2    reconciliation document.

3          Q.  What does Column E represent?

4          A.  Column E represents the last ledger

5    file we received from Synapse on 5/17.

6          Q.  What does Column F represent?

7          A.  Column F represents the ecosystem

8    balance, meaning, between all Synapse partner

9    banks what that balance was at those banks.

10          Q.  When you say the Synapse ecosystem

11    balance, is that as reconstructed during the

12    reconciliation that Evolve performed?

13          A.  That's correct.  It reconstructed,

14    yes.

15          Q.  What is Column G?

16          A.  Column G is the reconstructed Evolve

17    balance.

18          Q.  How about Column H?

19          A.  That is titled "the Balance Owed by

20    Evolve to End-User."

21          Q.  And Column I?

22          A.  Column I is the total Evolve payout.

23          Q.  Does that mean the total amount

24    Evolve actually paid to the end-user?

25          A.  I am unclear because it doesn't show

194

1    if the payment has happened or not.

2              Q. Does Column I reflect the amount

3    that Evolve believes should be paid to the

4    end-user?

5              A. I believe so.

6              Q. Is Column J the interest portion of

7    the payout?

8              A. Yes.  That is the interest portion

9    of the total Evolve reconciliation payout.

10             Q. How would Evolve decide what amount

11   was owed by Evolve to the end-user?

12             A. For which column?

13             Q. Let me ask the question a little

14   differently. Column E has a balance. Column F

15   has a balance. Column G has a balance for each

16   end user.  Then I understand in this chart

17   Column H selects either Column E, Column F or

18   Column G as the correct amount to be paid to the

19   end-user; is that right?

20             A. Yes.

21             Q. Are you familiar with this document,

22   Mr. Vendetti?

23             A. Yes, sir, I am. I just didn't -- I'm

24   not the preparer.  Like I'm not Ankura. So as

25   you are telling these things, I am just making

195

1  sure they line up with how I am reading and

2  understanding the document.

3          Q. Let me cut to the chase.  By my read

4  of this document, what Evolve did was it looked

5  at Columns E, and F, and G for each end-user and

6  it decided that it owed the end-user the lowest

7  amount in those three columns.

8          Is that what Evolve did?

9          MS. DAVIS: Objection.  Misstates the

10 document.

11         A.  Yes.  That is not.  Evolve itself

12 did not do anything with this. This was Ankura

13 performing the work and Ankura took data sources

14 from Evolve from Synapse and from the Fed,

15 meaning, actual transaction money movement and

16 reconstructed balances based on that 5/17

17 balance.

18         Q. Let's go to Column 43 here.

19         A. Column 43 or Row 43?

20         Q. Thank you, Mr. Vendetti.  Thank you.

21 I am sure that is going to happen a lot more as

22 the day goes on, so please correct me when I

23 make a misstatement like that. Row 43 is for

24 REDACTED - CONFIDENTIAL, REDACTED - CONFIDENTIAL, correct?

25         A. Yes.  That is what I see.

196

1          Q. Should I make this a little bigger?

2          A. No.  I am looking at it on a

3     separate screen.

4          Q. So who did Evolve decide in Column H

5     that it would pay out $25 to the user?

6     (Internal Side Bar of witness.)

7          THE WITNESS: Hold on one second,

8     Betty.  Is it okay, if you are okay, here there

9     are notifications from Teams coming up and I

10    don't want to like ...

11         A. Sorry.  Ask the question again,

12    Evan.

13         Q. In Row 43, under REDACTED - CONFIDENTIAL, this

14    spreadsheet decides that REDACT is going to be paid

15    $25.  How did it decide that $25 is the right

16    figure?

17         A. I believe because when they

18    reconstruct the balance, and it was greater than

19    what the Synapse ecosystem balance had, they

20    deferred to the Synapse ecosystem balance.

21         Q. So did it choose the lesser of

22    Columns E, F and G?

23          MS. DAVIS: Objection.  Misstates the

24    testimony.

25         A. I don't know if that is for every.

197

1  In this instance it is putting $25 there. I

2  don't know if the logic, I don't know the logic

3  for, if it is comparing the columns and choosing

4  a lesser value. I think it is just based on the

5  reconciliation work that they did.

6          Q. Mr. Vendetti, do you know why for

7  REDACTED - CONFIDENTIAL  in Row 43 here Evolve decided to pay

8  REDACTED - CONFIDENTIAL  $25 as opposed to $75?

9          MS. DAVIS:  Asked and answered.

10         A. Yes. In going back to it, so I

11 believe when they reconstruct the balance, if

12 the balance is showing greater then they defer

13 to what was on the Synapse ledger.

14         Q. Is there any circumstance?  We have

15 looked at this, and from what we can understand,

16 the amount Evolve decided to pay in each

17 instance on this spreadsheet was the lowest

18 number of E, F and G.

19         Are you aware of any row on this chart

20 in which Evolve decided to pay an amount other

21 than the lowest dollar figure that was in

22 Columns E, F and G?

23         MS. DAVIS:  Objection.  The document

24 speaks for itself.

25         A. Yes.  Without going through it, I

198

1  don't know.

2          Q. It is your understanding that with

3  respect to Row 43, you believe that because the

4  reconstituted Evolve balance was higher they

5  decided to pay REDACTED - CONFIDENTIAL either the Synapse

6  ledger balance or the reconstituted Synapse

7  ecosystem balance; is that right?

8          MS. DAVIS:  Objection.  Form.

9          A. That is my understanding is that

10 when they reconstruct the balance that it is

11 going to go to the Evolve reconstructed balance.

12 If it is greater, then they will defer to the

13 Synapse partner ledger balance reconstructed

14 ecosystem balance.

15         Q. I am sorry.  Could you say that

16 again?

17         A. When they reconstruct the balances,

18 and it shows reconstructed Evolve balance, if

19 that balance is greater than the ecosystem

20 balance, or the ledger balance, then it will

21 defer to the ecosystem or ledger balance of

22 5/17.

23         Q. If the Evolve reconstruction balance

24 is higher than the other two balances, how does

25 it decide which of the other two balances to pay

199

1  out?

2          A. I am not sure on the logic there.

3  That would be with Ankura and how they decided

4  to do it.

5          Q. Is it your testimony that no one at

6  Evolve knows why Columns E, F or G were chosen

7  with respect to end-users?

8          MS. DAVIS: Objection.  Misstates

9  testimony?

10          A. No.  My testimony is I don't know

11  the answer to that question.

12          Q. Are you the designee with respect to

13  the Ankura reconciliation?

14          MS. DAVIS: Objection.  Form.

15  Objection.  Speaks for itself.

16          A. I don't know if I am designated as

17  that or not.

18          Q. Other than what you testified to

19  here today, do you know anything else about the

20  Ankura reconciliation?

21          A. No.  I don't think so.

22          Q. Was Synapse based in California?

23          A. That is my understanding.

24          Q. Did Evolve deliver user transaction

25  information to Synapse in California?

200

1           A. Are you asking? I am not clear.

2    Physically or just did we provide?  What's your

3    question?

4           Q. I mean electronically.  Like did

5    Evolve electronically deliver user transaction

6    information to Synapse in California?

7              MS. DAVIS:  Objection.  Scope.

8           A. Evolve would send transactional data

9    to Synapse based on the information that was

10   processed to the bank.

11          Q. Did Evolve send that transaction

12   information to Synapse in California or Synapse

13   in some other state?

14             MS. DAVIS:  Same objection.

15          A. I am unclear where their servers

16   resided. Wherever their servers were is where

17   the information was sent.

18          Q. Did Synapse send user transaction

19   account balance information to Yotta and Yotta

20   end-users?

21             MS. DAVIS: Objection.  Calls for

22   speculation.

23          A. Yes.  I am not familiar with the

24   inner workings of their operations for that.

25          Q. Was Synapse Evolve's agent?

201

1              MS. DAVIS: Objection.  Vague.

2              A. Agent for?

3              Q. You understand what it means to be

4   an agent?  You understand the concept of an

5   agency relationship?

6              MS. DAVIS: Maybe go ahead and define

7   it for me.

8              Q. We will come back to that.

9              MS. DAVIS:  Are you still using the

10  spreadsheet, Evan?

11             MR. MANDEL. No.  That's a great point.

12  Thank you.

13             Q. Did any vendors assist Evolve in

14  determining whether there was a shortfall in

15  end-user funds?

16             A. Yes.

17             MS. DAVIS:  Objection. Vague.

18             A.  Evolve contracted with Ankura to

19  help with the reconciliation effort for Synapse.

20             Q. Other than Ankura, did Evolve engage

21  any other vendors?

22             MS. DAVIS: Engage in any other vendors

23  for?

24             Q. To determine whether there was a

25  shortfall in end-user funds or identify the

202

1  magnitude of the shortfall?

2          MS. DAVIS:  Objection. Vague.

3          A. I am not aware of any other firms

4  that were involved in the reconciliation after

5  May 2024.

6          Q. How about before May 2024?

7          A. ███ REDACTED - CONFIDENTIAL ███

8  ███ REDACTED - CONFIDENTIAL ███

9  ███ REDACTED - CONFIDENTIAL ███

10  ███ REDACTED - CONFIDENTIAL ███

11          Q. ███ REDACTED - CONFIDENTIAL ███

12  ███ REDACTED - CONFIDENTIAL ███

13          MS. DAVIS: Objection.  Vague.

14          A. ███ REDACTED - CONFIDENTIAL ███

15  ███ REDACTED - CONFIDENTIAL ███

16          Q. Was the transaction information that

17  Yotta end-users received on their account

18  statements correct?

19          MS. DAVIS:  Objection.  Vague.

20          A. I don't know the full answer to

21  that.

22          Q. Were there ever account statements

23  that had incorrect transaction information on

24  them?

25          MS. DAVIS: Objection. Asked and

203

1  answered.

2          A. Yes.  Previously when you asked

3  that, I referenced the Reconciliation by Evolve

4  website where they published a couple of

5  documents related to Yotta end-users but that

6  appeared incorrect.

7          Q. Right.  Were the account balances

8  contained on the Yotta end-user statements

9  correct?

10          MS. DAVIS: Objection.  Vague.

11          A. Yes.  What time period?

12          Q. Between 2020 and 2024?

13          A. I don't fully know the answer there.

14  I know between '19 and like '23 you know

15  materially we believed the statements and the

16  balances were correct, but then again, when we

17  switch into brokerage as the resolution involved

18  during that time period showed in those

19  published statements at least knowing that they

20  published there the statement was inaccurate.

21  So I can't speak to the whole population.

22          MR. MANDEL: I'm sorry.  Tommy, could

23  you repeat me back that answer to me?

24  (Whereupon, record read back.)

25          Q. Could end-users actually withdraw

204

1  the balances in their accounts between 2019 and

2  October 10, 2023?

3          A. Which end-users?

4          Q. Yotta end-users?

5          A. I don't know how the Yotta App

6  works. I am not sure if like they have the

7  ability to just withdraw from there.  It's like

8  a full on banking app.

9          Q. Let me rephrase those questions.

10  Were the Yotta end-users' balances that were set

11  forth on their account statements actually

12  available to Yotta end-users between 2020 and

13  October 2023?

14          A. I don't know through the October

15  time period, but I know I would say up until the

16  September time period that the balance is on

17  their statement again were clearly recurrent

18  which means they are available to the end-users

19  if they were to access them.

20          Q. Were there ever any freezes or

21  pauses on Evolve adding new FinTech partners or

22  programs?

23          A.  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25          Q. What time period or time periods

205

1    REDACTED - CONFIDENTIAL

2         A. Is this in respect to Evolve or in

3    respect to Synapse?

4         Q. I am interested in when Evolve

5    wasn't adding new partners or programs and I am

6    only interested in the FinTech partners and

7    programs. I'm only interested in the open

8    banking division.

9         A. For Evolve, REDACTED - CONFIDENTIAL. REE

10   REDACTED - CONFIDENTIAL

11   REDACTED - CONFIDENTIAL

12        Q. Is it your testimony REDACTED - CONFIDENTIAL

13   REDACTED - CONFIDENTIAL

14   REDACTED - CONFID?

15        MS. DAVIS: Objection. Misstates

16   testimony.

17        A. REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL, that's my testimony. I don't know if

19   this helps in terms of context. Why I am saying

20   that is like going back to '22 when we first

21   notified Synapse of our non-renewal we asked

22   them to pause on boarding of new platforms and

23   customers because as they were going to be off

24   boarding we don't want to have a new integration

25   and bring that into the mix as we were trying to

206

get into wind down.

2        Q. **REDACTED - CONFIDENTIAL**

3        **REDACTED - CONFIDENTIAL**

        MS. DAVIS:  I caution the witness not
to reveal any confidential supervisory
information.

        A. Yes.  I am not sure I can answer
that then.

        Q. Setting aside what regulators were
telling Evolve, did Evolve always want to grow
its open banking division?

        MS. DAVIS: Objection.  Scope.

        A. Ask it again and then maybe give me
a time frame.  Yes, ask it again.  Sorry.

        Q. Between 2019 and 2024, was it
Evolve's goal to grow its open banking division?

        MS. DAVIS: Objection.  Scope.

        A. Yes, it was. We were actively trying
to grow that division.

        Q. Aside from any restrictions imposed
by regulators, did Evolve have any reason why it
wouldn't want to add new partners or new
programs to its open banking division?

        A. Outside of what I just mentioned
with the Synapse piece not that I can think of.

207

```
1        Q. Let's talk about REDACTED - CONFIDENTIAL.  Was

2        REDACTED - CONFIDENTIAL

3        REDACTED - CONFIDENTIAL

4        REDACTED - CONFIDENTIAL

5   REDACTED - CONFIDENTIAL   ?

6        A.  REDACTED - CONFIDENTIAL

7        Q.        REDACTED - CONFIDENTIAL

8        A. I think there was a like, REDACT

9        REDACTED - CONFIDENTIAL

10       REDACTED - CONFIDENTIAL

11       REDACTED - CONFIDENTIAL

12       REDACTED - CONFIDENTIAL

13       REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL.

15       Q.   REDACTED - CONFIDENTIAL

16       A.       REDACTED - CONFIDENTIAL

17       Q.       REDACTED - CONFIDENTIAL

18       REDACTED - CONFIDENTIAL

19       A.       REDACTED - CONFIDENTIAL

20       REDACTED - CONFIDENTIAL

21       REDACTED - CONFIDENTIAL

22       REDACTED - CONFIDENTIAL

23       REDACTED - CONFIDENTIAL

24       Q.       REDACTED - CONFIDENTIAL

25       REDACTED - CONFIDENTIAL
```

208

1      REDACTED - CONFIDENTIAL

2   REDACTED - CONFIDENTIAL

3          A.        REDACTED - CONFIDENTIAL

4          REDACTED - CONFIDENTIAL

5   REDACTED - CONFIDENTIAL

6          Q.        REDACTED - CONFIDENTIAL

7        REDACTED - CONFIDENTIAL

8          A.   REDACTED - CONFIDENTIAL

9          Q.        REDACTED - CONFIDENTIAL

10         REDACTED - CONFIDENTIAL

11       REDACTED - CONFIDENTIAL

12         A.        REDACTED - CONFIDENTIAL

13         REDACTED - CONFIDENTIAL

14       REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL

16             REDACTED - CONFIDENTIAL

17         REDACTED - CONFIDENTIAL

18         REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL

20         Q.        REDACTED - CONFIDENTIAL

21       REDACTED - CONFIDENTIAL

22         A.        REDACTED - CONFIDENTIAL

23         Q.        REDACTED - CONFIDENTIAL

24         A.   REDACTED - CONFIDENTIAL

25         Q.        REDACTED - CONFIDENTIAL



209

1   REDACTED - CONFIDENTIAL

2   REDACTED - CONFIDENTIAL

3   REDACTED - CONFIDENTIAL

4        A.    REDACTED - CONFIDENTIAL

5   REDACTED - CONFIDENTIAL

6   REDACTED - CONFIDENTIAL

7        Q.    REDACTED - CONFIDENTIAL

8   REDACTED - CONFIDENTIAL

9        MS. DAVIS: Objection.   Vague.

10       A.    REDACTED - CONFIDENTIAL

11  REDACTED - CONFIDENTIAL

12  REDACTED - CONFIDENTIAL

13  REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL

15  REDACTED - CONFIDENTIAL

16       Q.    REDACTED - CONFIDENTIAL

17  REDACTED - CONFIDENTIAL

18       A.    REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL

20       Q.    REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL

22       A.    REDACTED - CONFIDENTIAL

23  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25       Q.    REDACTED - CONFIDENTIAL

210

1  REDACTED - CONFIDENTIAL

2      A.  REDACTED - CONFIDENTIAL

3      Q.  REDACTED - CONFIDENTIAL

4      A.  REDACTED - CONFIDENTIAL

5  REDACTED - CONFIDENTIAL

6      Q.  REDACTED - CONFIDENTIAL

7  REDACTED - CONFIDENTIAL

8  REDACTED - CONFIDENTIAL

9      MS. DAVIS: Objection.  Form.

10     A.  REDACTED - CONFIDENTIAL

11  REDACTED - CONFIDENTIAL

12     Q.  REDACTED - CONFIDENTIAL

13  REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL

15     MS. DAVIS: Objections.  Assumes facts.

16     A.  REDACTED - CONFIDENTIAL

17  REDACTED - CONFIDENTIAL

18     Q.  REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL

20     A.  REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL

22  REDACTED - CONFIDENTIAL

23     Q.  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25     A.  REDACTED - CONFIDENTIAL

211

1    Q.    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    A.    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    Q.    REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9         MS. DAVIS: Objection.   Vague.

10        A.  That?   I don't know because I

11   don't --   REDACTED - CONFIDENTIAL   .

12        Q.    REDACTED - CONFIDENTIAL

13   REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15        A.    REDACTED - CONFIDENTIAL

16   REDACTED - CONFIDENTIAL

17        Q.    REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL

20        A.    REDACTED - CONFIDENTIAL

21   REDACTED - CONFIDENTIAL

22   REDACTED - CONFIDENTIAL

23   REDACTED - CONFIDENTIAL

24   REDACTED - CONFID

25        Q.  Sorry.    REDACTED - CONFIDENTIAL

212

1   REDACTED - CONFIDENTIAL

2        A.        REDACTED - CONFIDENTIAL

3        Q.        REDACTED - CONFIDENTIAL

4   REDACTED - CONFIDENTIAL

5        MS. DAVIS: Objection.  Document will

6   speak for itself.

7        A.        REDACTED - CONFIDENTIAL

8   REDACTED - CONFIDENTIAL

9        Q.        REDACTED - CONFIDENTIAL

10  REDACTED - CONFIDENTIAL

11       MS. DAVIS: Objection.  Again, the

12  document will speak for itself.

13       A.        REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL

15  REDACTED - CONFIDENTIAL

16  REDACTED - CONFIDENTIAL

17       Q. Let's talk about the supposed

18  migration of Yotta funds to the Synapse

19  Brokerage ecosystem. Who determined how much in

20  Yotta end-user funds would be moved from Evolve

21  to the Synapse Brokerage ecosystem?

22       A. Synapse would determine that.

23       Q. Did Synapse determine the correct

24  amount of funds to migrate or the incorrect

25  amount of funds or Evolve doesn't know?

213

1        A. Evolve doesn't know.

2        Q. After the migration occurred, were

3   the Yotta end-user Evolve DDAs closed?

4        A. Once they migrated to Synapse

5   Brokerage the DDAs were not closed.

6        Q. Am I correct that those DDAs were

7   used to process Yotta end-user transactions

8   during the Synapse Brokerage period?

9        A. Sorry.  Say it again. I'm sorry.

10       Q. Sure.  Am I correct that during the

11  Synapse Brokerage period, the Yotta end-users'

12  Evolve DDAs were used to process their

13  transactions?

14       A. That is correct.

15       Q. At any point in time were the Yotta

16  end-users' DDAs remapped to different accounts?

17       MS. DAVIS:  Objection. Vague.

18       A. To my knowledge all the accounts

19  that were migrated to Brokerage at some point

20  later on in either late '23 or early '24 then

21  the accounts were remapped to Brokerage

22  accounts.

23       Q. Do you know when that remapping

24  occurred?

25       A. No.  I don't know the specific time

214

1   or date of it.

2          Q. Am I correct that the Yotta

3   migration was supposed to happen sometime in the

4   first half of October, if I remember correctly,

5   of 2023?

6          A. That is my prior recollection as

7   well.

8          Q. So the Yotta end-users V accounts

9   would not have been remapped for sounds like

10  approximately the first 60 days of the Synapse

11  Brokerage period?

12         A. Without looking at the date to know

13  when it was, yes, they were not remapped

14  immediately, I think is your question.

15         Q. Yes.  So even after the Yotta funds

16  were supposedly migrated to Synapse Brokerage,

17  their V accounts remained mapped to the FBOs

18  that they had been mapped to prior to the

19  migration; correct?

20         A. That is accurate.

21         Q. After the supposed migration of

22  Yotta end-user funds, did Synapse report to

23  Evolve that the Yotta DDAs continue to hold

24  end-user funds?

25             MS. DAVIS: Objection.  Vague.

215

1          A. Ask it again.

2          Q. Sure.  Am I correct that Synapse

3    continued to provide a ledger to Evolve in

4    November and December 2023?

5          A. Correct.  They were providing some

6    ledger file.

7          Q. Did that ledger indicate that Yotta

8    end-user funds remained in the FBOs that they

9    were in prior to the supposed Synapse Brokerage

10   migration?

11          MS. DAVIS: Objection.  Vague as to

12   time.

13          A. The FTL didn't specify which FBO the

14   funds were in. It just represented funds that

15   were at Evolve.

16          Q. Did it identify the funds by

17   end-user?

18          A. Yes.

19          Q. So the FTL identified the account

20   balance for each Yotta end-user, but didn't tie

21   that account balance to a particular FBO;

22   correct?

23          A. Correct.

24          Q. Did the FTL indicate that those

25   amounts were being held in a DDA account?

216

1          MS. DAVIS:   Objection.  Vague.

2          A. Which amounts?

3          Q. The Yotta end-user account balances

4  in November and December of 2023.

5          A. Being held in a DDA account,

6  meaning, at Evolve or how do you mean?

7          Q.  At Evolve?

8          A. So like all the accounts at Evolve

9  are a DDA account.  How they are listed on their

10 ledger, I don't know, if the account type on

11 their ledger was listed as a DDA or if it was

12 listed as something different.

13         Q. I'm sorry. What did you mean by ...

14 you know, let me just move on.  In November and

15 December 2023, did Evolve understand that Yotta

16 end-user funds remained in Evolve DDAs?

17         MS. DAVIS: Objection.

18         A. My recollection of that time is that

19 like we had talked about earlier all of the

20 funds for Yotta had moved off, and anything that

21 was here was transitory coming in and out with

22 Synapse Brokerage because they had migrated to

23 Brokerage and Evolve at that time was not

24 holding funds for end-users in their DDA.

25         Q. Was Evolve sweeping out Yotta

217

1  end-user funds to Synapse Brokerage partner

2  banks?

3          A. I don't think the term -- you are

4  saying the term sweeping.  I know that term

5  differently. We were transacting based on the

6  files that Synapse gave us.  Is that what you

7  are asking?

8          Q. I agree with you. I don't want to

9  get bogged down with the word sweep.  In

10  November and December 2023, was Evolve

11  transferring Yotta end-user funds to Synapse

12  Brokerage partner banks?

13          MS. DAVIS: Objection.  Vague.

14          A. In that time period Evolve was

15  processing the files that Synapse gave us for

16  the direction to funds for their programs for

17  Synapse and Synapse Brokerage.

18          Q. Does Evolve know whether in November

19  and December 2023 it was transferring or

20  sweeping Yotta end-user funds to Synapse

21  Brokerage program banks?

22          MS. DAVIS: Objection.  Vague.

23          A. I would have to look at the records

24  to officially say yes or no that we were, but my

25  understanding with Brokerage at the time is that

218

1  we were providing a payment processing service

2  for those Yotta end-users and other end-users

3  that had their accounts migrated to Brokerage,

4  but the DDAs remained open.

5          So without seeing the transactions, I

6  can't fully say, but it would reason that, yes,

7  we were moving funds based on their direction

8  because the Yotta end-users were still

9  transacting and using their accounts or using

10  their brokerage accounts.

11          Q. At some point did Evolve stop

12  sweeping or transferring Synapse Brokerage

13  end-user funds out of Evolve?

14          A. We did hold funds, I think later on

15  in '24 when we lost access to our dashboard we

16  stopped processing files for Synapse Brokerage

17  and Synapse.

18          Q. Sure. In early May 2024 Evolve

19  stopped processing transactions for Yotta

20  end-users; correct?

21          A. Correct.

22          Q. How about doing that before that, at

23  some point before that, did Evolve stop sweeping

24  or transferring Synapse Brokerage end-user funds

25  to Synapse Brokerage program banks?

219

1          A. With respect to Yotta, I am not 100%

2    sure.  I know during our testimony today we

3    looked at a time period where there was a file

4    that appeared to be held up because of a

5    negative balance. I don't know if it contained

6    Yotta information or not.

7          Q. I understood at some point in time

8    Evolve just stopped sweeping all Synapse

9    Brokerage funds to the Synapse program banks; is

10   that not correct?

11         A. I am saying I don't know.

12         Q. Who at would Evolve would know the

13   answer that question?

14         A. Hank Word, Scot Lenoir, and Chris

15   Staab during that time.

16         Q. That does not sound very promising

17   considering it sounds like the two of them are

18   pleading the 5th.  Are you aware that FINRA has

19   alleged that Evolve stopped sweeping end-user

20   funds to the Synapse Brokerage program banks?

21          MS. DAVIS: Objection.  Scope.

22         A. I am not aware of what FINRA has

23   alleged.

24         Q. After the supposed migration of

25   Yotta end-user funds to Synapse Brokerage, REDACTED - CON

220

1        REDACTED - CONFIDENTIAL

2   REDACTED - CONFIDENTIAL ?

3           MS. DAVIS: Can you repeat that one

4   back, Evan?

5           Q. Sure.  After Yotta end-user funds

6   were supposedly migrated to Synapse Brokerage,

7        REDACTED - CONFIDENTIAL

8   REDACTED - CONFIDENTIAL ?

9           A.    REDACTED - CONFIDENTIAL

10          Q. In 2024 did Synapse make certain

11  ledger entries that had the effect of

12  designating funds held at Evolve as Yotta funds?

13          A. Yes.

14          Q. Why were those ledger entries made?

15           MS. DAVIS: Objection.  Calls for

16  speculation.

17          A. Yes.  I don't know why Synapse would

18  make those ledger entries.

19          Q. Has Evolve had any discussions with

20  Synapse about those ledger entries?

21           MS. DAVIS:  Objection.  Scope.

22          A. I don't know fully.

23          Q. Did Evolve have the authority to

24  reject those ledger entries?

25           MS. DAVIS: Objection.  Calls for a

221

1  legal conclusion.

2        A. In your sense of rejecting a ledger

3  entry, again, they hold the ledger.  We don't

4  have access to it.  So we just get a file.  So

5  there is not a rejection that we can do on it,

6  per se, so I don't what you mean by reject that.

7        Q.  I am turning your attention to

8  Plaintiff's Exhibit 91.  This is the 2024

9  consent decree between Evolve and the Fed and

10 Arkansas State Bank Department. Are you familiar

11 with this document, Mr. Vendetti?

12       A. Not yet.

13       Q. Have you read this document before?

14       A. Give me a few minutes. Let me just

15 look through it and see.

16 (Whereupon, Plaintiff Yotta's Exhibit 91 is

17 marked for identification, 2024 Consent Decree.)

18       Q. I am really only going ask you about

19 a couple of sections related to the open banking

20 division. So let me show you where those are.  I

21 think, really, it is beginning on page 5 through

22 page 9, and then a long way.  It's much more.

23 And page 18, so 5 to 19.

24       A. Did you say through page 9, Evan?

25       Q. Yes, 5 through 9 and then 18.

222

1          A. Yes, I'm sorry. I am aware of this

2     document, yes.

3          Q. Then I just want to briefly refer to

4     one paragraph on page 2 or two paragraphs.  The

5     first two paragraphs on page 2, I will let you

6     read those to yourself.

7          THE VIDEOGRAPHER:  Sorry, Evan.  This

8     is Exhibit 90?

9          MR. MANDEL:  91.

10          THE VIDEOGRAPHER:  91, pardon me, got

11     it.

12          A.  I think I have read them.

13          Q. On page 2 here of Plaintiff's

14     Exhibit 91, the first paragraph, it states, "In

15     the most recent safety and soundness examination

16     of the bank issued on August 11, 2023 identified

17     deficiencies with the bank's risk management of

18     OBD and other related deficiencies."

19          During what period of time did that

20     examination that was issued on August 11, 2023

21     cover?

22          MS. DAVIS: I am going to go ahead and

23     instruct the witness not to answer on

24     confidential supervisor and bank examination

25     privilege.

223

1          Q. I assume you are going to follow

2     that instruction, Mr. Vendetti?

3          A. Oh, yes, sir, I will follow that

4     instruction.

5          Q. That's okay.  Then the next

6     paragraph, the same paragraph of the next

7     question, "During what period of time were the

8     deficiencies in the bank's management that were

9     found on August 30, 2023?

10          MS. DAVIS: Same objection. I am going

11     to instruct witness not to answer on the basis

12     of confidential supervisor information and the

13     bank's examination privilege.

14          Q. Turning your attention to page 5,

15     and obviously will be subject of the motion that

16     is in the process of being filed, page 5, this

17     refers to Open Banking Division Management and

18     it says within paragraph 3A, it says, "Within 90

19     days the bank shall submit a written plan and

20     the plan shall include the following four

21     items."

22          And then it says, "Roman II:  Measures

23     to ensure that the individuals or groups charged

24     with responsibility for OBD possess the

25     appropriate subject matter expertise, stature,

224

1  independence, and authority have clearly defined

2  roles and responsibilities and are allocated

3  adequate resources and staffing."

4         Between 2019 and 2024, did OBD's

5  management lack appropriate subject matter

6  expertise?

7         A. Not that I am aware of.

8         Q. Between 2019 and 2024, did

9  individuals or groups in OBD lack the

10 appropriate stature?

11        MS. DAVIS: Objection.  Vague.

12        A. What do you mean by that?

13        Q. I mean whatever stature means in

14 this document that Evolve signed?

15        MS. DAVIS:  Objection.  Calls for

16 speculation.

17        A. Yes.  I am unsure of it's meaning,

18 so I can't speak to that.

19        Q. Did OBD Management lack the

20 necessary independence at any point between 2019

21 and 2023?

22        A. Not to my knowledge.

23        Q. Did OBD Management lack sufficient

24 authority between 2019 and 2023?

25        A. Not to my knowledge.

225

1          Q. Between 2019 and 2023, did OBD

2    Management have clearly defined roles and

3    responsibilities?

4          A. Yes.

5          Q. Between 2019 and 2023, did Open

6    Banking Division Management have sufficient

7    resources and staffing?

8          A. To my knowledge, yes.

9          Q. Turning your attention down to

10   lettered paragraph C here on the same page, page

11   6 of Plaintiff's Exhibit 91.  Between 2019 and

12   2023, did the Open Banking Division have

13   appropriate policies?

14         A.  We had policies in place. I don't

15   know if they were appropriate for what this

16   document is requesting.

17         Q. In your view were they appropriate

18   to protect depositors?

19          MS. DAVIS: Objection. Vague.

20         A. They were appropriate for what they

21   were written to be policies for.

22         Q. Between 2019 and 2023, in Evolve's

23   view, did the Open Banking Division have

24   appropriate procedures?

25         A. Yes.

226

1      Q. How about processes?

2      A. Yes.

3      Q. Yes. How about controls?

4      A. Yes.

5      Q. Between 2019 and 2023, did Evolve do

6  everything that was appropriate to make sure

7  that the ledger and subledger, how the Open

8  Banking Division was adequately maintained?

9      A. We did what we believed was

10 appropriate at that time.

11     Q. Looking back upon it today, does

12 Evolve believe that it had sufficient controls

13 in place to make sure the ledger and subledger

14 were properly maintained?

15     A. Looking back where we are at today

16 [REDACTED - CONFIDENTIAL]

17 [REDACTED - CONFIDENTIAL] . [REDACTED - CONFIDENTIAL]

18 [REDACTED - CONFIDENTIAL] .

19     Q. In retrospect, should Evolve have

20 had different subledger and ledger policies and

21 practices in place between 2019 and 2023?

22     MS. DAVIS: Objection.  Form.

23     A.  Ask it again, Evan.

24     Q.  Sure.  Looking back upon the 2019,

25 through 2023 period, does Evolve wish it had

227

1  different controls in place with respect to its

2  Open Banking Division, ledger and subledger?

3          MS. DAVIS: Objection.  Vague.

4          A. I don't know about wish. I mean

5  hindsight is 20/20, so as time goes on

6  businesses develop and this was a novel area

7  during that time, so I feel like we have

8  developed over time.

9          But knowing today if we go back in

10 time, would we start where we are at today, yes,

11 but I mean I wouldn't have said that then.  You

12 know hindsight is 20/20.

13         Q. Since the FinTech business was such

14 a novel business for Evolve, did Evolve not

15 really know what it was doing between 2019 and

16 2023?

17         A. I would say the business wasn't just

18 novel for Evolve. It was novel for the industry

19 itself.  I will start with that, and sorry, ask

20 your second part of the question.

21         Q. Sure.  Since it was a novel

22 business, did Evolve not know what it was doing?

23         A. Evolve knew what it was doing in

24 engaging with FinTech customers and working with

25 them to develop the next iteration of financial

228

technology.

Q. Turning to the next page, Roman II
states that "Within 60 days the bank shall
retain an independent third party to conduct a
comprehensive review of OBD."

Did Evolve do that?

MS. DAVIS:  I am going to instruct the
witness not to answer on the grounds of on the
basis of confidential supervisor information and
the bank's examination privilege.

Q. I am not asking what it told
regulators. I am asking whether Evolve hired a
third party to conduct a comprehensive review of
the OBD?

MS. DAVIS: Same objection and scope,
sorry.

MR. MANDEL:  You are instructing him
not to answer?

MS. DAVIS:  Yes.  I am instructing him
not to answer.

Q. Did Evolve prepare a written report
of findings, conclusions and recommendations?

MS. DAVIS: I am going to again object
on confidential supervisor information and the
bank's examination privilege. I instruct the

229

1  witness not to answer.

2          Q. Has Evolve shared any reports

3  received from third parties that were hired to

4  undertake this review with third parties?

5          MS. DAVIS:  Objection. Can you say it

6  again? I need to understand.  I don't know if I

7  should instruct him not to answer.

8          Q. This paragraph refers to a

9  comprehensive review. Did Evolve share that

10 comprehensive review with anyone other than

11 regulators?

12         MS. DAVIS: Yes.  Again, I am going to

13 instruct the witness not to answer on the basis

14 of confidential supervisor information and

15 banking examination privilege.

16         MS. MANDEL: They shared it with third

17 parties, so there has been a waiver.

18         MS. DAVIS: Same objection.  I'm going

19 to direct the witness not to answer.

20         MR. MANDEL:  This is like a basic

21 privilege for your question. It is not whether

22 it was shared with third parties other than

23 regulators is not privileged.

24         MS. DAVIS: Yes, and also we didn't

25 designate anyone on this topic.  So still scope

230

1   and I direct you not to answer.

2           Q. Does Evolve currently have to obtain

3   prior written approval from regulators to

4   establish new FinTech partners or programs?

5           MS. DAVIS: I still instruct the

6   witness not to answer based of banking

7   examination privilege and confidential

8   supervisor information.

9           MR. MANDEL:. This is public. This,

10  right here, what we are looking at is public.

11  That is not private.

12          MS. DAVIS: You asked if they still

13  need to, right, and what is it? What are you

14  pointing out?

15          MR. MANDEL:  I mean if the fact that

16  they needed to do this is public, then the fact

17  that they no longer need to do it, if that's the

18  case, could not be private. The regulator

19  obviously decided that this requirement should

20  be public. Everyone should know that Evolve is

21  required to do this.

22          MS. DAVIS: Can we take a break,  Evan?

23          MR. MANDEL:  Sure.  Well, let's just

24  get through this last question. Do you want to

25  think about this last question or want to

231

1  instruct him not to answer?

2          MS. DAVIS: I do want to take a break

3  and think about your question.

4          MR. MANDEL:  Of course.  No problem.

5          THE VIDEOGRAPHER: The time is 5:57

6  p.m.  We are going off the record.

7          THE VIDEOGRAPHER:  The time is

8  approximately 6:10 p.m.  We are back on the

9  record.

10          MR. MANDEL:  How did the thinking

11  about the last question turn out?

12          MS. DAVIS:  Yes.  Can you repeat the

13  question?  Sorry.  I do not think I can. I think

14  that will be clearer.

15          MR. MANDEL: Tom, are you able to read

16  it back?

17          THE REPORTER:  Even, sorry, I just

18  started a new file, but if you give me a couple.

19          MR. MANDEL:  That's okay. I got it.

20          MS. DAVIS:  In general, Evan, I think

21  the document speaks for itself and any

22  non-public communications after this, I am going

23  to instruct him not to answer on the grounds of

24  confidential supervisor and bank examination

25  privilege.

232

1    Q. Did Evolve share any assessment of

2    its controls with any third parties other than

3    regulators?

4         MS. DAVIS:  When you are asking that,

5    you are asking about the one that is supposed to

6    talk about in this report?

7         MS. MANDEL:  Yes.

8         MS. DAVIS: I am going to direct the

9    witness not to answer on the grounds of on the

10    basis of confidential supervisor information and

11    the bank's examination privilege.

12    Q. Did Evolve engage any third parties

13    to review its controls separate and apart from

14    this report or separate and apart from this

15    consent decree?

16    A.  REDACTED - CONFIDENTIAL

17    Q. Turning your attention to 2017 Bank

18    Services Agreement.  This has been marked

19    already as Plaintiff's 48.  Are you familiar

20    with this document, Mr. Vendetti?

21    A. This appears to be the bank service

22    agreement between Evolve and Synapse Financial

23    Technology Company from 2017.

24    Q. Are you familiar with it?

25    A. Somewhat, yes.

233

1      Q.    REDACTED - CONFIDENTIAL

2      REDACTED - CONFIDENTIAL

3      REDACTED - CONFIDENTIAL

4      REDACTED - CONFIDENTIAL

5      REDACTED - CONFIDENTIAL

6      REDACTED - CONFIDENTIAL

7      REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9           MS. DAVIS: Objection as to time.

10          A.  When are you asking?

11          Q.  Well, beginning on April 18, 2017,

12     REDACTED - CONFIDENTIAL ?

13          MS. DAVIS: Objection.   Vague.

14          A.    REDACTED - CONFIDENTIAL

15     REDACTED - CONFIDENTIAL

16          Q.    REDACTED - CONFIDENTIAL

17     REDACTED - CONFIDENTIAL

18          A.    REDACTED - CONFIDENTIAL

19          Q.  Turning your attention to REDACTED - CONFIDENTIAL

20     REDACTED - CONFIDENTIAL

21     REDACTED - CONFIDENTIAL

22     REDACTED - CONFIDENTIAL

23     REDACTED - CONFIDENTIAL

24   REDACTED - CONFIDENTIAL ?

25          A.    REDACTED - CONFIDENTIAL

234

Q. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

A. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

Q. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

A. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

Q. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

A. REDACTED - CONFIDENTIAL

Q. In this 2017 Bank Services
Agreement, REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL?

MS. DAVIS: Objection.  Misstates the
document.

A. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

Q. Well, at the time this document was
executed, REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL?

A. REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

235

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6         Q. You are saying in this document,

7    that is Plaintiff's Exhibit 48, REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL?

9         A. REDACTED - CONFIDENTIAL

10        Q. In this document, REDACTED - CONFIDENTIAL

11   REDACTED - CONFIDENTIAL?

12        A. REDACTED - CONFIDENTIAL

13        Q. REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15        A. REDACTED - CONFIDENTIAL

16   REDACTED - CONFIDENTIAL

17        Q. REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19        A. REDACTED - CONFIDENTIAL

20   REDACTED - CONFIDENTIAL

21   REDACTED - CONFIDENTIAL

22        Q. REDACTED - CONFIDENTIAL

23   REDACTED - CONFIDENTIAL

24   REDACTED - CONFIDENTIAL

25        A. REDACTED - CONFIDENTIAL

236



1      REDACTED - CONFIDENTIAL

2   REDACTED - CONFIDENTIAL

3      Q. Who hired REDACTED - CONFIDENTIAL initially? Was it

4   Synapse or Evolve?

5      MS. DAVIS:  Objection. Vague.

6      A. Yes.  At which point?

7      Q. REDACTED - CONFIDENTIAL

8   REDACTED - CONFIDENTIAL

9   REDACTED - CONFIDENTIAL

10     A. REDACTED - CONFIDENTIAL

11  REDACTED - CONFIDENTIAL

12  REDACTED - CONFIDENTIAL

13     Q. REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL

15     A. REDACTED - CONFIDENTIAL

16  REDACTED - CONFIDENTIAL

17  REDACTED - CONFIDENTIAL

18     Q. REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL

20  REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL

22     A. REDACTED - CONFIDENTIAL

23  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25  REDACTED - CONFIDENTIAL

237

1    REDACTED - CONFIDENTIAL

2        Q.    REDACTED - CONFIDENTIAL

3        REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5        A.    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7        Q.  Let me just ask this question.  REDACTED - CON

8    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10       A.    REDACTED - CONFIDENTIAL

11       Q.    REDACTED - CONFIDENTIAL

12    REDACTED - CONFIDENTIAL

13    REDACTED - CONFIDENTIAL

14        MS. DAVIS:  Objection.  Misstates

15    testimony.

16       A.    REDACTED - CONFIDENTIAL

17    REDACTED - CONFIDENTIAL

18       Q.    REDACTED - CONFIDENTIAL

19    REDACTED - CONFIDENTIAL

20    REDACTED - CONFIDENTIAL

21    REDACTED - CONFIDENTIAL

22       A.    REDACTED - CON

23       Q.    REDACTED - CONFIDENTIAL

24    REDACTED - CONFIDENTIAL

25    REDACTED - CONFIDENTIAL

238

```
 1        A. REDACTED - CO

 2        Q.        REDACTED - CONFIDENTIAL

 3        A.        REDACTED - CONFIDENTIAL

 4  REDACTED - CONFIDENTIAL

 5        Q.        REDACTED - CONFIDENTIAL

 6        REDACTED - CONFIDENTIAL

 7        REDACTED - CONFIDENTIAL

 8        MS. DAVIS:  Objection.  Assumes facts.

 9        A. I'm sorry.  I didn't follow your

10  question. I'm sorry.

11        Q. Sure.  Am I correct that it is your

12  testimony that        REDACTED - CONFIDENTIAL

13        REDACTED - CONFIDENTIAL        ; right?

14        A. Correct.

15        Q.        REDACTED - CONFIDENTIAL

16        REDACTED - CONFIDENTIAL

17        REDACTED - CONFIDENTIAL

18        A.    REDACTED - CONFIDENTIAL

19        Q. Turning your attention to what we

20  will mark as --

21        MR. MANDEL: Are we on 92?

22        THE VIDEOGRAPHER: Yes.

23        Q. Plaintiff's Exhibit 92 is REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL dated June 18, 2019.  Do you

25  recognize this document, Mr. Vendetti?
```

239

```
 1   (Whereupon, Plaintiff Yotta's Exhibit 92 is
 2   marked for identification. REDACTED - CONFIDENTIAL
 3   dated June 18, 2019.)
 4           A. Yes, I have seen it.
 5           Q. Am I correct REDACTED - CONFIDENTIAL
 6   REDACTED - CONFIDENTIAL . I'm sorry. REDACTED
 7   REDACTED - CONFIDENTIAL . Should I give you a
 8   minute to read that?
 9           A. Yes, and is it okay if I take a
10   minute to read this real quick?
11           Q. Sure.
12           A. I have read it.
13           Q. Am I correct that REDACTED - CONFIDENTIAL
14   REDACTED - CONFIDENTIAL
15   REDACTED - CONFIDENTIAL
16   REDACTED - CONFIDENTIAL ?
17           MS. DAVIS: Objection.  The document
18   speaks for itself.
19           A. REDACTED - CONFIDENTIAL
20           Q. What do you understand that to mean?
21           MS. DAVIS:  Objection.  Best evidence.
22   The document speaks for itself.
23           A. Yes.  I am going to go just what the
24   document says here.
25           Q. REDACTED - CONFIDENTIAL
```

240

1    REDACTED - CONFIDENTIAL

2            MS. DAVIS:  What was the question

3    again?

4            Q.  Let me rephrase it.  REDACTED - CONFIDENTIAL

5    in Plaintiff's Exhibit 92    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL?

7            A.    REDACTED - CONFIDENTIAL

8             REDACTED - CONFIDENTIAL

9             REDACTED - CONFIDENTIAL

10            REDACTED - CONFIDENTIAL

11    REDACTED - CONFIDENTIAL

12            Q.  It sounds like you don't understand.

13    Withdrawn.    REDACTED - CONFIDENTIAL

14            A.    REDACTED - CONFIDENTIAL

15             REDACTED - CONFIDENTIAL

16        REDACTED - CONFIDENTIAL

17            Q.    REDACTED - CONFIDENTIAL

18             REDACTED - CONFIDENTIAL

19        REDACTED - CONFIDENTIAL

20            MS. DAVIS: Objection.  The document

21    speaks for itself.  Best evidence.

22            A.    REDACTED - CONFIDENTIAL

23            Q.  Sorry, I didn't hear that.

24            A.  I'm sorry.    REDACTED - CONFIDENTIAL

25             REDACTED - CONFIDENTIAL

241

1        REDACTED - CONFIDENTIAL

2        REDACTED - CONFIDENTIAL

3            Q.        REDACTED - CONFIDENTIAL

4            REDACTED - CONFIDENTIAL

5            MS. DAVIS: Objection.   Scope.

6            A.        REDACTED - CONFIDENTIAL

7            Q. Turning to the 2019 Master Agreement

8    between Synapse and Evolve, that's Plaintiff's

9    Exhibit 2, are you familiar with this document,

10   Mr. Vendetti?

11           MS. DAVIS:  Evan, I think you said

12   2019.  Can you just restate your question.

13           Q. Sure. Plaintiff's Exhibit 2 is the

14   2022 Master Bank Services Agreement between

15   Evolve and Synapse; is that right?

16           A. That's the document I see is the

17   September 23, 2022 Master Bank Services

18   Agreement.

19           Q. I am going to turn your attention to

20           REDACTED - CONFIDENTIAL

21           REDACTED - CONFIDENTIAL    .  Are you

22   following along here on the screen or do you

23   have it on your own?

24           A. I have it on my own right here.  You

25   said     REDACTED - CONFIDENTIAL    .

242

1    Q. Yes, I can blow it up for you if

2  this makes your life easier. REDACTED - CONFIDENTIAL

3  REDACTED - CONFIDENTIAL

4  REDACTED - CONFIDENTIAL

5  REDACTED - CONFIDENTIAL

6  REDACTED - CONFIDENTIAL

7  REDACTED - CONFIDENTIAL

8  REDACTED - CONFIDENTIAL

9  REDACTED - CONFIDENTIAL

10 REDACTED - CONFIDENTIAL

11    MS. DAVIS:  Objection.  Calls for

12 legal conclusion.  Document speaks for itself.

13    A.    REDACTED - CONFIDENTIAL

14 REDACTED - CONFIDENTIAL

15 REDACTED - CONFIDENTIAL

16    Q.    REDACTED - CONFIDENTIAL

17 REDACTED - CONFIDENTIAL

18 REDACTED - CONFIDENTIAL

19    A.    REDACTED - CONFIDENTIAL

20 REDACTED - CONFIDENTIAL

21    Q. Scrolling down REDACTED - CONFIDENTIAL. REDACTED - CO

22 REDACTED - CONFIDENTIAL

23 REDACTED - CONFIDENTIAL

24 REDACTED - CONFIDENTIAL

25 REDACTED - CONFIDENTIAL

243

1   REDACTED - CONFIDENTIAL

2   REDACTED - CONFIDENTIAL

3   REDACTED - CONFIDENTIAL

4   REDACTED - CONFIDENTIAL

5   REDACTED - CONFIDENTIAL

6   REDACTED - CONFIDENTIAL

7   REDACTED - CONFIDENTIAL

8   REDACTED - CONFIDENTIAL

9        MS. DAVIS:   Objection.   Document

10  speaks for itself.

11       A.   REDACTED - CONFIDENTIAL

12       Q.   REDACTED - CONFIDENTIAL

13  REDACTED - CONFIDENTIAL

14       A.   REDACTED - CONFIDENTIAL

15  REDACTED - CONFIDENTIAL

16  REDACTED - CONFIDENTIAL

17  REDACTED - CONFIDENTIAL

18       Q.   REDACTED - CONFIDENTIAL

19  REDACTED - CONFIDENTIAL

20  REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL

22  REDACTED - CONFIDENTIAL

23  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25  REDACTED - CONFIDENTIAL

244

```
1          MS. DAVIS: Same objection.  Document
2   speaks for itself.  Also calls for a legal
3   conclusion.
4          A.        REDACTED - CONFIDENTIAL
5   REDACTED - CONFID
6          Q. I don't know what that means.  REDACTED - CON
7   REDACTED - CONFIDENTIAL
8   REDACTED - CONFIDENTIAL
9   REDACTED - CONFIDENTIAL
10         MS. DAVIS: Same objections.
11         A.        REDACTED - CONFIDENTIAL
12  REDACTED - CONFIDENTIAL
13  REDACTED - CONFIDENTIAL
14  REDACTED - CONFIDENTIAL
15  REDACTED - CONFIDENTIAL
16  REDACTED - CONFIDENTIAL
17  REDACTED - CONFIDENTIAL
18  REDACTED - CONFIDENTIAL
19         Q.        REDACTED - CONFIDENTIAL
20  REDACTED - CONFIDENTIAL
21  REDACTED - CONFIDENTIAL
22  REDACTED - CONFIDENTIAL
23  REDACTED - CONFIDENTIAL
24  REDACTED - CONFIDENTIAL
25  REDACTED - CONFIDENTIAL
```

245

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5         MS. DAVIS:   Objection.   The document

6    speaks for itself.

7         A.         REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10    REDACTED - CONFIDENTIAL

11    REDACTED - CONFIDENTIAL

12    REDACTED - CONFIDENTIAL

13    REDACTED - CONFIDENTIAL

14    REDACTED - CONFIDENTIAL

15    REDACTED - CONFIDENTIAL

16    REDACTED - CONFIDENTIAL

17    REDACTED - CONFIDENTIAL

18         Q.         REDACTED - CONFIDENTIAL

19    REDACTED - CONFIDENTIAL

20    REDACTED - CONFIDENTIAL

21    REDACTED - CONFIDENTIAL

22    REDACTED - CONFIDENTIAL

23    REDACTED - CONFIDENTIAL

24    REDACTED - CONFIDENTIAL

25    REDACTED - CONFIDENTIAL

246

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3         MS. DAVIS: Objection.  Document speaks

4    for itself.  Calls for a legal conclusion.

5         A.    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFID

8         Q.    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10        MS. DAVIS: Objection.  Same

11   objections.  The document speaks for itself and

12   calls for a legal conclusion.

13        A.    REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL

16        Q.    REDACTED - CONFIDENTIAL

17   REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL

20        MS. DAVIS:  Same objection.  The

21   document speaks for itself.  Calls for a legal

22   conclusion.

23        A.    REDACTED - CONFIDENTIAL

24   REDACTED - CONFIDENTIAL

25   REDACTED - CO

247

1    Q.    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL

8    A.    REDACTED - CONFIDENTIAL

9    REDACTED - CONFIDENTIAL

10    REDACTED - CONFIDENTIAL

11    REDACTED - CONFIDENTIAL

12    Q.    REDACTED - CONFIDENTIAL

13    REDACTED - CONFIDENTIAL

14    REDACTED - CONFIDENTIAL

15    REDACTED - CONFIDENTIAL

16    REDACTED - CONFIDENTIAL

17    REDACTED - CONFIDENTIAL

18    REDACTED - CONFIDENTIAL

19    REDACTED - CONFIDENTIAL

20    REDACTED - CONFIDENTIAL

21    REDACTED - CONFIDENTIAL

22    REDACTED - CONFIDENTIAL

23    REDACTED - CONFIDENTIAL

24         MS. DAVIS:  Objection.  The document

25    speaks for itself.  Calls for a legal

248

```
 1   conclusion.
 2        A.    REDACTED - CONFIDENTIAL
 3        Q.    REDACTED - CONFIDENTIAL
 4        A.    REDACTED - CONFIDENTIAL
 5        Q.    REDACTED - CONFIDENTIAL
 6   REDACTED - CONFIDENTIAL
 7   REDACTED - CONFIDENTIAL
 8   REDACTED - CONFIDENTIAL
 9   REDACTED - CONFIDENTIAL
10   REDACTED - CONFIDENTIAL
11   REDACTED - CONFIDENTIAL
12   REDACTED - CONFIDENTIAL
13        MS. DAVIS: Objection. The document
14   speaks for itself.  Calls for a legal
15   conclusion.
16        A.    REDACTED - CONFIDENTIAL
17   REDACTED - CONFIDENTIAL
18   REDACTED - CONFIDENTIAL
19   REDACTED - CONFIDENTIAL
20        Q.    REDACTED - CONFIDENTIAL
21   REDACTED - CONFIDENTIAL
22   REDACTED - CONFIDENTIAL
23        A.    REDACTED - CONFIDENTIAL
24   REDACTED - CONFIDENTIAL
25   REDACTED - CONFIDENTIAL
```

249

1    REDACTED - CONFIDENTIAL

2         Q.              REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4         A.    REDACTED - CONFIDENTIAL

5         Q.              REDACTED - CONFIDENTIAL

6         REDACTED - CONFIDENTIAL

7         A.              REDACTED - CONFIDENTIAL

8              REDACTED - CONFIDENTIAL

9              REDACTED - CONFIDENTIAL

10             REDACTED - CONFIDENTIAL

11             REDACTED - CONFIDENTIAL

12        Q. Turning your attention to what has

13   been previously marked as Plaintiff's Exhibit

14   49. This is a consumer interest checking account

15   agreement dated May 2023.  Are you familiar with

16   this document?

17        A. I have seen it before.

18        Q. Did Evolve control the text in this

19   document?

20        MS. DAVIS: Objection.  Calls for a

21   legal conclusion.

22        A. I am not sure if Evolve controlled

23   the text in this document.

24        Q. Would Evolve tell Yotta what this

25   agreement had to say?

250

1          MS. DAVIS: Objection.  Form.

2          Q. Let me rephrase. Did Evolve tell

3    Yotta what this agreement had to say?

4          MS. DAVIS:  Same objection.

5          A. I am not 100% sure.  I know from

6    time to time, for instances like this, anything

7    that was going to be customer facing, it would

8    have to go through Evolve in some capacity to

9    make sure it met with compliance. But I can't

10   speak to if this document of its wording did

11   that same process and if we affected at all.

12         Q. Did Evolve have any agreements with

13   Yotta end-users dated after -- let me rephrase

14   that question. After this May 2023 agreement,

15   did Evolve and Yotta end-users enter into any

16   other agreements?

17         MS. DAVIS:  Objection.  Vague.

18         A. Can you ask it again?

19         Q. Sure.  My understanding is that the

20   Yotta end-users were required to enter into this

21   agreement in May 2023 and I am not aware of any

22   agreements that Evolve entered into with the

23   Yotta end-users after this May 2023 agreement.

24         I can't testify here. I'm asking you.

25   Is Evolve aware of any agreements that it

251

1  entered into with Yotta end-users after May

2  2023?

3          MS. DAVIS: Same objection.

4          A. I am not aware of other agreements

5  outside of a deposit agreement that we would

6  enter into with Yotta end-users.

7          Q. Turning your attention to the third

8  paragraph of this agreement.  The second line

9  states, "This agreement covers any account open

10  through platform that you may have with us now

11  or in the future and that is used primarily for

12  customer consumer purposes."

13          Did this agreement cover the DDAs that

14  Yotta end-users at Evolve during the Synapse

15  brokerage period?

16          MS. DAVIS:  Objection.

17          A. I am unsure.

18          Q. Did this agreement cover whatever

19  funds Yotta end-users had in the Synapse

20  brokerage program that were held at Evolve Bank?

21          MS. DAVIS:  Objection.  Calls for a

22  legal conclusion.

23          A. I am not sure, yes, which funds this

24  would cover.

25          Q. You don't know one way or the other;

252

1  correct?

2          A. Correct.

3          Q. Did Evolve enter into any agreements

4  with anyone related to Synapse Brokerage --

5  actually, let me rephrase that. Did Evolve enter

6  into any contracts with any Synapse entity

7  related to Synapse Brokerage?

8              MS. DAVIS:  Objection.  Scope.

9          A. I'm not sure I'm understanding your

10  question.  The only contract I know we entered

11  into was Synapse Brokerage.

12          Q. I'm sorry.  I didn't hear that.

13  Could you say that again?

14          A. My apologies.  I was saying the only

15  contract I'm aware of is what we entered into

16  with Synapse Brokerage.

17          Q. I think I heard you, but I didn't

18  understand it. Are you saying Synapse Brokerage

19  and Evolve did enter into a contract?

20          A. For payment processing services.

21  That's my understanding.

22          Q. For payment processing services.

23  And that was signed by both parties?

24          A. I would have to see the document to

25  confirm.

253

1          Q. But that is a document that you

2    recall seeing at some point in the past?

3          A. I recall there being a Synapse

4    Brokerage document.

5          Q. Sitting here today, do you recall

6    whether it was ever signed?

7          A. I would have to lay eyes on it.  I

8    can't fully recall.

9    (Plaintiff's Request for Documentation.)

10          Q.  If that document exists we request

11   a copy of it because I am not familiar with it.

12          Turning here to page 2 of Plaintiff's

13   Exhibit 49, it says, "Fees to bank.  There are

14   no fees charged by us and applicable for this

15   account." Did Evolve promise the Yotta end-users

16   that it would not charge them any fees?

17          MS. DAVIS:  The document speaks for

18   itself.

19          A. Yes.  The document reads "Fees to

20   bank." There are no fees charged by us and

21   applicable for this account.

22          Q. Does that mean that Evolve agreed

23   not to charge Yotta end-users any fees?

24          MS. DAVIS: Same objections.

25          A. That is how the document reads.

254

1        Q. In Section 1.4.1 on the next page,

2  it states, "Account statements will be

3  considered to be correct unless you notify us

4  through Synapse of any errors within 60 days of

5  becoming available." Did Evolve promise in this

6  agreement that account statements would be

7  correct?

8        MS. DAVIS: Objection.  The document

9  speaks for itself in the state's account.

10       A. Yes, the document state's account

11  statements will be considered to be correct

12  unless end-user notifies.

13       Q. Does that mean that this agreement

14  permitted Evolve to send incorrect account

15  statements to Yotta end-users?

16       MS. DAVIS: Objection.  Misstates the

17  testimony.  Misstates the document.  The

18  document speaks for itself.

19       Q. Let me rephrase the question.  Does

20  this agreement permit Evolve to send Yotta

21  end-users incorrect account statements?

22       A. I believe this just permits account

23  statements they are going to be considered

24  correct unless they notify.

25       Q. But "under this agreement," could

255

1  Evolve intentionally send Yotta end-users false

2  account statements?

3          MS. DAVIS: Objection.  Argumentative.

4          A. Just account statements will be

5  considered to be correct unless they notified.

6          Q. Do you know whether this agreement

7  permits Evolve to intentionally send Yotta

8  end-users false account statements.

9          MS. DAVIS:  Asked and answered.

10         A. Again, the account statements will

11 be considered to be correct unless notified and,

12 yes.

13         Q. Yes. I don't think I am getting an

14 answer to the question.  I don't want to waste

15 our time. I will give you one last chance to

16 tell me whether you think this agreement permits

17 Evolve to intentionally send users incorrect

18 account statements. Then I will move on.

19         MS. DAVIS:  Asked and answered.

20 Objection.  Call for a legal conclusion.  And I

21 am just putting a note that we would like a

22 break after this.

23         MR. MANDEL:  I'm sorry, Sarah, I didn't

24 hear the last part of what you said.

25         MS. DAVIS: I was just going to say.

256

1  We need a bio break as soon as you can.

2          MR. MANDEL:  Of course.  Just this

3  question and then we can take a break.

4          A.  Sorry. What was your question again

5  about?

6          Q. I want to give you one last chance.

7  Does this agreement permit Evolve to

8  intentionally send Yotta end-users false account

9  statements?

10          MS. DAVIS: Same objection.

11          A. Again, I don't know what this is

12  permitting. It is just stating what it states in

13  the document.

14          MR. MANDEL:  Let's take a break.

15          MS. DAVIS:  Ten minutes?

16          MR. MANDEL:  Whatever you like.

17          THE VIDEOGRAPHER: The time is 6:50

18  p.m. We are going off the record.

19  (Upon Resuming.)

20          THE VIDEOGRAPHER: The time is

21  approximately 6:58 p.m.  We are back on the

22  record.

23  BY MR. MANDEL:

24          Q. Turning back to Plaintiff's Exhibit

25  49.

257

1          MS. DAVIS:  Let us know what you're

2     looking at.

3          MR. MANDEL:  Very good point. Thank

4     you.

5          Q. We are now going to turn to Section

6     5.1.  It states, "We make funds available

7     according to the type of deposit and when the

8     funds are applied or credited to your account."

9          Does that mean that the funds are

10    required to be available to end-users after they

11    are credited to the account?

12          MS. DAVIS:  Objection.  The document

13    speaks for itself.  Calls for a conclusion.

14          A. What was your question, Evan?

15          Q. Does this contract require funds to

16    be available to end-users after they have been

17    credited to the end-user's account?

18          MS. DAVIS: Same objections.

19          A. If that is what the document

20    states, that is what it's stating.

21          Q. Do you have any reason to believe

22    that is not what it states?

23          MS. DAVIS: Same objections.  Document

24    speaks for itself.

25          A. Yes.  I am not going to guess on the

258

1  interpretation of the document.

2         Q. Do you understand that you are

3  Evolve's corporate designee with respect to

4  these contracts that we are reviewing here

5  today?

6         MS. DAVIS: Same objection as before.

7         A. If that is what I have been

8  designated on.

9         Q. Do you know one way or the other

10 whether you have been designated on these

11 contracts?

12        A. I do not.

13        Q. Turning to 7.2.3.10.

14 Whatever you like.  Third line from the bottom

15 here of 7.2.3.10 states, "We are responsible for

16 the accuracy of your account statements.  Not

17 the program banks." Does that mean Evolve is

18 responsible for the accuracy of Yotta end-users'

19 account statements?

20        MS. DAVIS: Objection.  Calls for a

21 legal conclusion.  The document speaks for

22 itself.

23        A. I am not going to attempt to

24 interpret who that means.

25        Q. You don't know one way or the other?

259

1          MS. DAVIS:  Same objection.

2          A. Correct.

3          Q. Let me see if I can help you out on

4   this one. This is the opening page of the

5   document and it states in this paragraph, the

6   second paragraph towards the bottom, "As used in

7   this document the words we, our, and us refer to

8   Bank and Synapse."

9          Turning back.  Do you see that there?

10         A. I do you see that.

11         Q. So turning back to 7.2.3.10, where

12  it states, third line from the bottom, "We are

13  responsible for the accuracy of your statements,

14  not the program banks." Does that mean that

15  Evolve and Synapse are responsible for the

16  accuracy of Yotta end-user's account statements?

17         MS. DAVIS:  Same objection.  The

18  document speaks for itself.

19         A. The line you just showed me "we" was

20  described as Synapse and Bank.

21         Q. The bank is Evolve; right?

22         A. To my knowledge in this, yes.

23         Q. A little farther up in the same

24  paragraph there is a reference to monthly

25  statement in the first, second, third, fourth

260

1   line, and then it says "(which will reflect the

2   total balance in your account and each

3   sub-deposit account excluding any payments or

4   amounts owed or belonging to us or any program

5   bank.)"

6        Does that mean any payments from

7   end-user funds had to be identified on the

8   monthly account statement?

9        MS. DAVIS: Same objection.  The

10  document speaks for itself.  Calls for a legal

11  conclusion.

12       A. I am going to defer to the document

13  here.  What it says is what it is saying.  I am

14  not going to interpret or try to guess what it

15  means.

16       MR. MANDEL:  I am pleased to report I

17  have no more questions about that document.

18       MS. DAVIS:  Oh, man!  I thought you

19  were going to say "No more questions."

20       MR. MANDEL:  No.  I have many more

21  questions.  Many, many, many more questions.  But

22  let's see if we can get through them quickly.

23       Q. Am I correct that we are on 93?

24  (Whereupon Plaintiff Yotta Exhibit 93 is marked,

25  December 18, 2023 letter from Orrick to

261

1  Synapse.)

2          THE VIDEOGRAPHER:  I was going to ask.

3  Is it not passed 94 the Evolve user agreement.

4  That was 93.  So then we are on 93 if that was

5  an old exhibit. My bad.

6          Q.  93 is a December 18, 2023 letter

7  from Orrick to Synapse.  Is this Caroline

8  Stapleton's signature on the bottom of this

9  document here?  I didn't hear your answer.

10          A. I'm sorry. I was looking forward on

11  the document so I could just lay eyes on it.

12          Q. I'm sharing.  If it helps.  It is on

13  the last page.

14          A. Yes.  That signature reads Caroline

15  N. Stapleton.

16          Q. Do you have any reason to believe

17  that Ms. Stapleton said anything on behalf of

18  Evolve that was false?

19          A. Not to my knowledge.

20          Q. Ms. Stapleton states, and this is

21  page 3, first full paragraph on the page, the

22  fourth line towards the end of the line, REDACTED

23  ████████████ REDACTED - CONFIDENTIAL ████████████

24  ████████████ REDACTED - CONFIDENTIAL ████████████

25  ████████████ REDACTED - CONFIDENTIAL ████████████

262

1    REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL

3    A.    REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    Q.    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    A.    REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL

9    Q. You understand there is a claim in

10    this case that Evolve improperly took Tabapay

11    fees from FBO accounts; right?

12    A. I do understand that.

13    Q.    REDACTED - CONFIDENTIAL

14    REDACTED - CONFIDENTIAL

15    REDACTED - CONFIDENTIAL

16    REDACTED - CONFIDENTIAL

17    REDACTED - CONFIDENTIAL

18    REDACTED - CONFIDENTIAL

19    A.    REDACTED - CONFIDENTIAL

20    REDACTED - CONFIDENTIAL

21    Q.    REDACTED - CONFIDENTIAL

22    REDACTED - CONFIDENTIAL

23    A. That is why  REDACTED - CONFIDENTIAL . I

24    don't know    REDACTED - CONFIDENTIAL

25    REDACTED - CONFIDENTIAL    -- I just don't know.

263

1    Q. How would you determine that?

2    A.    REDACTED - CONFIDENTIAL

3    REDACTED - CONFIDENTIAL

4    Q. Got it.  Is what you are saying is

5    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL

8    REDACTED - CONFIDENTIAL ?

9    A. I think you are saying what I'm

10   saying.  Just to kind of restate it.  REDACTED - CONFIDENT

11   REDACTED - CONFIDENTIAL

12   REDACTED - CONFIDENTIAL

13   REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL

16   Q. Got it.  So REDACTED - CONFIDENTIAL , and

17   let me see if I understand this, REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL

20   REDACTED - CONFIDENTIAL

21   REDACTED - CO ; correct?

22   MS. DAVIS: Objection.  Mistakes

23   testimony.

24   A.    REDACTED - CONFIDENTIAL

25   REDACTED - CONFIDENTIAL

264

1   REDACTED - CONFIDENTIAL

2   REDACTED - CONFIDENTIAL

3   REDACTED - CONFIDENTIAL

4   REDACTED - CONFIDENTIAL

5   REDACTED - CONFIDENTIAL

6          Q. Do you understand that is what Ms.

7   Stapleton is saying?

8          A. Ms. Stapleton is saying what I just

9   said?

10         Q. Yes. Let me see if I can make this

11  into a concrete example which you are trying to

12  do which I think is productive.

13          So let's say John Doe Yotta end-user

14  makes a $5 purchase for a cup of coffee at

15  Starbucks. The $5 is going to be debited from

16  his account; right?

17         A. Correct?

18         Q. And some portion of that $5 is

19  supposed to go to Tabapay, right, for processing

20  the transaction?

21         A. That's correct.  Like an interchange

22  network processing fee, yes.

23         Q. Let's call that a 10 cent fee, a

24  hypothetical fee, in this hypothetical example;

25  is that all right?

265

1          A. Sure.

2          Q. I understand Ms. Stapleton to be

3    saying, REDACTED - CONFIDENTIAL

4    REDACTED - CONFIDENTIAL

5    REDACTED - CONFIDENTIAL

6    REDACTED - CONFIDENTIAL

7    REDACTED - CONFIDENTIAL . Is that what you

8    understand, Ms. Stapleton to be saying?

9          MS. DAVIS: Objection. Misstates the

10   document.

11         A. Yes. So your example again, please?

12         Q. Sure.  John Doe buys a $5 cup of

13   coffee.  The $5 is deducted from his account,

14   but then 10 cents is deducted from the FBO that

15   holds his account on top of the $5 to pay

16   Tabapay. Am I correct that Ms. Stapleton is

17   saying that REDACTED - CONFIDENTIAL

18   REDACTED - CONFIDENTIAL

19   REDACTED - CONFIDENTIAL ?

20         MS. DAVIS:  Objection.  Incomplete and

21   incorrect hypothetical.

22         A. That is not how I am understanding

23   it.  I was following your example. REDACTED - CONFIDENTIAL

24   REDACTED - CONFIDENTIAL

25   REDACTED - CONFIDENTIAL

266

1   REDACTED - CONFIDENTIAL

2   REDACTED - CONFIDENTIAL

3   REDACTED - CONFIDENTIAL

4       Q. Ms. Stapleton is saying REDACTED - CONFIDENTIAL

5   REDACTED - CONFIDENTIAL

6   REDACTED - CONFIDENTIAL

7   REDACTED - CONFIDENTIAL

8   REDACTED - CONFIDENTIAL

9   REDACTED - CONFIDENTIAL

10  REDACTED - CONFIDENTIAL; right?

11      MS. DAVIS:  The document speaks for

12  itself.

13      A. How I read the document REDACTED - CONFIDENTIAL

14  REDACTED - CONFIDENTIAL

15  REDACTED - CONFIDENTIAL .

16      Q. Was Ms. Stapleton's statement

17  correct or incorrect?

18      MS. DAVIS: Objection.  Form.

19      A. How I understand payment processing

20  in this transaction,  REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL

22  REDACTED - CONFIDENTIAL

23  REDACTED - CONFIDENTIAL

24  REDACTED - CONFIDENTIAL

25  REDACTED - CONFIDENTIAL

267

1       REDACTED - CONFIDENTIAL

2           Q. So Evolve then disagrees with Ms.

3       Stapleton's statement?

4           MS. DAVIS:  Objection.

5           Q.        REDACTED - CONFIDENTIAL

6                  REDACTED - CONFIDENTIAL

7                  REDACTED - CONFIDENTIAL

8       REDACTED - CONFIDENTIAL

9           MS. DAVIS: Objection.  Mistakes the

10      testimony.

11          A. No.  I was just saying REDACTED - CONFIDENTIAL

12                 REDACTED - CONFIDENTIAL

13                 REDACTED - CONFIDENTIAL

14          REDACTED - CONFIDENTIAL       .

15          Q. Stepping away from our example for a

16      second to reality, do you have any reason to

17      believe -- well, actually, let's stick with our

18      example. Withdrawn.

19             Sticking with our example, do you have

20      any reason to believe that the Yotta end-users'

21      accounts weren't debited for the $5 that they

22      attempted to use to pay for the cup of coffee?

23          MS. DAVIS:  Objection.  Incomplete

24      hypothetical.

25          A. Say your question again?

268

```
 1         Q. Sure. Is there any question that the
 2  end-user was not debited for the $5 which it
 3  used to pay for the coffee?
 4         A. I think the question is REDACTED - CONFIDENTIAL
 5  REDACTED - CONFIDENTIAL
 6         REDACTED - CONFIDENTIAL
 7  REDACTED - CONFIDENTIAL.
 8         Q. Right.  Here's my point.  I want to
 9  cut to the chase as quickly as possible because
10  of the late hour.  I think we all know that when
11  Ms. Stapleton wrote this, everyone understood
12  that the end-users had been debited for the
13  purchases that they incurred on their debit
14  card.
15         The only question that was being
16  addressed by Ms. Stapleton was REDACTED - CONFIDENTIAL
17  REDACTED - CONFIDENTIAL
18         REDACTED - CONFIDENTIAL
19  REDACTED - CONFIDENTIAL; is that correct?
20         MS. DAVIS:  Objection.  Assumes facts.
21  Misstates the document.
22         A. Yes.  I am going to stick with what
23  the document is saying here.  I am not sure what
24  you had said about the assumption.  I don't know
25  if that's true.
```

269

1      Q. So you don't know one way or the

2  other whether Ms. Stapleton was REDACTED - CONFIDENTIAL

3  REDACTED - CONFIDENTIAL

4  REDACTED - CONFIDENTIAL

5  REDACTED - CONFIDENTIAL

6  REDACTED - CONFIDENTIAL?

7      MS. DAVIS:  Objection.  Misstates

8  testimony.  Asked an answered.

9      A.  I am not following that question. I

10 think I have already answered it.  So I'm going

11 to leave it there.

12      Q. Yes.  I will be honest. I am not

13 sure what your answer is.  Is Ms. Stapleton

14 saying REDACTED - CONFIDENTIAL

15 REDACTED - CONFIDENTIAL

16 REDACTED - CONFIDENTIAL?

17      MS. DAVIS: Objection.  The document

18 speaks for itself.  Calls for speculation.

19      A. Yes.  The document here is saying REDACT

20 REDACTED - CONFIDENTIAL

21 REDACTED - CONFIDENTIAL

22 REDACTED - CONFIDENTIAL

23 REDACTED - CONFIDENTIAL

24 REDACTED - CONFIDENTIAL.

25      Q. The next sentence states, REDACTED

270

1 REDACTED - CONFIDENTIAL

2 REDACTED - CONFIDENTIAL

3 REDACTED - CONFIDENTIAL

4 REDACTED - CONFIDENTIAL

5 REDACTED - CONFIDENTIAL

6 REDACTED - CONFIDENTIAL

7 REDACTED - CONFIDENTIAL

8          Let's break that up.  The first phrase

9 is " REDACTED - CONFIDENTIAL

10 REDACTED - CONFIDENTIAL

11 REDACTED - CO ."

12          Did Evolve and or Synapse fail to

13 account in real time for the use of end-user

14 funds to pay Tabapay-related fees?

15          A. I don't know on Synapse's side if

16 they were doing that correctly or not.

17          Q. What would have been the correct way

18 to account for that?

19          A. To use the interchange tables and

20 the processing fee tables to process

21 transactions in real time with the corresponding

22 fees that go with it so that when charges are

23 debited all the accounting is correct.

24          Q. What accounts should those fees have

25 been paid out of?

271

1         A. Which fees?

2         Q. Each Tabapay fees?

3         A. From wherever the underlying expense

4  was coming from or usage?

5         Q.  Yes. Do you mean the Tabapay fees

6  should have been paid out of an FBO account?

7         A.  The Tab a fees were paid out of an

8  account and I think we talked about this

9  earlier. The Tabapay fees are paid out of the

10 account, meaning REDACTED - CONFID which is an FBO account,

11 but it is a customer settlement transaction

12 clearing account, and then Synapse would move

13 money from the FBO account into that REDACTED - CO

14 account to clear those transactions.

15        Q. Next phrase says, " REDACTED - CONFIDENTIAL

16  REDACTED - CONFIDENTIAL

17  REDACTED - CONFIDENTIAL

18  REDACTED - CONFIDENTIAL

19 REDACTED - CONFIDENTIAL ."

20        Did Synapse need to transfer the funds

21 back into the end-users' accounts from which it

22 sourced the Tabapay fees?

23        A. If they were incorrectly taken, then

24 they should transfer them back.

25        Q. Then the last phrase is, " REDACTED - CONFIDENTIAL

272

1     REDACTED - CONFIDENTIAL

2    REDACTED - CONFIDENTIAL. "

3          Am I correct that you already testified

4    that you don't know whether Synapse correctly

5    reflected those payments in its ledger?

6          A. That's correct.

7          Q. Scrolling down to page 9 of this

8    document which talks about account analysis

9    charges.  The last sentence in this paragraph

10   states, "    REDACTED - CONFIDENTIAL

11   REDACTED - CONFIDENTIAL

12   REDACTED - CONFIDENTIAL

13   REDACTED - CONFIDENTIAL

14   REDACTED - CONFIDENTIAL

15   REDACTED - CONFIDENTIAL."

16         Did Synapse pay account analysis

17   charges from end-user funds from 2017 to 2020?

18         A.  The funds in the FBO account, that

19   is where the account analysis charges were done.

20   Again, that was on Synapse's ledger then to the

21   corporate funds that Synapse held in that

22   account.

23         Q. Got it.  So when Ms. Stapleton said

24   that    REDACTED - CONFIDENTIAL

25   REDACTED - CONFIDENTIAL, that was

273

1   incorrect; right?

2          MS. DAVIS: Objection.  Misstates the

3   testimony and misstates the document.

4          A. What was your question?

5          Q.  Sure.  Here Ms. Stapleton states,

6   " ███████████ REDACTED - CONFIDENTIAL ███████████

7   ███ REDACTED - CONFIDENTIAL ███ ." Do you agree or

8   disagree with that statement?

9          MS. DAVIS: Objection.  Form.

10          A.  ████████ REDACTED - CONFIDENTIAL ████████

11   ▮ Again we debited the ▮ accounts. It was

12   on Synapse to ledger those to their corporate

13   funds or not.  ██████ REDACTED - CONFIDENTIAL ██████

14   ██████ REDACTED - CONFIDENTIAL ██████

15          Q. Do you agree with Ms. Stapleton's

16   statement that  ████ REDACTED - CONFIDENTIAL ████

17   ██████ REDACTED - CONFIDENTIAL ██████

18   ██████ REDACTED - CONFIDENTIAL ██████ ?

19          A.  ████ REDACTED - CONFIDENTIAL ████

20   ██████ REDACTED - CONFIDENTIAL ██████

21   ██████ REDACTED - CONFIDENTIAL ██████

22   ██████ REDACTED - CONFIDENTIAL ██████

23   ██████ REDACTED - CONFIDENTIAL ██████

24   █ REDACTED - CONFIDENTIAL █

25          Q. Does Evolve have any reason to

274

1  believe that Synapse attributed the account

2  analysis fees to corporate funds?

3          A. Sorry?  Your question was, do I?

4  What was it again?

5          Q. Does Evolve have any reason to

6  believe that Synapse attributed the account

7  analysis charges to Synapse corporate funds?

8          MS. DAVIS:  Asked and answered.

9          A. Yes, I do believe they did that.

10          Q. Why does Evolve believe they did

11  that?

12          A. Going back to, I think, prior

13  conversations we have had today when we began

14  talking with one of their finance professionals

15  in late '19 or 2020, they recognized these

16  transactions.  So they were aware of them which

17  means that if they were aware of them they would

18  be recording them.

19          Q. Why did Ms. Stapleton think in 2023

20  REDACTED - CONFIDENTIAL

21  REDACTED - CONFIDENTIAL?

22          A. REDACTED - CONFIDENTIAL

23          Q. We will depose her and we will find

24  out.  Moving on to the next issue.  I am showing

25  you Plaintiff's Exhibit 94.  It begins on, and

275

1  let me show it to you, EBT-Yotta-0133558.

2  (Whereupon Plaintiff Yotta Exhibit 94 is marked,

3  EBT-Yotta-0133558, August 15, 2024 email from

4  Ignacio Sandoval to Thomas Puyn and others.)

5         MS. DAVIS:  Evan, so you know, you have

6  about 10 minutes left in the deposition.

7         MR. MANDEL:  I am not going to be able

8  to finish this in seven hours. If you are going

9  to hold us to the seven hours, we will raise it

10  with the court. If you want to try and go a

11  little later today we can try and go a little

12  later today.  You tell me.

13         MS. DAVIS:  I think we are, at least,

14  going to break at 7:00 and that is seven hours.

15         Q. This exhibit is an August 15, 2024

16  email from Ignacio Sandoval to, I believe a

17  number of people, and to Thomas Pyun.  I

18  understand this to be an email to FINRA.  Is Mr.

19  Sandoval an Orrick lawyer who represents Evolve,

20  Mr. Vendetti?

21         A. No.  I am looking for this document.

22         MS. DAVIS: Did you put in the chat,

23  Evan?

24         MR. MANDEL: I think so.  Is it not in

25  the chat?

276

1          A. I might have missed that. I searched

2     the reference number on it and I didn't see it.

3              THE VIDEOGRAPHER:  I am having trouble

4     finding it also.

5              MS. MANDEL:  Let me put it in.  It's in

6     the chat.

7              A. Thank you.  I am sorry.  I have it

8     up now.

9              Q. Sure.  Is Mr. Sandoval an Orrick

10    lawyer who represented Evolve before FINRA?

11             A. That's correct.

12             Q. Turning to page 563 of this

13    document.  This is numbered in a weird way.

14    Section 2, after Brokerage migration, CMA, and

15    then Question 1.

16              MS. DAVIS:  Could you share the

17    document?

18              MR. MANDEL:  I am not sharing it?  I am

19    so sorry.

20              MS. DAVIS:  Because there are some

21    numbering issues.

22              Q.  Right here in the middle of the

23    page, it says, "When funds were moved from DDA

24    to FBO, since the brokerage was active in August

25    2023, but the two FBO accounts were set up in

277

1  December 2023."

2         In response:  "Funds were kept in the

3  18 omnibus accounts during migration. Synapse

4  Technologies was directing the movement of funds

5  from those accounts. The funds in those accounts

6  were all commingled during the time when certain

7  of the FinTech platforms were leaving Synapse."

8         Does that mean in October, November

9  and December 2023, the Yotta end-user funds

10  remained in the 18 omnibus accounts?

11         MS. DAVIS:  Objection.  The document

12  speaks for itself.

13         A. It doesn't specify which ones, but

14  it mentions as you read in that second part, the

15  funds in those accounts are all coming up during

16  the time when certain other FinTech platforms

17  were leaving Synapse.  It doesn't list who was

18  present or not present.

19         Q. Do you have any reason to believe

20  Yotta end-users funds were not in the 18 omnibus

21  FBO accounts in October, November and December

22  2023?

23         MS. DAVIS:  Objection. Vague.

24         A. In what capacity?  As Synapse

25  Financial Technologies or Synapse Brokerage?

278

1      Q. I don't know what the accounts were

2  called, but these are the same 18 omnibus

3  accounts that were utilized prior to Synapse

4  Brokerage; correct?

5          MS. DAVIS: Objection.  Vague.

6      A. These are the same. These appear to

7  be the same 18 accounts that the Synapse program

8  had.

9      Q. Do you have any reason to believe

10  that Yotta end-user funds did not remain in

11  those accounts, those 18 FBO accounts at Evolve

12  in October, November and December 2023?

13          MS. DAVIS: Objection.  Vague.

14      A. Evan, I think it's hard for me to

15  answer the question.  When you say remain, to my

16  knowledge at this point Yotta had migrated off

17  and so the only funds that would exist would be

18  transitory being processed through as part of

19  like the brokerage.

20      Q. It sounds like it is your

21  understanding that after the supposed migration

22  in October of Yotta end-user funds to Synapse

23  Brokerage, it is your understanding that the

24  Yotta end-user funds did not remain in the 18

25  omnibus accounts that they had been in prior to

279

1 Synapse Brokerage; is that correct?

2          MS. DAVIS: Objection.  Misstates

3 testimony.

4          A. What I am trying to say is after the

5 migration of Yotta off of Evolve, is that any

6 funds that were at Evolve for Yotta end-users

7 were transitory, meaning, they were passing

8 through as part of clearing payment and

9 processing for Synapse Brokerage to their other

10 brokerage banks.

11          MS. DAVIS: Tom, could we get a time

12 check?

13          THE VIDEOGRAPHER: Yes.  It has been

14 just about seven hours and one minute.

15          MS. DAVIS:  I think we are going to end

16 it, Evan.

17          MS. MANDEL: I would like to go on for

18 at least a few more minutes and I am sure you

19 can accommodate me.

20          MS. DAVIS:  I will give you five more

21 minutes and then we are going to end the

22 deposition.

23          Q. Are you familiar with the reserve

24 account statements for the Synapse Evolve

25 reserve accounts that were in place?

280

1          A. I would need to see the statements.

2          Q. Are you designated on the topic of

3    the reserves that were set aside?

4          MS. DAVIS: Same objections as before.

5          A. I don't know if I'm designated or

6    not.

7    (Whereupon Plaintiff Yotta Exhibit 95 is marked,

8    Number 1169, an email EBT-Yotta-0054234.)

9          Q. Bringing you attention to

10   Plaintiff's Exhibit 95. This is not the right

11   one. I am showing you 1169 which is in the chat.

12   This is Plaintiff's Exhibit 95.  This is an

13   email EBT-Yotta-0054234.  In the middle of the

14   page here is an email from you. At the end you

15   state, "Thought it was interesting to see ...

16          MS. DAVIS:  Sorry. Can you say the

17   number of the document again?

18          A. What's the first four on it?

19          Q. It's 1169.  But it is really just

20   the whole thing is shown on my screen if that

21   helps.  Literally the whole document.

22          A. Go on.

23          Q. Here you state to Mr. Lenoir, "It

24   was interesting to see that they clearly have

25   REDACTED - CONFIDENTIAL

281

1   REDACTED - CONFIDENTIAL." What did you mean by that?

2          A. I don't fully recall.  I really need

3   to see the documents it is referencing if we

4   have it.

5          MS. DAVIS:  Last question.  We are over

6   the five minutes.

7          Q.  Were any          REDACTED - CONFIDENTIAL

8          REDACTED - CONFIDENTIAL                    ?

9          A.          REDACTED - CONFIDENTIAL

10         REDACTED - CONFIDENTIAL

11  REDACTED - CONFIDENTIAL

12         Q. I'm referring to REDACTED - CONFIDENTIAL

13  that you are referring to here.  If you don't

14  know what that is, then you can't answer the

15  question. So I can make this painless on all of

16  us. If you don't know what REDACTED - CONFIDENTIAL you are

17  referring to here, then there's not really, you

18  can't really answer the question.

19         A. Yes.  I mean I can read the

20  question, but I think I would need to see the

21  documents to make fully sure I am answering with

22  full understanding.

23         MS. DAVIS:  We are ending the

24  deposition.

25         MR. MANDEL:   We are going to need to

282

1  continue this deposition unfortunately.  We have

2  had a lot of issues in this case.

3         MS. DAVIS:  We obviously disagree.

4         MR. MANDEL:  Can you not interrupt me,

5  please? We have had a lot of problems in this

6  case with senior executives pleading the 5th

7  Amendment in refusing to answer our questions

8  about what's going on.

9         While I personally like Mr. Vendetti,

10 unfortunately, he doe not know what topics he is

11 identified on, what he has been designated on to

12 be the Rule 36(b)(6).  He has not been

13 adequately prepared.

14        It is a document intensive case. We

15 have a lot more documents to go through and

16 there were a number of interruptions today and

17 that should not have happened.

18        There were, frankly, a lot of times

19 spent reviewing documents that Mr. Vendetti

20 should have been familiar with.  So we are going

21 to continue this and if we can work that out,

22 great, and if we have to take it up with the

23 court, I understand.

24        MS. DAVIS:  We obviously disagree with

25 most of your contentions, if not all of your

283

1  contentions that you just said.  But understood.

2  Happy to meet and confer further.

3          MR. MANDEL: Good night, everyone, and

4  Mr. Vendetti -- why don't we go off the record?

5          THE VIDEOGRAPHER:  Thank you. This

6  concludes today's testimony given by Christopher

7  Vendetti. We are off the record at 7:42 p.m. and

8  finish for today.

9          (Deposition concludes.7:42 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

284

1

2          I, the witness herein, having read the

3     foregoing testimony, do hereby certify it to

4     be a true and correct transcript, subject to

5     the corrections, if any, shown on the

6     attached page.

7

8

9

10

11        _____

12                    CHRISTOPHER VENDETTI

13

14

15  Subscribed and sworn to

16  before me this _____ day

17  of _____ 20____.

18

19

20

21  _____

22

23

24

25

285

Certificate of Notary

Commonwealth of North Carolina

COUNTY OF CRAVEN

I, Tom Hubbard, do hereby Certify that the witness CHRISTOPHER VENDETTI, was duly sworn by me.

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action;

That this transcript is true and correct.

WITNESS my hand this date of December 21, 2025.

Thomas S. Hubbard, Jr.

My North Carolina Notary Commission

Expiration Date: July 28, 2030

_____
Signature

E R R A T A

286

1    NAME OF CASE:  YOTTA TECHNOLOGIES INC. v EVOLVE

2    BANCORP, INC., and EVOLVE BANK & TRUST

3    DATE OF DEPOSITION:  DECEMBER 11, 2025

4    NAME OF WITNESS:  CHRISTOPHER VENDETTI

5    PAGE LINE      FROM      TO          REASON

6    ____|_____|_____|_____|_____

7    ____|_____|_____|_____|_____

8    ____|_____|_____|_____|_____

9    ____|_____|_____|_____|_____

10   ____|_____|_____|_____|_____

11   ____|_____|_____|_____|_____

12   ____|_____|_____|_____|_____

13   ____|_____|_____|_____|_____

14   ____|_____|_____|_____|_____

15   ____|_____|_____|_____|_____

16   ____|_____|_____|_____|_____

17   ____|_____|_____|_____|_____

18

19   _____

20   Subscribed and sworn/affirmed before me

21   this _____ day of _____, 202__.

22

23   _____    _____

24     Notary Public        My Commission Expires

25

26

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

# REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

# REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL

# REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL

# REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL

REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL



REDACTED - CONFIDENTIAL