**MB MANDEL BHANDARI LLP**

80 Pine St | Fl 33 | New York, NY | 10005 | T. (212) 269-5600 | F. (646) 964-6667 | www.mandelbhandari.com

February 6, 2026

**BY ECF**

Hon. Trina L. Thompson
San Francisco Courthouse, Courtroom 9
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:   *Yotta Technologies Inc. v. Evolve Bank & Trust*, No. 3:24-cv-06456-TLT

Dear Judge Thompson,

     We represent Plaintiff Yotta Technologies, Inc. ("Yotta") and write in response to the Court's Questions for the Hearing (ECF No. 153).

**I.    Subject Matter Jurisdiction and Personal Jurisdiction**

     As set forth below, whether Yotta's principal place of business is in California or New York does not change the outcome regarding personal or subject matter jurisdiction, the UCL, or necessary parties. As a result, this Court need not make a determination as to the location of Yotta's principal place of business. *See, e.g. Unger v. Del E. Webb Corp.,* 233 F. Supp. 713, 715 (N.D. Cal. 1964) ("The Court need not determine where defendant's principal place of business is, so long as it is not [in the same state as Plaintiff]."); *Howell v. QS of Georgia, LLC,* No. 1:06-CV-479-TCB, 2007 WL 9702214, at *1 (N.D. Ga. Feb. 21, 2007) (same): *vanHooydonk v. MediPhysics, LLC*, No. 3-07-CV-0286-M, 2007 WL 9717518, at *1 (N.D. Tex. June 15, 2007) (since no party asserts defendant's principal place of business is in a location that would destroy diversity, the court need not determine where it is).

     **A.**    **Yotta's Principal Place of Business for Purposes of Subject Matter Jurisdiction**

     Evolve mischaracterizes Yotta's allegations. It is incorrect to argue that the existence of a virtual office in San Francisco is the only basis for concluding that Yotta's principal place of business is California. Yotta has been communicating with customers and vendors through its San Francisco office ever since it began doing business with customers. FAC ¶ 31. Yotta's Terms of Use states that "We, or our or Yotta means Yotta Technologies Inc. of 2261 Market Street #4313 San Francisco, CA 94114 and any related companies." *Id.* Yotta also uses its San Francisco address to communicate with third parties, including vendors. *Id.* After 2023, Yotta's sole office—not its "sole virtual office"—but its **only office** was its virtual office in California. *Id.* ¶ 34. Moreover, it makes sense that California would be the hub of Yotta's communications with

customers. Over 90,000 of Yotta's end-users have been California residents, more than any other state. *Id.* ¶ 32.

With respect to Yotta's statement in *Weiss v. Yotta Techs., Inc.*, No. 22-cv-08569, that it was located in New York, the complaint in that case was filed in 2022, when Yotta maintained an office in New York.[1] Yotta closed that office in early 2023. FAC ¶ 34. Yotta's answer in that case, filed later in 2023, presumably referred back to when the complaint was filed.

As the Supreme Court recognized in *Hertz Corp. v. Friend*, 559 U.S. 77, 95–96 (2010), "in this era of telecommuting, some corporations may divide their command and coordinating functions among officers who work at several different locations, perhaps communicating over the Internet." The Court went on to explain that the "test nonetheless points courts in a single direction, toward the center of overall direction, control, and coordination." *Id.*

Yotta's employees worked in different states, including California (*id*. ¶ 33), and after Yotta closed its New York office, it no longer had any office apart from its virtual one in California. FAC ¶ 34. Yotta's primary asset was its relationship with its customers, and the brick-and-mortar address that was most closely associated with those relationships was the San Francisco virtual office which served as its communications center.

Courts have recognized the challenges of identifying a principal place of business since COVID. *See, e.g. Cerco Bridge Loans 6 LLC v. Schenker*, 768 F. Supp. 3d 559, 573 (S.D.N.Y. 2025) ("After all, in the post-COVID-19 era ... substantially more employees telecommute… and many businesses have moved away from physical headquarters.) (internal citations omitted).

### B. Yotta's Principal Place of Business Has No Impact on this Court's Subject Matter Jurisdiction

With respect to subject matter jurisdiction, this Court has jurisdiction under 28 U.S.C. § 1332 as the matter in controversy in this action exceeds $75,000 and the parties are residents of different states. Evolve was organized under the laws of Arkansas and has its principal place of business in Tennessee. FAC ¶ 21. Yotta is a Delaware corporation. *Id.* Whether Yotta's principal place of business is in California or New York, there is total diversity of citizenship between Yotta and Evolve. A finding that Yotta is a New York corporation would have no impact on this Court's subject matter jurisdiction.

### C. Yotta's Principal Place of Business Has No Impact on this Court's Personal Jurisdiction over Yotta or Evolve

With respect to personal jurisdiction, by filing a complaint in this Court, Yotta has consented to personal jurisdiction. *See, e.g. Romero v. Citibank USA, Nat. Ass'n*, 551 F. Supp. 2d 1010,

---

[1] The *Weiss* complaint mis-stated the address of Yotta's New York office.

1014 (E.D. Cal. 2008). The location of Yotta's principal place of business is irrelevant to this consent.

The Court also has personal jurisdiction over Evolve regardless of Yotta's principal place of business. As set forth more fully below, Evolve's decision not to move for dismissal on the basis of personal jurisdiction renders it subject to this Court's jurisdiction. The location of Yotta's principal place of business similarly has no impact on this waiver.

### D. The Court Has Personal Jurisdiction over Evolve

This Court unquestionably has personal jurisdiction over Evolve. Personal jurisdiction is a waivable right. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985); *see also Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."); *S.E.C. v. Blazon Corp.*, 609 F.2d 960, 965 (9th Cir. 1979) ("A defendant cannot waive his right to assert a lack of subject matter jurisdiction, but he can confer jurisdiction over his person upon a court otherwise lacking that jurisdiction by expressly consenting to it.")

Under FRCP 12(b)(2) a party may assert "lack of personal jurisdiction" as a defense in a motion to dismiss. Under FRCP 12(h)(1)(A), if a party moves to dismiss but omits lack of personal jurisdiction as a basis to dismiss, **that party waives any argument regarding personal jurisdiction and is subject to the Court's jurisdiction**. FRCP 12(b)(h); *Ward v. Certain Underwriters at Lloyd's of London*, No. 18-CV-07551-JCS, 2019 WL 2076991, at *3 (N.D. Cal. May 10, 2019) ("Because the Underwriters have not moved under Rule 12(b)(2) to dismiss for lack of personal jurisdiction, they have waived any objection and are subject to this Court's personal jurisdiction."). Evolve did not assert a lack of personal jurisdiction as a defense in its Motion to Dismiss the original complaint (ECF No. 27), its Motion to Dismiss the Amended Complaint (ECF No. 65), or its Motion to Dismiss Pursuant to Rule 12(b)(7) on the ground that Synapse is a necessary party that has not been named (ECF No. 107). Accordingly, that defense is waived, and this Court has personal jurisdiction over Evolve. *See, e.g. Thomas v. Ampersand, Inc.*, No. 25-CV-05835-RFL, 2025 WL 3451481, at *1 (N.D. Cal. Dec. 1, 2025) (failure to object to personal jurisdiction renders defendant subject to the court's jurisdiction); *Agasino v. Am. Airlines Inc., No.* 19-CV-03243-LB, 2019 WL 3387803, at *3 (N.D. Cal. July 26, 2019) (by failing to move to dismiss for lack of personal jurisdiction, defendant "has waived any personal-jurisdiction arguments and is subject to personal jurisdiction here with respect to this case."). *Rosasen v. Kingdom of Norway*, No. 221CV06811JWHSP, 2022 WL 409679, at *5 (C.D. Cal. Feb. 10, 2022) ("a party may waive personal jurisdiction, so considering the issue sua sponte may be premature and prejudicial to plaintiff.").

Given Evolve's waiver, further analysis of its relationship to California is unnecessary.

However, even if Evolve had not waived jurisdiction, its activities are more than sufficient to confer jurisdiction in this State.[2] As identified in this Court's questions, the Ninth Circuit set forth the standard for specific jurisdiction over a defendant in *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004):

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

The *Schwarzenegger* test is easily met here.

As to the first prong of *Schwarzenegger*, a plaintiff only needs to show that the defendant has: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, No. 2:20-CV-08222 AB (EX), 2021 WL 3265013, at *2 (C.D. Cal. Apr. 8, 2021).

With respect to (1), Evolve clearly engaged in intentional acts. Evolve signed customer agreements with tens of thousands of California residents who opened Evolve bank accounts because of their relationship with Yotta. FAC ¶¶ 53-54. Evolve appointed Synapse—a California company—as its agent with respect to servicing its fintech programs including Yotta. *Id.* ¶¶ 179-183. Through Evolve's agreements with Synapse, Synapse conducted services for Evolve in California while Evolve retained full control and oversight over the programs. *Id.* Evolve's executives met with Synapse in California to plan and carry out Evolve's fraudulent scheme. *Id.* ¶140.

With respect to (2), that conduct was expressly aimed at the forum state. Evolve delivered a data stream to Synapse in California that was supposed to more-or-less instantaneously report on a customer-level any and all transactions that it effected. *Id.* ¶¶ 49, 244. That data stream contained false information and was sent to Synapse in California for the purpose of providing the data to

---

[2] Yotta includes this analysis in an effort to fully respond to the Court's questions but submits that this analysis is unnecessary as Evolve has waived jurisdiction. Moreover, even if Evolve had not waived jurisdiction, since it has not moved for dismissal based on a lack of personal jurisdiction, Yotta bears no burden to demonstrate jurisdiction. *See, e.g. Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, No. 2:20-CV-08222 AB (EX), 2021 WL 3265013, at *1 (C.D. Cal. Apr. 8, 2021) ("Once a defendant moves to dismiss, the plaintiff bears the burden of demonstrating the court's jurisdiction over the moving defendant.")

Yotta and its end users. *Id.* Over 90,000 of Yotta's end users were California residents. *Id.* ¶ 32. More of Yotta's end users reside in California than any other state, and Evolve's relationship with Yotta gave it access to those end users. *Id.* ¶¶ 32, 97-98. Those end users opened accounts directly with Evolve and signed onto Evolve's customer agreements, which were provided by Synapse—a California entity. *Id.* ¶¶ 55-56, 98. Finally, Yotta's end users received false information from Evolve through its California agent, Synapse. *Id.* ¶¶ 49, 244. *See, e.g. Diaz v. One Techs., LLC*, No. 22-55190, 2023 WL 6633842, at *1 (9th Cir. Oct. 12, 2023) ("[f]or purposes of personal jurisdiction, the actions of an agent are attributable to the principal.").

These facts fit squarely into case law finding that defendant's conduct was expressly aimed at California. *See, e.g.* R*odriguez v. Aquatic Sales Sols. LLC*, 735 F. Supp. 3d 1208, 1224 (C.D. Cal. 2024) (defendant's conduct expressly aimed at California where it operated an interactive website and 12% of its total sales were made to California); *Harman Int'l Indus.*, 2021 WL 3265013, at *3 (defendant "expressly aimed" acts at California where it had "actual knowledge" that its products will be sold in California); *see also Ballard v. Savage,* 65 F.3d 1495, 1499 (9th Cir. 1995) (reversing trial court's dismissal for lack of personal jurisdiction because "[b]y intentionally doing business with California and U.S. residents, the Bank 'purposefully availed itself of the benefit and privilege of conducting activities in California' and the United States.")

As to (3), Evolve could reasonably anticipate that Yotta would suffer harm in California. California was Yotta's largest market, with the greatest number of end users of any state. Again, Evolve knew that tens of thousands of end users were in California because those end users opened accounts at Evolve and had to provide the bank with know-your-customer disclosures. Evolve harmed Yotta by destroying its reputation with these end users and with prospective end users. *See, e.g. Harman Int'l Indus.*, 2021 WL 3265013, at *4 (noting that there only needs to be a "jurisdictionally sufficient amount of harm ... suffered in the forum state, it does not matter that even more harm might have been suffered in another state," and holding that defendant's sale of infringing items in California is sufficient harm because it would be "particularly impactful in the state.")

With respect to the second prong of *Schwarzenegger*, the claims arise directly out of Evolve's conduct in California. Among other things, Evolve (i) appointed its California agent—Synapse—to service these programs, (ii) communicated false information through the data stream of account information it sent to Yotta and end users via Synapse, and (iii) communicated false information in its customer agreements—which were provided by Synapse to end users, including tens of thousands in California—about the fees it was charging, the accuracy of its account statements, and its compliance with federal banking law and regulations. FAC ¶¶ 54, 56, 58-63, 66-71, 179-181, 244. As a result of Evolve's fraud, negligence, and unfair conduct, Yotta's reputation was damaged irreparably. That damage came as a direct result of its customers, including its California customers, losing their bank funds. *Id.* ¶¶ 15, 101-102.

As to the third and final *Schwarzenegger* prong, once the plaintiff satisfies the first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Rodriguez* 735 F. Supp. 3d at 1225. Evolve has not even attempted such a showing as it has waived any defense based on personal jurisdiction. But in any

event, it is fair and just for Evolve to be subject to this court's jurisdiction. Evolve operated branches in California at the time the lawsuit was filed, appointed a California agent to service its fintech programs, is registered to do business in California, and appointed a local agent for services of process. FAC ¶¶ 19, 23. Evolve knew that it had opened more accounts for Yotta end users in California than in any other state.

Finally, a finding by the Court that Yotta is a New York corporation would not change this outcome. Courts routinely hold that conduct occurring in California that destroys the California-based value of a company or product is sufficient to confer specific jurisdiction in California regardless of whether the plaintiff is a California company. *See, e.g. Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1232 (9th Cir. 2011) (even though neither plaintiff nor defendant are residents of California, "[b]ecause [Defendant's] actions destroyed this California-based value, a jurisdictionally significant amount of [Plaintiff's] economic harm took place in California."); *see also iYogi Holding Pvt. Ltd. v. Secure Remote Support, Inc*., No. C-11-0592 CW, 2011 WL 6291793, at *9 (N.D. Cal. Oct. 25, 2011)*, report and recommendation adopted sub nom. Iyogi Holding PVT Ltd. v. Secure Remote Support Inc.,* No. C 11-0592 CW, 2011 WL 6260364 (N.D. Cal. Dec. 15, 2011) (finding jurisdiction over defendants even where no parties were residents of California because defendants knew their acts would cause harm to plaintiff in California by damaging plaintiff's "business, reputation and goodwill…")

Evolve is well aware that its contacts with California are sufficient to render it subject to the jurisdiction of California courts. Again, Evolve did not assert a lack of personal jurisdiction as a defense in any of its motions to dismiss. This omission was not accidental. Evolve Bancorp. Inc., which is Evolve's parent, was originally named as a defendant in this action. It did move for dismissal based on lack of personal jurisdiction. Evolve Bancorp Inc.'s motion was based on an argument that it—unlike Evolve—did not have sufficient contact with the state of California. ECF No. 29. Evolve is without question subject to personal jurisdiction here.

## II.     Yotta's Citizenship and the California UCL

Yotta's citizenship is also irrelevant to the determination of whether the UCL applies. The UCL applies because a meaningful portion of the conduct at issue occurred in California. *See, e.g., TRC & Assocs. v. NuScience Corp.*, No. 2:13-CV-6903-ODW CWX, 2013 WL 6073004, at *1, 5 (C.D. Cal. Nov. 18, 2013) (Ohio plaintiff successfully stated UCL claim against California manufacturer and Florida distributor because "the relationship between [the manufacturer and distributor] gives rise to a reasonable inference that [the distributor] had some role in" "material misrepresentations originating in California with [the manufacturer].");  *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 340 (N.D. Cal. 2010) (UCL applied to claim that fireplaces were deceptively marketed where fireplaces were partially manufactured in California.); *People v. JTH Tax, Inc.*, 212 Cal. App. 4th 1219, 1242-47 (Cal. Ct. App. 2013) (Holding that Virginia franchisor was liable for California franchisee's advertising because it controlled the advertising and "persons can be found liable for … unfair business practices under normal agency theory.")

Evolve's cases do not suggest otherwise. In *Castagnola v. Hewlett-Packard Co.*, No. C 11-05772 JSW, 2012 WL 2159385, at *4 (N.D. Cal. June 13, 2012), the court dismissed the UCL

claim because plaintiffs did "not include any allegations that [the California defendant] had any input on the language used on the [supposedly false] webpage." *Standfacts Credit Servs., Inc. v. Experian Info. Sols., Inc.*, 405 F. Supp. 2d 1141, 1148 (C.D. Cal. 2005), involved an antitrust class action against three competitors—not an action against a bank that directed its California agent to disseminate its false account statements to its depositors and other misrepresentations from California.

### III. Synapse Is Not a Necessary Party

#### A. The Regulatory Proceedings Are a Red Herring

The Court inquired about whether Synapse's participation in regulatory proceedings satisfies the "claim" requirement in Rule 19. To the extent that Synapse has participated in regulatory proceedings, that participation has not satisfied the claim requirement. Nor does Synapse have a legally protected interest in the instant action as a result of a supposed enhanced risk of regulatory scrutiny.

Rule 19(1)(B) states that a person is a necessary party under that provision only when, among other things, "that person **claims** an interest relating to the subject of the action." (Emphasis added.) This unambiguous text uses "claims" as a verb and requires that the person affirmatively assert its interest. Consistent with this text, the Ninth Circuit has specifically held on numerous occasions that a person was not a necessary party because the person had not affirmatively claimed an interest in the case. *United Prods. & Tech. Ltd. v. Above Edge, LLC*, No. 24-2834, 2025 WL 1692761, at *2 (9th Cir. June 17, 2025) ("The record indicates that Imperial has been notified of this action and has not asserted an interest. The district court therefore did not err in entering judgment without joining Imperial."); *Roberts v. City of Fairbanks*, 947 F.3d 1191, 1204 (9th Cir. 2020) ("The State of Alaska is not a necessary party here because it has not claimed any interest relating to the subject of this action, as confirmed by Defendants."); *Altmann v. Republic of Austria*, 317 F.3d 954, 971 (9th Cir. 2002), *opinion amended on denial of reh'g*, 327 F.3d 1246 (9th Cir. 2003), and *aff'd on other grounds*, 541 U.S. 677 (2004) ("Given that all necessary parties are aware of the litigation and have chosen not to claim an interest, joinder of these parties is unnecessary to this suit."); *In re Cnty. of Orange*, 262 F.3d 1014, 1023 (9th Cir. 2001) ("Orange County cannot claim that the districts have a legally protected interest in the action unless the districts themselves claim that they have such an interest, and the districts have been silent."); *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999) ("Here, Sterilization Systems was aware of this action and chose not to claim an interest. That being so, the district court did not err by holding that joinder was "unnecessary.") (reading *Northrop Corp. v. McDonnell Douglas Corp.*, 706 F.2d 1030 (9th Cir. 1983), *Thomas, Head and Greisen Employees Trust v. Buster*, 95 F.3d 1149, 1460 n.18 (9th Cir. 1996), *United States ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 908 (9th Cir. 1994) as holding mas much); *Northrop*, 705 F.2d at 1043 (Government is not a necessary party where it "has never asserted a formal interest.")

*White v. Univ. of California*, 765 F.3d 1010, 1026-27 (9th Cir. 2014), is not to the contrary. In that case, the question was whether Indian Tribes were necessary parties in an action relating to how human remains would be treated. *Id.* The Ninth Circuit found that "[h]ere, the Repatriation

Committee has made formal claims to the La Jolla remains on behalf of the Kumeyaay Tribes." *Id*. at 1027; *see also id.* at 1015-16 ("The Tribes and their representatives claim the right to compel repatriation of the La Jolla remains to one of the Kumeyaay Nation's member tribes."). Because the Tribes had made formal claims to the remains, the Ninth Circuit had no reason to reach the question of whether anything short of the assertion of a formal claim could satisfy Rule 19's claim requirement. Even though it did not reach the question, in *dicta*, the court made clear that, in order for the interest to satisfy Rule 19, it must be "a claimed interest." *Id.* at 1026-27 (internal quotation marks omitted). Similarly, in *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002), the necessary party—the Navajo Nation—had repeatedly affirmatively asserted an interest in the action. *Id.* ("The Nation strenuously emphasizes the importance of the hiring preference policy to its economic well-being. In fact, the Nation asserts that '[without the hiring preference provision], the Navajo Nation leadership would never have approved this lease agreement.'"); *accord Salt River Project Agr. Imp. & Power Dist. v. Dawavendewa*, 528 U.S. 1098 (2000) (granting Navajo Nation leave to file brief as *amicus curiae*).

There is not a scintilla of evidence that, in the course of the regulatory proceedings, Synapse claimed an interest in this case. In fact, Synapse faces no meaningful risk of prospective regulatory scrutiny. Evolve points to three regulatory proceedings. Each will be addressed in turn.

First, the United States Consumer Finance Protection Bureau ("CFPB") entered into a consent decree with Synapse in which Synapse agreed to pay one dollar and forever cease engaging in the fintech business. ECF No. 107-5 ¶¶ 15, 18. It was necessary for the CFPB to obtain a favorable judgment against Synapse (or another person or entity) in order for the agency to use its Civil Penalty Fund to compensate end users for the moneys that Evolve and/or Synapse misappropriated or dissipated. ECF No. 107-6.; *In re Synapse Financial Techs., Inc.*, 1:24-bk-10646 (C.D. Cal. Bankr.), ECF No. 638 at 6 (the "Settlement Motion"). It was Synapse—not the CFPB—who asked the Bankruptcy Court to approve the consent decree. Settlement Motion at 2. In approving the consent decree, the Bankruptcy Court ruled that the settlement was "exceedingly favorable to" and "a fantastic result for creditors" of Synapse. *In re Synapse Financial Techs., Inc.*, 1:24-bk-10646 (C.D. Cal. Bankr.) ECF No. 675 at 12. The CFPB then announced that it would use its Civil Penalty Fund moneys to pay Synapse end users $46,248,291.[3] Whatever claims the CFPB had against Synapse have been resolved and there is no threat of prospective regulatory scrutiny of Synapse by the agency. The fact that the CFPB believed end users should receive $46 million but decided to seek only $1 from Synapse confirms that no regulator or enforcement authority is going to seek money from Synapse. And the fact that Synapse is permanently barred from doing business means that there is no reason for any regulator to use its resources to pursue injunctive relief. Nor did Synapse somehow claim an interest in the above-captioned action when it embraced a settlement with the CFPB that provided for the payment of its creditors.

Second, Evolve points to a FINRA enforcement action. In support of the instant motion, Evolve's counsel testified that "[o]n or about August 28, 2025, the Financial Industry Regulatory

---

[3] *See* Ex. A at 3, available at https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/civil-penalty-fund/.

Authority ("FINRA"), which is a self-regulatory organization [that] is under the oversight of the Securities Exchange Commission ("SEC"), filed a complaint **against Synapse**." ECF No. 107-1 ¶ 12 (emphasis added). That is false. In reality, FINRA filed a complaint against two former employees of Synapse Brokerage, which is a subsidiary of Synapse. FINRA decided not to bring an enforcement action against Synapse Brokerage, or, to the extent it could do so, Synapse. ECF No. 107-7 at p.1 ¶¶ 6, 11, 14. The fact that FINRA did not bring an enforcement action against Synapse Brokerage or Synapse confirms that no regulator is going to go do so. Because Synapse was not a party to the FINRA proceeding, it could not have claimed an interest in the instant action through that proceeding.

Third, Evolve points to a grand jury subpoena that a former Synapse employee received more than a year ago. ECF No. 148 at 3. More than a year has passed since the issuance of the subpoena, but it remains possible that criminal charges will be filed against Evolve, Evolve executives, and/or former Synapse executives. Because Synapse is penniless and permanently out of business, there is no reason for prosecutors to waste taxpayer dollars prosecuting the defunct business. *Cf. Fid. & Cas. Co. of New York v. Tillman Corp.*, 112 F.3d 302, 304 (7th Cir. 1997) ("Layden lacks the assets to pay a judgment and is not apt to acquire them later (his expertise in the insurance business has been rendered worthless by the nature of his crime), so as a practical matter no one is going to sue him."); *United States v. Running*, 7 F.3d 1293, 1296 (7th Cir. 1993) ("At trial, the government abandoned its claims against the two corporations because they were defunct.") There is no evidence that Synapse participated in the grand jury proceeding, nevermind any indication that it actually asserted an interest in the instant action in connection with that proceeding. After all, why would Synapse indirectly express an interest in this action in that proceeding when it could have effortlessly done so while producing massive amounts of information in the instant case? ECF No. 143-1 ¶¶ 8-9.

To the extent that Synapse's former executives are actually facing any prospective regulatory scrutiny, they have not claimed an interest in this action. Nor could they do so on behalf of Synapse because their interests are not necessarily aligned with those of Synapse. While Synapse has an obligation to maximize the payments received by its creditors, the former executives have no such obligation, and may very well prioritize other goals.

Evolve does not point to a single case in which a court found that a person was a necessary party because it faced a heightened risk of regulatory scrutiny. And countless courts have rejected such arguments. *See Ward v. Apple Inc.*, 791 F.3d 1041, 1050–51 (9th Cir. 2015) (leaving open the question of whether "the risk of regulatory scrutiny" could ever be a legally protected interest under Rule 19(a) and holding that there was no showing of increased regulatory risk in that case); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 2018 WL 11241771, at *13 (C.D. Cal. Apr. 11, 2018) (holding that risk that physicians would lose their license to practice medicine did not render physicians necessary parties); *Peltz v. State Farm Mut. Auto. Ins. Co.*, 538 F. Supp. 3d 498, 506 (W.D. Pa. 2021) (non-party was not necessary party despite pendency of criminal charges against non-party that raised at least some of the same issues as the civil action). The reason for this is obvious: the adjudication of the instant claims will not adversely affect Synapse's ability to defend itself in a future regulatory proceeding. *See Peltz*, 538 F. Supp. 3d at 506 ("Peltz bears the burden to prove that the vehicle was stolen, and that coverage is owed. A

finding of theft here would not prevent Haven from seeking to establish in a separate criminal proceeding that its possession is lawful. Thus, joinder is not required based on State Farm's speculation as to Haven's assertion of legal rights to the vehicle.")

> B. **Synapse's Possession of Relevant Information Does Not Transform It into a Necessary Party**

The Court inquires as to how Synapse's possession of information relevant to the instant action could render it a necessary party. It cannot:

> Ms. Levine also argues that she cannot take discovery of Mr. Levine unless he is joined as a party under Rule 19 and is therefore thwarted from presenting a defense. Again, this statement is wrong as a matter of law. Ms. Levine is free to seek discovery of Mr. Levine, regardless of whether he is a party or not. See Fed. R. Civ. P. 45 (establishing rules for taking discovery of non-parties).

*Travelers Prop. Cas. Co. of Am. v. Levine*, No. 17-CV-07344-LB, 2018 WL 3377692, at *3 (N.D. Cal. July 11, 2018) (footnote omitted).

> C. **Even if Synapse Is a Necessary Party, this Action Cannot Be Dismissed**

For all of the reasons set forth in Yotta's Brief (ECF No. 143), Synapse is not a necessary party. Even if Synapse were a necessary party, under Ninth Circuit case law, this action cannot be dismissed because Evolve can implead Synapse without destroying this Court's diversity jurisdiction. *See id.* at 13. Even Evolve does not dispute that diversity jurisdiction would be undisturbed if it impleaded Synapse. However, if this Court were to reject impleading Synapse, the Court still might not need to determine Yotta's principal place of business.

Yotta is incorporated in Delaware, which means it has Delaware citizenship for diversity jurisdiction purposes. 28 U.S.C.§ 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of ever State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business[.]") In responding to the Court's questions, we realized that Synapse may also be incorporated in Delaware. A shareholder resolution attached to Synapse's initial bankruptcy petition stated that, in April 2024, it was a Delaware corporation. *In re Synapse Financial Technologies, Inc.*, No. 1:24-bk-10646-MB (C.D. Cal. Bankr.), ECF No. 1 at 27. The Delaware Department of State's website indicates that a company named Synapse Financial Technologies, Inc. was incorporated in Delaware in 2016. Given the timing, we have not had an opportunity to definitely determine whether Synapse is currently incorporated in Delaware. Again, Synapse is not a necessary or indispensable party under Rule 19. However, if it were and if it is incorporated in Delaware, this Court would not possess diversity jurisdiction over this action without regard to Yotta's principal place of business for diversity jurisdiction purposes.

      Finally, *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365 (1978), is no bar to this Court having subject matter jurisdiction over the instant action. In 1990—more than a decade after *Owen* was decided—Congress enacted our nation's first supplemental jurisdiction statute, 28 U.S.C. § 1367. Instead of "assuming that § 1367… codif[ied] the existing state of the law of supplemental jurisdiction…. [o]rdinary principles of statutory construction apply. In order to determine the scope of supplemental jurisdiction authorized by § 1367, then, we must examine the statute's text in light of context, structure, and related statutory provisions" rather than the case law that predates the statute. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). Evolve argues that *Owen* stands for the proposition that a plaintiff may not "'defeat the statutory requirement of complete diversity by the simple expedient of suing only those defendants who were of diverse citizenship and waiting for them to implead nondiverse defendants.'" ECF NO. 148 at 2 (*quoting Oweni,* 437 U.S. at 374-75). In enacting Section 1367, Congress rejected that *dicta*. In any event, *Owen* is entirely distinguishable. There, after a plaintiff sued the defendant and the defendant impleaded a third-party, the plaintiff asserted "a new an independent" claim again the non-diverse third-party even though the claim "depended not at all upon whether or not [the original defendant] was liable." The independence of the claim was critical to the Court's analysis because prior case law recognized that supplemental jurisdiction existed when the "third-party complaint depends at least in part upon the resolution of the primary lawsuit." *Id.* at 376. In contrast, here, (1) Yotta will not assert any claims against Synapse if Evolve impleads it and (2) any claims that Yotta could assert against Synapse would be the very same claims that have already been asserted against Evolve, rather than "new and independent" claims.

      Respectfully submitted,

      /s/ Rishi Bhandari

      Rishi Bhandari