ARAVIND SWAMINATHAN (PRO HAC VICE)
aswaminathan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101
Telephone:  +1 206 839 4300
Facsimile:  +1 206 839 4301

MARC R. SHAPIRO (PRO HAC VICE)
mrshapiro@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:  +1 212 506 3546
Facsimile:  +1 212 506 5151

SARAH DAVIS (STATE BAR NO. 275145)
sdavis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:  +1 415 773 5700
Facsimile:  +1 415 773 5759

Attorneys for Defendant
Evolve Bank & Trust

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOTTA TECHNOLOGIES INC., <br><br> Plaintiff, <br><br> v. <br><br> EVOLVE BANK & TRUST, <br><br> Defendant. | Case No. 3:24 CV-06456-TLT <br><br> **EVOLVE BANK & TRUST'S RESPONSES TO QUESTIONS FOR THE HEARING** <br><br> Date:    February 10, 2026 <br> Time:    2:00 p.m. <br> Courtroom: 9, 19th Floor <br> Judge:   Hon. Trina L. Thompson <br> Trial Date: June 21, 2027 <br> Date Action Filed:  Sept. 13, 2024 |

I. **Evolve's Responses to the Court's Questions Regarding Personal Jurisdiction and UCL Standing (Questions I.A.ii & I.A.iii.a)**

Courts within the Ninth Circuit have recognized that considering personal jurisdiction *sua sponte* "is necessary and appropriate when the allegations in the complaint do not establish a basis for the court's exercise of personal jurisdiction." *Shoaga v. Blosada*, 2006 WL 6929450, at *8 (N.D. Cal. Jan. 24, 2006); *see also Wood v. Santa Barbara Chamber of Com., Inc.*, 705 F.2d 1515, 1518, 1522 (9th Cir. 1983) (affirming district court's *sua sponte* dismissal of defendants for lack of personal jurisdiction). Here, as the Court has recognized, Yotta prevaricated about whether its principal place of business is in California or New York in both the Complaint and FAC. *See, e.g.*, Compl. ¶ 17; ECF No. 54 (MTD Order) at 1; FAC ¶ 18. If the Court finds that Yotta is a citizen of New York, that finding would undermine the bases for both personal jurisdiction over Evolve and Yotta's standing to assert UCL claims.[1]

**Personal Jurisdiction.** Yotta being a New York citizen eliminates any basis for this Court to exercise personal jurisdiction over Evolve. Courts within the Ninth Circuit employ a three-part minimum contacts test for specific jurisdiction. ECF No. 153 at 2. Specifically, where a Court is dealing with a non-resident defendant, the Ninth Circuit demands that:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id*. If the plaintiff does so, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

---

[1] To the extent the Court is asking whether there would still be diversity jurisdiction over this action if Yotta is found to be a citizen of New York, the answer is yes because Yotta would still be diverse to Evolve, an Arkansas-chartered bank with its principal place of business in Tennessee.

To satisfy "the second prong of specific jurisdiction Plaintiff[] must establish 'a strong relationship among the defendant, forum, and the litigation.'" *Sheppard v. Fantasia Trading LLC*, 2024 WL 3707825, at *9 (C.D. Cal. July 26, 2024) (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365–66 (2021)). In particular, the Ninth Circuit has "long understood that for an injury to arise out of a defendant's forum contacts required 'but for' causation, in which a direct nexus exists between a defendant's contacts with the forum state and the cause of action." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504 (9th Cir. 2023) (cleaned up). While a claim can "relate[] to" a forum without such causation, the Supreme Court has emphasized that this phrase "incorporates real limits," *Ford*, 592 U.S. at 362, and requires that "[p]laintiff['s] alleged harm" must "occur in the forum where [the defendant] is sued," *Sheppard*, 2024 WL 3707825, at *9; *cf. Briskin v. Shopify, Inc.*, 135 F.4th 739, 760 (9th Cir. 2025) (en banc) (finding personal jurisdiction when defendant injured plaintiff it "knew was in California").

So, if Yotta is not a California citizen, it must plead facts showing that *its* purported injury arises out of or relates to *Evolve's* contacts with California. It doesn't. And "[t]he Ninth Circuit 'is clear that allegations of jurisdiction over each defendant must be established individually.'" *Loza v. Operation Influence LLC*, 2025 U.S. Dist. LEXIS 210337, at *6-7 (C.D. Cal. Oct. 23, 2025) (quoting *Seldin v. HSN, Inc.*, 2018 WL 3570308, at *8 (S.D. Cal. July 25, 2018)). But Yotta's allegations that this Court has jurisdiction over *Evolve* are based on (i) the residence and actions of *Synapse*; or (ii) conclusory legal assertions; or (iii) a combination of the two. *See* FAC ¶¶ 23–24, 49, 70, 140, 244–45. All are insufficient as a matter of law. *See Antaris Techs., Inc. v. Matthews,* 2025 WL 1939868, at *2-3 (N.D. Cal. July 15, 2025) (dismissing complaint for lack of personal jurisdiction where plaintiffs "did not plead facts sufficient to support" their conclusory allegations of personal jurisdiction); *Allen v. Shutterfly, Inc.*, 2020 WL 5517170, at *4 (N.D. Cal. Sep. 14, 2020) (holding the "portions of the [c]omplaint [p]laintiff cites for establishing [a] prima facie [showing] of personal jurisdiction are too conclusory to state a claim").

As the chart below shows, Yotta's allegations attempting to tie its claims to California[2] are limited to seven paragraphs of the FAC, each of which is insufficient. For example, Paragraph 23 alleges that Evolve "purposefully directed its activities at California, including through its relationship and contacts with Synapse, which included numerous meetings in and contacts with California, and the subject matter of this lawsuit and Yotta's claims arise out of and are related to that relationship and those meetings." FAC ¶ 23. This is a classic legal conclusion that does not identify any specific conduct by Evolve in California, much less a time, place, or date that it occurred or how it harmed Yotta in any way. *See Hangzhou Yilin Tech. Rsch. Co.*, *v. Zero Techs.*, *LLC*, No. CV 25-8717, 2025 U.S. Dist. LEXIS 188167, at *1-2 (C.D. Cal. Sept. 23, 2025) (finding allegations that "a substantial part of the events giving rise to this action involve the marketing, sale, and consumer confusion . . . in this District, and [d]efendant . . . directs business and derives substantial revenue from California consumers" were "conclusory allegations [that] are insufficient to support venue or personal jurisdiction"). Examining each allegation specifically:

| ¶ No. | Allegation | Reason Insufficient |
|---|---|---|
| 23 | Evolve "purposefully directed its activities at California, including through its relationship and contacts with Synapse, which included numerous meetings in and contacts with California, and the subject matter of this lawsuit and Yotta's claims arise out of and are related to that relationship and those meetings." | Conclusory. This is a classic legal conclusion that does not identify any specific conduct by Evolve in California, much less a time, place, or date that it occurred or how it harmed Yotta in any way. |
| 24 | "Evolve perpetrated its fraud in San Francisco, California, and regularly visited San Francisco to further its fraudulent scheme." | Conclusory and devoid of factual support. |

---

[2] Paragraphs 19, 23, and 36 allege that Evolve has "locations in California[,]" but those two locations were limited-service mortgage offices that are not alleged to have any connection to Yotta's claims, which all relate to representations regarding accounts opened through the Yotta app. FAC ¶¶ 19, 23, 36; *see also* ECF No. 54 at 16-17 (dismissing UCL claim finding Yotta's allegations that Evolve had locations in California insufficient to connect Yotta's claims to California).

| ¶ No. | Allegation | Reason Insufficient |
|---|---|---|
| 49 | "Evolve delivered a data stream to Synapse in California . . . .  Pursuant to the parties' agreement [between Synapse and Evolve], *Synapse* analyzed and organized Evolve's data stream from its California headquarters.  *Synapse* delivered this data electronically and continuously to Yotta." (emphasis added). | Makes clear that *Synapse* (in California), and *not Evolve*, obtained, analyzed and processed transaction data, and then delivered this data directly to Yotta. |
| 70 | ". . . To take another example, if a user wanted to direct deposit her paycheck . . . [t]he employer would then deliver the funds to Evolve.  Evolve would report the transaction to Synapse in California, and in California, *Synapse* would calculate the new account balance and, from California, *disseminate* the transaction and account balance information to Yotta and its end user." (emphasis added). | Again, makes clear that *Synapse* (in California) was the entity responsible for the taking transaction data, calculating account balances for Yotta users, and then sending that information to Yotta and its end users. |
| 140 | "Evolve planned and carried out a fraudulent scheme in California.  For instance, Evolve CEO Scott [sic] Lenoir met with Synapse in San Francisco, California on January 22, 2018, February 27, 2019, and August 2, 2021.  Evolve senior executive Hank Word met with Synapse in San Francisco, California on September 3, 2019, August 2, 2021, September 8, 2022, and September 9, 2022.  The purpose of these meetings and other meetings that Evolve attended in California was to plan and carry out Evolve's fraudulent scheme." | Conclusory allegations that establish only that Evolve met with Synapse.  Alleges no facts suggesting that the purpose of meetings between contracted parties Synapse and Evolve was "to plan and carry out Evolve's fraudulent scheme." |
| 244 | Evolve's alleged "misrepresentations were created in California, disseminated in California, and received in California . . . .  In California, Synapse – under Evolve's control – would input the information provided by Evolve into its systems, use the provided information to compute the account balances, and then disseminate the transaction and balance | Conclusory.  The allegation fails to identify any statements to Yotta *by Evolve* that were created, disseminated, or received in California.  Allegation of "control" over Synapse lacks any factual support and constitutes a legal conclusion. |

| ¶ No. | Allegation | Reason Insufficient |
|---|---|---|
|  | information to Yotta and users.  For the avoidance of doubt, all of these operations occurred in California." | Also, admits that Synapse was the entity responsible for the ledger calculations and disseminating that information to Yotta and end users. |
| 245 | "Yotta was also injured by Evolve's malfeasance in California.  Since early 2023, Yotta's sole office has been a virtual office in California . . . .  Yotta has also had employees who resided and worked from California.  *For the purposes of the UCL*, Yotta resides in and was injured in California." (emphasis added). | Conclusory.  There are no allegations that any Yotta employee in California received any alleged misrepresentations and no factual explanation of how a New York company was injured in California. |

For these reasons—because none of the allegations plead facts showing that *Yotta's* injuries arise out of or relate to *Evolve's* contacts with California—this Court has no personal jurisdiction over Yotta or Evolve.

**UCL Standing.**  Yotta's New York citizenship combined with the above-described fundamental pleading defects also mean that Yotta lacks standing to assert a UCL claim.  As this Court explained when it granted Evolve's first motion to dismiss Yotta's UCL claim for lack of standing: "The critical issues are whether the injury occurred in California and whether the conduct [of the defendant] occurred in California."  ECF 54 at 16 (quoting *Tidenerg v. Bidz.com, Inc.*, 2009 WL 605249, at *4 (N.D. Cal. Mar. 4, 2009)).

If the Court finds that Yotta is a New York citizen, that eliminates any even arguable basis for UCL standing.  "Simply put, the UCL does not apply to actions occurring outside of California that injure non-residents."  *Ehret v. Uber Techs. Inc.*, 68 F. Supp. 3d 1121, 1130 (N.D. Cal. 2014).  As reflected in the chart above, there are simply no allegations that any Yotta employee in California received any of the alleged misrepresentations by Evolve; nor is there any factual explanation for how a New York company was injured in California.  *See* FAC ¶ 245.  Indeed, none of the allegations above indicate, much less establish, that conduct *by Evolve* in California supports liability under the UCL.

1    Nor does the FAC contain any particularly pled facts that show any wrongful conduct by Evolve in California.  Yotta summarily claims that Evolve's alleged "misrepresentations [about account balances] were created in California, disseminated in California, and received in California[.]"  FAC ¶ 244.  But the non-conclusory facts pled in support of that allegation tell a different story.  Indeed, Yotta admits—as it must—that *Synapse*, not Evolve, is the entity that transmitted statements and balance information to Yotta.  *Id.*  And Yotta's original Complaint admitted that Synapse combined Evolve-provided data with its own data before transmitting the statements to Yotta and its end users.  Compl. ¶ 40; *see also* ECF No. 54 at 2.  In its FAC, Yotta did not even attempt to add facts to tie its other purported bases for its UCL claim, *e.g.*, allegedly violating "the program, recordkeeping and reporting, and compliance requirements of the Bank Secrecy Act" (FAC ¶ 242), to California.  Thus, the Court's prior order dismissing the UCL claim for lack of standing because Yotta failed to plead facts to show either that "alleged misconduct occurred in California" or that *Evolve's* "operations or decisions that resulted in the misconduct occurred in California" applies with equal force to the FAC.  ECF No. 54 at 16.

Finally, Yotta cannot establish UCL standing as to Evolve based on conduct by Synapse.  ECF No. 80 (Reply) at 11-13.  To the contrary, it is well-established that a "claim under section 17200 [the UCL] cannot be predicated on vicarious liability."  *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002).  Instead, a "defendant's liability must be based on his personal 'participation in the unlawful practices' and 'unbridled control' over the practices that are found to violate" the UCL.  *Id.* at 960.  Courts thus routinely hold that "non-resident plaintiffs c[an] not state a UCL claim against non-resident defendants" who themselves take no actions in California—even if an alleged "co-conspirator" did.  *Castagnola v. Hewlett-Packard Co.*, 2012 WL 2159385, at *4 (N.D. Cal. June 13, 2012); *Standfacts Credit Servs., Inc. v. Experian Info. Sols. Inc.*, 405 F. Supp. 2d 1141, 1148 (C.D. Cal. 2005).  So too here:  Because Yotta "does not specifically allege any wrongful acts by [Evolve itself] that occurred in California," as a non-resident plaintiff, it cannot state a UCL claim against Evolve.  *Standfacts*, 405 F. Supp. 2d at 1148.

**II. Evolve's Responses to the Court's Questions Regarding Necessary and Indispensable Parties (II.A.i, II.A.ii, II.A.iv)**

*Stewart v. Ahern*.  The Court quotes from *Stewart v. Ahern*, 32 F.2d 864 (9th Cir. 1929) regarding joinder: "As a general rule, no doubt, the corporation is a necessary and indispensable party to a suit of this kind, but there are exceptions to the rule, as where the corporation has been adjudicated a[s] bankrupt, or has been dissolved." *Id.* at 865.  This case, however, preceded the creation of Rule 19 and the Bankruptcy Code, and is not applicable here for at least two simple reasons—Synapse has neither been declared bankrupt nor has it formally dissolved.

*First*, Synapse has not been adjudicated as a bankrupt entity.  It originally filed for Chapter 11 bankruptcy, but on motion by the trustee, the bankruptcy proceeding was dismissed on November 12, 2025.  *See* ECF 103-7 (Dismissal Order of the Bankruptcy Court, *In re Synapse Fin. Techs., Inc.*, No. 1:24-bk-10646 (Bankr. C.D. Cal. Nov. 12, 2025), attached to Evolve's motion to dismiss for failure to join necessary party).  As a result, Synapse—as a corporation—reverted back to its status before those proceedings and remains susceptible to suit.  Legally, it continues to exist as an active entity with assets and liabilities, as well as insurance policies from which former executives have sought reimbursement.  Bankruptcy Code § 349 ("Unless the court, for cause, orders otherwise, a dismissal of a case . . . revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.").  Here, the "entity" in which the property revested is Synapse Financial Technologies, Inc.  To be clear: The practical effect of the bankruptcy dismissing the Synapse bankruptcy case is as if there were no bankruptcy at all.  Even if Synapse *had* been declared bankrupt—it hasn't—as Evolve explained in its reply, courts often consider whether a party is necessary even if they are in bankruptcy proceedings.  *See* ECF 148 (Reply) at 8-9.

Yotta knows this to be true.  It served discovery on Synapse, it continued to seek discovery after the bankruptcy was dismissed, and Yotta even argued in its opposition to the pending motion that Evolve should join Synapse as a party.  None of these things would be possible were Synapse truly and legally a dead entity, and Yotta would not undertake these actions if it sincerely believed that to be the case.

***Second***, Synapse has not been dissolved. It remains active as an entity in California in good standing with the Secretary of State and the Franchise Tax Board.[3] Legally speaking, Synapse is still capable of being a party. The *Stewart* court's discussion of joinder on this score cited only one case, *Walser v. Seligman*, from New York federal court in 1882. That case confirms that it "cannot be doubted that a corporation is capable of being sued until it is formally dissolved." *Walser v. Seligman*, 13 F. 415, 417 (S.D.N.Y. 1882). Because there has been no formal dissolution, Synapse can be named as a party. As Evolve's reply brief noted, that distinguishes decisions like *Lone Star Industries, Inc. v. Redwine*, 757 F.2d 1544 (5th Cir. 1985), and *Stiefel & Co. v. Blitz*, 1993 WL 526386 (S.D.N.Y. Dec. 14, 1993), which Yotta relies on. Those courts declined to join nonparties only because they had been "dissolved," *Stiefel*, 1993 WL 526386, at *2 & n.3, and "ceased to exist as a legal entity," *Lone Star*, 757 F.2d at 1548. There is no such bar to joinder here. Synapse has not dissolved, and as such has shareholders, directors and officers, even if they are not actively conducting Synapse business. Synapse owns everything free and clear that it owned before the bankruptcy. And it is precisely for this reason that other parties, including Yotta end users, have sought to join Synapse as liable for consumer claims related to their loss of access to funds that ran through the Synapse ecosystem and seek recovery under potentially applicable insurance policies. *See, e.g., In re Synapse Fin. Techs., Inc.*, No. 1:24-bk-10646 (Bankr. C.D. Cal. Sept. 15, 2025), ECF No. 657 (motion for relief from Synapse bankruptcy's automatic stay by Yotta end user to add Synapse as a necessary party to putative class action and liquidate insurance for damages). Indeed, as discussed above, even Yotta treats Synapse as a legal entity whenever it suits its purpose.

Additionally, the Ninth Circuit's dicta in *Stewart* was limited to "a suit of this kind." *Stewart*, 32 F.2d at 865. *Stewart* is a special case with unique facts that are not present here. There, the plaintiff had obtained a judgment in Idaho court against an Idaho corporation. *Stewart*, 32 F.2d at 864. But the plaintiff's attempted "execution on the judgment was returned unsatisfied." *Id.* So

---

[3] As of the date of this filing, a member of the public can visit the California Secretary of State's search tool at https://bizfileonline.sos.ca.gov/search/business and search for either Synapse's company number (3928129) or name (Synapse Financial Technologies, Inc.). The result indicates Synapse's active status and good standing before the California Secretary of State and Franchise Tax Board.

Case 3:24-cv-06456-TLT    Document 155    Filed 02/06/26    Page 10 of 15

1    the plaintiff sought to recover another way: he filed suit in California against a "subscriber to" the
2    Idaho corporation's "capital stock" who "had not paid the subscription"—that is, an investor who
3    had contracted to buy the corporation's shares but not yet followed through on his financial
4    commitment. *Id.* at 865. Federal courts in California apparently had personal jurisdiction over that
5    investor. The case primarily concerned jurisdictional nuances between courts of equity and courts
6    of law. But in declining to name the Idaho corporation as a defendant, the plaintiff asserted "that
7    it was impossible to obtain a judgment against the corporation in any court within the state of
8    California for the reason that it had no status in California," "that no court within California had
9    any jurisdiction over it," and "that the corporation had no property or assets in the state of
10   California." *Id.* at 864-65.

11   *Stewart* held that the Idaho corporation was not a necessary and indispensable party only
12   because the suit arose in that unique procedural posture. The Ninth Circuit noted that when a
13   lawsuit implicates a corporation's liability, "[a]s a general rule . . . the corporation is a necessary
14   and indispensable party." *Id.* at 865. But this suit was different—not merely because the
15   corporation's liability had ***already*** been adjudicated, but also because the premise of the plaintiff's
16   claim against the investor was that the corporation effectively had ***no legal existence*** in California
17   (and judgment against it could not be satisfied elsewhere). Just as that lack of legal existence
18   "excuse[d the] plaintiff from obtaining a judgment against the corporation in the local jurisdiction,"
19   it "likewise excuse[d] him from making the corporation a party to the creditor's bill in that
20   jurisdiction." *Id.* In reaching this case-specific holding, *Stewart* suggested in dicta that a
21   corporation also might not be necessary and indispensable "where the corporation has been
22   adjudicated a bankrupt, or has been dissolved." *Id.* But that merely echoed the same narrow point:
23   A corporation that effectively does not legally exist or falls outside the scope of a court's
24   authority—like the Idaho corporation in *Stewart*, or a company that has been legally dissolved—
25   may not need to be joined.

26   Yotta's lawsuit bears no resemblance to the rare type of shareholder action in *Stewart*. And
27   Synapse is an entirely different sort of entity.

28

9

EVOLVE BANK & TRUST'S RESPONSES
TO QUESTIONS FOR THE HEARING
4:24 CV-06456-TLT

**The Interests of Synapse's Former Executives.** Because corporations act through their executives, courts have recognized in a range of contexts that "the officers and directors of a corporation share common legal interests with the corporation." *Buttonwood Tree Value Partners, L.P. v. R. L. Polk & Co.*, 2021 WL 3237114, at *8 (Del. Ch. July 30, 2021) (attorney-client privilege); *see, e.g.*, *Lara v. INEX*, 2012 WL 2849395, at *4 (E.D. Pa. July 11, 2012) ("[p]rivies to a company" include "officers . . . with similar legal interests" (citation omitted)). In particular, "the legal interests" of "the corporation and its officers" may be "similarly affected by the outcome of a legal proceeding." *Rucker v. Schmidt*, 794 N.W.2d 114, 120 (Minn. 2011).

That is the case here. Some regulatory investigations of Synapse have formally proceeded against the corporation itself, while others are proceeding against Synapse's former executives based on their oversight of or participation in the same facts alleged here. Thus, all of those regulatory actions implicate the same intertwined legal interests. Synapse can of course be held "liable for the acts of its officers and directors so long as they are acting within the scope of their agency for the corporation." *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *4 (C.D. Cal. Mar. 7, 2011); *see Signal Oil & Gas Co. v. Ashland Oil & Refin. Co.*, 49 Cal. 2d 764, 779 (1958) ("It has long been settled that the Directors are the chosen representatives of the corporation, and constitute to all purposes of dealing with others, the corporation. What they do within the scope of the objects and purposes of the corporation, the corporation does." (cleaned up)). Similarly, a corporate officer or director may be held liable for conduct undertaken on the corporation's behalf. *See Mewawalla v. Middleman*, 601 F. Supp. 3d 574, 597 & n.2 (N.D. Cal. 2022) (discussing *Frances T. v. Vill. Green Owners Assn.*, 723 P.2d 573, 583 (1986)); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf."). That is why corporations, including Synapse, maintain director and officer insurance policies.

Given all of that, the ongoing efforts of former Synapse executives to defend against regulatory investigations regarding the events at issue in this lawsuit underscore that Synapse's

legal interests are at stake here, such that it is a necessary and indispensable party. Even if Synapse is not currently operating commercially, it could be obligated to former executives, for example to draw down on its D&O policy—which demand was already made by its former Senior Director of Finance & Accounting in connection with a grand jury investigation, or for example if former executives are subject to regulatory penalties and seek indemnification from Synapse. And such regulatory penalties could prove more likely, or more severe, if this Court makes factual findings that Synapse (acting through its executives) acted wrongfully.

**Synapse's Established Interests.** Yotta argues that Rule 19 cannot apply unless Synapse affirmatively and explicitly proclaims its interest before the Court. This is not what the rule requires. Instead, Rule 19(a)(1)(B) says, in part, that an absent party is necessary if "that person claims an interest relating to the subject of the action." Fed. R. Civ. P. 19(a)(1)(B). When the Rule talks about "claiming" a legal interest implicated by the lawsuit, it means taking some sort of action that *establishes* that legal interest; it need not file something in the instant action or make an express statement to the Court or parties regarding its interest.

As Evolve explained in its reply, courts have found a claimed, relevant legal interest through prior conduct alone. ECF 148 (Reply) at 6. Indeed, courts often find that the non-party has claimed an interest without discussing the need for any explicit statement filed by the non-party. Rather, a non-party's conduct, wholly extraneous to the ongoing action, has been deemed sufficient. For example, in *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011) and *Hi-Tech Gaming.com Ltd. v. IGT*, 2008 WL 4952208 (D. Nev. Nov. 18, 2008), neither court required an express statement of interest. Rather, those courts found that the absent party's interests were determined based on the *plaintiff's allegations* or based on other conduct extraneous to the litigation. *In re Toyota*, 785 F. Supp. 2d at 906-07 ("Moreover, the unnamed foreign entities have an interest in the litigation because each respective entity's liability will necessarily be at issue."); *Hi-Tech Gaming*, 2008 WL 4952208 at *4 (non-party claimed an interest by being a party to the contract at issue: "IGT Canada is also a party to the Interim Agreement and has a legally protected interest in this action"); *see also LDFS LLC v. IEC Grp. Inc.*, 2017 WL 3215556, at *2 (D. Ariz. July 28, 2017) (citing *Bowen* and finding that a third-party claimed an interest because it was the

1  contracting party and the "core issue" of liability involved their performance under contract"). *Cf.*
2  *Lansdown v. Bayview Loan Servicing, LLC*, No. 2022 WL 4227245, at *4 (N.D. Cal. Sept. 13,
3  2022) (Hixson, J.) (non-party claimed its interest by signing promissory note at issue in the lawsuit
4  but finding that its interest was not significant enough because it was not alleged to have
5  participated in the breach).

6  Synapse and its executives did that here by performing under the contracts and defending
7  against regulatory actions. Synapse is not required to further "claim" its interest through some sort
8  of express, after-the-fact statement to this Court; it need not file something in the instant action or
9  make an express statement to the Court or parties regarding its interest.

10  Putting all that aside, though, the Court need not consider this issue. *Bowen's* discussion
11  about a non-party claiming an interest applies to Rule 19(a)(1)(B), which inquires as to the non-
12  party's interest. Subsection (A), on the other hand, asks whether the Court can accord complete
13  relief without the absent party. A party does not need to claim any interest under subsection (A).
14  Evolve argued in its opening brief that both subsections apply. The *In re Toyota* court explained
15  that because the plaintiff's allegations so heavily implicated the absent party's conduct that the
16  court could not accord complete relief without that absent party. "If Plaintiffs prevail, they cannot
17  obtain complete relief against the named Toyota Defendants, including TMC, because their claims
18  seek to hold the Toyota Defendants liable, in part, for the actions of unnamed subsidiaries and/or
19  sister companies." *In re Toyota*, 785 F. Supp. 2d at 906. While that court went on to find that the
20  absent party also had claimed an interest as explained above, the same reasoning would apply with
21  equal force here under either Rule 19(a)(1)(A) or (B).

22  So, here, Synapse is indispensable for two independent reasons: ***first***, under 19(a)(1)(A),
23  Yotta's allegations so heavily implicate Synapse's conduct that the Court cannot accord complete
24  relief without the absent party; and ***second***, under 19(a)(1)(B), Synapse has demonstrated its
25  interest by its conduct in performing under (and allegedly breaching) its contract with Yotta and
26  defending itself in other fora against the same allegations.

27  **Synapse's Unique Assets.** The Court asked how Synapse can possess assets in light of the
28  bankruptcy case. As discussed above, because the bankruptcy court dismissed the bankruptcy

petition without entering an order declaring Synapse bankrupt or otherwise making any findings as to its solvency, assets, etc., Synapse (like any debtor in a similar situation) returns to its pre-bankruptcy state. Accordingly, any assets that it possessed before the bankruptcy—which were not disposed in the bankruptcy proceedings—are still Synapse's.

**The Court Cannot Afford Complete Relief Without Synapse.** At its core, Yotta seeks to hold Evolve responsible for mistakes, mishandling, and misrepresentations by Synapse, and Synapse's failure to properly maintain access between Yotta and Evolve and failure to track, record, and ledger Yotta end users' transactions and balances. *See In re Toyota*, 785 F. Supp. 2d at 906. Synapse's transactional information and knowledge of that recordkeeping is implicated because (a) Synapse has control and knowledge of its own ledger; (b) Synapse should have its own transactional data; (c) Synapse owns and controls the information and data of its subsidiary, Synapse Brokerage, which swept end-user funds from Evolve to various third-party banks; and (d) Synapse is the only party with contractual privity with those third-party banks, which maintained separate transaction data of these transfers and may have control of the funds at issue. These issues are at the core of Yotta's allegations of wrongdoing against Evolve.

Indeed, Yotta advances a damages theory based on how many end users lost access to funds and the amount of money to which they lost access. Synapse froze access to information regarding Yotta end user transaction information shortly after it entered bankruptcy, and after Synapse acknowledged there were significant discrepancies in its ledger. But well before that, Yotta authorized Synapse to use its brokerage service to transfer all of Yotta's end-user funds from Yotta's omnibus account at Evolve into numerous other accounts at various third-party banks. Access to all those funds, information about those transactions, contractual privity with all those partners—each of these things rests with Synapse. To the extent Yotta's damages theory depends on this series of events, which were authorized by Yotta and controlled by Synapse, then Synapse having control over that information, those transactions, and those contracts are all reasons why Synapse should be present here. This is not the sole reason, however, that Evolve points to as to why Synapse should be joined. Rather, these elements layered on top of the other identified interests, and in combination with the Rule 19(b) factors that heavily weigh in favor of Synapse's

indispensability, all demonstrate, in the aggregate, why Yotta should have joined Synapse in this litigation.

Dated: February 6, 2026

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: */s/ Aravind Swaminathan*
ARAVIND SWAMINATHAN
Attorney for Defendant
Evolve Bank & Trust