# Exhibit B

SARAH DAVIS (STATE BAR NO. 275145)
sdavis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

AMISHA R. PATEL *(Pro Hac Vice Pending)*
apatel@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, MA 02116
Telephone: +1 617 880 1800
Facsimile: +1 617 880 1801

Attorney for Defendant
Evolve Bank & Trust

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| YOTTA TECHNOLOGIES INC.,<br><br>Plaintiff,<br><br>v.<br><br>EVOLVE BANK & TRUST and SYNAPSE FINANCIAL TECHNOLOGIES, INC.,<br><br>Defendants. | Case No. CGC-26-634858<br><br>UNLIMITED JURISDICTION<br><br>**DEFENDANT EVOLVE BANK & TRUST'S NOTICE OF DEMURRER AND DEMURRER TO COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Request for Judicial Notice, Declaration of Sarah Davis, and Declaration of Christopher Vendetti submitted concurrently herewith]<br><br>Date: November 6, 2026<br>Time: 9:00 am<br>Dept.: 302<br><br>Judge: Hon. Joseph M. Quinn<br>Action Filed: March 12, 2026 |

# NOTICE OF DEMURRER

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on November 6, 2026, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Department 302 of the above-entitled Court, located at 400 McAllister Street, San Francisco, CA 94102, Defendant Evolve Bank & Trust ("Evolve") will demur to Yotta Technologies Inc. ("Yotta") Complaint (the "Complaint") pursuant to California Code of Civil Procedure section 430.10(e).

Evolve's Demurrer to Yotta's Complaint is based on the ground that no cause of action alleges facts sufficient to state a claim upon which relief may be granted against Evolve, per California Code of Civil Procedure section 430.10(e), because the Complaint fails to plead all elements of the asserted causes of action and alleges facts that fail as a matter of law to state a claim. Evolve seeks an order sustaining its Demurrer without leave to amend, with prejudice, and for such other and further relief as the Court deems just and proper.

This Demurrer is based on this Notice of Hearing on Demurrer, Demurrer, and the Memorandum of Points and Authorities in support thereof, Declaration of Sarah Davis, Declaration of Christopher Vendetti, Request for Judicial Notice, the entire case file in this matter, and such other matters, both oral and documentary, as may properly come before the Court.

Dated: September 2, 2026

SARAH DAVIS
Orrick, Herrington & Sutcliffe LLP

By: *<u>/s/ Sarah Davis</u>*
SARAH DAVIS
Attorneys for Defendants

**DEMURRER TO COMPLAINT**

1. Defendant Evolve Bank & Trust ("Evolve") hereby demurs to the causes of action in Yotta's Complaint for fraud, conspiracy to commit fraud, negligent misrepresentation, negligence, violation of Cal. Bus. & Prof. Code §§ 17203–04, and restitution.

2. Evolve demurs to the cause of action asserting fraud on the ground that Yotta fails to allege facts sufficient to constitute any cause of action. Cal. Civ. Proc. Code § 430.10(e); *Rakestraw v. Cal. Physicians' Serv.*, 81 Cal. App. 4th 39, 43 (2000); *Aubry v. Tri-City Hosp. Dist.*, 2 Cal. 4th 962, 967 (1992).

3. Evolve demurs to the cause of action asserting conspiracy to commit fraud on the ground that Yotta fails to allege facts sufficient to constitute any cause of action. Cal. Civ. Proc. Code § 430.10(e); *Rakestraw*, 81 Cal. App. 4th at 43; *Aubry*, 2 Cal. 4th at 967.

4. Evolve demurs to the cause of action asserting negligent misrepresentation on the ground that Yotta fails to allege facts sufficient to constitute any cause of action. Cal. Civ. Proc. Code § 430.10(e); *Rakestraw*, 81 Cal. App. 4th at 43; *Aubry*, 2 Cal. 4th at 967.

5. Evolve demurs to the cause of action asserting negligence on the ground that Yotta fails to allege facts sufficient to constitute any cause of action. Cal. Civ. Proc. Code § 430.10(e); *Rakestraw*, 81 Cal. App. 4th at 43; *Aubry*, 2 Cal. 4th at 967.

6. Evolve demurs to the cause of action asserting violation of Cal. Bus. & Prof. Code §§ 17203–04 on the ground that Yotta fails to allege facts sufficient to constitute any cause of action. Cal. Civ. Proc. Code § 430.10(e); *Rakestraw*, 81 Cal. App. 4th at 43; *Aubry*, 2 Cal. 4th at 967.

7. Evolve demurs to the cause of action asserting restitution on the ground that Yotta fails to allege facts sufficient to constitute any cause of action. Cal. Civ. Proc. Code § 430.10(e); *Rakestraw*, 81 Cal. App. 4th at 43 (2000); *Aubry*, 2 Cal. 4th at 967.

8. Accordingly, as discussed in the accompanying Memorandum of Points and Authorities, the Court should sustain Evolve's Demurrer pursuant to Cal. Civ. Proc. Code § 430.10(e).

Dated: September 2, 2026

SARAH DAVIS
Orrick, Herrington & Sutcliffe LLP

By: */s/ Sarah Davis*
SARAH DAVIS
Attorneys for Defendants

**DECLARATION REGARDING COMPLIANCE WITH CCP § 430.41**

Pursuant to Cal. Civ. Proc. Code § 430.41, the undersigned counsel for Defendant Evolve Bank & Trust ("Evolve") declares as follows: On August 28, 2026, I met and conferred with Yotta's counsel by both email and videoconference regarding Evolve's Demurrer. I explained to Yotta's counsel the bases for Evolve's Demurrer. The parties did not reach an agreement resolving the objections that Evolve raises in its Demurrer.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: September 2, 2026

SARAH DAVIS
Orrick, Herrington & Sutcliffe LLP

By: */s/ Sarah Davis*
SARAH DAVIS
Attorneys for Defendants

## TABLE OF CONTENTS


**Page**

**I. INTRODUCTION ..... 1**

**II. BACKGROUND ..... 3**

A. Yotta Contracted with Synapse to Obtain Banking Services for its End Users, and Synapse Separately Contracted With Evolve. ..... 3

B. In 2023, Yotta Elects to Migrate End User Accounts From Evolve to Synapse's Brokerage ..... 5

C. Synapse Files for Bankruptcy and Cuts Off Evolve's System Access, Prompting Evolve to Freeze Yotta End User Accounts While It Investigates Potential Wrongdoing by Synapse ..... 6

D. Yotta Sues Evolve In District Court While Synapse's Bankruptcy Is Pending, And the District Court Dismisses All Claims Twice ..... 7

E. Yotta Files This Lawsuit Against Evolve and Synapse, Pursuing the Same Claims the District Court Dismissed ..... 8

**III. LEGAL STANDARD ..... 11**

**IV. LEGAL ARGUMENT ..... 11**

A. Yotta Fails To State A Fraud Claim ..... 11

1. Yotta's Fraud Theory Fundamentally Misapprehends Evolve's Banking Obligations. ..... 12

2. Yotta's Fraud Theory Fails On Its Own Terms Because the Complaint Does Not Allege That Evolve's Movement of Funds Left Evolve Unable To Honor All Yotta End User Withdrawal Requests. ..... 17

B. Yotta Fails to State a Conspiracy Claim ..... 20

C. Yotta Fails to State a Claim for Negligence or Negligent Misrepresentation ..... 20

D. Yotta Fails to State a UCL Claim Because It Fails To Identify Any Recoverable Restitution ..... 22

E. Yotta Fails to State a Claim for Quasi-Contract/Unjust Enrichment Against Evolve Because It Fails to Allege It Conferred a Benefit on Evolve ..... 24

**V. CONCLUSION ..... 25**

# TABLE OF AUTHORITIES


**Page(s)**

**Cases**

*11640 Woodbridge Condo. Homeowners' Ass'n. v. Farmers Ins. Exch.*, 110 Cal. App. 5th 211 (2025) ........ 21

*Alch v. Super. Ct.*, 122 Cal. App. 4th 339 (2004) ........ 24

*Am. Video Duplicating, Inc. v. City Nat'l Bank*, 2020 WL 6882735 (C.D. Cal. Nov. 20, 2020) ........ 25

*In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155 (N.D. Cal. 2019) ........ 20

*Aubry v. Tri-City Hosp. Dist.*, 2 Cal. 4th 962 (1992) ........ 2

*Blank v. Kirwan*, 39 Cal. 3d 311 (1985) ........ 11

*Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462 (2014) ........ 11

*Clark v. Homecomings Fin., LLC*, No. 08CV1687-IEG-NLS, 2009 WL 350660 (S.D. Cal. Feb. 11, 2009) ........ 20, 22

*Dawadi v. Adhikari*, 120 Cal. App. 5th 558 (2026) ........ 25

*Desrys v. Traditional Medicinals, Inc.*, No. 25-cv-07898-HSG, 2026 WL 1387413 (N.D. Cal. May 18, 2026) ........ 24

*Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677 (9th Cir. 2009) ........ 25

*Grover v. Bay View Bank*, 87 Cal. App. 4th 452 (2001) ........ 12

*Hodges v. Cnty. of Placer*, 41 Cal. App. 5th 537 (2019) ........ 13, 19

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ........ 22, 23

*Lazar v. Super. Ct.*,
12 Cal. 4th 631 (1996) .......... 11, 12, 18, 19

*Lee v. Luxottica N. Am., Inc.*,
65 Cal. App. 5th 793 (2021).......... 24

*Linear Tech. Corp. v. Applied Materials, Inc.*,
152 Cal. App. 4th 115 (2007).......... 11

*Lockley v. L. Off. of Cantrell, Green, Pekich, Cruz & McCort*,
91 Cal. App. 4th 875 (2001).......... 6

*Lockton v. O'Rourke*,
184 Cal. App. 4th 1051 (2010).......... 18

*Madrid v. Perot Sys. Corp.*,
130 Cal. App. 4th 440 (2005).......... 22, 23, 24

*May-Li Barki, M.D., Inc. v. Liberty Bank & Tr. Co.*,
20 P.3d 135 (Okla. 1999) .......... 13

*Morse v. Crocker Nat'l Bank*,
142 Cal. App. 3d 228 (1983).......... 14, 15

*People v. Franklin*,
63 Cal. 4th 261 (2016) .......... 6

*Rakestraw v. Cal. Physicians' Serv.*,
81 Cal. App. 4th 39 (2000).......... 2

*Schick v. Lerner*,
193 Cal. App. 3d 1321 (1987).......... 20

*Simi Mgmt. Corp. v. Bank of Am., N.A.*,
930 F. Supp. 2d 1082 (N.D. Cal. 2013) .......... 13

*Smith v. Pac. Props. & Dev. Corp.*,
358 F.3d 1097 (9th Cir. 2004).......... 25

*United States v. Fattah*,
914 F.3d 112 (3d Cir. 2019).......... 13, 14

*United States v. Lee*,
973 F.2d 832 (10th Cir. 1992).......... 13

*Varlitskiy v. Cnty. of Riverside*,
2020 WL 4187767 (C.D. Cal. June 11, 2020) .......... 21

**Statutes**

12 U.S.C. § 1813(m)(1) .......... 16

Cal. Bus. & Prof. Code §§ 17203–04 .......... 2

Cal. Civ. Proc. Code § 430.10(e) .......... 1, 2, 11

Cal. Civ. Proc. Code § 430.41 .......... 4

Consumer Financial Protection Act, 12 U.S.C. §§ 5564, 5565 .......... 1

**Court Rules**

Fed. R. Civ. P. 12(b)(6) .......... 7, 8

Fed. R. Civ. P. 12(b)(7) .......... 8

**Other Authorities**

Manuel A. Utset, *Transitive Counterparty Risk and Financial Contracts*, 78 Brook. L. Rev. 1441, 1473 (2013) .......... 16

## I. INTRODUCTION

Plaintiff Yotta Technologies Inc. ("Yotta") is a financial technology company ("fintech") that lost its customers' money. Yotta now claims that the resulting devaluation in its business is the fault of Evolve Bank & Trust ("Evolve"). But once the legal conclusions and inflammatory rhetoric are set aside, the actual pleaded facts—not to mention Yotta's judicially noticeable admissions in a recent Consent Order with California's Department of Financial Protection and Innovation ("DFPI")—show as a matter of law that Evolve cannot be held liable for Yotta's mistakes.

Yotta offered so-called "Savings Accounts" in which its customers (also referred to as end users) deposited funds in exchange for the opportunity to win prizes. Yotta contracted with another fintech, Synapse Financial Technologies, Inc. ("Synapse"), to handle key parts of the business, including managing the ledger (i.e., keeping track of all end user transactions and balances) and selecting FDIC-insured banks to hold end user deposits in omnibus accounts. Synapse initially chose Evolve as that bank, although in late 2023 Yotta moved its end users' funds to Synapse's own brokerage. In April 2024, Synapse declared bankruptcy and shuttered access to critical banking information regarding Yotta end user accounts, including the records identifying which bank had received each end users' funds. It has since emerged that Synapse's ledgers were wrong, which has made it difficult for end users to recover their full deposits.

Multiple regulatory actions have been initiated against Synapse and its executives for their failure to maintain adequate ledgers.[1] And Yotta itself was recently ordered to pay at least $1 million (and as much as $48 million) in penalties for misleading its end users about how safe their money was with Synapse (including the extent to which it was FDIC-insured). But Synapse, Yotta's actual business partner, is not a deep pocket.[2] So Yotta is now trying to extract damages

[1] *See, e.g., CFPB v. Synapse Fin. Techs., Inc*, No. 1:25-ap-0152-MB (C. D. Cal. Aug. 21, 2025) (alleging Synapse violated the Consumer Financial Protection Act, 12 U.S.C. §§ 5564, 5565 for failing to maintain adequate ledgers).

[2] Yotta nominally names Synapse as a defendant because the related federal action ruled that Synapse was a necessary party, but Yotta is explicit that it "has no desire to bring any claims against Synapse" and names Synapse in only one cause of action. Compl. ¶¶ 20, 247.

from Evolve with a baseless rewriting of history: According to the Complaint, after Synapse deposited Yotta end users funds into one or more "FBO account(s)" at the bank, Evolve "stole" from end users by moving money out of the account(s) for other banking purposes. Yotta urges that Evolve fraudulently hid this purported "theft" by leaving end user account balances unchanged, representing that it would allow end users to withdraw those balances, and stating more generally that it complied with applicable banking laws and regulations.

But those allegations are irreconcilable with Evolve's actual obligations to Yotta end users. Evolve issued Yotta end users demand deposit accounts ("DDAs"). By definition, such accounts mean that their issuers, like Evolve, promise only to pay deposits upon demand (i.e., upon a request for withdrawal). Indeed, DDA accounts do not require—and Evolve never promised—that Evolve would hold every penny deposited untouched, much less in a specific location.

It is thus unsurprising, as Judge Thompson already held in prior federal proceedings, that Yotta's rewriting of history fails to state a fraud claim for several independent reasons. First, the theory of "theft" that underpins all of Yotta's fraud allegations fundamentally mischaracterizes basic banking principles. As explained above, Evolve never promised Yotta's end users that it would store each specific dollar they deposited at Evolve as untouched cash reserves. Rather, Evolve made a contingent contractual promise to repay the full amount of those deposits (as reflected in end users' account balances) upon request, subject to account freezes to investigate potential misconduct. In the meantime, Evolve—like any modern bank—had discretion to use a portion of deposited funds for its own purposes. Evolve fulfilled its promise to end users: There is no allegation that anyone was unable to withdraw funds before Synapse's collapse forced Evolve to freeze accounts. The fact that Evolve allegedly moved some money out of the FBO account(s) along the way is not "theft"—it is a routine banking practice that had no impact on end users' contractual right to repayment of their deposits.

Moreover, even crediting Yotta's erroneous theory that Evolve's movement of money into and out of the FBO account(s) could establish "theft" from end users, the Complaint alleges no facts showing a net reduction in Evolve's cash reserves available to pay Yotta's end users. To the

contrary, Yotta's allegations demonstrate that the alleged withdrawals from the FBO account(s) were either offset by Evolve's infusion of reserve funds—a fact Yotta affirmatively pled in prior pleadings and cannot now disavow—or had no effect on the cash reserves at hand. Without plausible allegations of theft, all of Yotta's fraud allegations fail as a matter of law.

And that is before considering Yotta's admissions in the DFPI Consent Order. Yotta there admitted that it chose to migrate end user funds from Evolve to Synapse's brokerage in 2023, despite serious misgivings about Synapse's institutional competence; that Evolve thereafter played a far more limited role, merely providing certain services like direct deposit; that Synapse's bankruptcy led to tens of millions of dollars in end user losses just in California; and that end users were denied recovery because Yotta had misrepresented that their deposits remained FDIC-insured. ***That*** is the true history here. No surprise, then, that the Complaint's alternative retelling is entirely untethered to any pled particular facts and has no basis law.

Yotta's remaining causes of action likewise fail as a matter of law. Its negligence and negligent misrepresentation claims are barred by the economic loss doctrine. Although Yotta gestures toward the "special relationship" exception to that doctrine, California Supreme Court precedent is clear that a special relationship exception is narrow and limited to circumstances where the plaintiff is an intended beneficiary of the contract, which is not the case here. Yotta's UCL and restitution claims, in turn, fail because Yotta conferred no cognizable benefit on Evolve (even if Yotta's end users may have).

The legal flaws in Yotta's claims cannot be cured by amendment. Indeed, they persist even after Yotta had two previous chances to revise its pleadings, most recently with the benefit of full discovery in the Northern District. Evolve's Demurrer should therefore be sustained with prejudice.

## II. <u>BACKGROUND</u>

### A. <u>Yotta Contracted with Synapse to Obtain Banking Services for its End Users, and Synapse Separately Contracted With Evolve.</u>

Yotta is a startup fintech company. It marketed a prize-linked "Savings Account" through which its customers deposited money and received "the opportunity to win substantial prizes" (i.e.,

gamble) in place of the "traditional interest payments" a bank would offer. Compl. ¶ 25. Because "Yotta is not itself a bank," however, it still needed to "partner" with a bank "to serve as a custodian for customer accounts." *Id.* ¶¶ 27, 39. So Yotta turned to Synapse, which also was not a bank but acted as an intermediary between fintechs like Yotta and FDIC-insured banks. *See id.* ¶¶ 42-46.

Yotta "entered into a contract" with Synapse in February 2020. *Id.* ¶ 43. Under that contract, Synapse played a critical role in facilitating the Yotta Savings Account program. For example, "[p]ursuant to" the contract, Synapse was responsible for "deliver[ing] … data" about Yotta end users' deposits "electronically and continuously to Yotta." *Id.* ¶ 47. In other words, Synapse maintained the ledger (i.e., kept track of transactions and balances) for those deposits. *Id.* ¶¶ 46-48.

Yotta also tasked Synapse with selecting a bank to serve as the custodian of Yotta end users' deposits. To that end, Synapse reached a separate agreement with Evolve, a state-chartered, federally insured bank "based in Memphis," Tennessee. *Id.* ¶ 34; *see id.* ¶¶ 45-46. Under the Synapse-Evolve contract, Synapse arranged for each of Yotta's end users to enter into a Demand Deposit Account Agreement with Evolve (which the Complaint refers to as a "Customer Agreement"). *Id.* ¶¶ 51-53; *see* Declaration of Christopher Vendetti. ("Vendetti Decl."), ¶¶ 3-4, Ex. A ("Account Agreement");[3] . Yotta end users then used the Yotta mobile app to move money into their account, which Synapse deposited with Evolve. Critically, ***Yotta never entered a contract of any kind with Evolve.*** Declaration of Sarah Davis ("Davis Decl.") Ex. 4 at 2 ("N.D. Cal. Order"). Indeed, the Account Agreement expressly disclaimed such a relationship, emphasizing that "the products and services offered by [Yotta] are not endorsed or guaranteed by" Evolve; that Yotta and Evolve "are not partners, affiliates or joint venturers;" and that "[n]othing in this Agreement is intended to be read or understood" otherwise. Account Agreement § 2.8.

The Account Agreement, like any bank savings account agreement, granted Yotta's end users contingent contractual rights to repayment of their deposits. Compl. ¶ 57. Evolve also

[3] The Complaint expressly "incorporates by reference" the Account Agreement and all other "contracts and agreements referred to herein," Compl. ¶ 216, and thus are properly considered on Demurrer. *See* RJN at 2-3.

reserved the right to "'freeze' or place a hold on the balance in such Account" in the event it "suspects that any irregular, unauthorized, or unlawful activity may be occurring in connection with your Account." Account Agreement at 5.

Synapse agreed to pay Evolve "Account Analysis Charges" in exchange for Evolve's banking services. *See* Compl. ¶¶ 122-23. Synapse also served as the primary servicer of Yotta end users' accounts with Evolve, performing tasks "including receiving notices from" accountholders and "responding to any notices relating to questions or complaints concerning [the] Account." Account Agreement at 1; *see also* Compl. ¶ 46. In that capacity, Synapse created "one or more accounts" at Evolve designated "for the benefit of ('FBO') end users." Compl. ¶ 48. When Yotta end users deposited money through the Yotta app, Synapse was responsible for transferring the money into the Evolve FBO account(s). *Id.* Synapse also created "sub-deposit accounts" corresponding to each end user within the FBO account(s), which tracked the amount of each end user's funds at Evolve. Account Agreement at 1.

The FBO account(s) that Synapse created and funded were not limited to Yotta's end users. Synapse also deposited into that same account transfers from the end users of several other "Synapse-connected fintechs," including Mercury Technologies, Inc. and "various other fintech companies." Compl. ¶¶ 48, 130.

The Account Agreement between Evolve and Yotta end users did not specify where or how funds would be stored. But under the separate Synapse-Evolve contract, Synapse agreed to ensure that "the balance in each FBO" would "equal '100% of the amount of funds Deposited by [fintech] end Users in connection with such FBO account.'" *Id.* The Synapse-Evolve contract further required Synapse to fund a separate reserve account to cover, among other things, any subsequent deficiencies in the FBO account(s) or liabilities to Evolve. *See id.* ¶ 127.

### B. <u>In 2023, Yotta Elects to Migrate End User Accounts From Evolve to Synapse's Brokerage</u>

This arrangement continued for a few years. "In October 2023, Yotta informed [its end users] that it would be opening brokerage accounts for its customers with Synapse Brokerage LLC

("Synapse Brokerage"), subsidiary of Synapse[.]" Davis Decl. Ex. 1 ("DFPI Consent Order") ¶ 14.[4] Yotta told its end users this change meant "moving away from using a single bank, which was Evolve Bank & Trust, in order to access a network of FDIC insured banks" that Synapse would manage. *Id.* ¶ 17. Put simply, Yotta instructed Evolve to transfer Yotta's end users' funds to a Synapse Brokerage Partner Bank in October 2023, and Evolve did so. *See id.*

Yotta moved its end users' funds "even though it had serious concerns about Synapse" and believed there was "significant risk in trusting [Synapse] to execute a migration." DFPI Consent Order ¶ 20. Yotta even described Synapse as "always overpromising to maintain business [a]nd then underdeliver[ing] … [i]n company killing ways." *Id.* ¶ 22. Nonetheless, "Yotta entrusted its account holders' funds to Synapse." *Id.* Evolve played a far more limited role thereafter: "[A]ccount holders retained their pre-transition Evolve Bank routing and account numbers and were able to continue services such as direct deposit using their Evolve Bank account information." *Id.* ¶ 19.

### C. <u>Synapse Files for Bankruptcy and Cuts Off Evolve's System Access, Prompting Evolve to Freeze Yotta End User Accounts While It Investigates Potential Wrongdoing by Synapse</u>

Yotta's apparent misgivings about Synapse turned out to be well-founded. In April 2024, Synapse filed for bankruptcy. Soon after, "[o]n or about May 11, 2024," Synapse—the company that had for years serviced Yotta end user accounts and maintained the corresponding ledger of the location of Yotta end user funds—"turn[ed] off system access for Evolve." Compl. ¶¶ 158, 160. This "limited" Evolve's "visibility into activity related to [Yotta's] program." *Id.* ¶ 160.

Evolve responded the way any responsible bank would: It acted to "make sure no unexpected, unsafe, fraudulent, or other improper activity occurs within the program"—or had

---

[4] As explained in the concurrently filed Request for Judicial Notice, the Court may take judicial notice of the DFPI Consent Order and the truth of the facts recited therein. *People v. Franklin*, 63 Cal. 4th 261, 280 (2016) ("A court may take judicial notice of … the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments."). Yotta explicitly "[a]pproved" those facts and the remainder of the Consent Order's "form and content" to resolve its adversarial proceeding with DFPI. DFPI Consent Order at 14. The facts are thus "not reasonably subject to dispute" and therefore fit for "judicial notice." *Lockley v. L. Off. of Cantrell, Green, Pekich, Cruz & McCort*, 91 Cal. App. 4th 875, 882 (2001). But the Complaint fails to state a fraud claim even without considering those DFPI Consent Order facts.

already occurred in the lead-up to Synapse's insolvency. *Id.* ¶ 161. "[T]o maintain the integrity and security of end user accounts," Evolve suspended activity for all Synapse-affiliated accounts while it investigated the system access issue and performed a reconciliation, *id.* ¶ 160, lawfully exercising its contractual authority to "freeze" the accounts on suspicion of "any irregular, unauthorized, or unlawful activity," Account Agreement at 5. As it turns out, Synapse had failed to maintain accurate records of where end user funds had been deposited, and in what amounts: The trustee in the Synapse bankruptcy "report[ed] a 'shortfall' totaling tens of millions of dollars" across the Synapse Brokerage ecosystem, which included multiple different banks. Compl. ¶ 9.

### D. Yotta Sues Evolve In District Court While Synapse's Bankruptcy Is Pending, And the District Court Dismisses All Claims Twice

In September 2024, while Synapse remained in bankruptcy proceedings, Yotta sued Evolve in the United States District Court for the Northern District of California. *See* Davis Decl. Ex. 2. The lawsuit primarily took issue with Synapse's alleged misconduct, including inaccurate recordkeeping regarding Yotta end user accounts. *See, e.g.*, *id.* ¶¶ 40, 55. But Yotta could not sue Synapse while it was insulated from litigation by the bankruptcy stay. So Yotta attempted to shift Synapse's liability onto Evolve—a company that Yotta ***never actually contracted with***. Yotta's federal complaint lumped "Evolve and Synapse" together and sought to recover damages from Evolve for Synapse's purportedly unlawful behavior under theories of fraud, negligence, violation of California's UCL, and unjust enrichment. *See id.* ¶¶ 10, 110-40, 151-72.[5]

In a thorough 20-page order, the District Court dismissed Yotta's complaint for a host of legal deficiencies under Federal Rule of Civil Procedure 12(b)(6). *See* N.D. Cal. Order. Judge Thompson first determined that Yotta's fraud claim failed to "sufficiently plead the 'who, what, when, where, and how'" of any alleged misrepresentation by Evolve, relying instead on overheated and conclusory rhetoric. *Id.* at 12-13. The Court then dismissed Yotta's negligence claim because it sought purely economic damages and thus ran afoul of the economic loss doctrine, which bars

---

[5] Yotta initially pursued a claim for negligent interference with contractual relations, but "California does not recognize" that cause of action. N.D. Cal. Order at 15.

recovery for such damages absent a "special relationship" the District Court found lacking. *Id.* at 14. Turning to the UCL claim, the Court held that Yotta failed to establish statutory standing. *Id.* at 16. The Court also dismissed the unjust enrichment claim because the Complaint alleged, at most, that Yotta's end users—not Yotta "***itself***"—"conferred a benefit on Evolve." *Id.* at 17. On top of those legal deficiencies, Yotta also failed to establish that Synapse was not a necessary party to the litigation. *Id.* at 7-8.

In June 2025, Yotta filed an amended complaint in the Northern District. *See* Davis Decl. Ex. 3. The revised pleading contained more inflamed rhetoric, including repeated accusations that Evolve was somehow "running a ponzi scheme." *Id.* ¶ 117. Evolve again moved to dismiss under Rule 12(b)(6), arguing that the new allegations did nothing to remedy the flaws that doomed Yotta's claims. Separately, when Synapse emerged from bankruptcy and thus became amenable to suit, Evolve moved to dismiss under Federal Rule of Civil Procedure 12(b)(7), arguing that Yotta's lawsuit could not proceed in federal court because the amended complaint had impermissibly manufactured diversity jurisdiction by failing to name Synapse, a necessary and indispensable party to the dispute. *See* Davis Decl. Ex. 5.

Ultimately, the Northern District dismissed Yotta's amended complaint under Rule 12(b)(7) for failing to join Synapse as a defendant, without resolving Evolve's separate Rule 12(b)(6) motion. *Id.* The Northern District instructed that Yotta "may file this action with all necessary parties in state court." *Id.* at 14. Yotta is concurrently pursuing an appeal of that ruling in the Ninth Circuit, *see Yotta Techs., Inc. v. Evolve Bank & Trust*, No. 26-1535 (9th Cir.), and Evolve has filed a motion with this Court to stay all proceedings here until the appeal concludes.

### E. <u>Yotta Files This Lawsuit Against Evolve and Synapse, Pursuing the Same Claims the District Court Dismissed</u>

On March 12, 2026, Yotta re-filed its lawsuit in this Court, adding Synapse as a defendant. *See* Compl. ¶ 20. Most of the Complaint is carried over unchanged from the most recent federal complaint. *Compare* Compl. *with* Davis Decl. Ex. 3. Indeed, even after naming Synapse, Yotta still asserts five of its six claims (fraud, conspiracy to commit fraud, negligent misrepresentation,

violation of the UCL, and restitution) ***only*** against Evolve. These claims (along with negligence, which Yotta pleads against Evolve and Synapse) all focus on the years ***before*** Synapse filed for bankruptcy and Evolve froze end user accounts to investigate potential wrongdoing. The crux of the Complaint is that during those prior years, Evolve "stole more than $75 million from end users" and "lied" about its ostensible "theft." *Id.* ¶¶ 10, 14.

How Yotta is using the word "theft" is important. The Complaint ***does not allege*** that ***any*** Yotta end user, at ***any*** point before Synapse's bankruptcy and the related account freeze, was unable to withdraw funds from Evolve. In other words, the Complaint does not (and cannot) allege that any Yotta end user was denied their contractual right to repayment under the Account Agreement. Instead, the Complaint alleges only that Evolve moved funds out of the FBO account(s), purportedly leaving the account(s) with less money than would be required to simultaneously repay ***every*** deposit made by ***every*** end user of ***every*** Synapse-related fintech company (not just Yotta). *See id.* ¶¶ 121-125, 135-137. Yotta insists on that basis alone that Evolve "lied" every time it reported Yotta end users' account balances, even though the amount that Evolve ***owed*** to an end user was wholly unrelated to the cash reserves that happened to be in the FBO account(s) at any given time. Each claim in the Complaint is a variant on that theory. *See* Compl. ¶¶ 217-275.

Claim 1 urges that Evolve's alleged movement of money out of the FBO account(s) at points between 2020 and 2023 means that several contemporaneous statements by Evolve were fraudulent. Those statements, which are listed somewhat haphazardly in paragraph 219 of the Complaint and then as fifteen rows in a table in paragraph 215, fall into three buckets.

***First***, at its core, Yotta's theory is that Evolve fraudulently represented "that it would provide accurate account information" and "that Yotta customers could withdraw the funds they deposited into their accounts." *Id.*; *see id.* ¶ 215 rows 3-5. According to Yotta, its end users actually had less money in their accounts because Evolve had moved certain funds out of the FBO account(s). *See id.* ¶ 229. In the same vein, Yotta contends that Evolve's representation "that it would not charge any fees to Yotta's customers" was fraudulent because Evolve deducted $18 million from the FBO account(s) to cover Account Analysis and TabaPay fees. *Id.* ¶ 219; ¶ 215 row

1.[6]

***Second,*** from that premise, the Complaint contends that Evolve misrepresented its compliance with various banking laws and duties, including "that it would safeguard user funds;" that it was committed to "regulatory, compliance and risk mitigation requirements" and would raise any related "issues that could endanger user funds" at "[b]i-weekly compliance meetings;" and that its "systems are 'highly secure' and that user 'data is stored, and money is transferred at the highest industry standard set by the Federal Reserve.'" *Id.* ¶ 219; *see id.* ¶ 215 rows 2, 6-9, 13-14. Similarly, Yotta asserts that Evolve's representation "that Yotta end user funds were insured by the FDIC" was fraudulent because Evolve's movement of funds out of the FBO account(s) somehow "legally prohibited" Evolve "from insuring" end users' full account balances. *Id.* ¶¶ 156, 219; ¶ 215 row 15.

***Third***, Yotta asserts that Evolve fraudulently misrepresented the nature of its dispute with Synapse, including the cause of its decision to freeze end user accounts. *Id.* ¶ 219. The Complaint alleges that Evolve "lied" when it mentioned "a contractual disagreement" with Synapse in late 2023, and again when it described the May 2024 account freeze as intended to "maintain the integrity and security of end user accounts" while Evolve investigated Synapse's potential wrongdoing. Compl. ¶¶ 160, 219; *see id.* ¶ 215 rows 10-13. In Yotta's telling, those statements were fraudulent because Evolve was hiding that it had previously "breached the integrity and security of [end user] funds" by "stealing" money. *Id.* ¶¶ 160, 219, 230; *see id.* ¶ 215 rows 10-13.

Claim 2 asserts that Evolve also conspired with Synapse (but brings the claim against Evolve only) to commit fraud by making those same representations. *Id.* ¶¶ 221-226. Claim 3 alleges the same representations constitute negligent misrepresentation because "Evolve lacked reasonable grounds for believing that its representations were true and failed to exercise reasonable care in ascertaining whether the representations were accurate." *Id.* ¶ 236. Similarly, Claim 4 contends that the same representations reflect Evolve and Synapse's negligence. *Id.* ¶¶ 242-250.

---

[6] The Complaint's paragraph numbering is at times out of order and repeats several numbers. While the first paragraph of the fraud cause of action is numbered 217 and the final paragraph 220, there are ten intervening paragraphs. For clarity, the Demurrer cites the paragraph 219 that spans pages 43-48 of the Complaint and the paragraph 215 that spans pages 50-52 of the Complaint.

Claim 5 asserts that because these same representations were fraudulent or otherwise unlawful, they also violated the UCL. *Id.* ¶ 252. Finally, Claim 6 alleges that "Evolve has been unjustly enriched in retaining the revenues derived from Yotta deciding to use Evolve as a banking partner." *Id.* ¶ 270.

## III. LEGAL STANDARD

In evaluating a demurrer, courts must "admit[ ] all material facts properly pleaded" but need not accept as true "contentions, deductions or conclusions of fact or law." *Blank v. Kirwan*, 39 Cal. 3d 311, 318 (1985). To survive a demurrer, a complaint must "allege[s] facts sufficient to establish every element of each cause of action." *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 122 (2007); Cal. Civ. Proc. Code § 430.10(e). Accordingly, a court should sustain a demurrer "[i]f the plaintiff failed to plead, or if the defendants negated, any essential element of a particular cause of action." *Linear Tech.*, 152 Cal. App. 4th at 122.

## IV. LEGAL ARGUMENT

### A. Yotta Fails To State A Fraud Claim

"The elements of fraud…are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996). To adequately plead those elements, Yotta would need to meet a heightened pleading standard: "In California, fraud must be pled specifically; general and conclusory allegations do not suffice." *Id.* at 645. Where the defendant is a corporation, the "plaintiff's burden … is even greater," as "the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Id.* (quotation marks omitted); *see Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1471 (2014) (dismissing fraud allegations as "deficient under *Lazar* because they do not specify 'how, when, where, to whom, and by what means the representations were tendered'").

The Complaint flunks that legal test. Yotta purports to provide a summary chart identifying the "who," "what," "where," "when," and "how" for fifteen allegedly fraudulent statements. *See* Compl. ¶ 215. Every row of that chart shares the same fatal flaw: Yotta has not "pled specifically"

any facts showing ***how*** these statements were fraudulent. *Lazar*, 12 Cal. 4th at 645. That is because every one of Yotta's fraud allegations stems from the same unsubstantiated premise—that Evolve "stole" end user funds when it moved money from the FBO account(s). The Complaint alleges no facts establishing any such "theft," let alone that Evolve or its employees made any knowingly false statement in order to mask it. At most, Yotta offers the type of "general and conclusory allegations" of fraud—including wild accusations of a "ponzi scheme"—that California courts reject at the demurrer stage. *Id.*

**1. <u>Yotta's Fraud Theory Fundamentally Misapprehends Evolve's Banking Obligations.</u>**

The most fundamental failing in Yotta's fraud pleadings is a mischaracterization of Evolve's obligations to Yotta's end users, which reflects a basic misunderstanding of modern banking. When Evolve entered into the Account Agreement with Yotta end users, it contracted to accept their deposits and granted end users a contingent contractual right to repayment. *Supra* 4. That right was qualified in several ways: The Account Agreement "describe[d] how funds would be made available to customers, specifying the number of days it would take each type of funds to become available," and "allow[ed] Evolve to reject deposits and allow[ed] for certain delays in making funds available." Compl. ¶ 57. It also granted Evolve the right to "'freeze' or place a hold on the balance in such Account" in the event it "suspects that any irregular, unauthorized, or unlawful activity may be occurring in connection with your Account." Account Agreement at 5. But as long as an end user submitted a valid withdrawal request, Evolve was contractually obligated to pay it. *Id.*at 9-12; *see Grover v. Bay View Bank*, 87 Cal. App. 4th 452, 456 (2001) ("The relationship of bank and depositor is founded in contract.").

What the Account Agreement did ***not*** do was represent, or grant Yotta or its end users, a right to demand that Evolve would retain the full amount of their deposits in any particular place—be it a teller drawer, bank vault, or account, including the FBO account(s).[7] Indeed, the Account

[7] The Complaint alleges that Evolve's separate ***contract with Synapse*** required ***Synapse*** to place "100% of the amount of funds Deposited by end Users" into the FBO account(s). Compl. ¶ 48. But

Agreement did not specify how Evolve would store or otherwise use the cash deposits it received. That is "the very nature of modern banking." *United States v. Fattah*, 914 F.3d 112, 184 (3d Cir. 2019). Banks do not promise customers that they will "hold cash reserves equal to the full amount of their liabilities" (at all, let alone in a specific account). *Id.* Instead, banks promise, as Evolve did here, that they will pay all valid withdrawal requests. Each account holder "relies upon his contractual rights against the payee" bank, but "retain[s] no beneficial interest in the [specific] money" deposited. *Hodges v. Cnty. of Placer*, 41 Cal. App. 5th 537, 551 (2019); *see Simi Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1100 (N.D. Cal. 2013) ("A bank has limited duties to its customers. The relationship between the two is not fiduciary…[it] is contractual[.]").

In other words, "a bank and its depositor have a debtor-creditor relationship," and once a deposit is made, that specific money "is regarded as … [the bank's] own money, not its depositor's money." *May-Li Barki, M.D., Inc. v. Liberty Bank & Tr. Co.*, 20 P.3d 135, 140 (Okla. 1999); Account Agreement at 5("[T]he relationship between and the Bank is that of debtor and creditor[.]"). The bank has discretion in how to handle that money, subject to regulatory requirements like minimum "reserve" mandates. *Fattah*, 914 F.3d at 184. That enables the bank to lend, invest, or otherwise use a portion of deposited funds, generating interest for customers and revenue for the bank. The whole time, however, each customer's ***account balance*** and corresponding ***contractual right to repayment*** remains unchanged. This basic feature of deposit accounts explains why courts across the country have long held that "no cause of action for repayment arises until after the depositor demands repayment and the bank refuses." *May-Li Barki,* 20 P.3d at 140.; *see United States v. Lee*, 973 F.2d 832, 835 (10th Cir. 1992) (Lee, C.J., concurring) ("The funds are 'owned' by the bank which has borrowed from its depositor. Until repaid, the funds 'on deposit' belong to the bank which is a debtor of the customer. The customer does not 'own' any money until the bank honors a withdrawal record of transfer request.").

Yotta's theory of "theft," and all the fraud allegations that stem from it, mischaracterizes

---

there is no allegation that Evolve represented ***to Yotta or its end users*** that the FBO account(s) would be (let alone perpetually remain) funded at that level.

the bank-depositor relationship between Evolve and Yotta end users as something more akin to a safe deposit box than a demand deposit account. The Complaint asserts that when Evolve allegedly made certain transfers of money out of the FBO account(s) in the years before Synapse declared bankruptcy, Evolve "***stole***" money from Yotta's end users. That is not how banking works; Yotta's argument conflates Evolve's "cash reserves" with its "liabilities" to end users. *Fattah*, 914 F.3d at 184. Critically, the Complaint does not allege a single fact indicating that Evolve promised Yotta end users that it would keep the full amount of their deposits in the FBO account(s), and the Account Agreement confirms Evolve made no such representation to them. What Evolve (like any modern bank) promised was to honor valid withdrawal requests as they arose. *See* Compl. ¶ 57. And it fulfilled that promise. The Complaint never alleges that Evolve failed to pay a valid withdrawal request before freezing accounts to investigate Synapse's misconduct, as authorized by the Account Agreement. That Evolve allegedly moved money out of the multi-billion-dollar FBO account(s) along the way simply has no relevance to the accuracy of its representations to end users and Yotta.

This basic misunderstanding infects all three buckets of Yotta's fraud allegations (and every row in paragraph 215's chart). *Supra* 9-10.

***First***, the core of Yotta's fraud theory is that because Evolve allegedly moved money out of the FBO account(s) but made no corresponding change to end user account balances, its representations "that it would provide accurate account information" and "that Yotta customers could withdraw the funds they deposited into their accounts" became fraudulent. Compl. ¶ 219; *see* ¶ 215 rows 3-5. One thing simply has nothing to do with the other. Every modern bank practicing fractional reserve banking will, at various points in time, make use of a portion of deposited funds "for its own business purposes" rather than merely leaving it untouched. *Morse v. Crocker Nat'l Bank*, 142 Cal. App. 3d 228, 232 (1983). That does not alter customer account balances because the bank remains contractually "obligated to pay the debt reflected by the balance of the deposited funds upon its depositor's demand." *Id.* For the same reason, Evolve never broke its promise "that it would not charge any fees to Yotta's customers." Compl. ¶ 219; *see id.* ¶ 215 row 1. Moving money out of the FBO account(s) but leaving end users' account balances and corresponding right

to repayment unchanged does not, as a matter of law, constitute charging end users a fee.

***Second***, Yotta also fails as a matter of law to show any fraud in Evolve's representations "that it would safeguard user funds;" that it was committed to "regulatory, compliance and risk mitigation requirements;" and that its "systems are 'highly secure' and that user 'data is stored, and money is transferred at the highest industry standard set by the Federal Reserve.'" *Id.* ¶ 219; *see id.* ¶ 215 rows 2, 6, 8-9, 14. All of those statements are entirely consistent with Evolve's transfers of money out of the FBO account(s)—modern banks are ***expected*** to use a portion of cash reserves for their own purposes, and Evolve made no contrary promise to Yotta end users or Yotta itself. For the same reasons, Yotta has failed to allege facts showing Evolve failed to "raise all issues that could endanger user funds" during "compliance meetings," let alone that any Evolve employee intentionally masked such issues. Yotta insists that during these meetings Evolve hid the fact that it had "improperly taken" end user funds. Once again, however, Yotta has failed as a matter of law to allege any such "theft."[8]

Yotta's claim that Evolve fraudulently misrepresented "end user funds were insured by the FDIC" is another variation of the same misunderstanding. *Id.* ¶ 219; *see id.* ¶ 215 row 15. Yotta suggests that if Evolve moved money out of the FBO account(s), it thereby reduced the "funds … it was actually holding on behalf of end users," which meant it "was legally prohibited from insuring" end users' full account balances. *Id.* ¶ 156. That is entirely conclusory and flatly

[8] Perhaps recognizing as much, Yotta attempts to show that Evolve's stated commitment to "regulatory, compliance, and risk mitigation requirements" in ***September 2020*** was fraudulent by pointing to Evolve's "***June 11, 2024*** … Consent Decree with state and federal bank regulators, after an investigation had 'identified deficiencies with respect to the Bank's risk management and compliance with applicable laws, rules, and regulations.'" *Compl.* ¶ 179, 215 row 7 (emphasis added). The Complaint characterizes that Consent Decree as "an admission that Evolve's prior representations that it '[e]nsures clients meet regulatory, compliance and risk mitigation requirements for all solutions,' and 'enforce[s] federally mandated regulations,' was false." *Id.* ¶ 181. But that is a conclusory mischaracterization of the document. As even Yotta concedes, the Consent Decree never "identified" the "specific nature of the deficiencies uncovered by the regulators." *Id.* And it certainly did not identify deficiencies ***as of September 2020***, when Evolve's CEO made the relevant statement. The Consent Decree thus provides no plausible basis to infer that Evolve had failed to comply with any governing law, rule, or regulation in September 2020—let alone that Evolve's CEO knew of any purported non-compliance but intentionally said otherwise.

contradicted by the statute establishing FDIC insurance. That law provides that FDIC insurance applies to "the net amount ***due to any depositor*** for deposits in an insured depository institution"—not the amount of cash a bank retains at any given time. 12 U.S.C. § 1813(m)(1) (emphasis added). So fluctuations in cash reserves could not possibly "prohibit" Evolve from insuring deposits—indeed, those fluctuations are the ***premise*** of FDIC insurance. *See* Manuel A. Utset, *Transitive Counterparty Risk and Financial Contracts*, 78 Brook. L. Rev. 1441, 1473 (2013) (FDIC insurance combats risk of "[b]ank runs" that arises in "the fractional reserve system" because banks do not "keep 100 percent of their deposits on reserve").

***Third***, Yotta also fails as a matter of law to show that any of Evolve's representations about a contractual dispute with Synapse were fraudulent in any way. Yotta's contentions that Evolve's representations about a contractual dispute with Synapse in late 2023 were a ruse to "cover up" Evolve's "theft" and "ponzi scheme" all hinge on that same false premise that moving funds out of the FBO account(s) was improper. Compl. ¶¶ 219, 230. Moreover, Yotta's own pled facts demonstrate that Evolve was not seeking to induce Yotta to keep its end users' funds at Evolve—Yotta explicitly admits that Evolve told Yotta it could "transition [its end users] to another bank." *Id.* ¶ 219k. Yotta asserts in conclusory fashion that this offer was hollow "because there were not enough funds available." *Id.* But Yotta has not pled any facts showing that was the case, and indeed, it could not plead any such facts given its admission in the DFPI Consent Order that Yotta moved its end users' funds to Synapse Brokerage around that same time. DFPI Consent Order ¶¶ 14-23.

Relatedly, Yotta fails as a matter of law to establish any fraud in Evolve's characterization of the 2024 decision to freeze end user accounts while the bank investigated potential wrongdoing by Synapse. The Complaint insists that Evolve "lied" when it stated that it froze the funds to "maintain the integrity and security of end user accounts" because, in Yotta's telling, Evolve had previously "breached the integrity and security of those funds" by "stealing" from end users. Compl. ¶¶ 160, 219, 230; *see id.* ¶ 215 rows 10-13. Once more, the Complaint fails to allege facts showing that ***any*** of that supposed prior misconduct ever happened. What it ***does*** adequately plead is that Synapse had been the primary servicer of Yotta end user accounts at Evolve; had suddenly

declared bankruptcy; and had inexplicably "turn[ed] off system access for Evolve," cutting off its "visibility into activity related to [Yotta's] program." *Id.* ¶¶ 158, 160. Those allegations identify a plain threat to account integrity.

At bottom, Evolve received deposits from end users, gave those end users a contingent contractual right to repayment, and made all requisite repayments until it froze the accounts to investigate Synapse. Evolve's movement of money out of the FBO account(s) before the freeze did not break any commitment to end users or render any of its representations, including as to account balances and FDIC insurance, false. And Yotta's allegations certainly do not show that Evolve or its employees believed those representations (like account balances) were false when made. Yotta's fraud claim fails as a matter of law for that reason alone.

**2. <u>Yotta's Fraud Theory Fails On Its Own Terms Because the Complaint Does Not Allege That Evolve's Movement of Funds Left Evolve Unable To Honor All Yotta End User Withdrawal Requests.</u>**

Yotta's fraud claim separately fails as a matter of law on its own terms. Even crediting Yotta's erroneous theory that Evolve's alleged movement of money into and out of the FBO account(s) could establish "theft" from end users, the Complaint alleges no facts showing a net reduction in Evolve's cash reserves available to pay Yotta's end users.

The Complaint focuses on three instances where Evolve allegedly moved money out of the FBO account(s). The first two were (1) deducting just over $5 million to cover "Account Analysis" charges owed by Synapse, Compl. ¶ 121-22, and (2) debiting "user FBO accounts" for "over $13 million" in fees that Evolve owed to one of its service providers, TabaPay, *id.* ¶¶ 124-25. In total, those purportedly erroneous movements of money totaled around $18 million. That could not have created any shortfall in the FBO account(s) that prevented Yotta end users from receiving their full deposits after the May 2024 account freeze for a simple reason: the total debited equals less than the amount infused into the FBO account(s) by Evolve before the May 2024 freeze. As Yotta has acknowledged,[9] "$35 million of reserve funds [were deposited] into the customer FBO account(s),"

---

[9] Yotta now omits its previous allegation about the $35 million reserve infusion into the FBO account(s) from the Complaint and summarily urges that "at no point were the reserve funds ever

Davis Decl. Ex. 2 ¶ 78, "for the purpose of addressing shortfalls in customer funds," Compl. ¶ 127. This cushion more than offset Evolve's purported $18 million withdrawal.[10]

That leaves the third instance for which Yotta alleges Evolve moved money out of the FBO account(s): the migration of Mercury end user funds into a new, separate account at Evolve. *See id.* ¶ 132. Yotta asserts that because the FBO account(s) ***already*** "did not have sufficient funds" to cover the deposits of all Synapse-related end user deposits (not merely those of Yotta's end users), Evolve ***exacerbated*** the problem by migrating the full amount of Mercury end user deposits, leaving the remaining Synapse-related end users with the full purported shortfall.[11] *Id.* ¶¶ 135-136. As explained above, transferring the full amount end users demand upon their request is exactly what the debtor-creditor relationship requires (i.e., is not "theft" or "fraud"). And Yotta fails to plead any uncured deficit (*id.* ¶¶ 139-140) that could have been exacerbated.

Perhaps recognizing as much, Yotta separately asserts that when Evolve migrated money out of the FBO account(s) to the new Mercury account at Evolve, it allegedly moved an ***extra*** $50 million, thereby ***creating*** a deficit in the FBO account(s). *Id.* ¶ 137. But even crediting that

---

sufficient to make up for the funds that Evolve had stolen." Compl. ¶ 127. But the Court "may take judicial notice of prior pleadings and disregard inconsistent allegations or read into [an] amended complaint the allegations of the superseded complaint." *Lockton v. O'Rourke*, 184 Cal. App. 4th 1051, 1061 (2010).

[10] The Complaint summarily asserts that the reserve funds cannot have sufficed to balance out Evolve's alleged movements of money out of the FBO account(s) for "fees" because Yotta's end users have been unable to recover tens of millions of dollars in the wake of Synapse's bankruptcy. *See* Compl. ¶ 165. That is nothing more than "general and conclusory allegations" insufficient to state a fraud claim. *Lazar*, 12 Cal. 4th at 645. Yotta fails to plead specific facts identifying any movement of "fees" out of the FBO account(s) that exceeded the reserve infusion (and, of course, there are no allegations that Evolve refused to honor any demand for repayment during this time).

The Complaint separately asserts that "[o]n April 8, 2024, Evolve misappropriated $7,901,777.28 from the reserve account." Compl. ¶ 128. That conclusory allegation is unsubstantiated by any alleged facts, and makes no sense. As explained in the Evolve-Synapse Agreement, Evolve was explicitly authorized to deduct funds from the reserve account for Synapse-created liabilities, which is exactly what happened here (and Yotta does not allege otherwise). Vendetti Decl. Ex. B § 13.

[11] Notably, Yotta's allegation that the Mercury migration would have prevented it from moving its end user funds is belied by its admission in the DFPI Consent Order (¶¶ 19-23) that it transferred all of its end user funds away from Evolve to Synapse Brokerage around the same time in October 2023.

fantastical allegation, Yotta does not allege that the alleged over-migration actually impacted the amount available or owed to Yotta end users. To the contrary, Yotta admits that its end users' account balances (and thus their contractual right to demand repayment) did not change as a result of the migration. Compl. ¶¶ 139-140. Accordingly, if an extra $50 million had been moved, it remained at Evolve's fingertips if it was needed to fulfill Yotta end users' withdrawal requests; after all, no Mercury end user had any legal claim to it. *See Hodges*, 41 Cal. App. 5th at 551 (2019) (depositors do not "own" specific funds held by banks; they have "contractual rights" to recover the amounts of their deposits). Put simply, transferring more funds than Mercury end users could contractually claim would not have changed the amount owed by Evolve to Mercury or Yotta end users or the level of cash reserves available. No surprise, then, that Yotta does not allege that a single Yotta end user was unable to withdraw money from Evolve before the account freeze.

* * *

"[F]raud must be pled specifically," not through "general and conclusory allegations." *Lazar*, 12 Cal. 4th at 645. The specific facts pled in the Complaint (and admitted in the DFPI Consent Order) fail as a matter of law to establish any sort of "theft," let alone to identify corresponding fraudulent statements with the specificity that California law demands. At bottom, Yotta is left repeating the same circular, conclusory refrain: It must be that Evolve "stole $75 million in end user funds" before Synapse's bankruptcy simply because end users have been unable to recover that amount in the wake of Synapse's collapse. *See, e.g.*, Compl. ¶ 165. Yotta cannot survive demurrer on the strength of that unfounded tautology. Particularly when Yotta recently ***acknowledged*** in the DFPI Consent Order that it chose, despite internal concerns about Synapse's operations, to move end users funds ***out of*** Evolve in 2023 and place them with Synapse Brokerage.[12] Having imperiled and ultimately lost its customers' funds by making that change, Yotta has no legally viable basis for pointing the finger at Evolve.

[12] Again, Yotta's admissions in the DFPI Consent Order make it particularly puzzling that the Complaint alleges, without basis, that Evolve somehow hid that Yotta's "customers could not transition" to another institution. Compl. ¶ 215 row 11.

**B. Yotta Fails to State a Conspiracy Claim**

The Complaint fails to state a claim for conspiracy to commit fraud because it fails to state an underlying fraud claim. N.D. Cal. Order at 13 ("[T]here is no separate tort of civil conspiracy and no action for conspiracy to commit a tort unless the underlying tort is committed and damage results therefrom." (quoting *MH Pillars Ltd. v. Realini,* 277 F. Supp. 3d 1077, 1096 (N.D. Cal. 2017))); *see also Schick v. Lerner*, 193 Cal. App. 3d 1321, 1327 (1987) ("[A] civil conspiracy however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage.").

**C. Yotta Fails to State a Claim for Negligence or Negligent Misrepresentation**

There is no reason to depart from Judge Thompson's well-reasoned dismissal of Yotta's negligence and negligent misappropriation claims under the economic loss doctrine, because the same fatal flaws persist in the current Complaint. Like the N.D. Cal. Complaint, the Complaint here still alleges purely economic damages and fails to plead facts showing that "a special relationship existed between the parties." N.D. Cal. Order at 14. As Judge Thompson explained, the fundamental problem with Yotta's claims was that not even Yotta's customers—whose assets were directly in Evolve's possession—were in a special relationship with Evolve because "the ordinary bank-customer relationship is not a 'special relationship' giving rise to tort remedies." *Id.* (quoting *Freedom Gold USA LLC v. Bank of Am., N.A.*, No. 2:24-cv-08360-WLH, 2024 WL 5368652, at *7 (C.D. Cal. Nov. 15, 2024)); *see also, e.g.*, *Clark v. Homecomings Fin., LLC*, No. 08CV1687-IEG-NLS, 2009 WL 350660, at *3 (S.D. Cal. Feb. 11, 2009) ("California courts routinely reject these tort claims in the commercial banking context, finding no special relationship exists between borrowers and lenders."). The same conclusion thus applied, *a fortiori*, to Yotta itself, which was a step further removed. *See* N.D. Cal. Order at 14.[13]

[13] Consistent with the federal court action, this motion analyzes each of the Complaint's claims under California law. That said, Evolve reserves the right to argue, if necessary, at a later stage of the litigation that a different state's substantive law should apply. *See In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1170 (N.D. Cal. 2019) (explaining that a district court may come to a different conclusion as to choice-of-law questions at later stages of litigation, after "further development of the record" has occurred).

Binding California precedent also precludes the Court from finding a special relationship between Yotta and Evolve, because Yotta was not an intended beneficiary of any contract that Evolve performed; indeed, it was expressly disclaimed in the agreement between Evolve and Yotta's end users. The California Supreme Court has explained that a special relationship exists only where "the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 400 (2019); *see also Varlitskiy v. Cnty. of Riverside*, 2020 WL 4187767, at *2 (C.D. Cal. June 11, 2020) (holding "the special relationship exception [to the economic loss rule] is limited to commercial transactions where a defendant negligently performs a contract intended to benefit a plaintiff.").

Here, Evolve's agreements with Synapse and Yotta's end users—both of which are explicitly incorporated by reference into Yotta's Complaint (Compl. ¶ 216)—make clear that Yotta was not such an "intended beneficiary" of either. Evolve's MBSA with Synapse explicitly disavows the creation or existence of any third-party beneficiaries of the agreement. Vendetti Decl. Ex. B § 38. Likewise, the Account Agreement between Evolve and Yotta's end users explicitly addresses third-party beneficiaries—and makes clear that Yotta is not included in that group. In particular, the Account Agreement names as third-party beneficiaries only "Synapse" or other similar "service providers" that Evolve "engage[s] to render some or all" of the "services [to end users] under this Agreement"—a group that excludes Yotta, which was not "engage[d]" by Evolve to perform any "services." Account Agreement § 2.8; *see 11640 Woodbridge Condo. Homeowners' Ass'n. v. Farmers Ins. Exch.*, 110 Cal. App. 5th 211, 228 (2025) ("Under the maxim *expressio unius est exclusio alterius*, the fact that a contract expressly so provides tends to negate any inference that the parties also intended another consequence to flow from the same event.") (internal quotations omitted). What is more, that same provision specifically contrasts Yotta with the third-party beneficiaries like Synapse, by explaining that Yotta (unlike Synapse and other third-party beneficiaries) "has no authority to act or represent [Evolve] in any way" and is "not [a] partner[], affiliate[] or joint venture[]" of Evolve. Account Agreement § 2.8. The documents that Yotta itself "incorporates by reference," (Compl. ¶ 216), thus show that Yotta does not have special

relationship with Evolve as a matter of law.

Yotta tries to plead around these problems by insisting that Yotta's relationship with Evolve "was far closer and more complex than that of a typical depositor in a bank." Compl. ¶ 91. In service of that goal, Yotta goes so far as to imply that it had its own highly detailed, and mutually bargained-for, contractual arrangement with Evolve. Yotta alleges, for instance, that "Yotta provided Evolve with a hugely valuable service—customer acquisition—and Evolve paid Yotta for that service." Compl. ¶ 104. And it alleges that "Evolve and Yotta directly negotiated the interest rates Yotta would receive from the end user's investments." *Id.* ¶ 100.

As an initial matter, though, these new allegations do nothing because as Yotta has already admitted (as it must) that it "and Evolve Bank did not enter into a contract." N.D. Cal. Order at 2. Indeed, none of Yotta's new allegations actually show what Yotta claims—i.e., that "Yotta and Evolve's relationship was far closer and more complex than that of a typical depositor in a bank." Compl. ¶ 91. After all, typical bank depositors, too, enter into contractual agreements that specify the services to be rendered and the payments (often in the form of interest) to be provided in exchange. And typical bank depositors are likewise "wholly dependent on [the bank] to ensure that [their] assets [a]re protected." *Id.* ¶ 99. Yet, as Judge Thompson explained, "the ordinary bank-customer relationship is not a 'special relationship' giving rise to tort remedies." N.D. Cal. Order at 14 (quoting *Freedom Gold USA*, 2024 WL 5368652, at *7); *Clark*, 2009 WL 350660, at *3. So too here, where Yotta's new allegations do nothing to show that Yotta's relationship with Evolve was any more "special" than "the ordinary bank-customer relationship." N.D. Cal. Order at 14.

**D. <u>Yotta Fails to State a UCL Claim Because It Fails To Identify Any Recoverable Restitution</u>**

To state a UCL claim, a plaintiff must identify a viable theory for entitlement to restitution. *See Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 453 (2005) (affirming trial court's sustainment of demurrer for failing to plead any "viable UCL restitution claims"). Claims of other damages do not suffice because they are not recoverable under the UCL. *Id.* Nor do general claims of entitlement to "restitution." *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134,

1149-52 (2003) (finding the demurrer to the UCL cause of action had been properly sustained because while plaintiff casted the alleged damages as "restitution" it did not identify a viable theory for restitution recoverable under the UCL). Rather, the type of restitution available under the UCL is limited and the plaintiff must identify a viable theory of recovery to state claim. *See id.* "[I]n the UCL context—[] restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it." *Id.* at 455 (citing *Korea Supply Co.*, 29 Cal. 4th at 1144-45). Accordingly, a "plaintiff's assertion that [a] defendant[] received ill-gotten gain does not make a viable UCL claim unless the gain was money in which plaintiff had a vested interest." *Madrid*, 130 Cal. App. 4th at 455.

Here, Yotta fails to identify a viable theory of restitution because it does not identify any funds it paid (or otherwise held a vested *ownership* interest in) that are held by Evolve. *Cf* N.D. Cal. Order at 17 (dismissing Yotta's unjust enrichment claim and holding that Yotta failed to identify any benefit Yotta itself conferred on Evolve). Instead, this Complaint, like the prior N.D. Cal. complaints, continues to point to Yotta's "customer funds" that were allegedly withheld by Evolve as a loss of money or property to Yotta itself. Compl. ¶ 258. But by definition "customer funds" are owned by Yotta *customers*, not Yotta itself. *See Madrid*, 130 Cal. App. 4th at 455 (dismissing UCL claim and "reject[ing] plaintiff's apparent position that he could recover money [defendant] received from third parties" as a viable claim for restitution). Yotta separately claims that it "paid a price premium due to Evolve's false representations and omissions about its systems and practices." Compl. ¶ 258 But that allegation is a classic legal conclusion that should be disregarded when determining the sufficiency of the pleading. *See Desrys v. Traditional Medicinals, Inc.*, No. 25-cv-07898-HSG, 2026 WL 1387413, at *2 (N.D. Cal. May 18, 2026) (dismissing UCL claim where plaintiff did "not provide any factual basis supporting her conclusory claim that she paid a price premium") (collecting cases). As Yotta has admitted, it did not have a contract with Evolve and does not identify *any* funds that *Yotta* paid to Evolve, much less any funds that could constitute a "price premium." N.D. Cal. Order at 2 ("As discussed during oral argument, Plaintiff and Evolve Bank did not enter into a contract.").

Accordingly, the Court should sustain Evolve's Demurrer as to the UCL claim and does not need to otherwise reach Yotta's assorted kitchen sink theories of alleged UCL violations, because Yotta does not identify a viable theory for entitlement to restitution. *See Madrid*, 130 Cal. App. 4th at 453; *Lee v. Luxottica N. Am., Inc.,* 65 Cal. App. 5th 793, 807 (2021) (affirming dismissal via demurrer finding "lost business opportunity" was not a viable theory for restitution under the UCL); *Alch v. Super. Ct.,* 122 Cal. App. 4th 339, 408-409 (2004) (finding trial court correctly sustained the demurrer on UCL claim for failure to identify a viable theory of entitlement to restitution).

**E. Yotta Fails to State a Claim for Quasi-Contract/Unjust Enrichment Against Evolve Because It Fails to Allege It Conferred a Benefit on Evolve.**

Judge Thompson correctly dismissed Yotta's unjust enrichment claim because it "fail[ed] to sufficiently allege that Plaintiff *itself* conferred a benefit on Evolve." N.D. Cal. Order at 17. Instead, the Court explained, Yotta alleged only that "Evolve Bank was enriched 'by retaining Yotta's customer's money,'" meaning that any benefit was necessarily "paid [by] … Plaintiff's customers, not Plaintiff." *Id.* (quoting N.D. Cal. Compl. ¶ 173.)

The Complaint here repeats that same error. Like the original N.D. Cal. Complaint, it focuses on allegations about benefits that Yotta's ***end users***—not Yotta itself—supposedly conferred on Evolve, including that "[e]nd users opened over 100,000 Evolve accounts," that "end users deposited money in Evolve," and that "end users also opened Evolve debit and credit cards," all of which (Yotta says) "Evolve profited from" and "was enriched by." Compl. ¶¶ 262-67. As before, all of those benefits were supposedly "paid" to Evolve by "Plaintiff's customers, not Plaintiff" itself. N.D. Cal. Order at 17. Thus, they cannot sustain a claim for unjust enrichment.

The analysis remains unchanged by Yotta's new allegation that it "spent in excess of $20 million persuading end users" to confer those benefits. *See* Compl. ¶ 262. Yotta (rightly) does not suggest that this $20 million can constitute the requisite benefit that Evolve "'unjustly retained.'" N.D. Cal. Order at 17. After all, Yotta does not allege that Evolve ever received that money. Instead, Yotta's theory is that by spending this money, it should get credit ***indirectly*** for the benefits that its end users purportedly conferred, and as a result is entitled to receive all of "Evolve's profits."

Compl. ¶ 271. But courts have rejected exactly that argument, holding that "Plaintiff's indirect conferral of a benefit on Defendants is insufficient to satisfy the first element of a claim for unjust enrichment." *Am. Video Duplicating, Inc. v. City Nat'l Bank*, 2020 WL 6882735, at *6 (C.D. Cal. Nov. 20, 2020). As the Ninth Circuit clarified: "[A] non-governmental plaintiff may [not] properly seek to disgorge an entity with whom they are not in privity." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1106 (9th Cir. 2004). Yotta's allegation that it spent money to induce ***others*** to confer a benefit on Evolve still falls short of the showing required here—i.e., that Yotta ***itself*** conferred such a benefit. *See* N.D. Cal. Order at 17.

Yotta seems aware of this hurdle, as the Complaint employs artful language to try to plead around it. Specifically, Yotta suggests that it ***did*** have a direct relationship with Evolve by claiming that Evolve "stopped paying Yotta the interest [that Evolve] owed Yotta." Compl. ¶ 269; *see also id.* ¶ 270 (alleging that Evolve "fail[ed] to pay Yotta interest due"). But as Yotta elsewhere admits, Evolve itself did not owe—and was not responsible for paying—interest to Yotta; instead, "Yotta customer funds at Evolve would generate interest, and Evolve would pay much of that interest to Synapse which, in turn, would transmit significant amounts of the interest to Yotta." Compl. ¶ 107; *see also* N.D. Cal. Order at 2 (recounting Yotta's concession that it "and Evolve Bank did not enter into a contract"). In other words, Evolve owed interest to Synapse, not Yotta. And it was Synapse—not Evolve—that owed (and was responsible for) paying Yotta interest. Once again, then, the relationship between Yotta and Evolve "is simply too attenuated to support an unjust enrichment claim." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 685 (9th Cir. 2009).

## V. <u>CONCLUSION</u>

Evolve respectfully requests that the Court sustain its demurrers without leave to amend. Between the prior Northern District action and this one, Yotta has now had three opportunities to plead legally sufficient claims against Evolve—including the chance to amend its allegations in light of full discovery in the Northern District. The fact that fatal legal defects persist confirms that there is no "reasonable possibility that the defect[s] can be cured by amendment." *Dawadi v. Adhikari*, 120 Cal. App. 5th 558, 562 (2026) (affirming order sustaining demurrer with prejudice).

Dated: September 2, 2026

SARAH DAVIS
Orrick, Herrington & Sutcliffe LLP

By: */s/ Sarah Davis*
SARAH DAVIS
Attorneys for Defendants